JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MDL 2044

MAR 2 6 2009

FILED
CLERK'S OFFICE

**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

PLEADING NO. 4

|  |  |
|---|---|
| In re: | ) |
|  | ) |
| VERTRUE, INC. MARKETING AND SALES | ) |
| PRACTICES LITIGATION | ) |
|  | ) |

MDL Docket No. 2044

**RESPONSE OF DEFENDANTS
VERTRUE INCORPORATED AND ADAPTIVE MARKETING LLC TO
PLAINTIFFS' MOTION FOR TRANSFER OF ACTIONS TO THE SOUTHERN
DISTRICT OF CALIFORNIA PURSUANT TO 28 U.S.C. § 1407 FOR
CONSOLIDATED PRETRIAL PROCEEDINGS**

Pursuant to Rules 7.1(b) and 7.2(c) of the Rules of Procedure of the Judicial Panel

on Multidistrict Litigation, Defendants Vertrue Incorporated and Adaptive Marketing

LLC (collectively, "Defendants"), by and through their undersigned counsel, respond to

the numbered averments contained in Plaintiffs' Motion for Transfer ("Motion") as set

forth below, as well as further set forth in the Brief in Support of Defendants' Response

to Plaintiffs' Motion for Transfer, submitted concurrently herewith.

1.       Defendants deny that the Sanford action, Sanford, et al. v. MemberWorks,

Incorporated, et al., Case No. 02-CV-0601 (S.D. Cal.), is pending.  In fact, the Sanford

action was dismissed on March 9, 2009, and the judgment was entered for defendant.

OFFICIAL FILE COPY   IMAGED MAR 2 7 2009

Defendants deny that the charges at issue were made "illicitly". Defendants otherwise admit the averments contained in this paragraph.

2.    Defendants further deny that the Arbitrator found the telemarketing pitch to be a "recipe for disaster"; the Arbitrator merely found that there was no contract formed with Sanford, and awarded damages to her in the amount of $34.57. Defendants note that the Arbitrator ruled <u>against</u> Sanford on her claims for fraudulent concealment, violation of the Federal Unordered Merchandise Act, 39 U.S.C. § 3009, conversion, and unjust enrichment. Defendants otherwise admit the averments contained in this paragraph.

3.    Defendants note that the Motion to Dismiss filed on August 10, 2008 in the <u>Sanford</u> action also asked the court to decline to exercise supplemental jurisdiction over Sanford's state law claims. Defendants further note that the claims asserted under the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693 et seq., were dismissed not only because plaintiffs failed to show that the transactions at issue involved their debit cards, but also because Sanford's EFTA claims were time-barred. Defendants otherwise admit the averments contained in this paragraph.

4.    Defendants note that the <u>Sanford</u> court struck plaintiffs' proposed amendments concerning EFTA claims and state law claims not only for the reasons cited by Plaintiffs here, but also because the claims proposed had been already dismissed by the court's prior orders, and plaintiffs were specifically precluded from seeking to reintroduce them in their motion for leave to amend. <u>See</u> <u>Sanford</u> Action Dkt. No. 178 at 4 ("By permitting the Plaintiffs to essentially resurrect claims that were already dismissed without leave to amend in the Court's prior order, the Court would be unable to manage

its docket effectively and promote judicial economy.")  Defendants otherwise admit the averments contained in this paragraph.

5.     Denied.  The court in the <u>Sanford</u> action denied plaintiffs' motion for leave to amend on March 6, 2009.

6.     Defendants deny that plaintiff Michael Waslin re-filed the state claims dismissed in the <u>Sanford</u> action, since that action never included any claims for money had & received, reckless & wanton conduct, civil theft, or violations of Connecticut General Statutes § 42-110a et seq.  Defendants further deny that the charges at issue were made "illicitly".  Defendants otherwise admit the averments contained in this paragraph.

7.     Defendants further deny that plaintiffs Preston and Rita Smith re-filed the state claims dismissed in the <u>Sanford</u> action, since that action never included any claims asserted under the Ohio Deceptive Trade Practices Act, Ohio Revised Code § 4165 et seq., or the Ohio Consumer Sales Practices Act, Ohio Revised Code § 1345 et seq. Defendants further deny that the charges at issue were made "illicitly".  Defendants otherwise admit the averments contained in this paragraph.

8.     Defendants further deny that plaintiff Phyllis Callahan re-filed the state claims dismissed in the <u>Sanford</u> action, since that action never included any claims asserted under the Consumer Legal Remedies Act, Cal. Civ. Code § 1750 et seq., the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq., or the False Advertising Law, Cal. Bus. & Prof. Code § 17500 et seq.  Defendants further deny that they sought to relate the Callahan action to the <u>Sanford</u> action; in fact, Defendants' Notice of Related Cases specifically disclaimed such relation.  <u>See</u> <u>Callahan</u> Action Dkt.

No. 8 at 2.  Defendants further deny that the charges at issue were made "illicitly".
Defendants otherwise admit the averments contained in this paragraph.

9.      Defendants deny that the allegations contained in the <u>Callahan</u>, <u>Smith</u> and
<u>Waslin</u> actions are identical to the allegations in the <u>Sanford</u> action to the extent plaintiffs
refer to either the original complaint or the first amended complaint filed in the <u>Sanford</u>
action.  Defendants further deny the allegations contained in said complaints.  Defendants
further note that while allegations in the <u>Waslin</u> and <u>Callahan</u> actions are asserted on
behalf of a purported nationwide class, the allegations in the <u>Smith</u> action are limited to
consumers in Ohio.  Defendants also note that state law claims asserted in these actions
are different to the extent each of them attempts to state claims under statutory schemes
of their respective states. Defendants otherwise admit the averments contained in this
paragraph.

10.     Denied to the extent that Defendants' service copy of the subject Motion
did not include any said "remand petitions", and Defendants are not aware of any remand
petitions filed by Plaintiffs.  Defendants otherwise admit the averments contained in this
paragraph.

11.    Denied for the reasons stated in the Brief in Support of Defendants'

Response to Plaintiffs' Motion for Transfer, submitted concurrently herewith.

Date:   March 25, 2009

_____

Darrel J. Hieber
Robert J. Herrington
Marina V. Bogorad
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Telephone:     (213) 687-5000
Facsimile:     (213) 687-5600

J. Russell Jackson
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
Four Times Square
New York, New York 10036
Telephone:     (212) 735-3000
Facsimile:       (212) 735-2000

*Attorney for Defendants Vertrue*
*Incorporated and Adaptive Marketing LLC*

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAR 2 6 2009

FILED
CLERK'S OFFICE

# BEFORE THE JUDICIAL PANEL
# ON MULTIDISTRICT LITIGATION

|  |  |  |
|---|---|---|
| In re: | ) | MDL Docket No. 2044 |
|  | ) |  |
| VERTRUE, INC. MARKETING AND SALES | ) |  |
| PRACTICES LITIGATION | ) |  |
|  | ) |  |

## BRIEF IN SUPPORT OF DEFENDANTS' RESPONSE TO PLAINTIFFS'
## MOTION FOR TRANSFER OF ACTIONS TO THE SOUTHERN DISTRICT OF
## CALIFORNIA PURSUANT TO 28 U.S.C. § 1407 FOR CONSOLIDATED
## <u>PRETRIAL PROCEEDINGS</u>

RECEIVED
CLERK'S OFFICE
2009 MAR 26  A 11: 50
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

# TABLE OF CONTENTS

**PAGE No.**

FACTUAL BACKGROUND.................................................................................2

     A.     Parties ....................................................................................2

          1.     Defendants....................................................................2

          2.     Plaintiffs.......................................................................3

     B.     The Prior Lawsuits Filed by Plaintiffs' Counsel ............................3

          1.     The First Ohio Lawsuit......................................................3

          2.     Subsequently, Plaintiffs' Counsel Go West ........................4

          3.     Sanford:  The Loss That Launched Scores of
               Copycats ........................................................................6

     C.     Panel Proceedings............................................................8

ARGUMENT..................................................................................................8

    I.     The Southern District of California Has No Expertise in This
        Litigation ...................................................................................9

    II.     More Documents and Witnesses Are in the District of Connecticut.........10

    III.     The Northern District of Ohio Is a Centrally-Located, Desirable
        Forum............................................................................12

     A.     The Northern District of Ohio better serves the convenience
          of the parties and potential witnesses than does the
          Southern District of California .........................................12

     B.     The Northern District of Ohio also has the experience and
          capacity to handle a complex MDL action....................................16

CONCLUSION ...........................................................................................17

i

# TABLE OF AUTHORITIES

## CASES

In re A. H. Robins Co., Inc. "Dalkon Shield" IUD Products Liability Litigation,
406 F. Supp. 540 (J.P.M.L. 1975) ........................................................ 14

In re African-American Slave Descendants Litigation,
231 F. Supp. 2d 1357 (J.P.M.L. 2002) ................................................ 14

In re Air Crash Near Van Cleve, Mississippi, on Aug. 13, 1977,
486 F. Supp. 926 (J.P.M.L. 1980) ................................................ 13, 14

In re Anthracite Coal Antitrust Litigation,
436 F. Supp. 402 (J.P.M.L. 1977) ........................................................ 10

In re Bristol Bay, Alaska, Salmon Fishery Antitrust Litigation,
424 F. Supp. 504 (J.P.M.L. 1976) ........................................................ 11

In re Commercial Money Center, Inc., Equipment Lease Litigation,
229 F. Supp. 2d 1379 (J.P.M.L. 2002) ................................................ 15

In re Compensation of Managerial, Professional & Technical
Employees Antitrust Litigation,
206 F. Supp. 2d 1374 (J.P.M.L. 2002) ................................................ 17

In re Ford Motor Co. Crown Victoria Police Interceptor Products Liability
Litigation,
229 F. Supp. 2d 1377 (J.P.M.L. 2002) ................................................ 13

In re InPhonic, Inc., Wireless Phone Rebate Litigation,
460 F. Supp. 2d 1380 ........................................................................... 11

In re Inter-Op Hip Prosthesis Products Liability Litigation,
149 F. Supp. 2d 931 (J.P.M.L. 2001) .................................................. 15

In re Kugel Mesh Hernia Patch Products Liability Litigation,
493 F. Supp. 2d 1371 (J.P.M.L. 2007) ................................................ 11

In re: LTL Shipping Services Antitrust Litigation,
528 F. Supp. 2d 1378 (J.P.M.L. 2007) ................................................ 11

In re Library Editions of Children's Books,
297 F. Supp. 385 (J.P.M.L. 1968) ........................................................ 14

In re Merck & Co., Inc., Securities, Derivative & ERISA Litigation,
      360 F. Supp. 2d 1375 (J.P.M.L. 2005) ....................................................................11

In re Meridia Products Liability Litigation,
      217 F. Supp. 2d 1377 (J.P.M.L. 2002) ....................................................................13

In re New Motor Vehicles Canadian Export Antitrust Litigation,
      269 F. Supp. 2d 1372 (J.P.M.L. 2003) ....................................................................13

Sanford v. Memberworks, Inc.,
      483 F.3d 956 (9th Cir. 2007) ....................................................................................5

In re Transit Co. Tire Antitrust Litigation,
      350 F. Supp. 1165 (J.P.M.L. 1972) ........................................................................14

In re Travel Agent Commission Antitrust Litigation,
      290 F. Supp. 2d 1381 (J.P.M.L. 2003) ....................................................................13

In re Velocity Express, Inc., Wage & Hour Employment Practices Litigation,
      581 F. Supp. 2d 1368 (J.P.M.L. 2008) ....................................................................15

In re Vonage Initial Public Offering (IPO) Securities Litigation,
      471 F. Supp. 2d 1354 (J.P.M.L. 2007) ....................................................................10

In re Vonage Marketing & Sales Practices,
      505 F. Supp. 2d 1375 (J.P.M.L. 2007) ....................................................................10

In re Yamaha Motor Corp. Rhino ATV Products Liability Litigation,
      __ F. Supp. 2d __, MDL No. 2016,
      2009 WL 382262 (J.P.M.L. Feb. 13, 2009).......................................................13-14

## MISCELLANEOUS

Multidistrict Litigation Manual § 6:7 (West 2008) ..........................................................13

Defendants Vertrue Incorporated ("Vertrue") and Adaptive Marketing LLC ("Adaptive," and, collectively with Vertrue, "Defendants") agree that this Panel should create an MDL to manage the mélange of new class actions Plaintiffs' counsel are now filing after having lost their class action against Defendants in the Southern District of California. Defendants, however, disagree with Plaintiffs that the Southern District of California is the appropriate venue for this MDL

To begin with, although the progenitor of these recent class actions – Sanford, et al. v. MemberWorks, Inc., et al., Case No. 02-CV-0601 (S.D. Cal.) – was pending for seven years, no judge within the Southern District of California has any real expertise with these cases. Sanford was dismissed on the pleadings, without discovery, after referral to arbitration, and the judge who dismissed it – the Honorable Michael M. Anello – only had the case for about four months before that. Accordingly, it would be a mistake to conclude that the Southern District of California has a significant leg up on any other court that might receive these actions.

Second, Plaintiffs' counsel filed Plaintiff Waslin's action in Connecticut, where both Defendants maintain their corporate offices. Accordingly, Plaintiffs' counsel have conceded that this may be an appropriate venue. It also is the venue where the most documents and witnesses related to the Defendants are located. *Ceteris paribus*, Connecticut is a more appropriate forum for these cases than the Southern District of California.

Third, if this Panel is seeking a geographically central court to be the transferee forum, then the Northern District of Ohio is the logical choice. Plaintiffs' counsel effectively have conceded that this court is an appropriate venue, having filed the Smith

1

action there before the Honorable Patricia A. Gaughan.  Indeed, three of the four remaining Plaintiffs reside within the Northern District of Ohio, and one of Plaintiffs' national counsel firms—Landskroner Griego Madden Ltd.—is located there.  And given the geographic dispersal of the pending and threatened actions here, the Northern District of Ohio is a central location for all involved.

Accordingly, Defendants respectfully request that this Panel create an MDL and transfer the related cases to the District of Connecticut or the Northern District of Ohio, *not* the Southern District of California.

<div align="center">

**FACTUAL BACKGROUND**

</div>

The actions for pre-trial consolidation here are cold leftovers from claims that Plaintiffs' counsel have kept simmering for almost a decade in a few courts. Facing imminent dismissal of their last putative class action, Plaintiffs' counsel recently started filing and threatening putative class actions in state courts across the country in a last-gasp attempt to throw claims on various judicial walls and see what sticks.

**A.      Parties**

**1.      Defendants**

Defendant Adaptive is a wholly-owned indirect subsidiary of Vertrue, a private company.  Both Defendants are Delaware companies with corporate offices in Norwalk, Connecticut.  Adaptive is a leading provider of innovative membership programs that give its customers access to valuable discounts and savings on a wide variety of products and services in areas such as fashion, health, home improvement, and entertainment. These programs are marketed on nationwide basis through various channels, including the Internet and telemarketing.  These programs have been previously conducted by Memberworks Incorporated ("MWI").

<div align="center">2</div>

### 2.    Plaintiffs

The subject Motion purports to be brought by five plaintiffs, but one of them – Patricia Sanford – no longer has any pending claims because her action recently was dismissed on the pleadings by the Southern District of California. <u>See</u> <u>infra</u> at 5-6. Three of the other four plaintiffs are Ohio residents: namely, Preston Smith, Rita Smith, and Michael Waslin. Only the fourth plaintiff, Callahan, is a California resident. Those four remaining plaintiffs are currently maintaining three actions in three different federal districts: the Northern District of Ohio, the District of Connecticut, and the Southern District of California.

The potential tag-along actions identified in Plaintiffs' Motion, as well as those filed or threatened thereafter, are geographically dispersed. They involve eleven additional plaintiffs based in District of Columbia, Idaho, Arizona, Florida and (presumably) Georgia.[1] As Plaintiffs' papers further advised, additional potential tag-along actions are on their way to courts in New York, Texas, Illinois, Minnesota, Missouri, North Carolina, Nevada, Massachusetts and Arkansas. (Pl. Mem. at 7 n.3.)

### B.    The Prior Lawsuits Filed by Plaintiffs' Counsel

### 1.    The First Ohio Lawsuit

In 2001, two of the firms currently representing Plaintiffs here filed a putative class action in Ohio state court entitled <u>Brandy L. Ritt, et al. v. Billy Blanks, et al.</u>, Case No. CV 424237 (Cuyahoga Ct. Com. Pl., Ohio). The complaint asserted that callers were deceived into becoming members of MWI membership programs in connection with the

---

[1]    Two of these plaintiffs have only threatened litigation via a letter to Defendants' counsel, <u>see</u> <u>infra</u> at 7; since the threatened claims arise under a Georgia statute, Defendants presume that these plaintiffs are Georgia residents. In their papers, Plaintiffs also identified another potential tag-along action in Virginia, <u>Geldmacher, et al. v. Vertrue Inc., et al.</u>, Case No. CL09000069-00 (Arlington Cir. Ct., Va.) (Pl. Mem. at 5); however, Defendants do not intend to remove that action to federal court, and, therefore, it will not be eligible for MDL consolidation.

telemarketing sale of Billy Blanks' Tae-Bo work-out tapes, which were sold via a toll-free number answered by West Corporation or West Telemarketing Corporation or West Telemarketing LP (collectively, "West").   (Ex. 1 ¶1.)[2]   The plaintiffs' claims were asserted under Ohio law and purportedly brought on behalf of "all persons in the United States … who were charged unauthorized fees … on their credit card or debit card accounts in connection with enrollment in an MWI membership program." (Id. ¶ 30.)

The trial court denied class certification in this case on February 6, 2002. (Ex. 2.) After subsequent appeal, the court eventually certified a limited class on September 8, 2008.   That class included only Ohio purchasers of Tae-Bo products who made their purchases from September 1, 1998 through July 2, 2001 by calling a toll-free number answered by West and were subsequently enrolled in a MWI membership program.   (Ex. 3.)  On December 11, 2008, the case was dismissed pursuant to a settlement agreement between Plaintiff and West. (Ex. 4.)  Two of the Plaintiffs involved here, Preston Smith and Rita Smith, participated in that settlement.  See Smith Action Compl. at 8-9 n.5.

### 2.        Subsequently, Plaintiffs' Counsel Go West

Shortly after largely losing the class certification issue in Ritt, Plaintiffs' counsel filed a copycat lawsuit on March 28, 2002 in the Southern District of California entitled Sanford, et al.  v. MemberWorks, Incorporated, et al., Case No. 02-CV-0601 (S.D. Cal.). Just like Ritt in Ohio, Sanford was filed by the purchaser of Tae-Bo videos and alleged that MWI acted in conjunction with its "co-conspirators and telemarketing agents West Corporation and West Telemarketing Corporation" to charge unlawful membership fees. Sanford Action Dkt. No. 113 ¶1.   The Sanford complaint purported to represent a

---

[2]        All subsequent "Ex. _" references herein are to the documents submitted concurrently under a separate cover as Exhibits In Support Of Response Of Defendants Vertrue Incorporated And Adaptive Marketing LLLC To Plaintiffs' Motion For Transfer Of Actions To The Southern District Of California Pursuant To 28 U.S.C. § 1407 For Consolidated Pretrial Proceedings.

nationwide class of "all persons in the United States who, after calling a telephone number to inquire about or purchase another product, were (1) sent a membership kit in the mail; and (2) charged for a MemberWorks membership program." Id. ¶ 53. Thus, the proposed class in Sanford was virtually identical to class first asserted in Ritt, except Sanford included a federal cause of action under the Unordered Merchandise Act, 39 U.S.C. § 3009.

After the Sanford action had been pending for *less than four months*, the Honorable Marilyn L. Huff dismissed the federal claim against West, declined to exercise supplemental jurisdiction, and dismissed the action against West. Sanford Action Dkt. No. 36.[3] Plaintiff Sanford was ordered to arbitrate her individual claims against MWI. The Ninth Circuit later vacated the order compelling arbitration. See Sanford v. Memberworks, Inc., 483 F.3d 956, 965 (9th Cir. 2007).

When Sanford returned to the Southern District of California, it was before a different judge, the Honorable Larry Alan Burns. Sanford Action Dkt. No. 56. Plaintiff amended her complaint to add two Ohio residents, Preston and Rita Smith (the "Smiths"), as named plaintiffs, as well as another federal claim. Sanford Action Dkt. No. 113, FAC ¶ 15. She also sought to broaden her allegations. Sanford Action Dkt. No. 173. But on September 30, 2007, Judge Burns dismissed the complaint, holding that plaintiffs failed to state valid federal claims and declining to exercise jurisdiction over the remaining state claims. Sanford Action Dkt. No. 146. On Plaintiffs' motion for reconsideration, Judge Burns allowed Plaintiffs leave to move to amend to assert a RICO claim, but expressly

---

[3]     Sanford then filed a case in California state court against only West, which thereafter settled. As part of that settlement, Sanford released any and all claims relating to transactions made under agreements between West and MWI. See Sanford Action Dkt. Nos. 145-4 & 145-7; see also Callahan Action Dkt. No. 1, Ex. A (Compl. at 4 n.4). Sanford also agreed "to dismiss any allegations and claims against any party, **including MWI**, relating to or seeking recovery" for the released claims. Sanford Action Dkt. No. 145-7 ¶ 12.A (emphasis added).

prohibited them from seeking to reassert previously dismissed claims.  Sanford Action Dkt. No. 154.

On November 4, 2008, Sanford once again was transferred to a new judge, the Honorable Michael M. Anello.  Sanford Action Dkt. No. 155.  On March 6, 2009, Judge Anello held that Plaintiff Sanford lacked standing because of the release in the settlement of the West Action in California state court.  Sanford Action Dkt. No. 183.  The court further concluded that the Smiths: (1) failed to allege their RICO claims with required particularity; (2) lacked standing and sufficient facts to pursue their RICO claims grounded on allegations of obstruction of justice; and (3) cannot state a claim for RICO conspiracy.  Id. at 3-8.  On March 9, 2009, Judge Anello entered judgment for defendant, dismissing the Sanford action in its entirety.  Sanford Action Dkt. No. 186.

Notably, none of the three judges who presided over Sanford had any experience with the issues in the case other than adjudicating a motion to dismiss.  None oversaw any discovery, as none took place in the case, or in any way adjudicated the facts of the dispute.

### 3.   Sanford:  The Loss That Launched Scores of Copycats

By early 2009, the handwriting was on the wall that Sanford likely would be dismissed.  Plaintiffs' counsel decided to double down, filing a slew of copycat actions across the country. In the space of two months, they filed seven other purported class actions[4] and threatened ten more, all dealing with the same underlying scenario as their prior actions.  One of these newly-minted actions was filed by the Smiths – the same exact plaintiffs who were unsuccessful in the Sanford action.  These new actions are:

- Callahan, et al. v. Vertrue Incorporated, et al., Case No. CV-09-0236 WQH (POR), filed on January 8, 2009 in the Superior Court for the County of San Diego, State of California, thereafter removed to the United States District Court

---

[4]   This count excludes Geldmacher, for the reasons stated above, see supra n. _.

for the Southern District of California and currently pending there under Case No. 09-CV-0236 BEN (POR);[5]

- Smith, et al. v. Vertrue Inc., et al., Case No. CV 09 681974, filed on January 15, 2009 in the Court of Common Pleas for Cuyahoga County, Ohio, thereafter removed to the United States District Court for the Northern District of Ohio and currently pending there under Case No. 09-cv-00367;

- Waslin, et al. v. Vertrue Inc., et al., Case No. CV 09-00106, filed on January 22, 2009 in the United States District Court for the District of Connecticut;

- McKay, et al. v. Vertrue Inc., et al., Case No. 0001108-09, filed on February 23, 2009 in the Superior Court of the District of Columbia, thereafter removed to the United States District Court for the District of Columbia on March 16, 2009 and currently pending there under Case No. 09-00509;

- Gucker, et al. v. Vertrue, Inc., et al., Case No. CV 09-2264-C, filed on February 27, 2009 in the District Court of the Third Judicial District of the State of Idaho, County of Canyon; removal to the United States District Court for the Southern District of Idaho pending;

- Limon, et al. v. Vertrue, Inc., et al., Case No. C20091533, filed on March 3, 2009 in the Superior Court for the State of Arizona, County of Pima; removal to the United States District Court for the District of Arizona pending; and

- Rosenzweig, et al. v. Vertrue, Inc., et al., Case No. 2009 CA 009706, filed on March 19, 2009 in the Circuit Court of the 15th Judicial District for Palm Beach County, Florida; removal to the United States District Court for the Southern District of Florida pending.[6]

On February 23, 2009, Plaintiffs' counsel sent Defendants a letter indicating that yet another action, styled Ackermann v. Vertrue, Inc., et al., will be brought by two individuals asserting claims under a Georgia statute and thus apparently will be filed in Georgia. (Ex. 10.) Plaintiffs' papers here also indicate that another nine actions are on their way to courts in New York, Texas, Illinois, Minnesota, Missouri, North Carolina, Nevada, Massachusetts and Arkansas. (Pl. Mem. at 7 n.3.) Thus, in total, Plaintiffs' counsel intend to maintain *seventeen* almost identical actions pending in *seventeen*

---

[5] On March 2, 2009, Callahan amended her complaint. Callahan Action Dkt. No. 11. Since the amended complaint was not included in Plaintiffs' initial submission, Defendants submit it herewith. (Ex. 5.)

[6] Because Plaintiffs did not include the latter four complaints in their initial submission, Defendants submit them herewith. (Exs. 6 - 9.)

different jurisdictions across the country pertaining to the same exact subject matter against the same exact defendants.

### C.   Panel Proceedings

Plaintiffs in the Callahan, Smith, and Waslin actions seek transfer of their cases (hereinafter, the "Vertrue Cases"), as well as any potential tag-along cases, to the Southern District of California for purposes of pre-trial coordination.  Defendants agree that the cases should be transferred to a single district, but, for the reasons discussed below, urge selection of either the District of Connecticut or the Northern District of Ohio.

All of these cases are in their initial procedural stages: no answers or dispositive motions have been filed; no discovery have been provided; and no class has been certified.  In recognition of this fact, Plaintiffs have agreed that the cases should be stayed pending the Panel's decision on transfer.  As of this time, three of these cases (Smith, McKay and Waslin) have been stayed, and a motion to stay has been brought in Callahan. Smith Action Dkt. No. 9; Waslin Action Dkt. No. 27; Callahan Action Dkt. No. 14;[7] McKay Action Dkt. No. 7.

## ARGUMENT

Given that the parties are in agreement that an MDL should be created for the reasons stated in Plaintiffs' initial submission, the question before the Panel is whether the transferee forum should be the Southern District of California as Plaintiffs suggest, or some other forum.  Defendants respectfully urge the Panel to select the District of Connecticut or the Northern District of Ohio as the transferee forum.

---

[7]   Although the court in Callahan recently issued an order denying the jointly-requested stay of proceedings, see Callahan Action Dkt. No. 15, the parties intend to shortly renew the motion to provide additional information requested by the court.

I.      **The Southern District of California Has No Expertise in This Litigation**

Plaintiffs maintain that the Southern District of California is the better choice as a transferee forum here for essentially three reasons (aside from the docket caseload statistics addressed below, see infra at 11-12, 16-17): (1) it is more familiar with the actions at issue; (2) all plaintiffs support this choice, and (3) one of the firms representing Plaintiffs is located in the Southern District of California. (See Pl. Mem. at 8-10.)

Although the Southern District of California may have certain collective familiarity with the matter at hand, Judge Benitez – the only judge in that District who currently has a pending Vertrue Case before him – is no better acquainted with the matter than any other judge before whom a Vertrue case is presently pending. Plaintiffs' emphasis on the experience developed in the Southern District of California in relation to the Sanford action is misplaced – not only because the Sanford action already has been dismissed, but also because Judge Anello, who presided over the Sanford action at the time of its dismissal, had only had the case for a mere four months, and only as to pleading matters. (See supra at 5-6.)

Plaintiffs speciously assert that transferring the Vertrue Cases to the Southern District of California will "eliminate the expenses associated with the duplicative discovery, case management and motion practice" (Pl. Mem. at 8). But as Plaintiffs' counsel know, Sanford never progressed beyond the initial motion to dismiss, and thus duplicative discovery considerations are simply irrelevant here.

Even passing familiarity with the Sanford action would not facilitate management of the new Vertrue Cases, as Plaintiffs' counsel have tried hard to make the focus of the Sanford action (transactions involving West) irrelevant by broadening the allegations of the complaints. Moreover, although motion practice in the Sanford action dealt exclusively with the federal claims asserted there, most of the new Vertrue Cases involve state law claims arising under the laws of different states.

As to the remaining factors cited by Plaintiffs, they should be given little weight.

That in any given multidistrict litigation, the sheer number of plaintiffs involved would always transform their unanimous choice of a transferee forum into a "majority" choice (Pl. Mem. at 8) counsels in favor of giving the unanimous choice expressed by the defendants, although fewer in number, equal weight. And as for the location of one of the firms serving as Plaintiffs' national counsel (Coughling Stoia Geller Rudman & Robbins LLP), this factor has never been an important one in this Panel's analysis[8] – and should be given short shrift here, considering that Plaintiffs' *other* national counsel (Landskroner Griego Madden, Ltd.) is located in Cleveland, Ohio, the situs of one of Defendants' preferred transferee fora.

## II.   More Documents and Witnesses Are in the District of Connecticut

Defendants respectfully submit that the District of Connecticut – the current situs of the Waslin action – is a prudent choice for the transferee forum here. Both Defendants have corporate offices there; therefore, the District of Connecticut is the location of the relevant records and potential witnesses. Indeed, this Panel frequently favors such a location when choosing a potential transferee district – and often chooses such a location in the context of consumer fraud litigation. See, e.g., In re Vonage Mktg. & Sales Practices, 505 F. Supp. 2d 1375, 1377 (J.P.M.L. 2007) (in consumer fraud litigation,

---

[8]   See, e.g., In re Anthracite Coal Antitrust Litig., 436 F. Supp. 402, 403 (J.P.M.L. 1977) (that one federal district court would be a more conveniently located forum for majority of attorneys involved in multidistrict litigation than another district was not by itself a factor to be considered in selecting transferee forum for group of actions). Although Plaintiffs rely on In re Vonage Initial Public Offering (IPO) Sec. Litig., 471 F. Supp. 2d 1354 (J.P.M.L. 2007), as purportedly providing an example of the Panel's consideration of the lead counsel's convenience, the stated reasons for selecting the transferee forum in that case do not include such considerations. See id. at 1356 ("We conclude that the District of New Jersey is an appropriate transferee forum in this docket for the following reasons: (i) all but one of the actions in this docket were initially brought in that district; ii) Vonage is located in that district, and many of the relevant acts and transactions are alleged to have taken place there; and iii) no party supports centralization in any other district.").

holding that "the District of New Jersey is an appropriate transferee forum for this litigation. The District of New Jersey is a likely source of relevant documents and witnesses, inasmuch as Vonage's headquarters are located there."); In re InPhonic, Inc., Wireless Phone Rebate Litig., 460 F. Supp. 2d 1380, 1381 (J.P.M.L. 2006) (in consumer fraud litigation, finding that District of District of Columbia was appropriate transferee forum, as many relevant witnesses and documents were likely to be found in district, since it was the location of company's headquarters and related offices, and district was also the situs of a related proceeding); see also In re Bristol Bay, Alaska, Salmon Fishery Antitrust Litig., 424 F. Supp. 504, 507 (J.P.M.L. 1976) (finding that the Western District of Washington is "clearly the most appropriate transferee forum" since the corporate headquarters and records of all defendants are located in or near that district, as are "the personnel of defendants likely to be called as witnesses, [and] the majority of discovery will most likely take place in that vicinity"); accord In re Kugel Mesh Hernia Patch Prods. Liab. Litig., 493 F. Supp. 2d 1371, 1373 (J.P.M.L. 2007); In re: LTL Shipping Serv. Antitrust Litig., 528 F. Supp. 2d 1378, 1380 (J.P.M.L. 2007); In re Merck & Co., Inc., Sec., Derivative & ERISA Litig., 360 F. Supp. 2d 1375, 1377 (J.P.M.L. 2005).

Moreover, the District of Connecticut is endowed with considerable experience in handling complex MDL proceedings, as it has successfully handled twenty-four such actions;[9] currently, only six of them are still pending there – and only four of those actions are active.[10]  Furthermore, the District of Connecticut exhibits favorable docket conditions, which should further tilt the balance of factors in its favor.  For example, the

---

[9]    Compare http://www.jpml.uscourts.gov/General_Info/Statistics/Terminated_
Dockets_2008.pdf, at p. 3, with
http://www.jpml.uscourts.gov/Docket_Information/PendingMDL-
March-09.pdf, at p. 2.

[10]    See id.; see also In re Xerox Corp. Sec. Litig., MDL No. 1463 (inactive, date of last filing 2/9/09); In re Polychloroprene Rubber (CR) Antitrust Litig., MDL No. 1642 (inactive, date of last filing 10/15/08).

District of Connecticut has about the same number of actions per judgeship pending as does the Southern District of California (329 for the former v. 327 for the latter).[11]

Therefore, the District of Connecticut provides a more desirable alternative for this Panel's choice of the transferee forum for the Vertrue Cases than the Southern District of California.

**III.**     **The Northern District of Ohio Is a Centrally-Located, Desirable Forum**

Defendants recognize that the Panel may want to give consideration to more than just the convenience of the Defendants and the jurisdiction over witnesses and documents – even though Plaintiffs' counsel themselves have seen fit to sue Defendants in the District of Connecticut and thus have implicitly acknowledged its suitability as a forum. Accordingly, Defendants advocate the Northern District of Ohio as an alternate forum that also is more desirable for this litigation than the Southern District of California.

In choosing an appropriate transferee court, this Panel usually considers a range of factors that take into account the geographic dispersal of the actions involved, the location of the parties and the places in which they do business, and the capacity and experience of the potential transferee district to manage a complex MDL proceeding, all with a view to choosing a location that is fair and convenient for all the parties involved. Applying these factors here, this Panel could readily conclude that the Cleveland Division of the Northern District of Ohio is the best choice as venue for the Vertrue Cases.

    **A.**     **The Northern District of Ohio better serves the convenience of the parties and potential witnesses than does the Southern District of California**

A key consideration under Section 1407(a) is the "convenience of parties and witnesses." Because of its geographic centrality, the Northern District of Ohio would better serve this goal than the Southern District of California.

---

[11]     See http://www.uscourts.gov/cgi-bin/cmsd2008.pl.

This Panel in the past has expressed its preference for the selection of a centrally located transferee district. See Multidistrict Litig. Manual § 6:7, at n.1 (West 2008) (collecting cases). Indeed, this factor can overcome otherwise strongly favored factors. See, e.g., In re New Motor Vehicles Canadian Export Antitrust Litig., 269 F. Supp. 2d 1372, 1373 (J.P.M.L. 2003) (centrality trumps absence of any pending actions); In re Air Crash Near Van Cleve, Miss., on Aug. 13, 1977, 486 F. Supp. 926, 928 (J.P.M.L. 1980) (central location preferred to place of crash in air crash). Furthermore, as underscored in the Multidistrict Litigation Manual, the advantages of a geographically central forum increase as the number of actions increase. See Multidistrict Litig. Manual § 6:7.

As shown above, the Vertrue Cases are pending in the Cleveland Division of the Northern District of Ohio, the District of Connecticut, and the Southern District of California. Plaintiffs also identified potential tag-along actions in the District of Columbia and Idaho, and indicated that more related actions are on their way to courts in Arizona (already filed), Georgia, New York, Texas, Florida (already filed), Illinois, Minnesota, Missouri, North Carolina, Nevada, Massachusetts and Arkansas. Given the geographic dispersal of the actions involved, the Northern District of Ohio provides a convenient, geographically central location for all of these cases. See In re Travel Agent Comm'n Antitrust Litig., 290 F. Supp. 2d 1381, 1382 (J.P.M.L. 2003) (holding that transfer of actions to the Honorable Patricia A. Gaughan of the Northern District of Ohio, where one action was already pending, was appropriate; no district stood out as focal point for docket given geographic dispersal of constituent actions in California, Ohio and Texas); In re Ford Motor Co. Crown Victoria Police Interceptor Prods. Liab. Litig., 229 F. Supp. 2d 1377, 1378 (J.P.M.L. 2002) (selecting the Northern District of Ohio as the appropriate transferee forum where "[g]iven the geographic dispersal of constituent actions and potential tag-along actions, no district stands out as the focal point for this docket"); In re Meridia Prods. Liab. Litig., 217 F. Supp. 2d 1377, 1378 (J.P.M.L. 2002) (same); see also In re Yamaha Motor Corp. Rhino ATV Prods. Liab. Litig., __ F. Supp.

13

2d __, MDL No. 2016, 2009 WL 382262, at *2 (J.P.M.L. Feb. 13, 2009) (selecting a transferee judge based on, *inter alia*, her "central location," since "[g]iven the wide dispersal of these actions across the country, no forum stands out as a focal point for this litigation"); In re African-Am. Slave Descendants Litig., 231 F. Supp. 2d 1357, 1358 (J.P.M.L. 2002) (choosing the Northern District of Illinois as the transferee forum because "this geographically central district will be a convenient location for a litigation becoming nationwide in scope"); In re A. H. Robins Co., Inc. "Dalkon Shield" IUD Prods. Liab. Litig., 406 F. Supp. 540, 542-43 (J.P.M.L. 1975) (finding district of Kansas, because of its geographically central location, to be most suitable district for pre-trial consolidation); In re Transit Co. Tire Antitrust Litig., 350 F. Supp. 1165, 1166 (J.P.M.L. 1972) (where actions were pending "in four widely-separated states—Florida, Pennsylvania, California and Missouri", finding that "[b]ecause of Kansas City's geographically central location, it is easily accessible from all parts of the country and provides a more convenient forum to *all* parties than either Los Angeles or Philadelphia"); In re Library Editions of Children's Books, 297 F. Supp. 385, 387 (J.P.M.L. 1968) (considering logical transferee districts in New York and California but opting to transfer the cases to Illinois because of its central location; "although air travel renders both California and New York readily accessible, there is still something to be said for the convenience of a geographically central forum in coast-to-coast litigation").

The Northern District of Ohio is especially appropriate, given that three out of the four Plaintiffs requesting transfer here are Ohio residents (Preston Smith, Rita Smith, and Michael Waslin), and discovery as to their allegations would be taken out of Ohio, while all the other potential plaintiffs and witnesses, including the telemarketing entities and the sales staff involved in the transactions at issue, are so geographically dispersed that the centrality of the Northern District of Ohio would be immensely beneficial to discovery and other pre-trial proceedings. See In re Air Crash Near Van Cleve, 486 F. Supp. at 928 (holding that transfer to Northern District of Oklahoma of nine actions arising out of

Mississippi air crash would result in most expeditious resolution of the action and thus was appropriate, where discovery and other pretrial proceedings concerning liability issues focused on at least six different geographic areas, and the Northern District of Oklahoma was more centrally located and easily accessible transferee forum than was Southern District of Mississippi where the crash occurred).

By contrast, the Southern District of California's location, although convenient for one plaintiff and one law firm involved, provides no other geographic benefits, since it does not have any known or stated connection to any of the other parties involved. Furthermore, in terms of air-travel convenience, its San Diego location provides no more advantages than Cleveland, as both of them are major metropolitan centers with large international airports offering frequent air service to all the other jurisdictions involved. See, e.g., In re Commercial Money Ctr., Inc., Equip. Lease Litig., 229 F. Supp. 2d 1379, 1380 (J.P.M.L. 2002) ("In concluding that the Northern District of Ohio is an appropriate forum for this docket, we note that the Ohio district, where almost half of the constituent actions are already pending, is an accessible, metropolitan district.") (emphasis added); In re Inter-Op Hip Prosthesis Prods. Liab. Litig., 149 F. Supp. 2d 931, 933 (J.P.M.L. 2001) (same).

Defendants similarly have little or no connection to the Southern District of California: their business is conducted on nationwide basis with the fulfillment center located in Omaha, Nebraska, and both of the Defendants are Delaware companies with corporate offices in Connecticut. Given this dispersal of activity, the geographic centrality of the Northern District of Ohio is a factor that should be considered in favor of transferring the Vertrue Cases there. See In re: Velocity Exp., Inc., Wage & Hour Employment Practices Litig., 581 F. Supp. 2d 1368, 1369 (J.P.M.L. 2008) ("Given the geographic dispersal of pending actions, as well as the nationwide business of [the defendant], no particular district or region emerges as the focal point for this litigation. We are persuaded that the Eastern District of Wisconsin is an appropriate transferee

15

forum for this litigation. It is a centrally located district with the time and resources to devote to this litigation.").

In fact, if one were hard-pressed to pinpoint the "center of gravity" for the matter at hand, it certainly would seem that Ohio would be the best candidate, given that:

- The first class action addressing these allegations was brought in Ohio.

- A limited, statewide class was certified there.

- The two Smith Plaintiffs – who live in Ohio – participated in that Ohio settlement.

- At least three Plaintiffs live in Ohio.

- One of Plaintiffs' national counsel – Landskroner Griego Madden, Ltd – has its offices less than half a mile away from the doorstep of the courthouse in Cleveland.

The Northern District of Ohio's central location thus makes it an excellent choice as a transferee forum; as a comparative matter, it is more convenient for plaintiffs and defendants alike, as well as for potential witnesses, than the Southern District of California.

**B.      The Northern District of Ohio also has the experience and capacity to handle a complex MDL action**

The Northern District of Ohio also has the requisite experience and resources to manage a complex MDL docket dealing with alleged consumer fraud and would thus provide an appropriate forum for the Vertrue Cases.  The Northern District of Ohio has successfully handled twenty-five MDL actions, seventeen of which are no longer pending.[12]  By contrast, the Southern District of California has handled only twelve MDL actions.[13]

---

[12]      Compare http://www.jpml.uscourts.gov/General_Info/Statistics/Terminated_ Dockets_2008.pdf, at p. 20, with http://www.jpml.uscourts.gov/Docket_Information/PendingMDL-March-09.pdf, at p. 9.

[13]      See http://www.jpml.uscourts.gov/General_Info/Statistics/Terminated_ Dockets_2008.pdf, at p. 81.

Moreover, the Honorable Roger T. Benitez – the judge presiding over the Callahan action, which is the only pending Vertrue Case in the Southern District of California at this point – already has *two* pending MDL proceedings before him,[14] while the Honorable Patricia A. Gaughan, the judge presiding over the Smith action in the Northern District of Ohio, has none.[15]   See In re Comp. of Managerial, Prof'l & Technical Employees Antitrust Litig., 206 F. Supp. 2d 1374, 1376 (J.P.M.L. 2002) (holding that actions would be transferred to district where judge was not currently burdened with another complex multidistrict docket).

When evaluated on the criteria of MDL experience and capacity, the Northern District of Ohio is superior to the Southern District of California as a venue for the Vertrue Cases.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Panel enter an order transferring the Vertrue Cases for coordinated pretrial proceedings to the District of

---

[14]   See http://www.jpml.uscourts.gov/Docket_Information/PendingMDL-March-09.pdf, at p.2.  Although Plaintiffs maintain that these cases are inactive (Pl. Mem. at 10 n.4), at least one of them is current as of March 4, 2009, the date of the last entry.  See In re Morgan Stanley & Co., Inc., Overtime Pay Litig. (No. II), MDL No. 1806, Dkt. for Case No. 3:06-cv-02628-BEN-JMA.  It appears that in both MDL proceedings pending before Judge Benitez, the court is currently overseeing administration of settlements.  See id.; see also In re Peregrine Sys., Inc. Sec. Litig., MDL No. 1889, Dkt. for Case No. 3:02-cv-00870-BEN-RBB. Moreover, Plaintiffs' portrayal of another MDL proceeding pending in the Southern District of California, Countrywide Financial Corp. Mortgage Marketing & Sales Practices Litig., MDL No. 1988, as "inactive" is also inaccurate, given that the last entry on that docket is dated March 18, 2009.  See Dkt. for Case No. 3:08-md-01988-DMS-LSP.

[15]   See http://www.jpml.uscourts.gov/Docket_Information/PendingMDL-March-09.pdf, at p. 9.

Connecticut or the Northern District of Ohio, rather than the Southern District of California.

Date:   March 25, 2009

_____
Darrel J. Hieber
Robert J. Herrington
Marina V. Bogorad
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Telephone:     (213) 687-5000
Facsimile:      (213) 687-5600

J. Russell Jackson
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
Four Times Square
New York, New York 10036
Telephone:     (212) 735-3000
Facsimile:      (212) 735-2000

*Attorneys for Defendants Vertrue
Incorporated and Adaptive Marketing LLC*

18

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAR 2 6 2009

FILED
CLERK'S OFFICE

# BEFORE THE JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| In re: | MDL Docket No. 2044 |
| VERTRUE, INC. MARKETING AND SALES PRACTICES LITIGATION | |

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Response Of Defendants Vertrue Incorporated And Adaptive Marketing LLC To Plaintiffs' Motion For Transfer Of Actions To The Southern District Of California Pursuant To 28 U.S.C. § 1407 For Consolidated Pretrial Proceedings; Brief In Support Thereof; Exhibits In Support Thereof and this Certificate of Service was served by **FEDERAL EXPRESS NEXT BUSINESS DAY DELIVERY** on **MARCH 26, 2009**, to the following:

SEE ATTACHED PANEL SERVICE LIST

I declare under penalty of perjury that the foregoing is true and correct. Executed this 26th day of March 2009, at Los Angeles, California.

Darrel J. Hieber

2009 MAR 26 A 11: 51
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

RECEIVED
CLERK'S OFFICE

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAR 2 6 2009

FILED
CLERK'S OFFICE

**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| In re: | ) |
| | ) |
| VERTRUE, INC. MARKETING AND SALES | ) |
| PRACTICES LITIGATION | ) |
| | ) |

MDL Docket No. 2044

**EXHIBITS IN SUPPORT OF RESPONSE OF DEFENDANTS
VERTRUE INCORPORATED AND ADAPTIVE MARKETING LLC TO
PLAINTIFFS' MOTION FOR TRANSFER OF ACTIONS TO THE SOUTHERN
DISTRICT OF CALIFORNIA PURSUANT TO 28 U.S.C. § 1407 FOR
<u>CONSOLIDATED PRETRIAL PROCEEDINGS</u>**

**<u>INDEX</u>**

Exhibit 1: Plaintiffs' Third Amended Class Action Complaint in <u>Brandy L. Ritt, et al. v. Billy Blanks, et al.</u>, No. CV 424237 (Ohio Ct. C.P., Cuyahoga County) (July 5, 2001).

Exhibit 2: Journal Entry and Opinion denying motion for class certification in <u>Brandy L. Ritt, et al. v. Billy Blanks, et al.</u>, No. CV 424237 (Ohio Ct. C.P., Cuyahoga County) (Feb. 6, 2002).

RECEIVED
CLERK'S OFFICE
2009 MAR 26  A 11: 50
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

Exhibit 3:  Order Preliminarily Approving Settlement, Conditionally Certifying Settlement Class and Providing for Notice and Scheduling Order in Brandy L. Ritt, et al. v. Billy Blanks, et al., No. CV 424237 (Ohio Ct. C.P., Cuyahoga County) (Sept. 8, 2008).

Exhibit 4:  Order Finally Approving the Settlement Agreement and Directing Entry of the Final Stipulated Judgment Terminating This Case and Final Stipulated Judgment Terminating Action, in Brandy L. Ritt, et al. v. Billy Blanks, et al., No. CV 424237 (Ohio Ct. C.P., Cuyahoga County) (Dec. 11, 2008).

Exhibit 5:  First Amended Complaint in Callahan, et al. v. Vertrue Inc. et al., No. 09-CV-0236-BEN(POR) (S.D. Cal.) (Mar. 2, 2009).

Exhibit 6:  Class Action Complaint in McKay, et al. v. Vertrue Inc., et al., No. 0001108-09 (D.C. Super. Ct.) (Feb. 23, 2009).

Exhibit 7:  Class Action Complaint in Gucker, et al. v. Vertrue, Inc., et al., No. CV 09-2264-C (Idaho, 3d Dist.) (Feb. 27, 2009).

Exhibit 8:  Class Action Complaint in Limon, et al. v. Vertrue, Inc., et al., No. C20091533 (Ariz. Super. Ct.) (Mar. 3, 2009).

Exhibit 9:  Class Action Complaint in Rosenzweig, et al. v. Vertrue, Inc., et al., Case No. 2009 CA 009706 (Fla. Cir. Ct.) (Mar. 19, 2009).

Exhibit 10: Demand Letter dated February 23, 2009 from Coughlin, Stoia, Geller, Rudman & Robbins LLP to Vertue Inc. and Adaptive Marketing LLC regarding Ackermann, et al. v. Vertrue Inc., et al.

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

FILED

| | |
|---|---|
| **BRANDY L. RITT**<br>17120 Madison Avenue, Lower<br>Lakewood, Ohio 44107, | ) CASE NO:  CV424237<br>)<br>) **JUDGE JOSEPH D. RUSSO**<br>) |
| | ) |
| **KATHLEEN SOPPELSA**<br>83 Dorland Avenue<br>Berea, Ohio 44017, | )<br>)<br>) |
| | ) |
| **DENISE REEVES**<br>3614 Lennox Circle<br>Brunswick, Ohio 44212, | )<br>)<br>) |
| | ) |
| On Behalf of Themselves and All Others<br>Similarly Situated, and On Behalf of the<br>General Public, | ) **PLAINTIFFS' THIRD**<br>) **AMENDED CLASS ACTION**<br>) **COMPLAINT**<br>) |
| | ) **(JURY DEMAND** |
| **Plaintiffs,** | ) **ENDORSED HEREON)**<br>) |
| | ) |
| v. | ) |
| | ) |
| **BILLY BLANKS**, individually and on behalf<br>of **BILLY BLANKS' WORLD KARATE<br>CENTER, INC.**<br>14708 Ventura Boulevard<br>Sherman Oaks, California 91423 | )<br>)<br>)<br>)<br>) |
| | ) |
| and | )<br>) |
| | ) |
| **BG STAR PRODUCTIONS, INC.**<br>11150 Olympic Blvd., Ste. 1120<br>Los Angeles, California 90064 | )<br>)<br>) |
| | ) |
| and | )<br>) |
| | ) |
| **MEMBER WORKS, INC.**,<br>a Connecticut corporation, also known as,<br>**MWI ESSENTIALS, MWI LEISURE<br>ADVANTAGE, MWI HOME & GARDEN,<br>MWI CONNECTIONS**<br>9 West Broad Street<br>Stamford, Connecticut 06902 | )<br>)<br>)<br>)<br>)<br>)<br>) |

GERALD E. FUERST
CLERK OF COURTS
CUYAHOGA COUNTY

2009 JUL -5   P 4:

and                                                    )
                                                       )
                                                       )
NCP MARKETING GROUP, INC.,                             )
an Ohio corporation, also known as,                    )
NCP MARKETING, a division of                           )
Integrity Global Marketing                             )
4735 Belpar Street, N.W.                               )
Canton, Ohio 44718                                     )
                                                       )
and                                                    )
                                                       )
WEST CORPORATION,                                      )
a Nebraska corporation, doing business as              )
WEST TELEMARKETING SERVICES, INC.                      )
9910 Maple Street                                      )
Omaha, Nebraska 68134                                  )
                                                       )
and                                                    )
                                                       )
JOHN DOE(S) 1 THROUGH 49, inclusive                    )
True Names and Addresses Unknown,                      )
                                                       )
        Defendants.                                    )

Now come the Plaintiffs Brandy L. Ritt, Kathleen Soppelsa, Denise Reeves, and all others

similarly situated, by and through counsel, and for their complaint state the following:

### SUMMARY OF COMPLAINT

1.      Defendants Billy Blanks, Billy Blanks' World Karate Center, Inc., BG Star

Productions, Inc. ("the Billy Blanks Entities"), and Defendants Member Works, Inc. also known as

MWI Essentials, MWI Leisure Advantage, MWI Home & Garden, MWI Connections and other

MWI entities ("MWI"), NCP Marketing Group, Inc. also known as NCP Marketing ("NCP"), and

West Corporation, doing business as West Telemarketing ("West") (collectively "Defendants"), have

been and are engaged in the practice of making unauthorized and unlawful charges to Plaintiffs'

credit cards and debit cards. Several months (and then annually thereafter) after a valid credit card or debit card purchase of the products has been made, Defendants, without the purchasers' knowledge, authorization or consent, charge their credit cards or debit cards an amount somewhere between $60.00 and $100.00 for what is described as an annual self-renewing membership fee.

2.       More specifically, the participation of the individual defendants, which is explained in detail below, can be summarized as follows: NCP markets the TAE-BO videotapes. The Billy Blanks Entities, through the fame and celebrity of Billy Blanks himself, are the bait used to attract new customers into Defendants' network. NCP and West (NCP's telemarketer), through agreements with MWI, capture consumers' credit or debit card information when those consumers call to order the TAE-BO videotapes and/or other products. This information is then provided to MWI (pursuant to the noted agreements) who uses the information to charge consumers unauthorized membership fees and membership renewal fees which range from approximately $60.00 - $100.00 annually. The Defendants then share in the profits from the unauthorized fees generated from their unlawful scheme of charging consumers. The named Plaintiffs in this action were all victimized by Defendants by this precise method.

3.       Ironically, this so-called membership provides no benefit to the consumers and/or is nonexistent and has not been defined.[1] Indeed, Defendants' consumers do not participate in anything remotely resembling a membership. No membership information is provided to those charged the

---

[1]       Defendant MWI has indicated that actual memberships do exist and are sold; however, to date, Defendant MWI has failed to produce any documentation verifying the existence of any membership, despite Plaintiffs' discovery requests asking for the same. To the extent there is an actual membership program that exists, it is Plaintiffs' belief that the majority of so-called members are not aware that they are members of any MWI program and never receive any membership benefits.

memberships, and no membership benefits are explained to those charged the membership fees. This so-called membership is merely a label to conceal Defendants' theft of Plaintiffs' monies. Defendants' practice of charging credit card and debit card customers, without their knowledge or consent, for a membership that is unusable, impractical, provides no benefit to the consumers and/or is nonexistent, violates federal and state statutes, as well as common law principles.

## JURISDICTION AND VENUE

4.    This Court has jurisdiction over all causes of action asserted herein pursuant to the Ohio Constitution, Article IV, §4, because this case is a cause not given by statute to other trial courts.

5.    This Court has jurisdiction over each Defendant named above because each Defendant is either a corporation or association organized under the laws of the State of Ohio, a foreign corporation or association authorized to do business in Ohio and registered with the Ohio Secretary of State, or does sufficient business, has sufficient minimum contacts with Ohio, or otherwise intentionally avails itself of the Ohio market, through the manufacturing, production, promotion, sale, marketing and distribution of its products in Ohio, to render the exercise of jurisdiction by the Ohio courts permissible under traditional notions of fair play and substantial justice.

6.    Venue is proper in this Court because at all times relevant, Plaintiffs resided in their respective counties, including Cuyahoga County, and the Defendants either maintain offices in this County, a substantial portion of the practices complained of herein occurred in this County (since

4

the products here at issue were offered in this County) or because Defendants have received

substantial compensation as a result thereof in this County.

## PARTIES

7.      Plaintiff Brandy Ritt has been, at all times relevant to the action, a resident of the City

of Lakewood, County of Cuyahoga and State of Ohio.  Plaintiff purchased TAE-BO fitness

videotapes on or about December 15, 1998. Plaintiff purchased the TAE-BO fitness videotapes after

witnessing the television advertising campaign instituted by Defendants.  Several weeks after the

purchase of the TAE-BO fitness videotapes, Plaintiff's credit card was assessed an unsolicited and

undisclosed $72.00 charge by Defendants as billed by MWI Essentials. One year later, Plaintiff was

assessed another unsolicited, unauthorized and unexpected $84.00 charge by Defendants, as billed

by MWI Essentials. After inquiring about the charge, Plaintiff was informed by Defendant MWI that

the charges were for an annual self-renewing membership. This was the first time Plaintiff had ever

learned of the membership fee. (*See* Declaration attached as Exhibit "A.")

8.      Plaintiff Kathleen Soppelsa has been, at all times relevant to this action, a resident

of the City of Berea, County of Cuyahoga, State of Ohio.  Plaintiff purchased the TAE-BO fitness

videotapes on or about February 22, 1999.  Plaintiff purchased the tapes after witnessing the

television infomercial advertising campaign instituted by Defendants. On March 29, 1999, several

weeks after the purchase of the TAE-BO fitness videotapes, Plaintiff's Keybank Visa credit card was

assessed an unsolicited, unauthorized and unexpected $72.00 charge by Defendants as billed by

"MWI Essentials." One year later, on February 13, 2000, an additional unsolicited charge of $84.00

was assessed.  On January 22, 2001, a third unsolicited and unauthorized charge was assessed by

Defendants on Plaintiff's credit card in the amount of $84.00. (*See* Declaration attached as Exhibit "B.")

9.     Plaintiff Denise L. Reeves has been, at all times relevant to this action, a resident of the city of Brunswick, County of Medina, State of Ohio. Plaintiff purchased the TAE-BO fitness videotapes on or about September 2, 1998, using her Capital One Visa credit card. Plaintiff purchased the tapes after witnessing the television infomercial advertising campaign instituted by Defendants. On April 20, 1999, Plaintiff's credit card was assessed an unsolicited, unauthorized and unexpected $72.00 charge as billed by "MWI Leisure Advantage." On February 16, 2000, Plaintiff was billed again by Defendants in the amount of $87.00. On February 14, 2001, Plaintiff was billed yet a third time without authorization, in the amount of $89.95. (*See* Declaration attached as Exhibit "C.")

10.    Defendant Billy Blanks, individually, and on behalf of Billy Blanks' World Karate Center, Inc. has been, at all times relevant to the action, a California corporation, with its principal place of business located at 14708 Ventura Boulevard, Sherman Oaks, California 91423. Defendant BG Star Productions, Inc. has been, at all times relevant to the action, a California corporation with its principal place of business at 11150 Olympic Boulevard, Suite 1120, Los Angeles, California 90064. These Defendants (the Billy Blanks Entities) do business in Ohio (and throughout the nation) by and through a nationwide television advertising campaign, as well as by and through the interstate instrumentality of mailings throughout Ohio and the United States. Mr. Billy Blanks is a fitness expert and motion picture actor who is the principal behind Defendant Billy Blanks' World Karate Center, Inc. and BG Star Productions, Inc.; he is the primary feature of the TAE-BO fitness videotapes, as well as the massive television advertising campaign which is telecast nationwide.

6

Defendants operate and are involved in the unlawful scheme of charging TAE-BO customers unauthorized and unlawful fees to such customers' credit card and debit card accounts without their knowledge or consent. This scheme was formulated and operated by and through the civil conspiracy among the Defendants.

11. Defendant NCP Marketing Group, Inc. is an Ohio corporation with its principal place of business located 4735 Belpar Street, N.W., Canton, Ohio. Defendant NCP is a division of Integrity Global Marketing, a Delaware limited liability company doing business in Canton, Ohio. Defendant NCP does business in Ohio and throughout the Nation as NCP Marketing by and through a nationwide television advertising campaign, as well as by and through the interstate instrumentality of mailings throughout Ohio and the Nation. Defendant NCP is responsible for the creation and marketing of the TAE-BO videotapes. NCP is the owner and/or maintains full control over the TAE-BO property. Defendant NCP and Defendant MWI entered into express and tacit agreements for selling MWI's memberships and/or for providing MWI with consumers' credit or debit card information in conjunction with the sale of TAE-BO tapes and other products. Defendant NCP retained and contracted with Defendant West Telemarketing Services, Inc. to facilitate orders. Defendant NCP operates and is involved in the unlawful scheme of charging TAE-BO customers unauthorized and unlawful membership fees to their credit card and debit card accounts without the customers' knowledge or consent. This scheme was formulated and operated by and through the civil conspiracy among the Defendants.

12. Defendant Member Works, Inc. has been at all times relevant to the action, a Connecticut corporation whose primary place of business is 9 West Broad Street, Stamford, Connecticut. Defendant MWI does business in Ohio, and throughout the nation, as MWI Essentials,

7

MWI Leisure, MWI Home &Garden, MWI Connections, Health Trends, Travel Arrangements, Transmedia, Cardmember Protection Service, Countrywide Dental, 24 Protect, Smartsource, Value Max Shopping Service, Money Master and various other names under which it bills, by and through a nationwide television advertising campaign, as well as by and through the interstate instrumentality of mailings throughout Ohio and the nation. Defendant MWI entered into express and tacit agreements with Defendant NCP and NCP's telemarketing agent, Defendant West Telemarketing Service, Inc. Defendant MWI operates and is involved in the unlawful scheme of charging customers' credit card and debit card accounts for an unsolicited club membership associated with the purchase of TAE-BO fitness videotapes and other products, without the customers' knowledge or consent. This scheme was formulated and operated by and through the civil conspiracy among the Defendants.

13.   Defendant West Corporation has been, at all times relevant to the action, a Nebraska corporation whose primary place of business is 9910 Maple Street, Omaha, Nebraska 68134. Defendant West Corporation does business in Ohio and throughout the nation as "West Telemarketing Service, Inc.," operating telephone banks and processing orders for NCP Marketing, Inc.'s products, as well as other companies' products, from telephone purchasers making inbound telephone calls. These telephone calls result from infomercials and marketing of products on a national basis. Defendant West entered into express and tacit agreements with Defendants NCP and MWI to market and sell NCP products and MWI memberships. West Corporation, allegedly, reads scripts. During the transaction, it attempts an "upsell" and fraudulently signs up consumers for unauthorized credit/debit card charges for MWI memberships. This scheme was formulated and operated by and through a civil conspiracy among the Defendants.

8

14.     The true names and capacities of the Defendants sued herein as John Doe(s) 1 through 49, inclusive, are presently unknown to Plaintiffs, who therefore sue the Defendants by such fictitious names. Plaintiffs will seek to amend this Complaint and include John Doe(s) Defendants' true names and capacities when they are ascertained. Each of the fictitiously named Defendants are responsible in some manner for the conduct alleged herein and therefore the damages suffered by Plaintiffs, members of the Class, and the General Public.

15.     In committing the wrongful acts alleged herein, Defendants have pursued a common course of conduct, acted in concert with, aided and abetted and conspired with one another, in furtherance of their common plan, scheme or design to make unauthorized charges to customers' credit cards and debit cards for a nonexistent membership and thereafter to conceal and cover up their wrongdoing---all for their own personal profit. Each of these Defendants actually knew, or should have known, of the fraudulent conduct being committed and actively participated in covering up its true nature. Thus, in addition to the wrongful conduct herein alleged as giving rise to primary liability, Defendants further aided and abetted and knowingly assisted each other in breach of their respective duties, contracts and obligations as herein alleged, and acted as the agent of each other and participating in this wrongdoing.

16.     At all times herein mentioned in the causes of action alleged herein, each and every Defendant was an agent and/or employee of each and every other Defendant. In doing the acts alleged in the causes of action alleged herein, each and every Defendant was acting within the course and scope of this agency or employment, and was acting with the consent, permission and authorization of each of the remaining Defendants. All actions of each Defendant as alleged in the

9

causes of action stated herein were ratified and approved by every other Defendant or their officers or managing agents.

## DEFENDANTS' WRONGFUL CONDUCT

**The Tae-Bo Fitness Program**

17.    The TAE-BO fitness program is nothing short of an exercise phenomenon.  The creator of this program is the motion picture actor and fitness expert, Mr. Billy Blanks. His program is enormously popular throughout the country (and in the State of Ohio) and is marketed on television through a nationwide promotional program.  The program itself is extremely effective and has helped a great number of people achieve their goal of greater fitness.  There is no denying the popularity and effectiveness of this program.  It is, without a doubt, one of the most popular and effective fitness programs ever devised and marketed.

18.    The popularity and appeal of this program makes the unlawful and fraudulent conduct of the Defendants that much more reprehensible.  The popularity and talent of a motion picture actor and fitness expert has enticed tens of thousands (if not hundreds of thousands of people) to purchase the TAE-BO fitness program videotapes.  The purchasers of these tapes do so in good faith.  They provide hard-earned money to the Defendants in the expectation of receiving the TAE-BO fitness program tapes, and they do, in fact, receive these tapes.  What is not bargained for is an annual, recurring "membership" fee assessed to their credit cards or debit cards without their knowledge or consent.

19.    The effectiveness of the TAE-BO program is not at issue in this lawsuit, nor is the sale of the fitness program videotapes themselves at issue.  The program is popular and effective.

What is at issue is the assessment of an unlawful fee charged to Defendants' consumers without their knowledge or consent. This fee is for a purported membership that is not defined, disclosed, discussed or mentioned or in any way brought to the attention of the purchasers of the videotapes and other products. As such, it is an outright theft of the purchasers' money under the guise of a membership.

## The Tae-Bo Marketing Program

    20.    The marketing scheme of Defendants is massive, well coordinated and designed to sell TAE-BO videotapes. The phenomenon of the TAE-BO fitness program is a result not only of its effectiveness and popularity, but also because of this massive nationwide television marketing program. The TAE-BO fitness television infomercials and television commercials are familiar to any casual television viewer. As a result of the television advertising campaign, tens of thousands (if not hundreds of thousands) of consumers have bought the TAE-BO fitness program videotapes. The purchasers of these videotapes and other products are given the option of purchasing by credit card or debit card. To do this, purchasers are required to provide their names, credit card or debit card numbers and the expiration date of the credit card. Once the information is conveyed, NCP's responsibility is to transmit certain sales-related data to MWI. After the information is in Defendants' possession and control, it is utilized for their unlawful purpose of assessing a fee for fictitious, bogus and completely fabricated membership. The membership provides no benefit to the consumer, is unusable and/or impractical and/or is nonexistent and totally fictitious. Defendants' conduct is deceptive, unlawful and fraudulent and it cannot be justified in any manner.

11

21.     Defendants' work together to produce a script to be read to each purchaser of the TAE-BO tapes and to share information obtained from the telephone calls. MWI creates and NCP approves the scripts to be read when marketing the MWI programs in conjunction with TAE-BO exercise videos. NCP is responsible for ensuring the scripts are read verbatim on every eligible call. Furthermore, NCP, West, and MWI have marketing agreements which discuss membership into MWI programs and membership fees assessed to purchasers. NCP and West agreed to market the MWI programs and transmit billing information to MWI. The responsibilities of NCP and West included verifying and confirming the billing information and confirmation of order and transmitting the information to MWI. NCP and West are required to obtain customers' explicit acceptance of the offer and explicit understanding that they would be billed for enrolling in the MWI program. Part of the agreement includes the responsibility of NCP/West to provide toll-free numbers to all consumers enrolled in a program or accepting a trial membership.

22.     Defendants' conduct in managing, conducting and putting forth the massive nationwide advertising campaign is done with, and for, the purpose of selling the TAE-BO fitness program videotapes and other products and also with, and for, the unlawful purpose of assessing an unauthorized annual recurring membership fee.

**The Fictitious Membership**

23.     The purchasers of products, such as the immensely popular TAE-BO fitness program videotapes, are assessed a membership fee by Defendants. This undisclosed fee took the form of an annual self-renewing membership. A membership "in what" is not disclosed; the benefit of the membership is not defined. There simply is not a membership in any defined entity whatsoever. The

12

fees for this unusable and fictitious membership are unauthorized charges to the purchasers' credit cards or debit cards. The bargained for exchange, between Plaintiffs and Defendants, is for the TAE-BO fitness program videotapes or other products. What is not bargained for is the fictitious annual "membership" fee of anywhere between $60.00 and $100.00. The customers' explicit acceptance is not obtained. The "membership" is not defined and its benefits are not disclosed. In fact, there is no club or association to which a membership is granted. MWI, after receiving the information from NCP/West, is responsible for sending out the membership materials and customer service information to the persons enrolled. Customers never receive such information, only a charge on their credit/debit card. The term "membership" used by Defendants is an excuse for an unauthorized charge to those patrons who submit their credit card or debit card information in their purchase of the TAE-BO fitness program videotapes or other products. MWI is responsible for developing the alleged programs and "exclusively" services MWI's supposed customers. They are also responsible for the billing, cancellations, credits and refunds for the supposed "members."

24.    The services of West Corporation were retained by NCP Marketing, Inc. for the purposes of operating telephone banks and processing orders for NCP Marketing, Inc.'s TAE-BO products from telephone purchasers making inbound telephone calls. West Corporation employees were responsible for attempting to solicit membership to the MWI wholesale network club(s) by and through an "upsell" at the time of purchase of the TAE-BO tapes and other products advertised and marketed through infomercial and other vehicles for the sale of these products.

25.    This charge is an outright theft of monies from purchasers of the TAE-BO videotapes or other products. This theft takes place months and years after the initial purchase of the products obviously intended to avoid the attention and scrutiny of the purchasers. In this way, Defendants

13

increase their chances that the fictitious membership fees will go undetected by their customers. No membership information is provided to those charged the membership fees, and no membership benefits are explained to those charged the membership fee. Indeed, nothing is provided either in the form of information or explanatory material to those charged the membership fees. The recurring theft takes place annually or until complained of by the customer. MWI has the responsibility of sending out membership kits to all purchasers billing information as provided by NCP and West.

26.     These acts take place as a result of the concerted action, agreement and direction by the Defendants.

## The Role of the Individual Defendants

27.     The conduct of each of the Defendants contributed to the scheme designed to deceive and defraud Class members, resulting in the unlawful assessment of an unauthorized annual recurring membership fee.

(a)     **The Billy Blanks Entities** are, for lack of a better term, the "bait." The Billy Blanks Entities make and sell the popular TAE-BO workout tapes. The Billy Blanks Entities have agreed with the other Defendants to allow them access to their customers' credit and/or debit card information. The Billy Blanks Entities receive monetary payments in exchange for providing this information.

(b)     **NCP** is an Ohio corporation, with its principal place of business in Canton, Ohio. Through agreements with Defendant MWI, NCP oversees the scheme to defraud the Class members. NCP approved all scripts read to the Class members. NCP also hired West to operate the phone-bank which processes incoming calls on the TAE-BO videotapes and other products. NCP

14

oversees West, and purportedly "verifies" the Class members' agreement to join MWI's so-called membership programs, and authorization to charge their credit or debit cards. NCP receives a fee from MWI for each script that is read, and receives a portion of the "membership fees" for each Class member whose credit or debit card information it or Defendant West provides to MWI. NCP negligently, recklessly, and/or intentionally misrepresents and/or fails to verify Class members' consent to membership in MWI programs for its own profit.

(c)     West operates the "1-800" telephone number used in the sale of TAE-BO workout tapes and other products. West employees process Class members' orders of the TAE-BO videotapes and other products. Reading an identical script to every Class member, West then attempts to "upsell" the Class member into purchasing a purported self-renewing annual membership from MWI. Often, however, the script is *not read*, and MWI memberships are *never mentioned* to the Class member. West forwards the credit and debit card information it obtains in connection with the Class member's purchase of a TAE-BO workout tape (or other product) to NCP. On a bi-weekly basis, West also forwards this information to MWI. The Class member is then billed an annual self-renewing membership fee, even though the Class member did not authorize any charge to his or her credit or debit card. Like Defendant NCP, West receives a fee each time the script is read to a Class member, and receives a portion of the membership fee for each Class member's credit or debit card information it forwards to NCP and MWI. West negligently, recklessly and/or intentionally misrepresents consent and/or fails to read, mention or obtain Class members' consent to membership in MWI programs for its own profit.

(d)     **MWI** receives the Class member's credit and debit card information from NCP and West. Anywhere from three months to a year after the customer has purchased, *and been*

15

*billed for*, the "bait" product (*e.g.*, the TAE-BO workout tapes), MWI levies a second charge of

between $60.00 and $100.00 on the Class member's credit or debit card for a purported annual, self-

renewing membership program. The so-called "membership program" provides no clear or defined

benefit to purchasers of Defendants' products. According to its website, MWI's programs are:

> [D]esigned as turn-key operations which enhance our partners' product and service
> offerings while building customer loyalty and repeat business. Our dedication to the
> development of innovative products and services creates unique program offerings
> our clients use to differentiate themselves from their competition.

Memberworks website, "Who is Memberworks" (June 17, 2001). MWI pays a fee to NCP and to

West for each time that an "upsell" script is read to Class members purchasing products that NCP

is marketing. Defendant MWI's conduct, as described herein and hereafter, is negligently reckless

and/or intentional and undertaken for its own profit.

28.     Other than their credit or debit card statement, the Class members are not notified that

they have been "enrolled" in a purported MWI membership program. Defendants send no

notification whatsoever informing the Class members of their enrollment in the purported

membership program. Defendants do not send new "members" any invoice or record of the charge,

nor do they send any membership materials. Moreover, throughout the duration of the purported

"membership," Class members *never hear* from any of the Defendants about any purported

membership benefits; they do not receive newsletters, coupons, or any other notifications.

29.     The *only* notice that a Class member receives that he or she has been billed for a

purported membership is his or her credit or debit card statement reflecting a charge by MWI, which

the Class member may not notice depending on how closely the Class member reads the statement.

If the Class member notices and challenges the charge, the charge may be reversed. In this way,

16

Defendants conceal their deception from the other Class members and from the public. Those Class members who do not notice the charge are billed each year until they notice that they have been charged and complain. Moreover, there is no notification to the customer that the purported membership fee is being renewed. Accordingly, the Class member has a very short window to correct the damage by seeking a reversal of the unauthorized charge. The "membership fees" Defendants receive are nothing more than a theft of Class members' money.

## CLASS ACTION ALLEGATIONS

30.     Plaintiffs bring this action on behalf of themselves and all other persons similarly situated. The Class which Plaintiffs represent is composed of all persons in the United States (or such States as may be certified by the Court), who were charged unauthorized fees (or similar unauthorized charges) on their credit card or debit card accounts in connection with enrollment in an MWI membership program (the "Class"). The "upsell" of MWI services was directed to all customers in the contiguous 48 states of the United States, excluding Army Post Office addresses. Not included within the Class are Defendants and their officers, directors, employees, agents and/or affiliates.

31.     The Class is composed of tens of thousands to hundreds of thousands of persons geographically dispersed throughout Ohio and/or the United States, the joinder of whom in one action is impracticable, and the disposition of their claims in a Class action will provide substantial benefits to both the parties and the Court. The Class is ascertainable and maintains a sufficient community of interest since the rights of each member of the Class were violated in a similar fashion based upon Defendants' uniform scheme. The victimized customers can be identified in records

17

maintained by Defendants, and thus can be located and notified with specificity of the pendency of this action via first class mail using techniques and a form of notice customarily used in class action litigation.

32.    Plaintiffs' claims are typical of the members of the Class as a whole because of the similarity, uniformity and common purpose of the unlawful conduct of Defendants. Indeed, the massive TAE-BO advertising campaign is, by its very nature, designed to sell the TAE-BO exercise program videotapes—this can only be accomplished by a uniformity of conduct among the Defendants. Plaintiffs have sustained damage as a result of Defendants' wrongful conduct—in violation of federal and state statutes, as well as general principles of equity and fair play.

33.    Plaintiffs will fairly and adequately protect the members of the Class and Plaintiffs have retained competent counsel who are experienced in federal and state class action claims such as those asserted in this case.

34.    A class action is superior to all other methods for the just, fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, the damages suffered by individual Class members is not sufficient to justify the enormous cost associated with the prosecution of this type of litigation. The expense and burden posed by such individual litigation make it impossible for the Class members to individually redress the wrong done to them, nor would such an individual case be adequate to ensure that such practices cease to harm others. Further, there will be no difficulty in the management of this action as a class action.

35.    Common questions of law and fact exist as to all members of the Class and these common issues predominate over any question which go particularly to any individual member or the Class. Among such common questions of law and fact are the following:

18

(a)    What is the unfair, deceptive, untrue or misleading documents, releases, statements, contracts, advertisements and practices relating to the TAE-BO exercise program videotapes and/or Defendants' other products sold or marketed to the public;

(b)    How Defendants' acts, as alleged herein, violate federal statutes, Ohio statutes as well as general principles of equity and fair play;

(c)    The exact mechanism of the common course of conduct of unauthorized, membership fees charged to Class members' credit or debit card accounts without their knowledge or consent related to purchase of the TAE-BO exercise program videotapes and/or other advertised products;

(d)    What documents, releases, statements, advertisements, press releases, promotional material, television advertisements, radio advertisements, public disseminations omitted and/or misrepresented material facts that resulted in unauthorized membership fees charged to purchasers without their knowledge or consent;

(e)    Whether the Defendants acted willfully, recklessly and/or negligently in omitting to disclose and/or misrepresenting material facts or in aiding and abetting the making of such misstatements; and

(f)    The significant amount of damages the Class has sustained as a result of Defendants' wrongful conduct, and the proper measure of such damages.

36.    Nationwide class action treatment is appropriate because the marketing scheme at issue emanates from Ohio as the TAE-BO tapes are produced, manufactured and marketed (and the procedures at issue are directed) by the Billy Blanks Entities and West Corporation, by and through NCP Marketing, which is an Ohio corporation.

## FIRST CAUSE OF ACTION

**(Unlawful, Fraudulent and Unfair Business Acts and Practices in Violation of the Ohio Deceptive Trade Practices Act and the Ohio Consumer Sales Practices Act)**

37.    Plaintiffs reallege the allegations in paragraphs 1 through 36 above, as if fully set forth and incorporated herein.

38.    This cause of action is brought pursuant to the Ohio Consumer Sales Practices Act, Ohio Revised Code §§1345 *et seq.* (the "Act").

39.    The Defendants are "suppliers" in "consumer transactions" as defined by R.C. §1345.01 (C).

40.    The policies, acts and practices of Defendants as described above were intended to deceive Plaintiffs, members of the Class, and the General Public as described herein and have resulted (and will result) in annual fees being imposed on members of the Class.  These actions violated and continue to violate the Act in, at least, the following respect:

(a)    In violation of R.C. §1345.02 (A), Defendants' acts and practices constitute the use of unfair and deceptive representations in connection with a consumer transaction with the products in question;

(b)    In violation of R.C. §1345.02 (B)(1) and (B)(4), Defendants' acts and practices constitute the advertisement of the products in question without the intent to sell them as advertised; and

(c)    In violation of R.C. §1345.03 (A) and (B)(5), Defendants inserted unconscionable provisions into the sales contracts at issue herein by unilaterally attempting to

20

impose an automatic, unauthorized fee for enrollment in a fictitious and/or useless and unwanted membership.

41.     By reason of the foregoing, Plaintiffs, members of the Class, and the General Public have been (and will continue to be) irreparably harmed.

42.     Pursuant to R.C. §1345.09 (E), in conjunction with the filing of this Complaint, Plaintiffs will send this notice by certified mail, return receipt requested, to the Office of the Attorney General for the State of Ohio.

43.     The Ohio Deceptive Trade Practices Act R.C. §§4165, *et seq.* prohibits acts of unfair competition which means and includes and "unlawful...business act or practice."

44.     The policies, acts and practices alleged herein were intended to result in the imposition on Plaintiffs and Class members fees and charges which violate and continue to violate the "Act", §§1345, *et seq.*, specifically §1345.02 (A), §1345.02 (B)(1) and (B)(4), §1345.03 (A) and (B)(5).

45.     Defendants' violation of Revised Code §1302.92 and §2721, and other common and statutory laws which prohibit the imposition of fees in contravention of the express terms and provisions of the parties' agreements and Defendants' public and advertised representations regarding the same as set forth above, also violates the Ohio Deceptive Trade Practices Act §4165.02's proscription against engaging in unlawful business acts or practices.

46.     Defendants' conduct also violates the Deceptive Trade Practices Act §4165.02 in that Defendants either were or reasonably should have been aware that imposition of such representations and fees is unlawful under the circumstances.

21

47.     R.C. §4165.02 also prohibits acts of unfair competition which shall mean and include any "unfair or fraudulent business acts or practices." As described more fully above, Defendants' imposition of annual unauthorized and fraudulent membership fees in contravention of the express terms and provisions of the parties' agreements and Defendants' public and advertised representations regarding the same, as set forth above, constitutes an unfair business act or practice within the meaning of R.C. §4165.02, in that the justification for Defendants' conduct is outweighed by the gravity of the consequences to Plaintiffs, members of the Class, and the General Public.

48.     Defendants' acts as described above also had (and have) a tendency to deceive Plaintiffs, members of the Class, and the General Public, constituting a fraudulent business act or practice. Such conduct is ongoing and continues to this date.

49.     As a result of their conduct described above, Defendants have been (and will be) unjustly enriched. Specifically, Defendants have been unjustly enriched by the receipt of their ill-gotten gains from unauthorized credit card and debit card charges—many of which took place in Ohio.

50.     Plaintiffs reserve a right to allege other violations of law which constitute unlawful business acts or practices. Such conduct is ongoing and continues to this date.

51.     Plaintiffs, members of the Class, and the General Public are, therefore, entitled to the relief available under R.C. §1345.09 and §4165.03, as detailed below.

## SECOND CAUSE OF ACTION

### (Untrue or Misleading Advertising in Violation of the
### Ohio Deceptive Trade Practices Act)

52.     Plaintiffs reallege the allegations in paragraphs 1 through 51 above, as if fully set forth and incorporated herein.

53.     The Ohio Deceptive Trade Practices Act §4165.02 (A)(1) through (13) provides in pertinent part that:

> A person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation the person does any of the following: (1) Passes off the goods or services as those of another; (2) Causes the likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of the goods or services; (3) Causes the likelihood or confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another; (4) Uses deceptive representations or designations...in connection with goods or services; ... (11) Advertises goods or services with intent not to sell them as advertised; (12) Makes false statements of fact concerning the reasons for, existence of, or amounts of price.

54.     As a result of the foregoing claims made by Defendants through their advertising practices and promotional materials, which Defendants either knew, or by the exercise of reasonable care should have known, were neither true nor accurate, and as a further result of Defendants' failure to disclose the material facts alleged herein regarding the unauthorized fees for a fictitious membership, each of the Defendants has engaged in untrue and misleading advertising, constituting a violation of the Ohio Deceptive Trade Practices Act, §§4165.02, *et seq*. Such conduct is ongoing and continues to this date.

55.     Plaintiffs, members of the Class, and the General Public are, therefore, entitled to the relief available under R.C. §4165.03 (A)(2) and (B), as detailed below.

### THIRD CAUSE OF ACTION

#### (Fraud and Deceit)

56.     Plaintiffs reallege the allegations in paragraphs 1 through 55 above, as if fully set forth and incorporated herein.

57.     Plaintiffs and members of the Class ordered Billy Blanks TAE-BO videotapes. One to twelve months later, an approximate charge of anywhere between $60.00 and $100.00 dollars was charged from MWI/Member Works to the customers' credit card or debit card. One year later, a renewal charge appeared for approximately the same amount. These charges, if undetected, would have continually appeared in the subsequent years thereafter.

58.     Defendants falsely and fraudulently enrolled Plaintiffs and members of the Class in MWI, a program that charges a yearly fee, with automatic renewal.

59.     Customers placing calls to Defendant NCP's teleservices representative, Defendant West, to order TAE-BO videos, or other products, were to be offered an opportunity to purchase MWI memberships after they ordered their tapes. "Upsell" scripts for MWI memberships were to be created by MWI, approved by NCP and read by West to inbound callers. MWI was to bill and process orders, cancellations, credits and refunds to "members," as well as provide fulfillment materials and customer service to persons enrolled in MWI membership programs. NCP was to "upsell" MWI services to all customers in the contiguous 48 states of the United States, to ensure MWI's scripts were read verbatim, and to timely transmit sales-related data to MWI.

60.     Defendants concealed this material fact from Plaintiffs. Some members of the Class were specifically asked by West Corporation telemarketers to purchase a membership in MWI, and even though they declined the offer, they were fraudulently enrolled and charged the annual fee.

24

Other members of the Class were never asked by West Corporation telemarketers about purchasing an MWI membership; they were simply charged the unauthorized membership fees.

61.     Defendants falsely and fraudulently failed to obtain explicit acceptance, explicit understanding and proper verification in order to enroll Plaintiffs and those similarly situated in the MWI programs.  Fulfillment materials and customer service were fraudulently withheld and/or not provided by MWI.

62.     Notification of renewal was also fraudulently withheld by Defendants MWI, NCP and West and authorization for renewal was not obtained before Class members were charged by MWI.

63.     Plaintiffs and members of the Class reasonably relied on Defendants and believed that they were only making a one-time purchase of TAE-BO exercise tapes.

64.     Defendants' suppression of the material facts set forth above and throughout this Complaint defrauded Plaintiffs and the Class, is in direct violation of Ohio statutes, as well as principles of common law, for which Plaintiffs and members of the Class are entitled to recover damages.

**FOURTH CAUSE OF ACTION**

**(Negligent Misrepresentation)**

65.     Plaintiffs reallege the allegations in paragraphs 1 through 64 above, as if fully set forth and incorporated herein.

66.     In making representations to Plaintiffs and members of the Class described herein, Defendants failed to fulfill their duties to disclose the material facts set forth above.  Among the

direct and proximate causes of said failures to disclose were the negligence, recklessness and carelessness of Defendants.

67.    Defendants owed Plaintiffs and members of the Class the duty to act with reasonable care in retaining, training, and supervising its agents and sales agents. Defendants also failed to take reasonable steps to ensure that its representatives conducted themselves and sold Billy Blanks TAE-BO tapes and/or other products in accordance with the law and to ensure that the representatives disclosed all material facts and did not misrepresent or omit such facts in conducting such sales.

68.    Defendants as set forth herein, breached their duties to retain, train, supervise, monitor and discipline its sales force and to ensure full disclosure by them.

69.    Plaintiffs and the members of the Class were unaware of the falsity of Defendants' affirmative misrepresentations and their failure to disclose that Plaintiffs and members of the Class would be charged unauthorized membership fees on their credit or debit card accounts without their knowledge or consent. Plaintiffs and the members of the Class, as a direct and proximate result of Defendants' breaches of their various duties, reasonably relied upon such representations to their detriment. By reason thereof, Plaintiffs and members of the Class have suffered damage, in an amount according to proof at time of trial.

### FIFTH CAUSE OF ACTION

#### (Breach of Contract)

70.    Plaintiffs reallege the allegations in paragraphs 1 through 69 above, as if fully set forth and incorporated herein.

71.    Defendants entered into agreements with Plaintiffs and members of the Class by which they promised that the payment of a one-time fee would result in the shipment of the TAE-BO tapes to the customer.

72.    Plaintiffs and members of the Class performed their contractual obligations by making the premium payments required under their agreement with the Defendants.

73.    Defendants materially breached their duties under the agreements with Plaintiffs and members of the Class by charging fees in addition to those required by the terms of their agreement.

74.    By reason of the foregoing, Plaintiffs and members of the Class have been irreparably harmed and damaged in an amount according to proof at trial.

## SIXTH CAUSE OF ACTION

### (Unjust Enrichment)

75.    Plaintiffs reallege the allegations in paragraphs 1 through 74 above, as if fully set forth and incorporated herein.

76.    Defendants owed and continue to owe a duty to the public, including Plaintiffs, not to deceive them regarding the marketing of their products, and the fees associated with purchasing their products.

77.    Defendants, through their deceptive practices described in this Complaint, have induced many of its customers to purchase the TAE-BO tapes and/or other products; and, as a consequence, caused consumers to pay unauthorized membership fees on their credit or debit card accounts without their knowledge or consent.

78.     Defendants, having breached their duty not to deceive Plaintiffs as described in this Complaint, owed and continue to owe a duty to Plaintiffs to compensate them for the harm so caused, including reimbursement of any fictitious, unusable, impractical and/or nonexistent membership or other unauthorized or undisclosed fees incurred by purchasing Defendants' products.

79.     Because Plaintiffs have paid unauthorized membership fees to Defendants, Plaintiffs have conferred a benefit upon Defendants.

80.     Defendants' retention of the benefits so conferred upon them by Plaintiffs is unjust inasmuch as Defendants have caused the unauthorized membership fees to be incurred through the use of fraudulent and unlawful means as described in this Complaint.

81.     In equity and good conscience, Defendants should be ordered to pay restitution to Plaintiffs for such sums expended, and to be expended in the future, by the Plaintiffs to cover the unlawful and fraudulent fees paid (or to be paid) as a result of Defendants' conduct.

## SEVENTH CAUSE OF ACTION

### (Civil Conspiracy—Against All Defendants)

82.     Plaintiffs reallege the allegations in paragraphs 1 through 81 above, as if fully set forth and incorporated herein.

83.     Plaintiffs ordered the Billy Blanks TAE-BO exercise videotapes from the Billy Blanks Entities as marketed and sold by NCP Marketing and West Corporation.  Plaintiffs were subsequently charged, by MWI, unauthorized and unlawful membership fees as a direct result of the initial order without their consent.

28

84.     Defendants maliciously and intentionally acted in concert to injure Plaintiffs, through the unlawful enrollment.

85.     Causes of action I through VII establish the necessary existence of unlawful act(s) independent from the actual malicious confirmation between Defendants.   The Defendants' perpetrated fraud, breach of contract, negligence and violations of the Ohio Consumer Sales Practices Act and the Ohio Deceptive Trade Practices Act were illegal and were carried out independent from the conspiracy itself.

86.     As a direct and proximate result of the Defendants' conspired acts, the Plaintiffs have been damaged and are entitled to an award of compensatory and punitive damages in an amount in excess of Twenty-five Thousand Dollars ($25,000).

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiffs on behalf of themselves, the members of the Class and the General Public, pray for judgment and relief against Defendants as follows:

1.     As to the First and Second Counts:

(a)     Pursuant to the Ohio Consumer Sales Practices Act and the Ohio Deceptive Trade Practices Act §§1345.09 (D) and 4165.03 (A)(1), Plaintiffs, member of the Class, and the General Public seek an order of this Court ordering Defendants to immediately cease all acts of unfair competition and enjoin Defendants from continuing to conduct business via the unlawful, unfair or fraudulent business acts or practices as particularized herein.

(b)     Plaintiffs also request an order requiring Defendants to identify all Class members and pay restitution to Plaintiffs, all members of the Class, and the General Public so as to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful,

29

fraudulent or unfair business practice, in violation of applicable laws, statutes or regulations or constituting unfair competition or untrue or misleading advertising.

    2.    As to All Counts of Action:

        (a)    An order certifying that the action be maintained as a Class action;

        (b)    An order preliminarily and/or permanently enjoining Defendants from pursuing the policies, acts and practices complained of herein;

        (c)    Actual and compensatory damages in an amount in excess of $25,000 to be proven at trial, including any damages as may be provided for by statue;

        (d)    Exemplary and punitive damages in excess of $25,000;

        (e)    Reasonable attorneys' fees and costs of suit; and

        (f)    Pre and post-judgment interest; and

        (g)    Such other and further relief as this Court may deem necessary, proper and/or appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  7/5/01

Jack Landskroner (0059227)
The Landskroner Law Firm, Ltd.
55 Public Square, Suite 1040
Cleveland, OH 44113
(216) 241-7000

Milberg, Weiss, Bershad, Hynes & Lerach
Frank J. Janecek, Jr.
Stephen P. Polapink
600 West Broadway, Suite 1800
San Diego, CA 92101
(619) 231-1058

Milberg, Weiss, Bershad, Hynes & Lerach
Patrick J. Coughlin
100 Pine Street, Suite 2600
San Francisco, CA 94111
(415) 288 4545

**Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

A copy of the foregoing Third Amended Complaint was served upon counsel for Defendants this 5th day of July, 2001, along with a copy sent via certified mail to the Ohio Attorney General. A Praecipe has been filed with the Court to serve Defendant West via certified mail.

William J.F. Roll III, Esq.
Mark S. McNeill, Esq.
Sherman & Sterling
599 Lexington Avenue
New York, NY 10022

Brian Eisenberg, Esq.
Robert N. Rapp, Esq.
Calfee, Halter & Griswold
1400 McDonald Investment Building
800 Superior Avenue NE
Cleveland, OH 44114

**Attorneys for Defendant Member Works, Inc.**

H. Alan Rothenbuecher, Esq.
Lisa Del Grosso, Esq.
Brouse McDowell
500 First National Tower
Akron, OH 44308-1471

Todd E. Whitman, Esq.
Charles N. Kenworthy, Esq.
Allen, Matkins, Leck, Gamble
 & Mallory, L.L.P.
1901 Avenue of the Stars, Ste. 1800
Los Angeles, CA 90067-6019

**Attorneys for Blanks' Defendants and
 BG Star Productions, Inc.**

George L. McGaughey, Esq.
McDonald, Hopkins, Burke
 & Haber Co., L.P.A.
2100 Bank One Center
600 Superior Avenue East
Cleveland, OH 44114-2653

Jeffrey L. Laytin, Esq.
Mitchell C. Stein, Esq.
Richard B. Verner, Esq.
Salans, Hertzfeld, Heilbronn, Christy
 & Viener
620 Fifth Avenue
New York, NY 10022

**Attorneys for Defendant NCP Marketing**

_____
Jack Landskroner (0059227)

32

Ex A

## IN THE COURT OF COMMON PLEAS
## CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| BRANDY L. RITT, on behalf of Herself and All Others Similarly Situated, and on behalf of the General Public, | ) ) ) | CASE NO. 424237 |
| | ) | CLASS ACTION |
| Plaintiff, | ) ) | JUDGE JOSEPH D. RUSSO |
| | ) | |
| vs. | ) | DECLARATION OF BRANDY (RITT) |
| | ) | MAXIE |
| BILLY BLANKS ENTERPRISES, et al., | ) | |
| | ) | |
| Defendants. | ) | |

I, Brandy (Ritt) Maxie, declare as follows:

1.     After seeing a television infomercial for the TAE-BO fitness videotapes, I purchased the TAE-BO fitness videotapes by calling the advertised telephone number on December 15, 1998.

2.     I was charged $82.54 on my National City Bank Visa Credit Card.  (*See* Statement attached as Exhibit 1.)

3.     On January 20, 1999, my National City Bank Visa Credit Card was assessed and unsolicited, unauthorized and unexpected charge of $72.00 by a company listed on my credit card statement as MWI Essentials.  (*See* Statement attached as Exhibit 2.)

4.     On November 16, 1999, I was again assessed an unsolicited, unauthorized and unexpected charge of $84.00 by a company listed on my credit card statement as MWI Essentials.  (*See* Statement attached as Exhibit 3.)

5.     At no point in time was I offered or solicited for membership in any program offered by MWI or any of its subsidiary companies.

6.     At no point did I authorize or request membership in any MWI program.

7.   At no time was I provided any information on membership to any such MWI program.

8.   At no time was I provided any renewal information about any MWI membership program.

9.   At no time did I utilize or receive any benefit from MWI or any of its programs and/or membership.

I declare under penalty of perjury under the laws of the State of Ohio that the foregoing is true and correct.

Executed this 31 day of May, 2001, at Cleveland, Ohio.

BRANDY (KITT) MAXIE

# NationalCity.



**CLASSIC CARD SUMMARY**

ONE NCC PKWY KA162B
KALAMAZOO, MI 49009-8002

| New Balance | Minimum Payment | Due Date |
|---|---|---|
| 82.54 | 10.00 | 02/09/99 |

Account number

Amount Enclosed $ _____

*Address change? Place an "X" in the box below.*
*Print new address on back of statement.*

TO AVOID ADDITIONAL FINANCE CHARGES
ON PURCHASES, PAY YOUR ENTIRE NEW
BALANCE BY THE DUE DATE SHOWN ABOVE.

PLEASE MAKE CHECK PAYABLE TO:

NATIONAL CITY
P.O. BOX 65440
LOUISVILLE, KY 40285-5440

BRANDY L RITT
17120 MADISON AVE LOWR
LAKEWOOD OH 44107-3504

44892030102544820000082540000001000

# NationalCity.

Account number

| | |
|---|---|
| Credit Limit | $900.00 |
| Available Credit | $651.00 |
| Available for Cash Advance | $651.00 |
| Days in Billing Cycle | 31 |
| Statement Closing Date | 01/15/99 |

| ACCOUNT SUMMARY: | |
|---|---|
| Previous Balance | $93.06 |
| Payments/Credits | $93.06 |
| Purchases/Debits | $82.54 |
| Cash Advances | $0.00 |
| Finance Charges | $0.00 |
| Other Charges | $0.00 |
| New Balance | $82.54 |

## TRANSACTIONS

| Tran Date | Post Date | Reference Number | Description | Amount |
|---|---|---|---|---|
| 12/15 | 12/16 | 2415802PFKPBQ53F5 | # TAE BO       317-5790400  IN | 82.54 |
| 01/04 | 01/04 | 744892004SBZL28DW | PAYMENT*THANK YOU     LOUISVILLE  KY | 93.06CR |

## FINANCE CHARGES SUMMARY

| Rate Type | MONTHLY PERIODIC RATE* | CORRESPONDING ANNUAL PERCENTAGE RATE | FINANCE CHARGE | AVERAGE DAILY BALANCE |
|---|---|---|---|---|
| Current Purchases | 1.450% | 17.400% | $0.00 | $0.00 |
| Current Cash Advances | 1.608% | 19.300% | $0.00 | $0.00 |

BLENDED ANNUAL PERCENTAGE RATE:     19.30%
*THIS RATE MAY VARY

CUSTOMER SERVICE 1-800-622-3449
CUSTOMER SERVICE PO BOX 2349 KALAMAZOO MI 49003-2349
*Notice: See reverse side for important information on your account and its renewal.*

# NationalCity

VISA  MasterCard  CLASSIC CARD SUMMARY

ONE NCC PKWY KA162B
KALAMAZOO, MI 49009-8002

| New Balance | Minimum Payment | Due Date |
|---|---|---|
| 239.45 | 10.00 | 03/12/99 |

Account number

*Address change? Place an "X" in the box below.*
*Print new address on back of statement.*

☐

Amount Enclosed $ _____

TO AVOID ADDITIONAL FINANCE CHARGES
ON PURCHASES, PAY YOUR ENTIRE NEW
BALANCE BY THE DUE DATE SHOWN ABOVE.

PLEASE MAKE CHECK PAYABLE TO:

NATIONAL CITY
P.O. BOX 85440
LOUISVILLE, KY 40285-5440

BRANDY L RITT
17120 MADISON AVE LOWR
LAKEWOOD OH 44107-3504

44892030102544820000239450000001000

# NationalCity

Account number

| | | ACCOUNT SUMMARY: | |
|---|---|---|---|
| Credit Limit | $900.00 | Previous Balance | $82.54 |
| Available Credit | $660.00 | Payments/Credits | $82.54 |
| Available for Cash Advance | $660.00 | Purchases/Debits | $239.45 |
| Days in Billing Cycle | 31 | Cash Advances | $0.00 |
| Statement Closing Date | 02/15/99 | Finance Charges | $0.00 |
| | | Other Charges | $0.00 |
| | | New Balance | $239.45 |

## TRANSACTIONS

| Tran Date | Post Date | Reference Number | Description | Amount |
|---|---|---|---|---|
| 01/15 | 01/16 | 24301030HEVEEHWGV | # LONDON FOG THE WEATHER MAYFIELD HGHT OH | 90.42 |
| 01/15 | 01/16 | 24326840G2DEFY5S9 | # BAVARIAN VILLAGE MAYFIELD HTS  OH | 50.29 |
| 01/15 | 01/16 | 24610430G062NL0A3 | # CHAMPS #4632 MAYFIELD HEIG OH | 26.74 |
| 01/20 | 01/20 | 24692160L0002WV04 | # MWI*ESSENTIALS     800-809-3795 CT | 72.00 |
| 01/25 | 01/25 | 74489200SSBZLAVD2 | PAYMENT*THANK YOU    LOUISVILLE  KY | 82.54CR |

## FINANCE CHARGES SUMMARY

| Rate Type | MONTHLY PERIODIC RATE* | CORRESPONDING ANNUAL PERCENTAGE RATE | FINANCE CHARGE | AVERAGE DAILY BALANCE |
|---|---|---|---|---|
| Current Purchases | 1.450% | 17.400% | $0.00 | $0.00 |
| Current Cash Advances | 1.608% | 19.300% | $0.00 | $0.00 |

BLENDED ANNUAL PERCENTAGE RATE:     19.30%
*THIS RATE MAY VARY

CUSTOMER SERVICE 1-800-622-3449
CUSTOMER SERVICE PO BOX 2349 KALAMAZOO MI 49003-2349
*Notice: See reverse side for important information on your account and its renewal.*

Page 1 of 1

# National City.



ONE NCC PKWY KA162B
KALAMAZOO, MI 49009-8002

## CLASSIC CARD SUMMARY

| New Balance | Minimum Payment | Due Date |
|---|---|---|
| 179.68 | 10.00 | 01/10/00 |

Account number

Amount Enclosed $   95.68

Address change? Place an "X" in the box below.
Print new address on back of statement.

PLEASE MAKE CHECK PAYABLE TO:

NATIONAL CITY          4245/2000
P.O. BOX 85440
LOUISVILLE, KY 40285-5440

BRANDY L RITT          54543
17120 MADISON AVE LOWR
LAKEWOOD OH 44107-3504

44892030102544820000179680000001000

---

# National City.

Account number
Credit Limit                          $900.00
Available Credit                      $720.00
Available for Cash Advance            $720.00
Days in Billing Cycle                 32
Statement Closing Date                12/14/99

Pat

## ACCOUNT SUMMARY

| | |
|---|---|
| Previous Balance | $224.71 |
| Payments/Credits | $224.71 |
| Purchases/Debits | $179.68 |
| Cash Advances | $0.00 |
| Finance Charges | $0.00 |
| Other Charges | $0.00 |
| New Balance | $179.68 |

## TRANSACTIONS

Tae Boe

| Tran Date | Post Date | Reference Number | Description | Amount |
|---|---|---|---|---|
| 1/16 | 11/16 | 2469216A000SYEEPZ | MWI*ESSENTIALS        800-313-3540 CT | 84.00 |
| 11/21 | 11/21 | 2479252A55SRV0FNH | FAMILY TOY #24 ROCKY RIVER  OH | 56.68 |
| 11/24 | 11/24 | 7448920AASBZL3TL4 | PAYMENT*THANK YOU      LOUISVILLE  KY | 224.71CR |
| 12/10 | 12/10 | 2424651AT610V13LB | FLAT IRON CAFE CLEVELAND  OH | 39.00 |

## FINANCE CHARGES SUMMARY

| TRANSACTION TYPE | DAILY PERIODIC RATE* | CORRESPONDING ANNUAL PERCENTAGE RATE | FINANCE CHARGE | AVERAGE DAILY BALANCE |
|---|---|---|---|---|
| Purchases | .04904% | 17.900% | $0.00 | $0.00 |
| Cash Advances | .05424% | 19.800% | $0.00 | $0.00 |

ANNUAL PERCENTAGE RATE:        19.80%
*THIS RATE MAY VARY

$ 72.00
$ 84.00

Slamming

CUSTOMER SERVICE Call: 1-800-622-3449 or Write to: PO BOX 2349 KALAMAZOO MI 49003-2349
Notice: See reverse side for important information on your account and its renewal.

5170  SYD 2      10          7          Page 1 of 1          4245  2000   9652 .0003  991214  O1ABS1704482  O1ABS170      54543

2

| STATE OF OHIO | ) | | IN THE COURT OF COMMON PLEAS |
|---|---|---|---|
| CUYAHOGA COUNTY | ) | ss. | CASE NO. 424237 |

| | |
|---|---|
| BRANDY RITT, et. al. | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| BILLY BLANKS, et. al. | ) |
| Defendants. | ) |

JOURNAL ENTRY AND OPINION

## Joseph D. Russo, J.:

This cause came on to be heard upon Plaintiffs' Motion for Class Certification and the memoranda in opposition filed by the Defendants, NCP Marketing Group Inc. ("NCP"), West Corporation ("West"), MemberWorks Incorporated ("MemberWorks"). Upon consideration of the briefs submitted by the parties and, as more fully explained below, this Court hereby denies Plaintiffs' motion for class certification.

I.    INTRODUCTION

A.  THE PARTIES

i.  The Plaintiffs

The Plaintiffs are individuals who allege that they incurred unauthorized credit/debit card charges for membership programs offered by MemberWorks. Of the twenty individuals who submitted declarations in support of Plaintiffs' motion for class certification, it appears that nine individuals incurred charges in connection with the purchase of the Tae-Bo videos; ten individuals incurred charges in connection with the purchase of other products; and one person

incurred charges for a MemberWorks program through a direct contact with a MemberWorks telemarketer. [1]

### ii.   The Defendants

West, doing business as West Telemarketing is a publicly traded company.   Its subsidiaries and affiliates service inbound, interactive and outbound telephone calls.   On average, West's affiliates receive or make millions of calls per day relating to thousands of different products and services.   Defendants NCP and MemberWorks are two of West's clients.

NCP advertises and markets Tae-Bo videotapes, which are made and sold by Billy Blanks, Billy Blanks World Karate Center, Inc. and BG Star Productions (collectively "Billy Blanks Enterprises"). [2]   NCP contracted with West to provide teleservices to NCP in connection with the direct response infomercial marketing of NCP's Tae-Bo videos.

MemberWorks markets memberships in various savings clubs in a broad range of consumer industries including fashion, fitness, entertainment, appear, home improvements, and financial services.   MemberWorks markets its membership programs using a variety of methods, which include direct mail, credit card statement inserts, the Internet, and outbound telemarketing. Consumers who enroll in MemberWorks programs through the Internet must complete an order form and provide credit card information.   Those who enroll through direct mail and statement inserts enroll by sending their completed order forms to either MemberWorks or its client. Finally, those consumers who enroll through telemarketing channels are offered the opportunity

---

[1] Although Plaintiffs' Third Amended Complaint alleges that they all incurred unauthorized charges as a result of ordering Tae-Bo videos, Plaintiffs' motion for class certification addresses a broader class of individuals who incurred charges for *any* savings program through MemberWorks' telemarketing channels as well as internet marketing efforts.
[2] The Court notes that NCP Marketing Group Inc. was not involved in the sale or distribution of products other than the Tae-Bo videotapes.

2

to enroll in a MemberWorks program during a telephone call related to the purchase of a product.

## B.   MEMBERWORKS PROGRAMS

The sale of MemberWorks programs through various marketing channels serves as the basis for Plaintiffs' action.  Plaintiffs allege that Billy Blanks Enterprises serves as the "bait" to lure consumers into enrolling in MemberWorks programs.[3]  The evidence in the record suggests that in the case of the Tae-Bo videotapes, the sale of a MemberWorks program proceeds as follows:

- West's telephone operators answer calls from consumers wishing to purchase the Tae-Bo videotapes.

- Working from a pre-approved script prepared by NCP, an operator records the caller's shipping information and debit/credit card information and forwards the information to NCP's fulfillment company for processing.

- After recording a caller's order for Tae-Bo videotapes, the operator, reading from a script prepared by MemberWorks and approved by NCP[4], then offers the caller a trial membership in a MemberWorks savings program.[5]

- At the conclusion of the trial period, those individuals who allegedly enrolled in the savings program incur debit/credit card charges for the membership fee.  Each year thereafter, MemberWorks charges an annual renewal fee, unless the customer cancels the membership.

---

[3] Although approximately nine of the declarations provided in support of Plaintiffs' Motion for Class Certification are from consumers who purchased the Tae-Bo videos, the remaining declarants purchased products sold by companies who have, to date, not been named in this lawsuit.

[4] Testimony in the record suggests that the scripts prepared by MemberWorks vary depending on the marketing method employed and the particular program sold.  Defendants further allege that the scripts do not address all of the questions, which may be asked by callers; therefore, they form only a portion of the conversation between an operator and the caller.

[5] This method of marketing is known as an "up-sell."

Plaintiffs contend, however, that often the script is not read, and MemberWorks memberships are never mentioned to the caller. Plaintiffs further allege that West submits credit/debit card information on a bi-weekly basis to MemberWorks, which then bills consumers for the annual self-renewing membership even though he/she did not authorize the charges.

Pursuant to a contract between MemberWorks and NCP, MemberWorks pays NCP a flat fee of approximately $20 for each customer who accepts the trial membership regardless of whether the customer retains the membership after the trial period. NCP also receives approximately $10 for each customer who renews his/her membership. Pursuant to a contract between NCP and West, NCP pays West based upon the total number of minutes West operators spend on the phone in connection with orders for Tae-Bo videos and including the time spent on MemberWorks "upsells."

MemberWorks claims that upon enrollment in the programs, it sends a membership kit to every member, which includes a membership guide, a membership card, and an agreement entitled, "Terms of Membership and Membership Agreement" ("Agreement"). The Agreement contains a mandatory arbitration clause, which provides that disputes between the customer and MemberWorks must be resolved by submission to arbitration in Fairfield County, State of Connecticut, according to then existing rules of the American Arbitration Association. The Agreement also contains a choice of law provision, which states that the Agreement and the terms of membership are governed by the laws of the State of Connecticut.

Plaintiffs allege, however, that they did not receive any notice of their enrollment in the MemberWorks program. Plaintiffs assert that, other than their credit card statement, they did not receive any invoice or record of the charges. Indeed, Plaintiffs contend that they "never [heard]

4

from any of the Defendants about any purported membership benefits; they do not receive newsletters, coupons, or *** any other notification or indicia of membership."

On November 29, 2000, Plaintiffs filed suit against defendants.   Plaintiffs' Third Amended Complaint set forth claims for violations of Ohio's Deceptive Trade Practices Act and Consumer Sales Practices Act, Fraud and Deceit, Negligent Misrepresentation, Breach of Contract, Unjust Enrichment, and Civil Conspiracy.   On July 23, 2001, Plaintiffs filed their motion for class certification.   In their motion, Plaintiffs seek certification of a plaintiff class composed of

> All persons in the United States (of such States as may be certified by the Court), who were charged unauthorized fees (or similar unauthorized charges) on their credit or debit card accounts in connection with enrollment in an MWI[6] membership program.[7]

## II.    REQUIREMENTS FOR CLASS CERTIFICATION

In reviewing Plaintiffs' motion for class certification, the Court must carefully apply the class action requirement and conduct a rigorous analysis into whether the requirements of Civil Rule 23 have been satisfied.  *Hamilton v. Ohio Savings Bank* (1998), 82 Ohio St.3d 67, 71.  To that end, the Court must make seven affirmative findings before a case may be certified as a class action:  (1) an identifiable class must exist and the definition of the class must be unambiguous; (2) the named representatives must be members of the class; (3) the class must be so numerous that joinder of all members is impracticable; (4) there must be questions of law or fact common to the class; (5) the claims or defense of the representative parties must be typical of the claims or defenses of the class; (6) the representative parties must fairly and adequately protect the

---

[6] MWI refers to MemberWorks Incorporated.

[7] The proposed class definition set forth in Plaintiffs' Third Amended Complaint differs from this definition as it includes "all persons in the United States (or such States as may be certified by the Court), who were charged unauthorized, undisclosed and otherwise unknown membership fees (or similar unauthorized charges) on their credit card or debit card accounts."  In as much as the parties briefed the class certification issue based upon the definition set forth in Plaintiffs' motion for class certification, the Court will not consider the definition contained in the Third Amended Complaint.

interest of the class; and (7) one of the three Civ. R. 23(B) requirements must be satisfied. *Warner v. Waste Management Inc.* (1988), 36 Ohio St.3d 91, 94-98. Failure to meet any one of these requirements will defeat a request for class certification. *Schmidt v. Avco Corp.* (1984), 15 Ohio St.3d 310, 313.

## A. A CLEARLY IDENTIFIABLE CLASS

Plaintiff must demonstrate the existence of a clearly identifiable class. This requirement "will not be deemed satisfied unless the description of [the class] is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Hamilton*, 82 Ohio St. 3d at 71-72. Consequently, the class definition must be precise enough to "permit identification within a reasonable effort." *Warner*, 36 Ohio St.3d at 96. "If a court must come to numerous conclusions regarding class membership or adjudicate the underlying issues on behalf of each class member, then a proper class cannot be defined concisely." *Edwards v. McCormick* (2000), 196 F.R.D. 487, 493. [8]

In the present case, Plaintiffs identified a proposed class consisting of all individuals who received unauthorized credit and/or debit card charges for purported MemberWorks membership programs.[9] Plaintiffs maintain that this definition is clear and unambiguous because the "Defendants either charged a person an unauthorized membership fee or they did not." *Plaintiffs' Motion* at p. 6. Plaintiffs further argue that the proposed class can be readily

---

[8] With the exception of Civ.R. 23(F), which is not at issue in this case, Ohio Civ. R. 23 is identical to Fed. Civ.R. 23; therefore, federal authority is an appropriate aid in interpreting of the Ohio rule. *See Marks v. C.P.Chem. Co.* (1987), 31 Ohio St.3d 200, 201.

[9] After three amendments to the original complaint, the filing of Plaintiffs' motion for class certification and defendants' opposition to same, Plaintiffs, in their reply, attempted to modify, with out prior leave of Court, the proposed class definition to read as follows: "Customers of NCP throughout the nation, who have been enrolled in and have been charged for an MWI membership program and who have never contacted MWI to use membership benefits." Thereafter, Defendants' moved to strike the definition in Plaintiffs' reply brief based upon an untimely assertion of a new class definition. Their motions were granted by this Court's December 12, 2001 Orders.

ascertained from Defendants' own corporate records "because [the Defendants] charge class members every year until they are caught ***." *Plaintiffs' Motion* at p. 6.

The Defendants, on the other hand, challenge Plaintiffs' proposed class definition on two fronts.   First, Defendant MemberWorks asserts that determining class membership is complicated by the existence of a mandatory arbitration provision in each of the MemberWorks membership agreements.  In addition, all of the Defendants assert that the proposed definition is framed as a legal conclusion.

Turning first to the arbitration provision in the MemberWorks membership agreement, MemberWorks contends that its membership agreements contain mandatory arbitration provisions, which bind members to arbitrate any claims they may have against MemberWorks. Consequently, MemberWorks argues, the Court must conduct an individual hearing to determine whether arbitration provision is binding with respect to each potential class member.

The Court agrees.  Ohio law favors arbitration as a "relatively expeditious and economical" dispute resolution mechanism. *Schaefer v. Allstate Ins. Co.* (1992), 63 Ohio St.3d 708, 711-712.  Indeed, Ohio Rev. Code § 2711.01(A) provides that an agreement to arbitrate controversies arising out of a contract "shall be valid, irrevocable, and enforceable, except upon grounds that exist at law or in equity for the revocation of any contract."

Whether a controversy is subject to arbitration is generally an issue determined by the trial court. *See Gibbons-Grable Co. v. Gilbane Bldg. Co.* (1986), 34 Ohio App.3d 170.  Because a party cannot be compelled to arbitrate a controversy it has not agreed to arbitrate, Ohio Courts have held that in accordance with the provisions set forth in Ohio Rev. Code § 2711.03, "a trial is contemplated 'when the making of the arbitration agreement or the failure to perform it is in issue.'" *North Coast Inn, Inc. v. Wright & Associates Inc.* (July 24, 1988), Erie County App. No.

7

E-97-134, 1998 Ohio App. LEXIS 3372, unreported at *10.[10]    *See also Poling v. American Suzuki Motor Corp.* (Sept. 13, 2001), Cuyahoga County App. No. 78577, unreported (holding that R.C. §2711.03 requires a court to conduct a hearing to determine if there is a legitimate challenge to an arbitration clause.)

In this case, Plaintiffs deny that they received the membership agreement. Thus, the Court must not only determine whether the potential class members agreed to the arbitration provision but it must also determine whether the arbitration provision is binding as to each proposed class member. Because the Plaintiffs' proposed class definition requires a separate hearing on the issue of the arbitration provision, the Court finds that Plaintiffs' proposed class is not clearly ascertainable and, therefore, fails to satisfy the first requirement for class certification.

Notwithstanding the difficulty of ascertaining class members due to the arbitration provision, the Court will address Defendants' challenge to Plaintiffs' proposed class. Specifically, Defendants assert that the proposed class definition assumes the credit/debit card charges received by Plaintiffs were unauthorized; therefore, the Court must either assume the liability of the defendants or determine the merits of the case.

In support of their position, Defendants rely on the U.S. District Court decision in *Foreman v. Data Transfer Inc.* (E.D. Pa. 1995), 164 F.R.D. 400. In *Foreman*, the plaintiff sued to enjoin Data Transfer from sending unsolicited advertisements by fax in violation of the

---

[10] Ohio Rev. Code § 2711.03 provides in pertinent part:

(A) The party aggrieved by the alleged failure of another to perform under a written agreement for arbitration may petition any court of common pleas having jurisdiction of the party so failing to perform for an order directing that the arbitration proceed in the manner provided for in the written agreement. *** The court shall hear the parties, and, upon being satisfied that the making of the agreement for arbitration or the failure to comply with the agreement is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the agreement.
(B) If the making of the arbitration agreement or the failure to perform it is in issue in a petition filed under division (A) of this section, the court shall proceed summarily to the trial of that issue. If no jury trial is demanded as provided in this division, the court shall hear and determine that issue. ***

8

Telephone Consumer Protection Act. 164 F.R.D. at 400. The plaintiff petitioned to certify a class consisting of "all residents and businesses who have received unsolicited facsimile advertisements***." *Id.* at 402. The court rejected the class definition holding that identifying those potential class members who received "unsolicited" facsimile advertisements required a determination of the central issue of liability in the case and doing so "would essentially require a mini-hearing on the merits of each case." *Id.* at 403.

The Court finds Defendants' arguments persuasive. As a general rule, a trial court may not consider the merits of a case at the class certification stage. In fact,

> [n]othing in either the language or history of Rule 23 *** gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action. Indeed, such a procedure contravenes the Rule by allowing a representative plaintiff to secure the benefits of a class action without first satisfying the requirements for it. [Plaintiff] is thereby allowed to obtain a determination on the merits of the claims advanced on behalf of the class without any assurance that a class action may be maintained.

*Eisen v. Carlisle & Jacquelin* (1974), 417 U.S. 156, 177-178.

Several courts have relied on this reasoning in rejecting class definitions with difficulties similar to the Plaintiffs' definition in this case. In *McGee v. East Ohio Gas* (S.D. Ohio 2001), 200 F.R.D. 382, for instance, plaintiffs sought class certification, for damages purposes, of a subclass of individuals whose accounts were consolidated because of their marital status. The Court the court denied certification on the grounds that determining membership in the subclass would "require intensive individual fact finding with respect to the causation of each putative class member's challenged consolidation." *McGee*, 200 F.R.D. at 392. Similarly, in *Bledsoe v. Sheriff Claude C. Combs* (S.D. Ind. March 14, 2000), Case No. 99-1530C H/G, 2000 U.S. Dist. LEXIS 7454, at *2, plaintiffs sought certification of a proposed class of individuals arrested for

9

minor offenses that were required to undergo strip searches "unless [there] existed reasonable cause to believe they were carrying a weapon." The court denied certification and held

> The problem with this proposed class definition is that the court could not determine whether any individual was a member of the class without hearing evidence on what would amount to the merits of each person's claim. Where that type of inquiry is needed to determine whether a person is a member of a class, the proposed class action is unmanageable virtually by definition.

*Bledsoe*, 2000 U.S. Dist. LEXIS 7434, at *11. *See also Hall v. Jack Walker Pontiac Toyota Inc.* (Dec. 1, 2000), Montgomery App. No. 18014, 2000 Ohio App. LEXIS 5660 at *17. ("Since each claim requires individualized proof and the trial court was in the best position to analyze the difficulties of proceeding as individual cases versus a class action, we see no evidence of an unreasonable, arbitrary, or unconscionable attitude."); *Intratex Gas Company v. Beeson* (Tex. 2000), 22 S.W.3d 398, 405 ("Certifying a fail-safe class inevitably creates one-sided results. If the defendant is found liable, class membership is then ascertainable and the litigation comes to an end. A determination that the defendant is not liable, however, obviates the class, thereby precluding the proposed class members from being bound by the judgment.")

Applying the foregoing reasoning to the facts in the present case, Plaintiffs' proposed class definition creates an unmanageable class as it requires the Court to conduct a mini-hearing on the evidence to determine whether each potential class member consented to the charges at issue. Thus, only <u>after</u> deciding the merits of each potential class member's case, will the Court be able to identify the class. Because such a procedure contravenes the very purpose of this requirement for class certification, the Court finds that Plaintiffs have not adequately identified the class.

Having found that Plaintiffs failed to satisfy the first requirement, this Court need not proceed to an analysis of the remaining requirements for class certification. *Edwards v.*

*McCormick* (S.D. Ohio 2000), 196 F.R.D. 487, 493. *Accord Warner v. Waste Management, Inc.* (1988) 36 Ohio St.3d 91, syllabus ("An identifiable class must exist before certification is permissible.") Therefore, based upon the foregoing, Plaintiffs' motion for class certification is denied.

*It is so ordered.*

_____2/6/02_____
Date

_____
JOSEPH D. RUSSO, Judge

11

3

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

BRANDY L. RITT, KATHLEEN
SOPPELSA and DENISE REEVES, On
Behalf of Themselves and All Others
Similarly Situated, and On Behalf of the
General Public,

        Plaintiffs,

vs.

BILLY BLANKS, et al.,

        Defendants.

Case No. 424237

CLASS ACTION

Judge Joseph D. Russo

## ORDER PRELIMINARILY APPROVING SETTLEMENT, CONDITIONALLY CERTIFYING SETTLEMENT CLASS AND PROVIDING FOR NOTICE AND SCHEDULING ORDER

Plaintiffs and West Corporation, West Telemarketing Corporation and West Telemarketing LP ("West") have entered into a Settlement Agreement which, if approved by this Court, will resolve the claims alleged in Fourth Amended Class Action Complaint against West and the remaining Co-Defendant, Memberworks, Inc. ("the Litigation"). Pursuant to Ohio Rule of Civil Procedure 23, the Parties have moved for an order preliminarily approving the proposed settlement of this action. The Stipulation of Settlement dated as of August 19, 2008 (the "Settlement Agreement"), together with the Exhibits annexed thereto, sets forth the terms and conditions of the proposed settlement of the Litigation, including the dismissal of the Litigation with prejudice and entry of Final Stipulated Judgment upon the terms and conditions set forth therein. The Court having read and considered the Settlement Agreement and the Exhibits annexed thereto, the Motion for Preliminary Approval and its supporting declarations and the Proposed Class Notice,[1]

**HEREBY ORDERS AS FOLLOWS:**

1.    The Court does hereby preliminarily approve the Settlement Agreement and the settlement set forth therein, subject to further consideration at the final settlement approval hearing ("Settlement Hearing") described below.

2.    The Settlement Hearing shall be held before this Court on December 11, 2008, at 10:00 A.m., or as soon thereafter as counsel may be heard, to determine whether the proposed settlement of the Litigation on the terms and conditions provided for in the Settlement Agreement is fair, reasonable and adequate as to the *Ritt* Class and should be approved by the Court; and whether the Final Stipulated Judgment and/or Order as provided in Sections 8 and 11 of the Settlement Agreement should be entered without material alteration; to determine whether the Releases as set forth in the Settlement Agreement should be provided to the Parties; and to rule on such other matters as the Court may deem appropriate.

---

[1]    All capitalized terms and phrases contained herein that are not otherwise defined herein, shall have the same meanings as set forth in the Settlement Agreement.

3.    Any Class Member may enter an appearance in the Litigation, at his or her expense, individually or through counsel of his or her choice.  Class Members who do not enter an appearance will be represented by Class Counsel.

### Certification of Amended Class

4.    Pursuant to Ohio Rule of Civil Procedure 23, and for purposes of the Settlement only, and contingent on the Settlement being finally approved at the Settlement Hearing, the Court grants the Parties' request to amend the Class Definition previously certified by the Court, as follows:

The class definition of the original class that this Court certified is hereby amended and is now defined as follows:

> All persons in Ohio, who, from September 1, 1998 through July 2, 2001: (a) called a toll-free number answered by West Corporation or West Telemarketing Corporation or West Telemarketing LP (collectively "West") to purchase any Tae-Bo product; (b) purchased a Tae-Bo product; (c) subsequently were enrolled in a MemberWorks ("MWI") membership program; and (d) were charged for the MWI membership on their credit/debit card.  Specifically excluded from the Class are:  (a) West and its officers, directors, employees, agents and/or affiliates; (b) individuals or persons who were never charged or billed (prebill cancelled) for a MWI program; (c) individuals or persons who received full refunds for a MWI program; and/or (d) individuals or persons who purchased an upsell or upsells where West was compensated on the basis of reading scripts or providing telemarketing call-answering services such as on a per call basis or without compensation based on the profits or income from the MWI upsell or upsell program.

### Settlement Administration

5.    The Court appoints Gilardi & Co., 3301 Kerner Boulevard, San Rafael, California 94901 (hereinafter the "Settlement Administrator") to administrate the Notice Plan and the claims process, in conjunction with the information provided by FTI Consulting regarding class membership and claim amounts.

6.    The Court appoints FTI Consulting to identify Class Members and to calculate the claim amounts that will be paid to the Class Members who timely submit fully and properly completed Claim Forms, and to supply this information to the Settlement Administrator for use in providing notice and administering the claims process as provided under the Settlement.

3

7.      All reasonable costs incurred in administering the Settlement and notifying Class Members shall be paid as set forth in Section 6.H of the Settlement Agreement.  In the event the Settlement is not finally approved by the Court, or is terminated pursuant to its terms, or otherwise fails to become effective as set forth in the Settlement Agreement, neither the Plaintiffs nor any of their counsel shall have any obligation to West for the costs of publishing the Notice of Settlement and claims administration as set forth in Section 6.H of the Settlement Agreement.

## Form and Manner of Notice to the Class Members

8.      The Court approves, as to form and content, the Mailed Notice, Publication Notice, Internet Notice and the Claim Form, which are all attached hereto as Exhibits A-F (the "Notice Plan").  The Court finds that these Notices satisfy Ohio Rule of Civil Procedure 23(E) as they properly:  explain the Settlement terms and the nature of the Litigation; explain the procedures for the Class Members to follow for filing a claim to share in the Settlement recovery; explain the procedures for the Class Members to follow should they wish to exclude themselves from this class action; inform the Class Members they will be bound by the Orders and/or Stipulated Judgment in the case if they do not request exclusion; explain the procedures for the Class Members to follow should they wish to comment favorably or object to the Settlement; inform the Class Members of the Date and Time of the Settlement Hearing; inform the Class Members they may enter an appearance through counsel; and inform the Class Members how they can obtain additional information about the Litigation and/or the Settlement.

9.      The Court approves the following plan for delivery of the Notice that was agreed to by the Parties, and finds that the Notice Plan ensures a reasonable chance of reaching a "substantial percentage" of the Class Members and to meet the requirements of Ohio Rule of Civ. Pro. 23(E). *McDonald v. Medical Mutual of Cleveland, Inc.* (1974), 41 Ohio Misc. 158, 32 N.E.2d 705.  *See* Declaration of Dennis A. Gilardi in Support of Proposed Notice Plan.

10.     The Court finds that mailing the Notice of Class Action Settlement (Exhibit A hereto) by first class mail to all members of the *Ritt* Class, in conjunction with the supplemental publication of the Summary Notice (Exhibit B hereto) in the manner set forth in Exhibit F hereto, and creation of the dedicated website in the manner set forth in Exhibit C hereto, ensures a reasonable chance of

reaching a substantial percentage of the members of the *Ritt* Class. *McDonald, supra.* *See* Declaration of Dennis A. Gilardi in Support of Proposed Notice Plan.

11.     The Court finds the Notice Plan complies in all material respects with Ohio Rule of Civil Procedure 23(E), and meets the requirements of due process, and is the best notice practicable under the circumstances and shall constitute due and sufficient Notice to all persons entitled thereto.

<u>**Timing of Notice**</u>

12.     Within forty-five (45) calendar days after entry of this Order, the Settlement Administrator shall mail, by first class mail, a copy of the Notice of Class Action Settlement (Exhibit A) to all members of the *Ritt* Class who have been identified as Class Members, an electronic copy of which will be lodged under seal with the Court in conjunction with the Motion for Final Approval of Class Action Settlement. At least fourteen (14) calendar days prior to the Settlement Hearing, Plaintiffs shall serve and file with the Court proof, by affidavit or declaration, of such mailing.

13.     Within forty-five (45) calendar days after entry of this Order, the Settlement Administrator shall submit the Summary Notice (Exhibit B) in the manner set forth in Exhibit F hereto, which have been deemed most likely to reach the Class Members as is reasonably practicable. At least fourteen (14) calendar days prior to the Settlement Hearing, Plaintiffs shall serve and file with the Court proof, by affidavit or declaration, of such publishing.

14.     Within forty-five (45) calendar days after entry of this Order, the Settlement Administrator shall implement the dedicated Notice Website (Exhibit C hereto), in the form and manner set forth in the Settlement Agreement at Section 6.E and Exhibit H thereto, which shall continue until the Settlement Hearing. At least fourteen (14) calendar days prior to the Settlement Hearing, Plaintiffs shall serve and file with the Court proof, by affidavit or declaration, of such implementation.

<u>**Procedure for Requesting Exclusion**</u>

15.     Any person falling within the definition of the Class who desires to request exclusion from the Class ("Request for Exclusion") shall do so as set forth in the Notice. That is, Class Members wishing to make such a request shall mail the Request for Exclusion in written form by first class mail to the address designated in the Notice, which must be postmarked no later than

November 20, 2008.  The Request for Exclusion must include all of the following:   (a) the case name and civil action number, (b) the person's name, address, and telephone number, and (c) that the person wishes to be excluded from the Class.  The Letter must also be signed by the Class Member. No group, representative, or class Requests for Exclusion will be permitted.  The Request for Exclusion shall not be valid or effective unless it provides the required information and is made within the time and manner stated above, or the exclusion is otherwise accepted by the Court.

16.     All Class Members shall be bound by all determinations, orders, and judgments in this action, whether favorable or unfavorable, unless such persons request exclusion from the Settlement in a timely and proper manner, as provided herein and as set forth in the Mailed Notice and Summary Notice.

17.     All Class Members who submit valid and timely Requests for Exclusion, in the manner set forth in this paragraph and in the Notice, shall not be entitled to receive any payment out of the Settlement Funds as described in the Settlement; shall not be bound by any further orders or judgments for or against the Class, and shall have no right to object to the Settlement or to be heard at any hearings scheduled for the Court's consideration of the Settlement.

## Objection to the Settlement

18.     Any Member of the Class may appear and show cause, if he, she or it has any, why the proposed Settlement of the Litigation should or should not be approved as fair, reasonable and adequate, or why a stipulated judgment should or should not be entered, by filing any comments or objections to the Settlement, including any supporting briefs with this Court on or before November 20, 2008, *and* serving all such papers on the Parties in accordance with the procedures set forth in the Notice documents to *each* of the following:

M. Jerome Elmore
Bondurant, Mixson & Elmore, LLP
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, Georgia  30309

Class Counsel (West Settlement)
Attn:  Chris Collins
655 West Broadway, suite 1900
San Diego, California  92101

19.     Any comment or objection must clearly indicate the civil action number of this case, the name, address and telephone number of the Class Member and must be signed by the Class Member or his or her attorney.

20.     Any Class Member who does not make his or her objection in the manner provided herein shall be deemed to have waived such objection and shall forever be foreclosed from making any objection to the fairness, justness, reasonableness or adequacy of the proposed Settlement, unless otherwise ordered by the Court. The filing of any objection shall not extend the time within which a Class Member must file a Request for Exclusion should they desire to exclude themselves from the Class.

21.     Attendance at the Settlement Hearing is not necessary; however, persons wishing to be heard orally in opposition to the approval of the Settlement are required to indicate in their written objection their intention to appear at the Settlement Hearing. Class Members need not appear at the Settlement Hearing or take any other action to indicate their approval of the Settlement.

### Claim Process

22.     Class Members who wish to participate in the Settlement shall complete and submit a Claim Form (Exhibits D and E hereto) in accordance with the instructions contained therein. Unless the Court orders otherwise, all Claim Forms must be postmarked no later than January 12, 2009. Any Class Member who does not submit a timely and properly and fully completed Claim Form shall be bound by the Settlement Agreement and Final Stipulated Judgment and barred from sharing in the distribution of the proceeds of the Settlement Fund, unless otherwise ordered by the Court.

### Responses to Objections

23.     Any Motion for Final Approval of the Settlement, responses to objections (if any) and/or papers supporting the Settlement shall be filed and served twenty (20) days prior to the Settlement Hearing.

24.     Plaintiffs' Motion for Attorneys' Fees and/or the payment of incentive fees to the class representatives in the amount set forth in Sections 10.A, 10.H and 10.L of the Settlement Agreement shall be filed and served twenty (20) days prior to the Settlement Hearing.

7

## Miscellaneous

25.   All proceedings in the Litigation are stayed until further order of the Court, except as may be necessary to implement the Settlement or comply with the terms of the Settlement Agreement. Pending final determination of whether the Settlement should be approved, all Class Members and each of them, and anyone who acts or purports to act on their behalf, shall not institute and are enjoined from: (a) filing, commencing, prosecuting, intervening in or participating as plaintiff, claimant or class member in any other lawsuit or administrative, regulatory, arbitration or other proceeding in any jurisdiction against West as those entities are defined in the Settlement, based on or relating to, or arising out of the claims and causes of action in the Fourth Amended Class Action Complaint or the Plaintiffs' Released Claims, as that term is defined in the Settlement Agreement ("the Released Claims"); (b) filing, commencing or prosecuting a lawsuit or administrative, regulatory, arbitration or other proceeding against West as those entities are defined in the Settlement Agreement as a class action on behalf of any Class Members who have not timely excluded themselves (including by seeking to amend a pending complaint to include class allegations or seeking class certification in a pending action) based on, relating to, or arising out of the claims and causes of action in the Fourth Amended Class Action Complaint or the Plaintiffs' Released Claims; and (c) attempting to effect an opt out of a class of individuals in any lawsuit or administrative, regulatory, arbitration or other proceeding against West, as those entities are defined in the Settlement based on, relating to or arising out of the claims and causes of action in the Fourth Amended Class Action Complaint or the Plaintiffs' Released Claims.

26.   Nothing in this Order, the Settlement, the fact of the settlement, the settlement proceedings, the settlement negotiations or any related document shall be used as an admission of any act or omission by West or be offered or received in evidence as an admission, concession, presumption or inference of any wrongdoing by West in any proceeding. This Order, the Settlement, the fact of settlement, the settlement proceedings, the settlement negotiations and any related documents may, however, be used as set forth in Section 13.E of the Settlement Agreement and thus, in such proceedings as may be necessary to consummate or enforce the Settlement Agreement.

27.     In the event that:  (a) the proposed Settlement is not finally approved by the Court or entry of a Final Stipulated Order and/or Judgment dismissing and terminating this action as provided in the Settlement does not occur, or (b) the Court in the case, *Patricia Sanford et al. v. MemberWorks, Inc. West Corporation and West Telemarketing Corporation*, pending in the United States District Court, S.D. California, Civil Action No. CV-02-00601-LAB, does not grant leave to Amend the Complaint as described in the Settlement Agreement (or requires Settlement approval and does not grant such approval), or (c) the Settlement is Terminated pursuant to the terms of the Settlement Agreement, or (d) the proposed Settlement is not approved by the Court or entry of a Final Stipulated Judgment and/or Order dismissing and terminating action as provided in the Settlement does not occur in the case styled, *Brandy L. Ritt et al v. Billy Blanks et al.*, Case No. 424237, pending in the Court of Common Pleas in Cuyahoga County, Ohio ("the *Ritt* case"), all drafts, negotiations, discussions and documentation relating to the Settlement and all Orders entered by the Court in connection therewith (including the Order amending the class definition of the Original *Sanford* Class and certifying the Nationwide Settlement Subclass), shall become null and void, and shall not be offered or received in evidence or used or referred to for any purpose, in this Action or in any other proceeding.  In such event, as is provided for in the Settlement Agreement, the affected Settlement and all negotiations and proceedings relating thereto shall be withdrawn without prejudice to the rights of any of the Parties thereto, who shall be restored to their respective positions as they existed on January 4, 2008, including the return of all payments made by West into the Escrow Account or Trust Account.  In such case, Plaintiffs shall be free to pursue any claims available to them, and West shall be free to assert any claims or defenses available to them, including but not limited to, denying the suitability of this case for class treatment.

28.     In the event the Settlement is terminated for any permissible reason allowed under the Settlement Agreement, neither the Settlement, nor the settlement negotiations, shall operate in any way to create any additional claims, or negate any available substantive or procedural defenses, relating to Plaintiffs' Released Claims and West's Released Claims (as defined in the Settlement Agreement) that existed as of January 4, 2008.

9

29.     The Court reserves the right to continue the date of the Settlement Hearing without further notice to the Class Members, and retains jurisdiction to consider all further applications arising out of or connected with the proposed Settlement, and to enforce the terms of the Final Stipulated Judgment and/or Order. The Court may approve the Settlement, with such modifications as may be agreed to by the Parties to the Settlement, if appropriate, without further Notice to the Class.

30.     If the Settlement is finally approved at the Settlement Hearing, the Court shall enter a Final Stipulated Order and/or Judgment dismissing this case with prejudice and terminating this Litigation in a form that is attached to the Settlement Agreement as Exhibit I, and incorporating it as the Final Stipulated Order and/or Judgment of the Court, which shall be binding on all Class Members who have not previously made a Request for Exclusion in accordance with this Order and the terms of the Settlement.

31.     The Court finds that nothing in the Settlement Agreement, the fact of the Settlement, this Order or any other Orders and/or Judgments entered into as part of or as a result of the Settlement Agreement causes any claims of the Nationwide Settlement Subclass (as defined in the Settlement Agreement) to relate back to the filing of the original Complaint or any amended Complaint in this action or to the filing of the Complaint or any amended complaint in the *Sanford* federal case, nor causes any claim of the Nationwide Settlement Subclass to be time-barred that was not already time-barred. Thus, any claim by any member of the Nationwide Settlement Subclass that would have been barred by the applicable statute of limitations as of the date of this preliminary or conditional certification of the Nationwide Settlement Subclass remains time-barred, and is permitted for purposes of this Settlement solely because West has elected, for purposes of this Settlement only, to not assert that bar as to those Subclass members who do not opt out of the Settlement. In the event the Settlement is not effectuated for any reason, the Court finds that the claims of the Nationwide Settlement Subclass will revert to the position in which they existed on the date of preliminary or conditional certification of the Nationwide Settlement Subclass, and that any claims that were time-barred on that date, if any, will remain time-barred, regardless of West's not asserting the statute of limitations issue solely for the purposes of Settlement as to those Subclass

members who do not opt out of the Settlement.  Any claim that was not time-barred, if any, will remain unaffected by this Settlement.

IT IS SO ORDERED this ~~8th~~ day of ~~July~~ September , 2008

The Honorable Joseph D. Russo

EILEEN A. GALLAGHER
ACTING ADMINISTRATIVE JUDGE

Submitted by:

M. Jerome Elmore
Bondurant, Mixson & Elmore, LLP
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, Georgia  30309
(404) 881-4100

Jack Landskroner
Landskroner · Grieco · Madden, Ltd.
1360 West 9th Street, Suite 200
Cleveland, Ohio 44113
(216) 522-9000

Frank J. Janecek, Jr.
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway, Suite 1900
San Diego, California  92101
(619) 231-1058

RECEIVED FOR FILING

SEP 0 8 2008

GERALD E. FUERST, CLERK
By _____ Deputy

THE STATE OF OHIO
Cuyahoga County
SS.
I, GERALD E. FUERST, CLERK OF
THE COURT OF COMMON PLEAS
WITHIN AND FOR SAID COUNTY
HEREBY CERTIFY THAT THE ABOVE AND FOREGOING IS TRULY
TAKEN AND COPIED FROM THE ORIGINAL _____
NOW ON FILE IN MY OFFICE.
WITNESS MY HAND AND SEAL OF SAID COURT THIS
DAY OF _____ A.D. 20___
GERALD E. FUERST, Clerk
By _____ Deputy

11

4

55000496

# IN THE COURT OF COMMON PLEAS
## CUYAHOGA COUNTY, OHIO

BRANDY L RITT ON BEHALF OF HERSELF AND
ALL OTHERS
     Plaintiff

Case No: CV-00-424237

Judge: JOSEPH D RUSSO

BILLY BLANKS ENTERPRISES DBA TAE BO ET AL
     Defendant



## JOURNAL ENTRY

89 DIS. W/ PREJ - FINAL

FINAL STIPULATED JUDGMENT TERMINATING ACTION. OSJ.
COURT COST ASSESSED AS DIRECTED.

OSJ

_____
Judge Signature            Date

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| BRANDY L. RITT, et al., | ) | **CASE NO. CV424237** |
| | ) | |
| Plaintiffs, | ) | **JUDGE JOSEPH D. RUSSO** |
| | ) | |
| v. | ) | **ORDER FINALLY** |
| | ) | **APPROVING THE SETTLEMENT** |
| BILLY BLANKS, et al., | ) | **AGREEMENT AND DIRECTING** |
| | ) | **ENTRY OF THE FINAL** |
| Defendants. | ) | **STIPULATED JUDGMENT** |
| | ) | **TERMINATING THIS ACTION** |

The matter came before the Court for hearing pursuant to the Order of this Court dated
December 11, 2008, on the motion of the Parties for final approval of the settlement set forth in
the Settlement Agreement dated August 19, 2008 (the "Settlement"), which is attached to the
motion as Exhibit 1A. Due and adequate notice complying with all of the requirements of due
process having been given to the Class as required in said Order, and the Court having
considered the moving and supporting papers, any objections and comments timely received
regarding the Settlement, the record in this case, and the arguments and authorities of counsel
and otherwise being fully informed in the premises and good cause appearing therefore,

**IT IS HEREBY ORDERED AND ADJUDGED:**

1.      This Final Approval Order and the Final Stipulated Judgment, which I have or
shortly hereafter will enter, specifically incorporate by reference all the terms of the Settlement
(with exhibits) and all the definitions and terms used in the Settlement.

2.      The Court has jurisdiction over the subject matter of this action, Plaintiff, the
Class, and Defendants West Corporation and West Telemarketing Corporation (hereinafter
referred to as "West").  This Court is a proper and convenient venue for the adjudication of the

161435

claims made in this action, and for the consideration, approval, and administration of the settlement of the Litigation.

3.     Pursuant to Ohio Rule of Civil Procedure 23, the Court previously certified an Original *Ritt* Class that was amended and provisionally certified in the Preliminary Approval Order, which class as amended in the Preliminary Approval Order is hereby finally approved: All residents of Ohio who, from September 1, 1998 through July 2, 2001, (a) called a toll-free number answered by West Corporation or West Telemarketing Corporation or West Telemarketing LP (collectively "West") to purchase any Tae-Bo product; (b) purchased a Tae-Bo product; (c) subsequently were enrolled in a MemberWorks ("MWI") membership program; and (d) were charged for the MWI membership on their credit/debit card.  Specifically excluded from the Class are (a) West and its officers, directors, employees, agents and/or affiliates; (b) individuals or persons who were never charged or billed (prebill cancelled) for a MWI program; (c) individuals or persons who received full refunds for a MWI program; and/or (d)  individuals or persons who purchased an upsell or upsells where West was compensated on the basis of reading scripts or providing telemarketing call answering services such as on a per call basis or without compensation based on the profits or income from the MWI upsell or upsell program (hereinafter the "*Ritt* Class" or "Class Members").  The members of the *Ritt* Class are identified in Exhibit A to the Markham Sherwood Declaration submitted under seal in conjunction with the parties' motion for class action settlement.

4.     The form and method of Notice given by the Parties in accordance with the Settlement constitutes the best notice practicable under the circumstances, complies with the requirements of due process, and constitutes valid and sufficient notice to all Members of the *Ritt* Class pursuant to Ohio Rule of Civil Procedure 23.

161435

5.      The terms of the Settlement (including exhibits) are fair, reasonable, adequate and in the best interests of the *Ritt* Class and all of the terms of the Settlement, which are specifically incorporated herein by reference (including exhibits), shall be carried out in accordance with the terms of the Settlement and are binding on all Class Members who did not validly and properly exclude themselves.

6.      Upon the Effective Date, Plaintiffs and each and every Class Member are deemed to have fully, finally and forever released, relinquished and discharged West of liability from any and all of Plaintiffs' Released Claims.

7.      Upon the Effective Date, West is deemed to have fully, finally and forever released, relinquished and discharged Plaintiffs of liability from any and all of West's Released Claims.

8.      Upon the Effective Date, Plaintiff and each and every Class Member are hereby permanently and forever barred and enjoined from instituting, asserting, commencing, prosecuting or continuing to prosecute, the Plaintiffs' Released Claims in any forum.

9.      Except as to any individual claim of those persons (identified in Exhibit A attached hereto) who have validly and timely requested exclusion from the *Ritt* Class, the Litigation and all claims contained therein against all Defendants, as well as all of the Released Claims are dismissed with prejudice and Final Judgment shall be entered as to West without further costs to West as provided in the Settlement Agreement. The Parties are to bear their own costs, except as otherwise provided in the Settlement Agreement.

10.     The Settlement payments to the Class as provided in the Settlement at Sections 3-5 and the attorneys' fees portion of the Settlement as set forth in Section 10 of the Settlement and the incentive payments to the named Plaintiffs as set forth in Section 10.L are all approved and

shall be made in accordance with the terms, conditions and deadlines contained therein. Accordingly, West shall pay the sum of $5,823,239.27 ($5,400,832.00 in fees and $422,407.27 in expenses) to Class counsel and the sum of $5,000 to each of the following named Plaintiffs in this case: Brandy Ritt, Kathleen Soppelsa and Denise Reeves.

11.     This Final Approval Order, the Settlement, any act performed or document executed pursuant to or in furtherance of the Settlement, and the fact of the Settlement are not and may not be deemed to be and may not be used as: (a) an admission of or evidence of the truth of any fact alleged or the validity of any claim alleged in the Litigation against West or any other Released Persons; or (b) an admission of or evidence of any wrongdoing, fault, omission, or liability of West and any Released Person in any proceeding in any court, administrative agency or other tribunal (whether judicial or administrative). However, nothing in this paragraph shall preclude any Party hereto from using the Settlement, this Final Approval Order or the Final Stipulated Judgment, or any act performed or document executed pursuant thereto in evidence: (i) in a proceeding to consummate, monitor or enforce the Settlement and the terms thereof and the Final Stipulated Judgment; or (ii) in a proceeding brought by or against any of the Parties in order to support a defense or counterclaim based upon principles of *res judicata*, collateral estoppel, release, waiver, good faith settlement, judgment bar or reduction, or any other theory of claim or issue preclusion or similar defense or counterclaim, or (iii) in West's sole discretion to use in support of any indemnity, contribution or similar claim that it may assert against any other entity.

12.     In the event that this Final Approval Order or the Final Stipulated Judgment do not become Final, or the Settlement does not become effective, or the Effective Date does not occur or other parts of the Settlement are not carried out or are invalid for any reason, or the

Settlement is otherwise terminated in accordance with its provisions, the Parties hereto shall be restored to their respective positions as of January 4, 2008, and this Order and the Final Stipulated Judgment (except this paragraph and the Court's retention of jurisdiction set forth in the Final Stipulated Judgment) shall have no further force or effect, shall be vacated and be rendered null and void *nunc pro tunc* as if the Settlement had not been entered or filed with the Court. The terms and provisions of this Order and the Final Stipulated Judgment (except this paragraph) and the Settlement shall at that time have no further force or effect with respect to the Parties and shall not be used in any action or proceeding for any purpose, except as required by law or by the Settlement and any funds put into Escrow or Trust account according to the Settlement shall be returned to West.

13.    Without in any way affecting the finality of this Order and the Final Stipulated Judgment, this Court shall have exclusive and continuing jurisdiction over the Parties hereto to implement, effect, interpret, administer, monitor and enforce this Order and the Final Stipulated Judgment and all  provisions thereof with respect to all Parties hereto and all beneficiaries hereof, including Plaintiff, Class Members, Class Counsel and the Released Persons. Any and all disputes, requests or petitions regarding or arising out of the enforcement, construction, administration or interpretation of the Judgment or Stipulation must be made, if at all, to this Court. To the extent that the terms of the Settlement are not carried out, do not become effective or are invalid for any reason, including that the Effective Date does not occur, this Court's retention of jurisdiction will allow it to vacate this Order and any other related Orders and/or Judgments so that the Parties can be put into their respective positions as contemplated by the express terms of the Settlement.

161435

14. Plaintiffs and West have consented to the entry of this Final Approval Order and the entry of the Final Stipulated Judgment as set forth in the Settlement, without trial or adjudication of any issue of fact or law.

15. This Order Finally approves the Settlement, dismisses this action with prejudice against all Defendants, and directs entry of the Final Stipulated Judgment.

16. Notice of this Final Approval Order and of the Final Stipulated Judgment shall be given by posting these documents on the Dedicated Website until January 12, 2009.

Pursuant to Ohio Rule of Civil Procedure 41, the Court determines that there is no just reason for delay, this case is dismissed with prejudice, and expressly directs the entry of the final stipulated judgment terminating this action, as set forth in more detail in the Settlement Agreement and in the form presented by agreement of counsel and attached to the motion for final approval as Exhibit 1A.

IT IS SO ORDERED.

DATED: ___12/11/08___                    _____

THE HONORABLE JOSEPH D. RUSSO

RECEIVED FOR FILING

DEC 1 1 2008

GERALD E. FOERST, CLERK
By _____ Deputy

161435

# **EXHIBIT A**

## Final Opt Out List for the *Ritt* Class

Exhibit C - Ritt Exclusion Report

**Gilardi**
&Co LLC

11/19/2008

| | |
|---|---|
| Ritt Filing Deadline: | 1/12/2009 |
| Ritt Opt out Deadline: | 11/20/2008 |
| Ritt Objection Deadline: | 11/20/2008 |

| ClaimID | FirstName | LastName | City | State |
|---|---|---|---|---|
| WEST1-2001521 | CAROL | BIXEL | BLUFFTON | OH |
| WEST1-2004983 | MARY | DOUGHERTY | CINCINNATI | OH |
| WEST1-2011113 | KIMBERLY | LEWIS | WILLOWICK | OH |
| WEST1-2011587 | KAY | MAGUIRE | OAK HARBOR | OH |
| WEST1-2020113 | ROSE ANN | WEBB | PAINESVILLEOH | RITT |

Total Exclusions Received as of November 19, 2008: 5



55000441

# IN THE COURT OF COMMON PLEAS
# CUYAHOGA COUNTY, OHIO

BRANDY L RITT ON BEHALF OF HERSELF AND
ALL OTHERS
       Plaintiff

Case No: CV-00-424237

Judge: JOSEPH D RUSSO

BILLY BLANKS ENTERPRISES DBA TAE BO ET AL
       Defendant

## **JOURNAL ENTRY**

ORDER FINALLY APPROVING THE SETTLEMENT AGREEMENT AND DIRECTING ENTRY OF THE FINAL
STIPULATED JUDGMENT TERMINATING THIS ACTION. OSJ.

OSJ

Judge Signature         Date

12/11/2008

Page 1 of 1

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | |
|---|---|
| **BRANDY L. RITT, et al.,** ) | **CASE NO. CV424237** |
| ) | |
| Plaintiffs, ) | **JUDGE JOSEPH D. RUSSO** |
| ) | |
| v. ) | **FINAL STIPULATED JUDGMENT** |
| ) | **TERMINATING ACTION** |
| **BILLY BLANKS, et al.,** ) | |
| ) | |
| Defendants. ) | |
| ) | |

Having given Final Approval to the Settlement Agreement[1] between Plaintiffs and West in an Order entered on 12/11 , 2008, the Court hereby enters this Final Stipulated Judgment incorporating by reference the terms of the Final Approval Order and the Settlement Agreement, including without limitation the full, final and irrevocable release and discharge of West from any and all Plaintiffs' Released Claims, and of Plaintiffs from any and all of West's Released Claims, and terminates this action with prejudice against all Defendants.

Except as expressly and specifically provided in the Settlement Agreement, West shall have no liability for any damages, costs, fees or otherwise, including without limitation, claims for interest (pre or post judgment), penalties, costs and attorneys' fees. Plaintiffs and West have consented to entry of this Final Stipulated Judgment without trial or adjudication of any issue of fact and law.

This shall constitute a full and final judgment as to West of all of the Plaintiffs' Released Claims, precluding Plaintiffs and any and all *Ritt* Class Members who have not timely and validly excluded themselves from the Settlement from subsequently asserting any of Plaintiffs'

---

[1]    All capitalized terms used in this Final Stipulated Judgment shall have the same definition and meaning as those used and defined in the Settlement Agreement, which is attached to Plaintiffs' Motion for Final Approval as Exhibit A.

161438

Released Claims against West. This shall also constitute a full and final judgment as to Plaintiffs of all of West's Released Claims, precluding West from asserting any of West's Released Claims against Plaintiffs.

Without affecting the finality of this Judgment, the Court hereby retains exclusive and continuing jurisdiction over the Parties to implement, effect, interpret, administer, monitor and enforce this Final Stipulated Judgment and all provisions thereof. Any disputes, requests or petitions regarding or arising out of the enforcement, construction, administration or interpretation of this Final Stipulated Judgment must be made to this Court.

The Court determines that there is no just reason for delay and expressly directs the entry of final judgment in accordance with Ohio Rule of Civil Procedure 41. This case is therefore terminated and dismissed with prejudice. Notice of this Judgment will be given as set forth in the Final Approval Order.

So entered this ___ day of December, 2008.

The Honorable Joseph D. Russo

RECEIVED FOR FILING

DEC 1 1 2008

GERALD E. FUERST, CLERK
By _____ Deputy

161438

5

1  COUGHLIN STOIA GELLER
     RUDMAN & ROBBINS LLP
2  PATRICK J. COUGHLIN (111070)
   FRANK J. JANECEK, JR. (156306)
3  CHRISTOPHER COLLINS (189093)
   CHRISTIE SURIEL (228036)
4  655 West Broadway, Suite 1900
   San Diego, CA  92101
5  Telephone:  619/231-1058
   619/231-7423 (fax)
6

7  LANDSKRONER • GRIECO
     • MADDEN, LTD.
8  JACK LANDSKRONER
   1360 West 9th Street, Suite 200
9  Cleveland, OH  44113
   Telephone:  216/522-9000
   216/522-9007 (fax)
10

11 LAW OFFICES OF ARTIE BARAN, APC
   ARTIE BARAN (159259)
12 4545 Murphy Canyon Road, Suite 300
   San Diego, CA  92123
13 Telephone:  858/560-5600
   858/836-0318 (fax)

14 Attorneys for Plaintiff

15                  UNITED STATES DISTRICT COURT

16                SOUTHERN DISTRICT OF CALIFORNIA

17

18 PHYLLIS CALLAHAN, On Behalf of Herself )   Case No. 09-CV-0236-BEN(POR)
   and All Others Similarly Situated in the State )
   of California,                               )   CLASS ACTION
19                                              )
                                                )
20              Plaintiff,                      )   FIRST AMENDED COMPLAINT FOR:
                                                )   (1) VIOLATION OF CONSUMERS LEGAL
21        vs.                                   )   REMEDIES ACT; (2) UNLAWFUL,
                                                )   FRAUDULENT AND UNFAIR BUSINESS
22 VERTRUE INCORPORATED, previously             )   PRACTICES; (3) UNTRUE AND/OR
   known as MEMBERWORKS,                         )   MISLEADING ADVERTISING;
23 INCORPORATED, ADAPTIVE                        )   (4) CONVERSION; (5) UNJUST
   MARKETING LLC, and DOES 1 through 50,         )   ENRICHMENT; (6) FRAUD AND DECEIT;
24                                              )   AND (7) NEGLIGENT
                Defendants.                     )   MISREPRESENTATION
25 _____ )

26

27

28

1    Now come Phyllis Callahan ("Plaintiff") on behalf of herself and all others similarly situated,

2    by and through counsel, and for her complaint states the following:

3    **SUMMARY OF COMPLAINT**

4    1.    Defendant MemberWorks, Incorporated,[1] also known as MWI Essentials, MWI

5    Leisure Advantage, MWI Home & Garden, MWI Connections, MWI Value Max and other MWI

6    entities, which subsequently changed its name to Vertrue Incorporated (collectively, "MWI"),[2] in

7    conjunction with its co-conspirators, the telemarketing entities (collectively, the "Telemarketers" or

8    "Telemarketing Entities")[3] and the bait product suppliers ("Bait Product Suppliers") have been

9    engaged in the practice of making unlawful charges to consumers' credit and/or debit cards through

10   a scheme involving the mailing of an unordered membership program marketed through the use of a

---

11

12   [1]    MemberWorks, Incorporated, with Adaptive Marketing LLC and Doe defendants 1 through 50 are referred to herein as "Defendants."

13   [2]    As used in this Amended Complaint, the term "Defendants" does not refer to West

14   Corporation, and/or West Telemarketing Corporation and/or West Telemarketing, L.P., and their predecessors, successors, present and former owners, subsidiaries, affiliates, employees, officers,

15   directors, agents, attorneys and assigns, including West Direct, Inc. and West TeleServices Corporation (collectively, "West").  Therefore, any reference to acts or omissions by "Defendants"

16   does not include or refer to the West entities.  Further, the claims for relief in this Amended Complaint do not arise from  actions or omissions under the following agreements: the March 16,

17   1998 "Joint Marketing Agreement between West Telemarketing Corporation and MemberWorks Incorporated," and/or the January 1, 1999 "Agreement" between West Telemarketing Corporation

18   and MemberWorks Incorporated, and/or the July 1, 1999 "Joint and Wholesale Marketing Agreement" between West Telemarketing Corporation, West Teleservices Corporation and

19   MemberWorks Incorporated and/or the December 1, 2001 "Wholesale and Retail Marketing Agreement" between MemberWorks Incorporated and West Direct, Inc., and any amendments or

20   addendums to these agreements.  Thus, by way of example (but without limitation), any acts or omissions that include, relate to or were part of an upsell to a Tae-Bo product that occurred under or

21   as part of one of the agreements listed in this footnote 2, are not included in the claims and allegations of this Amended Complaint.

22   [3]    As used in this Amended Complaint, the terms "Telemarketers" and "Telemarketing

23   Entities" and the allegations of this Amended Complaint referring to acts or omissions of the "Telemarketing Entities" and "Telemarketers" do not include or refer to the actions or omissions of

24   West Corporation and/or West Telemarketing Corporation under the March 16, 1998 "Joint Marketing Agreement between West Telemarketing Corporation and MemberWorks Incorporated,"

25   and/or the January 1, 1999 "Agreement" between West Telemarketing Corporation and MemberWorks Incorporated, and/or the July 1, 1999 "Joint and Wholesale Marketing Agreement"

26   between West Telemarketing Corporation, West Teleservices Corporation and MemberWorks Incorporated and/or the December 1, 2001 Wholesale and Retail Marketing Agreement between

27   MemberWorks Incorporated and West Direct, Inc., and any amendments or addendums to these agreements.

28

1   deceptive script.  Defendants obtain the necessary information to mail their unwanted membership

2   (and charge for it) through the use of a telemarketing scam.  By this method, Defendants are able to

3   accomplish the old and pernicious practice of mailing unsolicited merchandise and then tricking

4   consumers into paying for it.

5        2.      MWI, in concert with the Telemarketers and the Bait Product Suppliers, through

6   agreements with MWI, capture consumers' credit and/or debit card information when those

7   consumers call to order products – products which are *not* marketed or produced by MWI.  This is

8   referred to as an "inbound" telemarketing call, as the consumer initiates the call.  The consumer has

9   initiated the call to inquire about or purchase a product usually advertised with a 1-800 number.  The

10  consumer *does not call* to order an MWI product.  In fact, the consumer has most likely never heard

11  of MWI and has no expectation of receiving an MWI membership program when the call is made by

12  the consumer.  However, the consumer gives his/her credit and/or debit card information which

13  Defendants capture long before the consumer ever hears of any MWI product. This private financial

14  information is then used by Defendants to charge the consumer for a membership the consumer

15  never wanted or agreed to purchase.

16       3.      MWI has reached agreements with a number of Telemarketing Entities, whereby the

17  consumer is subjected to a deceptive sales pitch to purchase an MWI membership program before

18  the call made by the consumer to purchase an unrelated product is completed.  This is referred to as

19  an "unrelated upsell."  MWI's products are not related to the product sought by the consumer and the

20  consumer has no idea that an MWI product will be made a part of the call – or even what an MWI

21  product is.

22       4.      MWI prepares a script for the Telemarketers to use for the unrelated upsell.  As more

23  specifically alleged below, MWI pays the Telemarketers and the Bait Product Suppliers a fee for

24  each consumer who they enroll in MWI's membership programs.   Some number of MWI

25  membership programs are sold through a joint venture and wholesale arrangement between MWI

26  and the Telemarketers, where MWI and the Telemarketers jointly pay a separate fee to the Bait

27  Product Suppliers for each of their customers enrolled in an MWI program. The Telemarketers, who

28  handle the inbound calls, approve the scripts, read the scripts to the consumers, capture the

1  consumers' credit and/or debit card information and transmit that information to MWI to mail the

2  "kits" and bill the consumers' cards.

3      5.      After the consumers have given the information necessary to purchase the product the

4  consumers called to buy, a deceptive script is read to the consumers informing them that they will be

5  sent *free* materials in the mail.   Consent to receive the materials in the mail is not requested.

6  Consent to bill the credit and/or debit cards is not requested.   In actuality, Defendants enroll

7  consumers in a membership and mail them a membership "kit."  Consumers are deceived and do not

8  know that they have been enrolled in a "membership" and will be charged $60-$170 annually unless

9  they call MWI to inform them that they want to cancel the FREE 30-day trial membership.  MWI

10  mails a packet with a membership card to the consumers which allows the consumers to access the

11  so-called benefits of an MWI membership.   This membership, for which consumers are charged

12  unless they affirmatively ask to cancel and return the membership card, is unordered merchandise

13  and must therefore be free to the consumers under the federal statute governing such practices.  By

14  enrolling consumers who called to order an unrelated product and mailing those consumers a

15  membership kit without the prior express consent of the consumers, consumers are unwittingly

16  charged by Defendants for a membership they neither requested nor intended to purchase.

17      6.      Despite the fact that the consumers are never asked their permission for the

18  Telemarketers to provide their credit and/or debit card information to defendant MWI, the class

19  members' confidential credit and/or debit card information is given to defendant MWI, who uses the

20  information to charge consumers membership fees and membership renewal fees which range from

21  $60-$170 annually.    Although defendant MWI processes the charges, neither it nor the

22  Telemarketing Entities send the consumers any bill or invoice notifying them that their credit and/or

23  debit cards have been assessed such a charge.

24      7.      In order to conceal its scheme, defendant MWI will reverse the charges for those

25  consumers who notice that they have been assessed a charge on their credit and/or debit card

26  statements who call to question the charge and get through Defendants' multifarious system of

27  avoiding cancellations.  However, as Defendants know, a significant percentage of the population

28  does not closely review their credit and/or debit card statements, and will not notice the offending

1  charge (as was the case with plaintiff Patricia Sanford ("Sanford") in the federal action, *Sanford, et*

2  *al. v. MemberWorks, Inc., et al.*, No. 02-CV-0601 (S.D. Cal.) ("*Sanford* Federal Class Action"),[4]

3  who did not realize she had been assessed such a charge until the ***second*** time it appeared on her

4  credit card statement). These individuals are charged between $60-$170, each year, until they notice

5  the charge and complain. ***Defendants never send any bill or invoice to the class members notifying***

6  ***them that they have been, or will be, charged.*** The named Plaintiff and class members in this action

7  were all victimized by Defendants by this same exact method.

8       8.      Defendants share in the revenues and profits generated from their deceptive scheme

9  of mailing unordered merchandise and then charging consumers for it.

10                        **JURISDICTION AND VENUE**

11       9.      This Court has jurisdiction over all claims under 28 U.S.C. §1332(d). Jurisdiction is

12  proper because: (1) the aggregated claims of the individual members of the proposed class exceed

13  the sum or value of $5,000,000; and (2) this is a class action in which Plaintiff and Defendants are

14  citizens of different states. 28 U.S.C. §1332(d)(2).

15       10.     This Court has jurisdiction over each defendant described below because each

16  defendant is either a corporation or association organized under the laws of the State of California, a

17  foreign corporation or association authorized to do business in California and registered with the

18  California Secretary of State, or does sufficient business, has sufficient minimum contacts with

19  California or otherwise intentionally avails itself of the California market, through the

20  _____

21  [4]      The *Sanford* Federal Class Action was filed in 2002, as a class action against West and MWI
in the United States District Court for the Southern District of California. The claims against MWI

22  were asserted on behalf of all consumers in the United States enrolled in an MWI membership in
connection with their purchase of an unrelated bait product. The claims against West were asserted

23  on behalf of all consumers in the United States enrolled in an MWI membership program who were
customers of a joint venture between MWI and West or were wholesale customers of West. The

24  district court dismissed the federal count against West and declined to exercise supplemental
jurisdiction over the state law claims. Plaintiffs re-filed the state law claims against West (*Sanford v.*

25  *West Corporation and West Telemarketing Corporation, et al.*, Case No. GIC 805541 (the "*West*
Action")) and was ultimately assigned to the Honorable Ronald L. Styn. The *West* Action included

26  the same or similar claims, based on the same factual allegations asserted in this action. The court in
the *West* Action certified a class (February 16, 2007 Order Granting Plaintiffs' Motion for Class

27  Certification), the case settled and Final Approval of the settlement was entered on December 24,
2008.

28

1  manufacturing, production, promotion, sale, marketing and distribution of its products in California,

2  to render the exercise of jurisdiction by the California courts permissible under traditional notions of

3  fair play and substantial justice.

4         11.     Venue is proper in this Court because at all times relevant, Plaintiff Phyllis Callahan

5  resided in San Diego County, and Defendants either maintain offices in this District, a substantial

6  portion of the practices complained of herein occurred in this District (since the products here at

7  issue were mailed to this District) or because Defendants have received substantial compensation as

8  a result thereof in this District.

9                                **PARTIES**

10         12.     Plaintiff Phyllis Callahan ("Callahan") has been, at all times relevant to the action, a

11  resident of the City of San Diego, County of San Diego and State of California. Callahan purchased

12  Nad's Natural Hair Removal ("Nad's") after viewing the television advertising campaign for the

13  product. After the sale of Nad's was complete, the telemarketer who answered the call read MWI's

14  deceptive telemarketing pitch to Callahan informing her she was receiving a risk-free 30-day trial

15  membership, emphasizing the thank you gift was FREE and that Callahan "WON'T BE BILLED."

16  The language of the deceptive telemarketing pitch is quoted in full in ¶22 below. The telemarketer

17  thereafter transferred Callahan's confidential credit card information to MWI using the wires.

18  Callahan's credit card was assessed unsolicited and unexpected charges totaling $183.95 for one or

19  more of the MWI membership programs. In connection with the Nad's product, Callahan's credit

20  card was assessed an unsolicited and unexpected $84.00 charge by Defendants for a Connections

21  membership in or around November 2000. In or around September 2001, her credit card was billed

22  an additional $99.95 for its renewal. Callahan must have noticed this second charge, as she was

23  refunded $99.95 in or around November 2001. Until recently, Callahan was completely unaware of

24  the initial $84.00 charge or that she had been enrolled in the Connections membership and/or that her

25  credit card had been billed. Callahan never utilized the membership.

26

27

28

13.     In addition, Plaintiff includes in her allegations the names, the dates of the fraudulent charges and the bogus membership in which each was enrolled for 236,107[5] of the unnamed class members.  The names of the unnamed class members represent only a fraction of the unnamed class members included in the proposed class.  The identity of the remainder of the unnamed class members are contained within MWI's electronic database(s), and will be revealed through discovery.  Each of these unnamed class members, as well as each of the unnamed class members who have yet to be identified through discovery, received the deceptive telemarketing pitch at the end of their calls, the language of which is quoted at ¶22 below.

14.     At this time, without the benefit of discovery from Defendants, Plaintiff is aware that the most recent telemarketing pitch was made on or about September 10, 2002, and that the most recent fraudulent charge occurred on October 15, 2002.  Based upon a database MWI produced in the related California state court action, Plaintiff is aware that the most recent fraudulent charge to a West Subclass member[6] was levied on March 9, 2007 – the month that the database was produced.  Accordingly, based upon this information Plaintiff believes that discovery will reveal a continuation of the pattern and practice of fraudulently charging the credit and debit cards of the class members in this action, through at least March 2007, through the present and for the foreseeable future.

15.     Defendant Vertrue Incorporated, previously known as MWI, has been, at all times relevant to the action, a Delaware corporation whose primary place of business is 20 Glover Avenue, Norwalk, Connecticut.  Defendant MWI does business in California, and throughout the nation, as MWI Essentials, MWI Leisure Advantage, MWI Home & Garden, MWI Connections, Health Trends, Travel Arrangements, Transmedia, Cardmember Protection Service, Countrywide Dental, 24 Protect, Smartsource, Value Max Shopping Service, Money Master Tai Value Max, Tai Vital Basics

---

[5]     The information regarding these unnamed class members was obtained pursuant to a protective order and is required to be filed under seal.  If the Court desires, Plaintiff will amend this Amended Complaint to add these additional unnamed class members.

[6]     As noted above, the claims of the West Subclass members were severed from this action and subsequently settled with West and this action seeks no recovery for those dismissed West Subclass members.

1   and various other names under which it markets and charges consumers, by and through nationwide

2   telemarketing campaigns, as well as by and through the interstate instrumentality of mailings

3   throughout California and the nation.  Defendant MWI entered into express and tacit agreements

4   with the Telemarketers and the Bait Product Suppliers.  Defendant MWI drafted the deceptive script

5   used and sought comments from and approval by the Telemarketers.  Defendant MWI operates and

6   is involved in the unlawful scheme of charging the credit card and/or debit card accounts of

7   consumers for unordered merchandise.

8           16.     Defendant Adaptive Marketing LLC is a Delaware limited liability company with its

9   principal place of business in Norwalk, Connecticut (collectively with Vertrue Incorporated).

10  Adaptive Marketing LLC is a wholly-owned subsidiary and "operating company" of Vertrue

11  Incorporated.  Adaptive Marketing LLC shares personnel with Vertrue Incorporated and markets

12  Vertrue Incorporated's membership programs.  There exists, and at all relevant times, a unity of

13  interest and ownership between MWI and Adaptive Marketing LLC, such that any individuality and

14  separateness between each of them ceased and each is the alter ego of the other in that each entity is

15  completely controlled, dominated, managed and operated without regard for corporate individuality.

16          17.     The true names and capacities of defendants sued herein as Does 1 through 50,

17  inclusive, are presently unknown to Plaintiff, who therefore sues the defendants by such fictitious

18  names.  Plaintiff will seek to amend this Amended Complaint and include the Doe defendants' true

19  names and capacities when they are ascertained.  Each of the fictitiously named defendants are

20  responsible in some manner for the conduct alleged herein and are therefore responsible for the

21  damages suffered by Plaintiff and class members.

22          18.     In committing the wrongful acts alleged herein, Defendants have pursued a common

23  course of conduct, acted in concert with, aided and abetted and conspired, in furtherance of their

24  common plan, scheme or design to make unauthorized charges to customers' credit cards and/or

25  debit cards for an unsolicited, unwanted and unordered membership and thereafter to conceal and

26  cover up their wrongdoing – all for their own personal profit.  Each of these Defendants actually

27  knew, or should have known, of the fraudulent conduct being committed and actively participated in

28  covering up its true nature.  Thus, in addition to the wrongful conduct herein alleged as giving rise to

1  primary liability, Defendants further aided and abetted and knowingly assisted each other in breach

2  of their respective duties, contracts and obligations as herein alleged, and acted as the agent of each

3  other in participating in this wrongdoing.

4       19.    At all times herein mentioned in the claims for relief alleged herein, each and every

5  defendant was an agent and/or employee of each and every other defendant.  In doing the acts

6  alleged in the claims for relief alleged herein, each and every defendant was acting within the course

7  and scope of this agency or employment, and was acting with the consent, permission and

8  authorization of each of the remaining Defendants.  All actions of each defendant as alleged in the

9  claims for relief stated herein were ratified and approved by every other defendant or their officers or

10  managing agents.

11  <div align="center">**DEFENDANTS' WRONGFUL CONDUCT**</div>

12  **The Upsell**

13       20.    Defendants obtain the necessary information to bill consumers for MWI memberships

14  by piggybacking onto popular consumer products.  MWI looks for products advertised heavily on

15  television or in print which ask consumers to call a 1-800 number to order that product.  Some

16  examples of the products which MWI uses to upsell its programs are: vitamins, knives, Q-Ray

17  bracelets, Edgemaster paint rollers, Simoniz car washer, flowers, dance videos, AB Slide, ultrasonic

18  toothbrushes and OxiClean.

19       21.    The consumers see the advertising for the product (such as a Nad's, a Simoniz car

20  washer or an OxiClean infomercial) and call the 1-800 number.  The consumer has not seen or heard

21  anything about any MWI product and has no desire or intent to purchase an MWI product.  The

22  consumer is most likely to wind up speaking with an employee of the Telemarketers.  The

23  consumers go through the process of ordering the product they wanted and the Telemarketing

24  Entities who handle the incoming calls "capture" the consumers' credit and/or debit card

25  information.  This portion of the call may take anywhere from 5-15 minutes or so.

26       22.    Before the Telemarketers let the consumer off the line, MWI has the Telemarketing

27  Entities read the following deceptive script to the consumers:

28

1    Mr(s) _____, for purchasing **[NAME OF BAIT PRODUCT]** today, we're
     sending you a risk-FREE 30-day membership to **[MWI PROGRAM]**, a service
2    designed to SAVE YOU 20% from leading stores such as **[STORES]**, PLUS
     additional savings on eyewear, beauty products, haircuts and more!  After 30 days,
3    the service is extended to a full year for just $6 a month, billed annually in advance
     to the credit card you're using today.  If you want to cancel, just call the toll-free
4    number that appears in your kit in the first 30 days and YOU WON'T BE BILLED.
     So look for that kit in the mail, OKAY?[7]
5
6         23.    The words in ALL CAPITAL LETTERS are the words the telemarketer emphasizes

7    when reading the script. In other words, MWI emphasizes that the trial membership is "FREE," and

8    that class members "WON'T BE BILLED." At the end of the call, MWI merely tell class members:

9    "So look for that kit in the mail, OKAY?"  MWI does not ask the consumers if they want to receive

10   the purported trial membership, let alone any agreement to be enrolled in the membership.  And,

11   MWI does not ask the consumers for permission or consent to charge their credit and/or debit cards.

12        24.    At most, the consumer is led to believe that a free trial membership will be mailed to

13   the consumer to evaluate, and if the consumer likes the product he or she can call to purchase a

14   membership. *No express consent to mail the membership is obtained from the consumer, let alone*

15   *any agreement to be enrolled in the membership. Nor is any express consent requested to bill the*

16   *consumers' credit and/or debit cards*. This is Defendants' "upsell" and Defendants' excuse for

17   charging consumers for a membership program they neither wanted nor ordered.

18        25.    Notwithstanding the failure to obtain consent to enroll consumers in MWI's

19   membership programs and charge their cards, the Telemarketing Entities transfer the class members'

20   confidential credit and/or debit card information, which they obtained when the consumers called to

21   purchase the unrelated products, to MWI.  MWI then mails a membership kit and charges the

22   consumers' credit and/or debit cards.  Neither Defendants, the Telemarketing Entities nor the Bait

23   Product Suppliers seek or obtain the consumers' express consent to charge the MWI membership to

24   the consumers' credit and/or debit card accounts.

25   _____

26   [7]    While there can be minor variations to the script – *e.g.*, the list of stores can change, the MWI
     program can change, the script may say "to thank you for your purchase," or as a "special thanks,"
27   and such – the substance of the pitch is identical across all scripts.

28

26.    The fraud at issue is the assessment of an unsolicited and unlawful fee charged to consumers which the consumers did not seek out and did not want. The consumers are deceived by Defendants' purposely misleading script, then mailed a membership kit and enrolled and charged for a membership they did not want or order. Defendants' automatic self-renewing membership is an outright theft of money under the guise of a membership.

**The Mechanics of the Scheme**

27.    To generate calls, Defendants rely on the popularity of the non-MWI products offered by the bait entities.

28.    After a consumer has viewed an infomercial or read an advertisement for a bait product they want to purchase, the class members call a "1-800" telephone number to order the product. The purchasers of these products are given the option of purchasing by credit card or debit card. To complete the purchase, the class members are required to provide their names, credit and/or debit card numbers and the expiration date to the Telemarketers who answer the calls and process the sales. Thus, at the end of the purchase transactions, the Telemarketing Entities possess all of the information necessary for MWI to assess the unsolicited membership fees against unsuspecting consumers.

29.    After the financial information for the sale of the advertised bait product is obtained by the Telemarketers, MWI has them read the "upsell" script. The message of the upsell script is that the consumer will be mailed a 30-day, risk-free trial membership. The class members are not asked whether they want to enroll, they are not billed or invoiced and they are not asked to give or to confirm their credit or debit card information to pay for the membership. Instead, Defendants wait approximately 30 days and then charge the class members' credit and/or debit cards using the information Defendants received from consumers when they purchased the product they actually wanted.

30.    The class members are never asked to provide their confidential credit or debit card information in connection with the unrelated MWI upsell. Class members are never asked to give permission to permit their confidential financial information to be transferred to defendant MWI. The class members are never even asked if they want to receive the purported membership materials

1  – rather they are simply informed that for purchasing the advertised product, risk-free materials will

2  be mailed to them.  They are not told that they are now enrolled members in the program.  The

3  membership kit which allows the consumer to access the so-called benefits of the program are

4  mailed shortly after the call.

5          31.     Approximately one month after the call, defendant MWI uses the confidential

6  financial information it received from the Telemarketing Entities to charge the class members' credit

7  and/or debit cards.

8          32.     The class members do not know they have been enrolled in MWI's membership

9  programs and therefore never use any of the programs' so-called benefits.  *See* ¶¶49-56 below.

10  Defendants count on this deception and subsequent non-use of the benefits to hold the costs of the

11  programs to a nominal amount thus making the annual fees pure profit for Defendants.

12          33.     Unless the class members notice the charge to their debit and/or credit card and call to

13  complain, the class members will continue to be charged $60-$170 each and every year.  As with the

14  initial charges to the class members' credit and/or debit cards, no invoice or bill is ever sent to the

15  class members to inform them that their credit and/or debit cards have been, or will be, charged by

16  defendant MWI.  What is even more insidious is that the purported "annual" membership is charged

17  every 11 months and, similarly, no invoice or bill is ever sent to the class members for renewal

18  charges.

19          34.     The fraud is perpetuated because the customers' prior expressed acceptance or

20  consent to enroll in the membership is not obtained.  Defendants do not clearly and unambiguously

21  communicate the terms of the purported membership programs.  The membership that is mailed is

22  neither risk-free, nor a free 30-day trial as was represented by Defendants.  Defendants charge the

23  class members for a membership they did not order.  The consumers charged for the membership

24  who never use the so-called benefits are paying $60-$170 per year for nothing.

25          35.     Defendants know that consumers do not understand that they will be charged a

26  membership fee unless they call to cancel.  Defendants mail the membership kit fully understanding

27  that the consumer will not understand they are being charged for the materials.  Further, Defendants

28  have designed the generic membership materials so as to appear to be "junk mail" so the materials

1   will be discarded and thus never read.  Defendants know that consumers do not expressly consent to

2   the membership but Defendants mail it anyway.  Defendants purposely design their scripts to

3   maximize consumers' confusion and allow Defendants to "enroll" the maximum number of

4   unsuspecting persons.  Defendants then mail the membership kit to the deceived and/or confused

5   consumers who Defendants "enroll" in the MWI memberships.  Defendants are able to maximize

6   their profits at the expense of the consumers deceived by Defendants' scheme.

7          36.     The *only* notice that a class member receives that he or she has been charged for a

8   membership is his or her credit or debit card statement reflecting a charge – which may or may not

9   identify MWI as the entity who levied the charge – which the class member may not notice

10  depending on how closely the class member reads his or her credit and/or debit card statement.  If

11  the class member notices and challenges the charge, the charge may be reversed or a pro rata refund

12  may be sent.  In this way, Defendants conceal their deception from the other class members and from

13  the public.  Those class members who do not notice the charge are billed every 11 months until they

14  notice that they have been charged and complain.

15         37.     These acts take place as a result of the concerted action, agreement and direction by

16  Defendants.

17  **The Lack of Audiotaped Confirmations**

18         38.     Until required as part of the Nebraska Attorney General "Better Practices"

19  requirements, Defendants failed to confirm consumers' acceptance of the upsell offer by MWI for

20  many, if not most, of the "enrolled" consumers.

21         39.     Accordingly, no audiotaping of the upsells occurred for most of the class members

22  deceived by Defendants.

23  **The Deceptive "Upsell" Script**

24         40.     Defendants worked together to produce a script to be read to each consumer.  MWI

25  creates the deceptive scripts to be read when marketing the MWI programs and the Telemarketing

26  Entities comment on and approve the deceptive scripts.

27         41.     Defendants purposely avoid clearly and unambiguously notifying consumers that

28  their credit and/or debit cards will be charged between $60-$170 for the "membership" mailed to

1   them.  No focus groups or other consumer research is undertaken by Defendants.  Even after

2   Defendants received numerous consumer complaints, ranging from a lack of any recollection of ever

3   even hearing of MWI or any of its purported memberships to accusations of fraud and theft,

4   Defendants avoided ascertaining whether their scripts clearly and unambiguously (i) requested

5   consent from the consumer to mail, and charge for, the membership, (ii) notified the consumers of

6   the terms of the purported membership or (iii) informed the consumers that their credit and/or debit

7   cards would be charged.

8        42.    Defendants are well aware of the fact that consumers are deceived by their scripts as

9   seven state attorneys general alleged that MWI was deceiving consumers and MWI settled the

10  matters with five of the attorneys general, and agreed to pay civil penalties in excess of $2 million to

11  one of those attorneys general.  Defendants know that consumers are misled into believing that they

12  are not making a purchase decision regarding the MWI memberships.  Defendants' script is intended

13  to, and does, convey to consumers that the membership mailed to them is a free trial membership,

14  which if they like the membership they can call to order.

15       43.    The scripts are written and designed to be read in a manner intended to confuse,

16  mislead and deceive consumers.

17       44.    Defendants' conduct is deceptive, unlawful and fraudulent and it cannot be justified

18  in any manner.  Indeed, seven different attorneys general have determined that the MWI scripts are

19  deceptive and do not clearly and unambiguously communicate to consumers that they will be

20  charged for an annual self-renewing membership unless they affirmatively act to cancel the

21  membership.  Nor do the scripts inform the class members that they will be required to return the

22  purported membership card should they desire to cancel.

23  **The Membership**

24       45.    After receiving the class members' confidential financial information by

25  piggybacking onto the advertised product, defendant MWI mails out membership materials and

26  customer service information to the persons enrolled.  Then, MWI simply bills the consumers $60-

27  $170 each year.

28

46.     Defendants have designed the generic purported membership materials so as to appear to be "junk mail" in the hopes that the materials will be discarded and thus never read. If the packet mailed by MWI for the risk-free trial membership is thrown out by the recipient, then the consumer will not have the number to access the so-called benefits. The kits are mailed out bulk rate indicating the lack of value of the material. The kits contain a cheap paper membership card typical of cards received in mail solicitations. This card is, however, the actual membership card for the enrolled member. By making the kit typical junk mail, Defendants further conceal the fact that the class members have been charged an annual, self-renewing membership fee.

47.     Other than the one line on their credit and/or debit card statements, the class members are not notified that they have been "enrolled" in an MWI membership program or that their credit and/or debit cards have been charged. Defendants do not send new "members" any invoice or record of the charge. Moreover, after the membership kits are mailed and consumers are charged and throughout the duration of the "membership," class members never hear from any of the Defendants about any membership benefits. After the initial mailing of the membership kit, consumers do not receive any newsletters, coupons, surveys or any other notifications. The only thing they receive is a charge of $60-$170 on their credit and/or debit cards.

48.     The term "membership" used by Defendants is merely an excuse to take money from consumers who submit their credit and/or debit card information for their purchase of other products. Defendants take consumers' money by mailing them an unordered membership and then charging them for it.

**Lack of Usage of the Membership Benefits**

49.     The manner in which a consumer can access the purported membership is further evidence of Defendants' scheme to defraud. Other than the purported membership kit, Defendants do not send "members" anything. No newsletter or other correspondence is sent to the class members. No confirmation letters or satisfaction surveys are sent. The class members receive nothing after they are charged, or before the next time they are charged.

50.     For consumers to obtain the purported membership benefits, they must contact defendant MWI either by telephone or via the Internet, and obtain certificates through MWI. If the

1    retail establishment works with MWI, then the consumer can order a certificate that can be used at

2    that retail establishment.  Unless the consumer knows to call MWI, they receive nothing.[8]

3        51.    In the *West* Action, MWI produced a database containing the transactions of 567,430

4    California consumers, many of whom are members of the class, and some of whom are members of

5    the previously dismissed West Subclass – whose claims arising under West's Joint Venture and

6    Wholesale arrangements with MWI have been settled and for which no recovery is sought in this

7    action.  The database establishes that 552,605 (or 97.5%) of the consumers included in this database

8    never used any membership benefits.  The database establishes that out of 567,430 consumers

9    included in the data, ***only one person*** purchased any of the following membership benefits:

10    

| | |
|---|---|
| $25 Exxon Gas Card | $25 WalMart Gift Card |
| $25 Gas Card Choice A | $25 Babies R Us Gift Card |
| $25 Warner Bros. Certificate | $25 SunCoast Gift Card |
| $25 Hollywood Video Gift Cards | Hickory Farms Offer |
| Lady Footlocker Merchandise Certificate | Sharper Image Coupon |

13        52.    The database establishes that out of 567,430 consumers ***only two people*** bought one

14    or more of the following:

15    

| | |
|---|---|
| ARCO Gas Cards | $25 Structure Certificates |
| $10 Olive Garden Gift Cards | $25 Bloomingdales Certificates |
| Zales Certificates | |

17        53.    The database establishes that out of 567,430 consumers ***only three people*** bought one

18    or more:

19    

| | |
|---|---|
| $10 Toys R Us Certificates | $25 Borders Gift Cards |
| $25 Barnes and Nobel Gift Certificates | |

20        54.    The database establishes that out of the 567,430 consumers, ***four*** people bought one

21    or more $25 Toys R Us Gift Cards or a $10 Applebees Certificates; ***five*** bought a GNC Coupon;

22    ***eight*** bought a $10 Blockbuster Gift Card or a $25 Linens-N-Things Gift Card; ***ten*** bought a $25

23    Sam Goody Gift Card, a $25 K-Mart certificate or a $10 Red Lobster/Olive Garden Certificate; ***11***

24    bought a $10 Outback Steak House Certificate or a $25 Lowes Gift Card; ***12*** bought a $25 KB Toys

25

26    _____

[8]       Some coupons of nominal value are included in some membership kits.  However,

27    Defendants pitch their reward program as the biggest member benefit and the reward program requires the "member" to contact MWI to use it.

28

1   Gift Card; *16* bought a Pier 1 Gift Card; *17* bought a $25 Footlocker Certificate; *26* bought a $25

2   Home Depot Gift Certificate; *28* bought a $25 Sears Certificate; *35* bought a Nordstrom Gift

3   Certificate; *36* bought a $25 TJ MAXX Certificate; and just *152* people bought a $25 Target gift

4   card.  Equally significant, the most purchased benefits were purchased by less than one percent of

5   the 567,430 consumers – just 0.4% (2,250 people) received one or more $40 Hair Cut Rebates and

6   just 0.7% (4,063 people) received 4/$5 Dining Rebates.

7          55.    As part of its investigation, the Iowa Attorney General sent questionnaires to 400

8   Iowa residents enrolled in MWI membership programs.  The Iowa Attorney General reported that,

9   most of the consumers who responded indicated that they had never used their membership and none

10  of those responding said they were satisfied members.

11         56.    The lack of use of the membership benefits demonstrates that Defendants knew, or

12  should have known that the people they charged $60-$170 were utterly unaware that they had been

13  charged for and enrolled in the MWI memberships.  Consumers were treating the membership kit as

14  the law allows; they were ignoring it and assuming they had no obligation to the sender of the

15  unordered merchandise.  Defendants charged them and took their money in violation of law.

16  **Consumer Complaints**

17         57.    Immediately after the first customers were charged for an MWI membership,

18  Defendants began receiving an enormous number of customer complaints.  These complaints ranged

19  from the consumers having no recollection of ever being told about an MWI program to irate

20  consumers alleging theft and fraud by Defendants.  A simple Internet search for "MemberWorks,"

21  pulls up thousands of consumer complaints, including at websites such as www.ripoffreport.com,

22  www.consumeraffairs.com and www.uspeakout.com.  Despite receiving such complaints and despite

23  knowing of the existence of a number of Internet sites dedicated to complaining about MWI and its

24  unlawful practices, Defendants took no steps to make sure that their marketing practices were not

25  deceptive.

26         58.    In addition to complaints directly by consumers, MWI received numerous inquiries

27  by the Better Business Bureau (the "BBB") regarding its practices as they related to customers.

28  Defendant MWI received an unsatisfactory rating by the BBB due to a pattern of complaints

1  concerning unauthorized charges to consumers' credit cards.  The BBB's website reported on

2  June 30, 2006 that it had processed a total of 2,277 complaints about MWI in the previous 36

3  months, including 765 in the previous year.  The conduct giving rise to these complaints continues.

4  Almost one year later, on June 2, 2007, the BBB's website reported that it had processed a total of

5  2,180 complaints about MWI in the previous 36 months, including 667 in the previous year.

6       59.     Defendants received so many complaints from consumers that they scripted responses

7  to "frequently asked questions" or "FAQs" for their customer service representatives.  The following

8  "frequently asked questions" were received by Defendants who prepared scripted responses to them:

9            (a)     "I received my credit card bill and saw this Essentials or Home & Garden

10  Rewards program listed here for $84 – what is this";

11           (b)     "I don't remember hearing about Essentials or Home & Garden Rewards";

12           (c)     "I said 'no' to this program";

13           (d)     "I didn't authorize this program"; and

14           (e)     "Who authorized this billing/purchase?"

15       60.     The conduct of each of the Defendants contributed to the scheme designed to deceive

16  and defraud class members, resulting in the unlawful assessment of an unsolicited annual recurring

17  membership fee.

18  **Governmental Actions**

19       61.     Every governmental and judicial entity to review Defendants' telemarketing practices

20  has concluded they are deceptive and misleading.

21       62.     Seven attorneys general (from Minnesota, New York, Nebraska, California, Florida,

22  Ohio and Iowa) have separately concluded that the telemarketing scheme Defendants employed was

23  deceptive.  In the words of the Minnesota Attorney General:

24            "They just say at the end of the script so we're going to send you the package
              in the mail ok and they never say Is it OK to charge your credit card? . . . [The
25            Telemarketers] tell you that the deal is about you getting something for nothing . . . .
              You're going to get a free gift, you're going to get a risk-free membership and that's

26

27

28

1    not what the real deal is. The real deal is you're going to get charged unless you act
     to cancel that."[9]
2

3    63.    According to the New York Attorney General:

4    Consumers may be confused and mistakenly believe that (1) their credit card or bank
     card accounts will not be debited unless they directly provide their billing
     information to MW; (2) they do not have to take any affirmative action to avoid
5    being charged a membership fee; (3) they do not have to take any affirmative action
     to avoid being charged a renewal fee upon expiration of the initial membership term;
6    and (4) they are not making a purchasing decision at the time of the telemarketing
     call.
7

8    64.    The New York Attorney General also charged that:

9    Because the trial offer is termed "risk free," Consumers may be confused or fail to
     understand that they will be charged a membership fee unless they cancel their
10   membership before the end of the trial offer. By reason of the foregoing, the
     Attorney General believes that MW has engaged in business conduct that has the
     tendency and capacity to be deceptive and misleading in violation of New York's
11   consumer protection laws.

12   65.    As a result of the Minnesota and New York Attorneys General investigations, MWI

13   was forced to stop reading its scripts to Minnesota and New York consumers until the scripts were

14   revised to: (i) inform consumers that they would be billed after 30 days if they did not call to cancel;

15   and (ii) ask the consumers' permission to charge their credit and/or debit cards. While in 2001 MWI

16   ultimately revised the scripts in Minnesota and New York, it did not include similar disclosures on

17   any of its scripts read in any other state.

18   66.    Following on the Minnesota and New York investigations the Nebraska Attorney

19   General implemented an investigation into the deceptive telemarketing practices. As a result, MWI

20   was required to modify its scripting nationwide to inform consumers that they would be billed after

21   30 days if they did not call to cancel; ask their permission to charge their credit and/or debit cards.

22   The new scripting requirements were referred to as "Best Practices" requirements or "Best Practices"

23   scripting. Prior to the June 1, 2001 deadline for implementing the Best Practices scripting, MWI

24   tested the disclosures on several "bait" products. The results were dramatic as affirmative responses

25   to the telemarketing script dropped to nearly zero. In response to the test results, MWI secured an

26   _____

27   [9]  *Why Some U.S. Flag Buyers Are Seeing Red*, ABC News.com, Nov. 28, 2001.

28

                                           - 18 -                    09-CV-0236-BEN(POR)

1   extension of the implementation date, and returned to using the old deceptive scripting to maximize

2   their "sales."

3        67.     As a result of the Minnesota and New York Attorneys General investigations, MWI

4   was forced to stop reading its scripts to Minnesota and New York consumers until the scripts were

5   revised to: (i) inform consumers that they would be billed after 30 days if they did not call to cancel;

6   and (ii) ask the consumers' permission to charge their credit and/or debit cards. While in 2001 MWI

7   ultimately revised the scripts in Minnesota and New York, it did not include similar disclosures on

8   any of its scripts read in any other state.

9        68.     On October 21, 2003, the Florida Attorney General filed a complaint concerning

10  Defendants' deceptive telemarketing practices. Noting that MWI reported annual revenue of $400

11  million, the Florida Attorney General's Office indicated its investigation estimated that 50% of all

12  sales were reported as "unauthorized." In 2004, MWI also entered into a settlement agreement with

13  the Florida Attorney General relating to the sale of its products in conjunction with unrelated

14  infomercial products.  MWI agreed to pay a $950,000 fine.  The agreement also required MWI to

15  clearly disclose all terms and conditions of its programs, and to obtain consumers' express consent to

16  charge their credit cards for MWI programs.

17       69.     The Iowa Attorney General filed suit on May 11, 2006.

18       70.     As part of its investigation, the Iowa Attorney General sent questionnaires to 400

19  Iowa residents enrolled in MWI membership programs.  Among the questionnaire respondents, 67%

20  indicated that they did not know they were members and/or that they did not authorize MWI to

21  charge them.  The Iowa Attorney General reports that: "Most of the rest of the consumers who

22  responded indicated that they had never used their membership, or thought that they had already

23  cancelled.  None of those responding said that they were satisfied members."

24       71.     On information and belief, in order to circumvent the scripting requirements required

25  by the Nebraska, Minnesota, New York, Florida and California Attorneys General, MWI hatched a

26  scheme to allow it to continue its deceptive telemarketing practices.  Without discussing the matter

27  with any of the Attorneys General, MWI and certain of the Telemarketers took the position that the

28  Best Practices requirements did not apply to enrollments originated by the Telemarketers.  This

1    meant that while Best Practices scripting would have to be used where MWI simply paid a fee to the

2    Telemarketers to read the scripts and where consumers were enrolled under the joint venture

3    arrangements with the Telemarketers, the old deceptive scripting would continue to be read by

4    Telemarketers having wholesale arrangements with MWI.  Certain of these Telemarketers would

5    then turn around and "sell" the enrolled consumers back to MWI who would bill the credit and/or

6    debit cards of consumers for the bogus memberships.

7        72.    In 2002, the Federal Trade Commission (the "FTC") published its Notice of Proposed

8    Rulemaking (the "Notice") pertaining to telemarketing sales rules stating "in many preacquired

9    account telemarketing solicitations, products and services (often buyers' clubs) are marketed through

10   the use of free trial offers, which are presented to consumers as 'low involvement marketing

11   decisions.'"  *See* 67 Fed. Reg. 4492, 4501 (Jan. 30, 2002).  The Notice went on to state,

12   "[c]onsumers are asked merely to consent to the mailing of materials about the offer.  Consumers

13   frequently do not realize that the seller or telemarketer already has their billing information in hand

14   and, instead, mistakenly believe they must take some action before they will be charged – *i.e.*, that

15   they are under no obligation unless they take some additional affirmative step to consent to the

16   purchase." *Id.*

17       73.    In 2003, the FTC enacted rules to combat "abusive telemarketing . . . practices" by

18   telemarketers using a "free-to-pay conversion feature" when the telemarketers have "preacquired

19   account information."  *See* 16 C.F.R. §310.4.  Significantly, in adopting these rules, the FTC

20   included defendant "MemberWorks Incorporated" among a list of "bad actors" charged with

21   engaging in this type of abusive telemarketing practices.  68 Fed. Reg. 4580, 4621 n.472 (Jan. 29,

22   2003).  The rule sets forth three objective requirements which, at a minimum, must be satisfied to

23   meet the FTC's informed consent requirement.  MWI would have had to "obtain *from the customer*,

24   at a minimum, the last four (4) digits of the account number to be charged."  16 C.F.R.

25   §310.4(a)(6)(i)(A).  It would have had to "obtain *from the customer* his or her express agreement *to*

26   *be charged* for the goods or services *and to be charged using the account number* [identified by the

27   customer]."  16 C.F.R. §310.4(a)(6)(i)(B).  And MWI would have had to "make and maintain an

28   audio recording of the entire telemarketing transaction." 68 Fed. Reg. 4580, 4621 n.471 (Jan. 29,

1   2003).  In order to circumvent these requirements, MWI began charging $1 for the 30-day trial so

2   that at the end of 30 days, there would not be a "pay to pay" conversion.

3       74.    In connection with the rule-making proceedings, MWI submitted a purported

4   consumer survey on the understandability of the telemarketing scripts.  The FTC concluded that

5   MWI's survey was biased in its favor and that even in the face of this bias the study demonstrated

6   that "at least 46 percent of the respondents did not even 'mostly' understand the way in which they

7   would be billed after listening carefully to a sales offer involving preacquired account information

8   and a 'free-to-pay conversion' feature."  68 Fed. Reg. 4580, 4621 n.468 (Jan. 29, 2003).

9       75.    In the *Sanford* Federal Class Action, after weighing the evidence and expert

10  testimony submitted, the federal arbitrator concluded:

11          When I look at the overall picture here from an objective reasonable person
            viewpoint I consider: the experience that MWI has had in thousands of these cases,
12          the circumstances of this type of call (an unsolicited, unexpected offer read by MWI
            with high sounding words such as "RISK-FREE" membership – "YOU WON'T BE
13          BILLED" – "So, look for this kit in the mail, OKAY?"), *I conclude that even if the
            script was read to [the consumer], [they were] misled, [they] didn't agree to this*
14          *"deal," there was no meeting of the minds*, and MWI not only could suspect, but
            knew that many of the callers did not understand that they were making a "deal" to
15          purchase a membership and assuming a burden to act.

16  Arbitration Award at 6-7.

17      76.    In reaching this conclusion, the arbitrator stated: "I conclude that the script has fuzzy

18  language, would have been read in less than 30 seconds (my estimate) as a fast sell over the phone

19  for a product that had nothing to do with the purpose of [the consumer's] call.  The script, if it was

20  read to [the consumer], was *foisted upon [them] in a quick, slick and misleading sales pitch that*

21  *few people would understand*."  *Id.* at 7.  Ultimately, he found: "*This script is a recipe for*

22  *misunderstanding and confusion when heard by a consumer hearing it under the circumstances*."

23  *Id.* at 8.

24      77.    In the *Ritt* action, the Ohio Court of Appeals found the upsell scripts were deceptive

25  and misleading:

26          The fact is, with or without authorization, consumers who stayed on the telephone
            line long enough to receive the entire scripted pitch would not have known the
27

28

ramifications of what they were agreeing to once the upsell had been pitched to them and they said "yes" to receiving a membership kit.[10]

## TOLLING OF THE STATUTE OF LIMITATIONS

78.     The running of any applicable statutes of limitation has been tolled for several reasons.

**Tolling by Virtue of MWI's Fraudulent Concealment**

79.     Through various techniques and devices of secrecy, deception and misrepresentation, Defendants affirmatively and intentionally concealed the existence of their unlawful and unfair telemarketing practices from Plaintiff, class members and the public. The fraudulent concealment, deception and misrepresentation existed before Plaintiff was enrolled and charged and continued throughout the class period. Defendants carried out their violations of law in secret and consistently deceived, misrepresented and concealed the truth regarding the unauthorized enrollment into the various membership programs and the unauthorized charging of Plaintiff's and class members' credit and/or debit cards. Such acts included purposely designing their scripts to maximize consumers' confusion, thus allowing Defendants to enroll the maximum number of unsuspecting consumers.

80.     Defendants' scheme is based upon their knowledge that a large segment of the consumer population does not check their credit card statements and/or would miss the charge even if they did review their credit card statement.

81.     So as to assuage any suspicion that a consumer may have, Defendants emphasize that the trial membership they are sending is "FREE" and that the class members "WON'T BE BILLED."

82.     To conceal the fact of billing consumers' credit and/or debit cards, Defendants intentionally did not send Plaintiff or class members any invoice or any other notification that they were going to charge their cards. Similarly, to conceal the true facts concerning the billing of the

---

[10]     *Ritt v. Billy Blanks Enters.*, No. 80983, 2003 Ohio App. LEXIS 3297, at \*7, \*20-\*21 (Ohio Ct. App. July 10, 2003).

1  consumers' credit and/or debit cards, after they billed the consumers' credit and/or debit cards,

2  Defendants did not send any invoice, or notification of the fact that they had in fact billed the class

3  members' cards.

4        83.     Another method that Defendants used to conceal their wrongful practices from

5  Plaintiff and the class was to reverse the charges for any consumer that is able to track down the

6  source of the illicit charge and calls to complain.  After reading scripts in an attempt to keep the

7  consumer enrolled, Defendants and/or their agents will reverse the charges for complaining

8  consumers so that the complaints do not get escalated to the point that their practices become

9  common knowledge and reach the ears of the consumers they illicitly enrolled in, and charged for,

10  the bogus programs.  Further evidence of this concealment is demonstrated by the existence of a

11  Frequently Asked Questions script providing their telephone operators and/or operators of their

12  agents, with scripted answers to consumer questions/statements such as "I did not authorize this

13  charge," "how did you get my credit card number" and "what is this program," among others.

14        84.     To further conceal their wrongful conduct from those consumers who do review their

15  credit card statements, Defendants intentionally charged $60-$170 – amounts that were unlikely to

16  rouse suspicion from the consumer and provoke any further inquiry.  Indeed, had Defendants billed

17  the consumers' credit and/or debit cards for several hundred dollars, consumers would be more

18  likely to notice the illicit charges and seek to have them reversed.  Similarly, the identification of the

19  charges was designed to conceal the illicit nature of the subject charges, as the charges were

20  identified by such words as "Essentials," "Value Max" and "Home and Garden," among others.  A

21  consumer who reviewed his or her statement seeing a charge for $75 to "Essentials," for example

22  would likely perceive such name to be a clothing store, curio store, drug store or other retail

23  establishment from which his or her spouse would have made a purchase, and thus not pursue any

24  further inquiry to determine if the charge was legitimate or fraudulent.

25        85.     Through such acts of fraudulent concealment, even assuming that a class member

26  noticed the charge on their credit or debit card statement, the existence of a charge for Essential,

27  Value Max, Home & Garden or others would not provide any indication to the class member that

28  their card was fraudulently charged.

86.     Defendants' scheme worked perfectly on Plaintiff and the class members. Succumbing to Defendants' practices of fraudulent concealment described above, Plaintiff did not notice the fraudulent charge when she was originally enrolled, and charged, by Defendants. Accordingly, while in November 2001, Callahan was refunded a renewal fee of $99.95, she had absolutely no knowledge that she had previously been billed an $84.00 membership fee.  While Plaintiff does not recall contacting Defendants regarding the renewal charge, she was subsequently refunded $99.95.   Upon inquiring about a renewal charge, on information and belief it was Defendants' policy not to inform consumers that this was a second "renewal" charge and that they had previously billed one or more times earlier.

87.     It was not until a few months prior to the filing of the original complaint that Callahan learned of the wrongful charges.

88.     By virtue of their pervasive deception and misrepresentation and concealment of facts, Defendants successfully concealed from Plaintiff and class members the truth about the memberships thereby tolling the running of any applicable statutes of limitation.  Plaintiff and class members were unaware of, and through the exercise of due diligence could not have discovered, the existence of such violations until after they had been charged for the membership.

89.     In the alternative, based on the facts alleged herein, Defendants are estopped from relying on any statutes of limitation because of their fraudulent concealment, deception and misrepresentation of facts regarding the enrollment into the membership programs and unauthorized charges.  They were under a duty to disclose this information because it is non-public information over which Defendants had exclusive control, because Defendants knew this information was not available to Plaintiff and the class members and because this information was crucial to the consuming public in making purchasing decisions.

**Tolling by Reason of Prior Class Action Pending**

90.     This is a related case to the *Sanford* Federal Class Action. The *Sanford* Federal Class Action was filed on March 28, 2002. In addition to federal claims, the *Sanford* Federal Class Action originally included state law claims.  The state law claims were finally dismissed from the federal action on December 23, 2008. Under established case law, the filing of the *Sanford* Federal Class

1  Action against MWI tolls all statutes of limitation until a final judgment of dismissal, which is no

2  longer subject to additional appeals, has been entered.

3      91.    The court in the *Sanford* Federal Class Action issued an order on September 29, 2008,

4  granting defendants' motion to dismiss the federal claims, and refusing to exercise supplemental

5  jurisdiction over plaintiff Sanford's and the class members' state law claims.  Furthermore, relying

6  on *Wright v. Schock*, 742 F.2d 541, 545 (9th Cir. 1984) (citing *Crown, Cork & Seal Co. v. Parker*,

7  462 U.S. 345, 352-53 (1983)), the federal court held the pendency of the federal action "tolled the

8  statute of limitations for individual claims, mitigating prejudice to members of the putative class."

9      92.    On October 14, 2008, plaintiffs filed an *ex parte* application for reconsideration,

10  asking the federal court for leave to amend the complaint, which application was granted on

11  November 3, 2008, directing plaintiffs to file a motion for leave.  On November 17, 2008, plaintiffs

12  filed the motion for leave to amend.  On December 16, 2008, defendants filed an *ex parte* motion to

13  dismiss or, in the alternative, to strike, among other things, the state law claims from the proposed

14  amended federal complaint, arguing that "the Court previously dismissed numerous state law claims

15  without prejudice, and thus the state law claims can be pursued in the appropriate state court(s)."

16  MemberWorks Inc.'s Memorandum of Points and Authorities in Support of *Ex Parte* Application for

17  Dismissal or, in the Alternative, to Strike Claims and Additional Parties at 8.  On December 23,

18  2008, the federal court struck the state law claims from the proposed amended complaint, holding:

19  "Furthermore, dismissing the action would not preclude Plaintiffs from pursuing relief in other

20  venues.  The Court has not precluded the Plaintiffs from pursuing its state law claims in state court."

21  Order Striking Counts I, IX, X, and XI from the Proposed TAC Attached to Plaintiffs' Motion for

22  Leave to Amend at 4.

23      93.    On January 8, 2009, Callahan filed a class action complaint on behalf of herself and

24  all others similarly situated in the state of California in the Superior Court of the State of California

25  in the County of San Diego entitled *Phyllis Callahan v. Vertrue Incorporated, et al.*, Case No. 37-

26  2009-00080962-CU-BT-CTL.

27      94.    As the above facts establish, Defendants have at all times known the core facts

28  concerning the claims for which Plaintiff and the class members seek to hold them accountable.

1    Defendants have also known that at no time has Plaintiff ever intended to drop the claims asserted

2    against them.  Accordingly, there is no prejudice to Defendants in permitting Plaintiff and the class

3    members to proceed with this action and prosecute their rights against Defendants.

4                                **CLASS ACTION ALLEGATIONS**

5                95.      Plaintiff brings this action on behalf of herself and all other persons similarly situated.

6    The class which Plaintiff represents is composed of all persons in the United States who, after calling

7    a telephone number to inquire about or purchase another product, between January 1, 1998 and

8    December 31, 2002: (i) were sent a membership kit in the mail; and (ii) charged for an annual MWI

9    membership program (the "Class").  However excluded from the Class are all persons enrolled in a

10   MWI program under the March 16, 1998 "Joint Marketing Agreement between West Telemarketing

11   Corporation and MemberWorks Incorporated," and/or the January 1, 1999 "Agreement" between

12   West Telemarketing Corporation and MemberWorks Incorporated, and/or the July 1, 1999 "Joint

13   and Wholesale Marketing Agreement" between West Telemarketing Corporation, West Teleservices

14   Corporation and MemberWorks Incorporated and/or the December 1, 2001 Wholesale and Retail

15   Marketing Agreement between MemberWorks Incorporated and West Direct, Inc., and any

16   amendments or addendums to these agreements.[11]  Not included within the Class are Defendants and

17   their officers, directors, employees, agents and/or affiliates.

18               96.      The Class is composed of millions of persons geographically dispersed throughout

19   the country, the joinder of whom in one action is impracticable, and the disposition of their claims in

20   a class action will provide substantial benefits to both the parties and the Court.

21               97.      The Class is ascertainable and maintains a sufficient community of interest since the

22   rights of each member of the Class were violated in a similar fashion based upon Defendants' use of

23   a uniform script that was read to the class members.

24

25   _____

26   [11]      The identities of the consumers encompassed by this exclusion are identified on Exhibit A to
     the Declaration of Markham Sherwood Re Mailing of Notice and Claim Form, Report on Opt-Outs

27   and Objections Received, filed in the *West* Action in support of plaintiffs' final approval of
     settlement.

28

98.    The victimized consumers can be identified in the databases maintained by Defendants.   More specifically, Defendants maintain databases that contain the following information: (i) the name of each class member "enrolled" in an MWI program via an inbound call; (ii) the address of each such class member; (iii) the date each class member was enrolled; (iv) the date and amount each class member was charged; and (v) the date and amount each class member was refunded.  Thus the class members can be located and notified with specificity of the pendency of this action using techniques and a form of notice customarily used in class action litigation.

99.    Plaintiff's claims are typical of the members of the Class as a whole because of the similarity, uniformity and common purpose of the unlawful conduct of Defendants.  Each class member was read the subject "upsell" script.  Each class member was mailed a membership kit for an MWI membership program.  Each class member has sustained damage as a result of Defendants' wrongful conduct in violation of federal and state statutes, state common law, as well as general principles of equity and fair play.

100.    Plaintiff will fairly and adequately protect the members of the Class as Plaintiff has retained competent counsel who are experienced in federal and state class action claims such as those asserted in this case.

101.    A class action is superior to all other methods for the just, fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, the damages suffered by individual class members are not sufficient to justify the enormous cost associated with the prosecution of this type of litigation.  The expense and burden posed by such individual litigation makes it impossible for the class members to individually redress the wrong done to them, nor would such an individual case be adequate to ensure that such practices cease to harm others.  Further, there will be no difficulty in the management of this action as a class action.

102.    Common questions of law and fact exist as to all members of the Class and these common issues predominate over any questions which go particularly to any individual member of the Class.  Among such common questions of law and fact are the following:

(a)    did Defendants mail memberships to the class members without obtaining prior express consent or acceptance;

1          (b)     were the subject "upsell" scripts deceptive;

2          (c)     did Defendants clearly and unambiguously communicate that the class

3    members would be charged unless they called defendant MWI to cancel the "risk-free" trial

4    membership;

5          (d)     were the membership materials deceptive;

6          (e)     did Defendants act willfully or recklessly;

7          (f)     did Defendants' acts, as alleged herein, violate federal statutes, California

8    statutes and/or general principles of equity and fair play;

9          (g)     what amount of damages has the Class sustained as a result of Defendants'

10   wrongful conduct, and the proper measure of such damages; and

11         (h)     what restitution is due to class members.

12   <center>**COUNT I**</center>

13   <center>**Violation of California Civil Code §1750 *et seq.***
**Consumers Legal Remedies Act**</center>
14   <center>**(On Behalf of Plaintiff and the Members of the Class)**</center>

15       103.    Plaintiff hereby realleges and incorporates by reference the allegations contained in

16   ¶¶1-102 above. Plaintiff asserts this claim on behalf of herself and on behalf of the members of the

17   Class.

18       104.    This cause of action is brought pursuant to the Consumers Legal Remedies Act, Cal.

19   Civ. Code §1750 *et seq.* (the "Act").

20       105.    The policies, acts and practices of Defendants as described above were intended to

21   deceive Plaintiff and class members as described herein and have resulted (and will result) in annual

22   fees being imposed on members of the Class. These actions violated and continue to violate the Act

23   in, at least, the following respect:

24         (a)     in violation of §1770(a)(4) of the Act, Defendants' acts and practices

25   constitute the use of deceptive representations in connection with the products in question;

26         (b)     in violation of §1770(a)(9) of the Act, Defendants' acts and practices

27   constitute the advertisement of the products in question without the intent to sell them as advertised;

28   and

1    (c)    in violation of §1770(a)(19) of the Act, Defendants inserted unconscionable

2  provisions into the sales contracts at issue herein by unilaterally attempting to impose an automatic,

3  unauthorized fee for enrollment in a fictitious membership.

4    106.    By reason of the foregoing, Plaintiff and members of the Class have been (and will

5  continue to be) irreparably harmed.

6    107.    Pursuant to §1782 of the Act, in conjunction with the filing of this action, Plaintiff

7  has given written notice to Defendants of the particular violations of §1770 of the Act; Plaintiff's

8  intention to file an amended complaint if Defendants failed to offer appropriate consideration or

9  other remedy for damages under the Act, or if Defendants failed to offer appropriate consideration or

10  other remedy to all affected consumers as described in the written notice, demanded that Defendants

11  rectify the actions described above and gave notice to all affected consumers of their intent to do so.

12  Defendants failed to respond to Plaintiff's demand within 30 days of such written notice.

13    108.    Plaintiff and class members are entitled to, pursuant to Cal. Civ. Code §1780(a)(2), an

14  order enjoining Defendants' above-described wrongful acts and practices, providing restitution to

15  Plaintiff and members of the Class plus actual, punitive and statutory damages, interest and ordering

16  the payment of costs and attorneys' fees and other relief deemed appropriate and proper by the Court

17  under Cal. Civ. Code §1780.

18  **COUNT II**

19  **Unlawful, Fraudulent and Unfair Business Acts and Practices in**
**Violation of California Business and Professions Code §17200** *et seq.*
20  **(On Behalf of Plaintiff and the Members of the Class)**

21    109.    Plaintiff hereby realleges and incorporates by reference the allegations contained in

22  ¶¶1-108 above.  Plaintiff asserts this claim on behalf of herself and on behalf of the members of the

23  Class.

24    110.    California Bus. & Prof. Code §17200 *et seq.* prohibits acts of unfair competition,

25  which means and includes any "unlawful . . . business act or practice":

26    (a)    The policies, acts and practices alleged herein were intended to result in the

27  imposition on Plaintiff and class members, fees and charges which violate and continue to violate the

28  Act, Cal. Civ. Code §1750 *et seq.*, specifically §1770(a)(4), (a)(9) and (a)(19); and

- 29 -                        09-CV-0236-BEN(POR)

1        (b)     Defendants' violation of Cal. Civ. Code §§3275 and 1671, and other common

2 and statutory laws which prohibit the imposition of fees in contravention of the express terms and

3 provisions of the parties' agreements and Defendants' public and advertised representations

4 regarding the same as set forth above, also violates Cal. Bus. & Prof. Code §17200's proscription

5 against engaging in unlawful business acts or practices.

6       111.    Defendants' violation of Cal. Bus. & Prof. Code §17500 *et seq.* also violates the

7 prohibition against unlawful business acts and practices.

8       112.    Defendants' conduct violates Cal. Bus. & Prof. Code §17200 *et seq.* in that

9 Defendants either were or reasonably should have been aware that imposition of such fees is

10 unlawful under the circumstances.

11       113.    California Bus. & Prof. Code §17200 *et seq.* also prohibits acts of unfair competition,

12 which shall mean and include any "unfair or fraudulent business act[s] or practice." As more fully

13 described above, Defendants' imposition of annual unauthorized and fraudulent membership fees in

14 contravention of the express terms and provisions of the parties' agreements and Defendants' public

15 and advertised representations regarding the same, as set forth above, constitutes an unfair business

16 act or practice within the meaning of Cal. Bus. & Prof. Code §17200 *et seq.* in that the justification

17 for Defendants' conduct is outweighed by the gravity of the consequences to Plaintiff and members

18 of the Class.

19       114.    Defendants' acts as described above also had (and have) a tendency to deceive

20 Plaintiff and class members, constituting a fraudulent business act or practice. Such conduct is

21 ongoing and continues to this date.

22       115.    As a result of their conduct described above, Defendants have been (and will be)

23 unjustly enriched. Specifically, Defendants have been unjustly enriched by the receipt of their ill-

24 gotten gains from unauthorized credit card charges – many of which took place in California.

25       116.    Plaintiff reserves the right to allege other violations of law which constitute unlawful

26 business acts or practices. Such conduct is ongoing and continues to this date.

27       117.    Plaintiff and class members are, therefore, entitled to the relief available under Cal.

28 Bus. & Prof. Code §17200 *et seq.*, as detailed below.

**COUNT III**

**Untrue and/or Misleading Advertising in Violation of California
Business and Professions Code §17500 *et seq*.
(On Behalf of Plaintiff and the Members of the Class)**

118.    Plaintiff hereby realleges and incorporates by reference the allegations contained in ¶¶1-117 above.  Plaintiff asserts this claim on behalf of herself and on behalf of the members of the Class.

119.    California Bus. & Prof. Code §17500 provides that:

It is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property . . . to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement, concerning that real or personal property . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . . .

120.    As a result of the foregoing claims made by Defendants through their advertising practices and promotional materials, which Defendants either knew or by the exercise of reasonable care should have known were neither true nor accurate, and as a further result of Defendants' failure to disclose the material facts alleged herein regarding the unauthorized fees for a fictitious membership, Defendants have engaged in untrue and misleading advertising, constituting a violation of Cal. Bus. & Prof. Code §17500 *et seq*.  Such conduct is ongoing and continues to this date.

121.    Plaintiff and the class members are, therefore, entitled to the relief available under Cal. Bus. & Prof. Code §17500 *et seq*., as detailed below.

**COUNT IV**

**For Conversion
(On Behalf of Plaintiff and the Members of the Class)**

122.    Plaintiff hereby realleges and incorporates by reference the allegations contained in ¶¶1-121 above.  Plaintiff asserts this claim on behalf of herself and on behalf of members of the Class.

123.    Defendants have converted to their own use property belonging to Plaintiff and the members of the Class through unlawful acts and conduct.  The specific sum of money that was

1   converted by Defendants should be readily identifiable from information and records in Defendants'

2   possession or control.

3       124.   Defendants knowingly or intentionally charged and collected money for unordered

4   merchandise from the credit and/or debit card accounts of consumers, including Plaintiff and the

5   members of the Class.  Defendants obtained money from consumers through fraud and/or deception.

6   Defendants thus converted to their own use property, specifically monies, belonging to Plaintiff and

7   the Class.

8       125.   The specific sum of money of Plaintiff and the members of the Class that was

9   converted by Defendants is readily identifiable from information and records in Defendants'

10   possession or control.

11       126.   As a direct and proximate result of Defendants' unlawful acts and conduct, Plaintiff

12   and the members of the Class were deprived of the use of their money that was unlawfully converted

13   by Defendants, and are thereby entitled to restoration of their monies, interest on these monies from

14   the date said monies were converted by Defendants to the date of judgment, compensatory damages

15   (including overdraft fees paid by consumers due to Defendants' conversion of their money) and

16   punitive damages.

17   <div align="center"><strong>COUNT V</strong></div>

18   <div align="center"><strong>For Unjust Enrichment</strong></div>
<div align="center"><strong>(On Behalf of Plaintiff and the Members of the Class)</strong></div>

19

20       127.   Plaintiff hereby realleges and incorporates by reference the allegations contained in

21   ¶¶1-126 above.  Plaintiff asserts this claim on behalf of herself and on behalf of the members of the

22   Class.

23       128.   Defendants have received, and continue to receive, a benefit at the expense of

24   Plaintiff and the members of the Class.

25       129.   Defendants have fraudulently and/or deceptively charged and collected membership

26   fees and/or renewals from consumers, including Plaintiff and the members of the Class, for

27   unordered merchandise.  Accordingly, Defendants have received benefits which they have unjustly

28   retained at the expense of Plaintiff and the members of the Class.

130.    As a direct and proximate result of Defendants' unlawful acts and conduct, Plaintiff and the members of the Class were deprived of the use of their money that was unlawfully charged and collected by Defendants, and are therefore entitled to restoration of their monies.

### COUNT VI

**For Fraud and Deceit**
**(On Behalf of Plaintiff and the Members of the Class)**

131.    Plaintiff hereby realleges and incorporates by reference the allegations contained in ¶¶1-130 above.  Plaintiff asserts this claim on behalf of herself and on behalf of the members of the Class.

132.    The acts, conduct and practices of Defendants, as alleged above, were fraudulent and deceptive.  The use of deceptive scripts assuring consumers that they were being mailed a free 30-day trial membership is and was likely to mislead, and did in fact mislead, Plaintiff and the members of the Class.

133.    Plaintiff and the members of the Class ordered non-MWI products.  Approximately one month later, class members were enrolled in an MWI membership program and were charged an approximate amount of $60-$170 to their credit and/or debit cards.  Eleven months after the initial charge, Defendants charged the class members approximately the same amount (usually 15%-25% more) without seeking any approval to do so.  These charges, if undetected, will keep occurring in subsequent years.

134.    Through the use of deceptive scripts that were read to the class members, Defendants concealed material facts from Plaintiff and class members.  Defendants tell and have told members of the Class that they are being mailed a risk-free 30-day trial membership.  No permission to use the consumers' credit and/or debit cards is sought or obtained.  The scripts deceive members of the Class.  After mailing the unsolicited membership kit to the class members, Defendants charge the members of the Class for an unsolicited and unwanted membership.

135.    Defendants falsely and fraudulently utilize deceptive scripts that conceal from the class members that they will be automatically charged unless the class members affirmatively call

1  Defendants to cancel the membership.  Defendants' scripts contain misrepresentations and are

2  intended to, and do, deceive the class members.

3      136.  Defendants intentionally designed the scripts and the purported membership material

4  in order to mislead the class members into believing that they would receive a risk-free trial

5  membership that they could try out, and if they liked the membership, the class members could

6  contact Defendants to purchase a full membership.  The true facts are just the opposite – Defendants

7  charge the class members unless they call to cancel.

8      137.  Defendants have intentionally designed the generic membership materials so as to

9  appear to be "junk mail" so the materials will be discarded and thus never read.  If the packet mailed

10  by MWI for the risk-free trial membership is thrown out by the recipient, then the consumer will not

11  have the number to access the benefits.  The kits are mailed out bulk rate indicating the lack of value

12  of the material.  In this way, Defendants further conceal the fact that the class members will be

13  charged an annual, self-renewing membership fee.

14      138.  To further their scheme to conceal the true facts, Defendants never send any invoice

15  or bill to Plaintiff and the class members informing them that their credit and/or debit cards were

16  going to be, or were in fact, charged.

17      139.  Defendants' renewal of the purported memberships is fraudulently concealed by

18  Defendants in the same manner.  No bill or invoice is sent to the class members informing them that

19  they were going to be, or had in fact, been charged.

20      140.  Plaintiff and the members of the Class reasonably relied on Defendants and believed

21  that they were making a one-time purchase of non-MWI products.

22      141.  Defendants' false and misleading statements and suppression of the material facts set

23  forth above and throughout this Amended Complaint defrauded Plaintiff and the Class, and are in

24  direct violation of federal and state statutes, as well as principles of common law, for which Plaintiff

25  and the members of the Class are entitled to recover damages, including punitive damages.

26

27

28

**COUNT VII**

**For Negligent Misrepresentation**
**(On Behalf of Plaintiff and the Members of the Class)**

142.     Plaintiff hereby realleges and incorporates by reference the allegations contained in ¶¶1-141 above.  Plaintiff asserts this claim on behalf of herself and on behalf of the members of the Class.

143.     In making representations to Plaintiff and members of the Class described herein, Defendants failed to fulfill their duty to disclose the material facts set forth above.  Among the direct and proximate causes of said failures to disclose were the negligence and carelessness of Defendants.

144.     Defendants owed Plaintiff and members of the Class the duty to act with reasonable care in retaining, training and supervising their agents and sales agents.  Defendants also failed to take reasonable steps to ensure that their representatives conducted themselves in accordance with the law and to ensure that the representatives disclosed all material facts and did not misrepresent or omit such facts in conducting such sales.

145.     Defendants, as set forth herein, breached their duties to retain, train, supervise and discipline their sales force and to ensure full disclosure by them.

146.     Plaintiff and the members of the Class were unaware of the falsity of Defendants' affirmative misrepresentations and their failure to disclose that Plaintiff and members of the Class would be charged undisclosed and unauthorized fees for a fictitious membership on their credit and/or debit card accounts.  Plaintiff and the members of the Class, as a direct and proximate cause of Defendants' breaches of their various duties, reasonably relied upon such representations to their detriment.  By reason thereof, Plaintiff and members of the Class have suffered damage, in an amount according to proof at time of trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and on behalf of the members of the Class, prays for judgment against Defendants as follows:

A.     As to the Second and Third Counts:

1        (i)     pursuant to Cal. Bus. & Prof. Code §§17203 and 17535, Plaintiff and

2 members of the Class, seek an order of this Court ordering Defendants to immediately cease all acts

3 of unfair competition and enjoin Defendants from continuing to conduct business via the unlawful,

4 unfair or fraudulent business acts or practices as particularized herein;

5        (ii)    Plaintiff also requests an order requiring Defendants to identify all class

6 members and pay restitution to Plaintiff and all members of the Class so as to restore all funds

7 acquired by means of any act or practice declared by this Court to be an unlawful, fraudulent or

8 unfair business act or practice, in violation of applicable laws, statutes or regulations or constituting

9 unfair competition or untrue or misleading advertising; and

10       (iii)   Plaintiff also requests an order of the Court requiring Defendants to disgorge

11 to the State of California all monies wrongfully collected that could not be returned to class members

12 as alleged herein and all monies and profits derived by Defendants as a result of the wrongful,

13 deceptive, unfair and/or unlawful acts, conduct and practices alleged above, and requiring

14 disgorgement and/or imposing a trust upon Defendants' ill-gotten monies and freezing Defendants'

15 assets.

16     B.   As to all Counts:

17        (i)     for an order certifying the Class and appointing Plaintiff and her counsel to

18 represent the Class;

19        (ii)    an order requiring Defendants to effect and pay the costs of restoring the

20 rights and benefits owing to Plaintiff and other members of the Class under the agreements which

21 are the subject of this action and a corrective advertising campaign;

22       (iii)   for a declaration that any unordered merchandise received by Plaintiff and the

23 members of the Class from Defendants may be treated as a gift by the recipient under applicable

24 federal law;

25       (iv)   for an order imposing a constructive trust upon all monies and assets

26 Defendants have acquired from Plaintiff and the members of the Class as a result of Defendants'

27 unlawful, unfair, fraudulent and deceptive practices;

28

1            (v)    restitution of all monies acquired by Defendants from Plaintiff and the Class

2    as a result of Defendants' wrongful practices described above as may be provided for by equity

3    and/or by statute;

4            (vi)    actual and compensatory damages sustained by Plaintiff and the members of

5    the Class as a result of Defendants' unlawful acts and conduct, including interest and any overdraft

6    fees caused by Defendants' unlawful taking of consumers' money in an amount to be proven at trial,

7    including any damages as may be provided for by statute;

8            (vii)    exemplary and punitive damages;

9            (viii)   reasonable attorneys' fees and costs of suit;

10           (ix)    pre-and post-judgment interest; and

11           (x)    For an order awarding such other and further relief as this Court may deem

12   just and proper.

13                      **JURY DEMAND**

14         Plaintiff demands a trial by jury.

15   DATED:  March 2, 2009          COUGHLIN STOIA GELLER

16                          RUDMAN & ROBBINS LLP
                     FRANK J. JANECEK, JR.

17                        CHRISTOPHER COLLINS
                     CHRISTIE SURIEL

18                           s/ CHRISTOPHER COLLINS

19                        CHRISTOPHER COLLINS

20                        655 West Broadway, Suite 1900
                     San Diego, CA  92101

21                        Telephone:  619/231-1058
                     619/231-7423 (fax)

22                        LANDSKRONER • GRIECO • MADDEN, Ltd.

23                        JACK LANDSKRONER
                     1360 West 9th Street, Suite 200

24                        Cleveland, OH  44113
                     Telephone:  216/522-9000

25                        216/522-9007 (fax)

26

27

28

1
2                                          LAW OFFICES OF ARTIE BARAN, APC
                                           ARTIE BARAN
3                                          4545 Murphy Canyon Road, Suite 300
                                           San Diego, CA  92123
                                           Telephone:  858/560-5600
4                                          858/836-0318 (fax)

5                                          Attorneys for Plaintiff

6      S:\CasesSD\Memberworks\01 CA STATE_Callahan\CPT FAC Callahan Federal.doc

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

<u>CERTIFICATE OF SERVICE</u>

2          I hereby certify that on March 2, 2009, I electronically filed the foregoing with the Clerk of

3     the Court using the CM/ECF system which will send notification of such filing to the e-mail

4     addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

5     mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

6     participants indicated on the attached Manual Notice List.

7          I certify under penalty of perjury under the laws of the United States of America that the

8     foregoing is true and correct.  Executed on March 2, 2009.

9

10                                             <u>s/ CHRISTOPHER COLLINS</u>
                                                CHRISTOPHER COLLINS

11                                             COUGHLIN STOIA GELLER
                                                   RUDMAN & ROBBINS LLP
12                                             655 West Broadway, Suite 1900
                                                San Diego, CA  92101-3301
13                                             Telephone: 619/231-1058
                                                619/231-7423 (fax)
14

15                                             E-mail:  ChrisC@csgrr.com

16

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 3:09-cv-00236-BEN-POR

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Marina Bogorad**
  mbogorad@skadden.com,bparham@skadden.com

- **Christopher Collins**
  Chrisc@csgrr.com

- **Robert J Herrington**
  robert.herrington@skadden.com,nandi.berglund@skadden.com,joanne.otero@skadden.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

6

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

0001108-09

| | |
|---|---|
| JAMMIE McKAY, 1400 Jackson Street, NE<br>Washington, DC 20017 and<br><br>CLAIRE TEASLEY, 2117 "L" Street, NW<br>Suite 273 – Washington, DC 20037,<br>On Behalf of Themselves and All Others<br>Similarly Situated in the District of Columbia,<br><br>Plaintiffs,<br><br>vs.<br><br>VERTRUE INCORPORATED, previously<br>known as MEMBERWORKS,<br>INCORPORATED<br>20 Glover Avenue<br>Norwalk, CT 06850<br><br>ADAPTIVE MARKETING LLC<br>20 Glover Avenue<br>Norwalk, CT 06850, and<br><br>DOES 1 through 50,<br><br>Defendants. | Case No.<br><br>CLASS ACTION<br><br>DEMAND FOR TRIAL BY JURY<br><br>(1) VIOLATION OF THE DISTRICT OF<br>COLUMBIA CONSUMER PROTECTION<br>PROCEDURES ACT;<br><br>(2) CONVERSION;<br><br>(3) UNJUST ENRICHMENT;<br><br>(4) FRAUD AND DECEIT; AND<br><br>(5) NEGLIGENT MISREPRESENTATION |

RECEIVED
Civil Clerks Office

FEB 2 3 2009

Superior Court of the
District of Columbia
Washington DC

ORIGINAL COMPLAINT

NOW COMES, Jammie McKay and Clarie Teasley, on behalf of themselves and all others

similarly situated in the District of Columbia (collectively, "Plaintiffs"), by and through counsel, and

for their complaint state the following:

- 1 -

## SUMMARY OF COMPLAINT

1.      Defendants MemberWorks, Inc.,[1] also known as MWI Essentials, MWI Leisure Advantage, MWI Home & Garden, MWI Connections, MWI Value Max and other MWI entities, which subsequently changed its name to Vertrue Incorporated (collectively, "MWI"),[2] in conjunction with its co-conspirators, the telemarketing entities (collectively, the "Telemarketers" or "Telemarketing Entities")[3] and the bait product suppliers (the "Bait Product Suppliers") have been engaged in the practice of making unlawful charges to consumers' credit and/or debit cards through a scheme involving the mailing of an unordered membership program marketed through the use of a

---

[1]      MemberWorks, Inc., with Adaptive Marketing LLC and Doe defendants 1 through 50 are referred to herein as "Defendants."

[2]      As used in this Complaint, the term "Defendants" does not refer to West Corporation, and/or West Telemarketing Corporation, and/or West Telemarketing, L.P. and their predecessors, successors, present and former owners, subsidiaries, affiliates, employees, officers, directors, agents, attorneys and assigns, including West Direct, Inc. and West TeleServices Corporation (collectively, "West"). Therefore, any reference to acts or omissions by "Defendants" does not include or refer to the West entities. Further, the claims for relief in this Complaint do not arise from actions or omissions under the following agreements: the March 16, 1998 "Joint Marketing Agreement between West Telemarketing Corporation and MemberWorks Incorporated," and/or the January 1, 1999 "Agreement" between West Telemarketing Corporation and MemberWorks Incorporated, and/or the July 1, 1999 "Joint and Wholesale Marketing Agreement" between West Telemarketing Corporation, West Teleservices Corporation and MemberWorks Incorporated and/or the December 1, 2001 "Wholesale and Retail Marketing Agreement" between MemberWorks Incorporated and West Direct, Inc., and any amendments or addendums to these agreements. Thus, by way of example (but without limitation), any acts or omissions that include, relate to or were part of an upsell to a Tae-Bo product that occurred under or as part of one of the agreements listed in this footnote 1, are not included in the claims and allegations of this Complaint.

[3]      As used in this Complaint, the terms "Telemarketers" and "Telemarketing Entities" and the allegations of this Complaint referring to acts or omissions of "Telemarketing Entities" and "Telemarketers" do not include or refer to the actions or omissions of West Corporation and/or West Telemarketing Corporation under the March 16, 1998 "Joint Marketing Agreement between West Telemarketing Corporation and MemberWorks Incorporated," and/or the January 1, 1999 "Agreement" between West Telemarketing Corporation and MemberWorks Incorporated, and/or the July 1, 1999 "Joint and Wholesale Marketing Agreement" between West Telemarketing Corporation, West Teleservices Corporation and MemberWorks Incorporated and/or the December 1, 2001 Wholesale and Retail Marketing Agreement between MemberWorks Incorporated and West Direct, Inc., and any amendments or addendums to these agreements.

deceptive script. Defendants obtain the necessary information to mail their unwanted membership (and charge for it) through the use of a telemarketing scam. By this method, Defendants are able to accomplish the old and pernicious practice of mailing unsolicited merchandise and then tricking consumers into paying for it.

2.      MWI, in concert with the Telemarketers and the Bait Product Suppliers, through agreements with MWI, capture consumers' credit and/or debit card information when those consumers call to order products – products which are *not* marketed or produced by MWI. This is referred to as an "inbound" telemarketing call, as the consumer initiates the call. The consumer has initiated the call to inquire about or purchase a product usually advertised with a 1-800 number. The consumer *does not call* to order an MWI product. In fact, the consumer has most likely never heard of MWI and has no expectation of receiving an MWI membership program when the call is made by the consumer. Moreover, the consumer gives his/her credit card or debit card information, which Defendants capture long before the consumer ever hears of any MWI product. This private financial information is then used by Defendants to charge the consumer for a membership the consumer never wanted or agreed to purchase.

3.      MWI has reached agreements with a number of Telemarketing Entities, whereby the consumer is subjected to a deceptive sales pitch to purchase an MWI membership program before the call made by the consumer to purchase an unrelated product is completed. This is referred to as an "unrelated upsell." MWI's products are not related to the product sought by the consumer and the consumer has no idea that an MWI product will be made a part of the call – or even what an MWI product is.

4.      MWI prepares a script for the Telemarketers to use for the unrelated upsell. As more specifically alleged below, MWI pays the Telemarketers and the Bait Product Suppliers a fee for each consumer who they enroll in MWI's membership programs. Some number of MWI

membership programs are sold through a joint venture and wholesale arrangement between MWI and the Telemarketers, where MWI and the Telemarketers jointly pay a separate fee to the Bait Product Suppliers for each of their customers enrolled in an MWI program. The Telemarketers, who handle the inbound calls, approve the scripts, read the scripts to the consumers, capture the consumers' credit and/or debit card information and transmit that information to MWI to mail the "kits" and bill the consumers' cards.

5.       After the consumers have given the information necessary to purchase the product the consumers called to buy, a deceptive script is read to the consumers informing them that they will be sent *free* materials in the mail. Consent to receive the materials in the mail is not requested. Consent to bill the credit and debit cards is not requested. In actuality, Defendants enroll consumers in a membership and mail them a membership "kit." Consumers are deceived and do not know that they have been enrolled in a "membership" and will be charged $60-$150 annually unless they call MWI to inform them that they want to cancel the FREE 30-day trial membership. MWI mails a packet with a membership card to the consumers which allows the consumers to access the so-called benefits of an MWI membership. By enrolling consumers who called to order an unrelated product and mailing those consumers a membership kit without the prior express consent of the consumers, consumers are unwittingly charged by Defendants for a membership they neither requested nor intended to purchase.

6.       Consumers are never asked their permission for the Telemarketers to provide their credit and/or debit card information to MWI. MWI has the Telemarketing Entities transfer the class members' confidential credit and/or debit card information to MWI, who uses the information to charge consumers membership fees and membership renewal fees which range from $60-$150 annually. Although MWI processes the charges, neither it nor the Telemarketing Entities send the

- 4 -

consumers any bill or invoice notifying them that their credit and/or debit cards have been assessed such a charge.

7.     In order to conceal their scheme, MWI will reverse the charges for those consumers who notice that they have been assessed a charge on their credit and/or debit card statements who call to question the charge and get through Defendants' multifarious system of avoiding cancellations.  However, as Defendants know, a significant percentage of the population does not closely review their credit and/or debit card statements, and will not notice the offending charge (as was the case with plaintiff Patricia Sanford in the federal action, *Sanford, et al. v. MemberWorks, Inc., et al.*, No. 02-CV-0601 (S.D. Cal.) ("*Sanford* Federal Class Action"),[4] who did not realize she had been assessed such a charge until the *second* time it appeared on her credit card statement). These individuals are charged between $60-$150, each year, until they notice the charge and complain. ***Defendants never send any bill or invoice to the class members notifying them that they have been, or will be, charged***. The named Plaintiffs and the class members in this action were all victimized by Defendants by this same exact method.

8.     Defendants share in the revenues and profits generated from their deceptive scheme of mailing unordered merchandise and then charging consumers for it.

_____

[4]     The *Sanford* Federal Class Action was filed in 2002, as a class action against West and MWI in the United States District Court for the Southern District of California.  The claims against MWI were asserted on behalf of all consumers in the United States enrolled in an MWI membership in connection with their purchase of an unrelated bait product.  The claims against West were asserted on behalf of all consumers in the United States enrolled in an MWI membership program who were customers of a joint venture between MWI and West or were wholesale customers of West.  The district court dismissed the federal count against West and declined to exercise supplemental jurisdiction over the state law claims.  Plaintiffs re-filed the state law claims against West (*Sanford v. West Corporation and West Telemarketing Corporation, et al.*, Case No. GIC 805541 (the "*West* Action")) and was ultimately assigned to the Honorable Ronald L. Styn.  The *West* Action included the same or similar claims, based on the same factual allegations asserted in this action.  The *West* court certified a class (February 16, 2007 Order Granting Plaintiffs' Motion for Class Certification), the case settled and Final Approval of the settlement was entered on December 24, 2008.

9.     Defendants' conduct violates the District of Columbia Consumer Protection Procedures Act ("CPPA"), and also constitutes fraud and deceit, conversion, unjust enrichment and negligent misrepresentation.  Plaintiffs, therefore, seek on behalf of themselves and all others similarly situated in the District of Columbia compensatory and punitive damages, costs, attorneys' fees and injunctive relief against Defendants barring them continuing deceptive and false business and trade practices in connection with their advertising and enrollment in Defendants' membership programs.

### JURISDICTION AND VENUE

10.     This is an action for damages, injunctive relief and other statutory relief pursuant to the CPPA, D.C. Code §§28-3901-28-3911, and the common law to obtain injunctive relief to prevent the unlawful acts and practices alleged in this Complaint and other relief, including restitution, civil penalties, costs of investigation and attorneys' fees.

11.     This Court has jurisdiction over Defendants pursuant to D.C. Code §11-921 because each defendant is either a corporation or association organized under the laws of the District of Columbia, a foreign corporation or association authorized to do business in the District of Columbia, or does sufficient business, has sufficient minimum contacts with District of Columbia or otherwise intentionally avails itself of the District of Columbia market, through the manufacturing, production, promotion, sale, marketing and distribution of its products in the District of Columbia, and committing a tortuous act within the District of Columbia to render the exercise of jurisdiction by the District of Columbia courts permissible under traditional notions of fair play and substantial justice.

12.     Venue is proper in this Court since Plaintiffs, as well as numerous class members reside in and throughout the District of Columbia and Defendants either maintain offices in the District of Columbia, a substantial portion of the practices complained of herein occurred in the

District of Columbia or because Defendants have received substantial compensation as a result thereof in the District of Columbia.

13.     Venue is also proper in this Court in that the state law claims alleged herein were severed from the *Sanford* Federal Class Action, and the federal court directed that the state law claims be filed in state court.

## PARTIES

14.     Plaintiff Jammie McKay ("McKay") has been, at all times relevant to the action, a resident of the District of Columbia. Plaintiff McKay purchased Tae-Bo fitness videotapes after viewing the television advertising campaign for the product. In connection with this purchase, MWI charged plaintiff McKay unsolicited, unauthorized and unexpected charges for several of MWI's membership programs. Plaintiff McKay was never asked for his consent to be charged for any of these MWI membership programs. Moreover, plaintiff McKay never utilized or received any benefit from any of the MWI membership programs. Plaintiff McKay's credit card was assessed unsolicited and unexpected charges totaling approximately $180.00 for one or more MWI membership programs.

(a)     On or about February 14, 2000, at the end of the call to purchase the bait product, Tae-Bo fitness exercise videotapes, the telemarketer who answered the call read MWI's deceptive telemarketing pitch to plaintiff McKay informing him he would be receiving a risk-free 30-day trial membership, emphasizing the thank you gift was FREE and that plaintiff McKay, "WON'T BE BILLED." The language of the deceptive telemarketing pitch is quoted in full in ¶27 below. The telemarketer thereafter transferred plaintiff McKay's confidential credit card information to MWI using the wires. Thereafter, on March 14, 2000, in connection with the Tae-Bo product, plaintiff McKay's credit card was assessed an unsolicited and unexpected $84.00 charge by Defendants for a Travel Arrangement's membership.

- 7 -

(b)     On January 15, 2001, MWI charged plaintiff McKay's credit card an unsolicited and unexpected renewal fee of $99.95 (charged as "MWI Travel").

15.     Until recently, plaintiff McKay was completely unaware of the charges or that he had been enrolled in any MWI membership and/or that his credit card had been billed.

16.     Plaintiff Claire Teasley ("Teasley") has been, at all times relevant to the action, a resident of the District of Columbia.  Plaintiff Teasley purchased Tae-Bo fitness videotapes after viewing the television advertising campaign for the product.  In connection with this purchase, MWI charged plaintiff Teasley unsolicited, unauthorized and unexpected charges for a MWI membership program.  Plaintiff Teasley was never asked for her consent to be charged for the MWI membership program.  Moreover, plaintiff Teasley never utilized or received any benefit from any of the MWI membership programs.  Plaintiff Teasley's credit card was assessed unsolicited and unexpected charges for one or more MWI membership programs.

(a)     On or about April 9, 2000, at the end of the call to purchase the bait product, Tae-Bo fitness exercise videotapes, the telemarketer who answered the call read MWI's deceptive telemarketing pitch to plaintiff Teasley informing her she was receiving a risk-free 30-day trial membership in Travel, emphasizing the thank you gift was FREE and that plaintiff Teasley, "WON'T BE BILLED."  The language of the deceptive telemarketing pitch is quoted in full in ¶27 below.   The telemarketer thereafter transferred plaintiff Teasley's confidential credit card information to MWI using the wires.  Thereafter, on May 9, 2000, in connection with the Tae-Bo product, plaintiff Teasley's credit card was assessed an unsolicited and unexpected $84.00 charge by Defendants for a Travel Arrangement's membership.

(b)     On March 12, 2001, MWI charged plaintiff Teasley's credit card an unsolicited and unexpected renewal fee of $99.95 (charged as "MWI Travel").

17.     Until recently, plaintiff Teasley was completely unaware of the renewal charge or that she had been enrolled in any MWI membership and/or that her credit card had been billed.

18.     In addition, Plaintiffs include in their allegations the names, the dates of the fraudulent charges and the bogus membership enrollments of unnamed District of Columbia class members.[5] The names of the unnamed class members represent only a fraction of the unnamed class members included in the proposed class.  The identity of the remainder of the unnamed class members are contained within MWI's electronic database(s), and will be revealed through discovery. Each of these unnamed class members, as well as each of the unnamed class members who have yet to be identified through discovery, received the deceptive telemarketing pitch at the end of their calls, the language of which is quoted at ¶27 below.

19.     At this time, without the benefit of discovery from Defendants, Plaintiffs are aware that the most recent telemarketing pitch was made on or about September 10, 2002, and that the most recent fraudulent charge occurred on October 15, 2002.  Based upon a database MWI produced in the related California state court action, Plaintiffs are aware that the most recent fraudulent charge to a *West* subclass member was levied on March 9, 2007 – the month that the database was produced. Accordingly, based upon this information Plaintiffs believe that discovery will reveal a continuation of the pattern and practice of fraudulently charging the credit and debit cards of the class members in this action, through at least March 2007, through the present, and for the foreseeable future.

20.     Defendant Vertrue Incorporated, previously known as MWI, has been, at all times relevant to the action, a Delaware corporation whose primary place of business is 20 Glover Avenue, Norwalk, Connecticut.  Defendant MWI does business in the District of Columbia, and throughout

---

[5]     The information regarding these unnamed class members was obtained pursuant to a protective order and is required to filed under seal.  If the Court desires, Plaintiffs will amend this complaint to add these additional unnamed class members.

- 9 -

the nation, as MWI Essentials, MWI Leisure Advantage, MWI Home & Garden, MWI Connections, Health Trends, Travel Arrangements, Transmedia, Cardmember Protection Service, Countrywide Dental, 24 Protect, Smartsource, Value Max Shopping Service, Money Master Tai Value Max, Tai Vital Basics and various other names under which it markets and charges consumers, by and through nationwide telemarketing campaigns, as well as by and through the interstate instrumentality of mailings throughout the District of Columbia and the nation. Defendant MWI entered into express and tacit agreements with the Telemarketers. Defendant MWI drafted the deceptive script used and sought comments from and approval by the Telemarketers. Defendant MWI operates and is involved in the unlawful scheme of charging the credit card and/or debit card accounts of consumers for unordered merchandise.

21.    Defendant Adaptive Marketing LLC is a Delaware limited liability company with its principal place of business in Norwalk, Connecticut (collectively with Vertrue Incorporated). Adaptive Marketing LLC is a wholly-owned subsidiary and "operating company" of Vertrue Incorporated. Adaptive Marketing LLC shares personnel with Vertrue Incorporated and markets Vertrue Incorporated's membership programs. There exists, and at all relevant times, a unity of interest and ownership between MWI and Adaptive Marketing LLC, such that any individuality and separateness between each of them ceased and each is the alter ego of the other in that each entity is completely controlled, dominated, managed and operated without regard for corporate individuality.

22.    The true names and capacities of defendants sued herein as Does 1 through 50, inclusive, are presently unknown to Plaintiffs, who therefore sues the Doe defendants by such fictitious names. Plaintiffs will seek to amend this Complaint and include the Doe defendants' true names and capacities when they are ascertained. Each of the fictitiously named defendants are responsible in some manner for the conduct alleged herein and are therefore responsible for the damages suffered by Plaintiffs and class members.

23.     In committing the wrongful acts alleged herein, Defendants have pursued a common course of conduct, acted in concert with, aided and abetted and conspired, in furtherance of their common plan, scheme or design to make unauthorized charges to customers' credit cards and/or debit cards for an unsolicited, unwanted and unordered membership and thereafter to conceal and cover up their wrongdoing – all for their own personal profit. Defendants actually knew, or should have known, of the fraudulent conduct being committed and actively participated in covering up its true nature. Thus, in addition to the wrongful conduct herein alleged as giving rise to primary liability, Defendants further aided and abetted and knowingly assisted each other in the breach of their respective duties, contracts and obligations as herein alleged, and acted as the agent of each other in participating in this wrongdoing.

24.     At all times herein mentioned in the claims for relief alleged herein, each and every defendant was an agent and/or employee of each and every other defendant. In doing the acts alleged in the claims for relief alleged herein, each and every defendant was acting within the course and scope of this agency or employment, and were acting with the consent, permission and authorization of each of the remaining Defendants. All of the actions of each defendant as alleged in the claims for relief stated herein were ratified and approved by every other defendant or their officers or managing agents.

## DEFENDANTS' WRONGFUL CONDUCT

**The Upsell**

25.     Defendants obtain the necessary information to bill consumers for MWI memberships by piggybacking onto popular consumer products. MWI looks for products advertised heavily on television or in print which ask consumers to call a 1-800 number to order that product. Some examples of the products which MWI uses to upsell its programs are: Nad's, Tae-Bo, vitamins, knives, Q-Ray bracelets, Edgemaster paint roller, Simoniz car washer, flowers, dance videos, AB Slider, ultrasonic toothbrushes and OxiClean.

- 11 -

26.     The consumers see the advertising for the product (such as a Tae-Bo, a Nad's, a Simoniz car washer or an OxiClean infomercial) and call the 1-800 number. The consumer has not seen or heard anything about any MWI product and has no desire or intent to purchase an MWI product. The consumer is most likely to wind up speaking with an employee of the Telemarketers. The consumers go through the process of ordering the product they wanted and the Telemarketing Entities who handle the incoming calls "capture" the consumers' credit or debit card information. This portion of the call may take anywhere from 5-15 minutes or so.

27.     Before the Telemarketers let the consumers off the line, MWI has the Telemarketing Entities read the following deceptive script to the consumers:

> Mr(s) _____, for purchasing **[NAME OF BAIT PRODUCT]** today, we're sending you a risk-FREE 30-day membership to **[MWI PROGRAM]**, a service designed to SAVE YOU 20% from leading stores such as **[STORES]**, PLUS additional savings on eyewear, beauty products, haircuts and more! After 30 days, the service is extended to a full year for just $6 a month, billed annually in advance to the credit card you're using today. If you want to cancel, just call the toll-free number that appears in your kit in the first 30 days and YOU WON'T BE BILLED. So look for that kit in the mail, OKAY?[6]

28.     The words in ALL CAPITAL LETTERS are the words the telemarketer emphasizes when reading the script. In other words, MWI emphasizes that the trial membership is "FREE," and that class members "WON'T BE BILLED." At the end of the call, MWI merely tells class members: "So look for that kit in the mail, OKAY?" MWI does not ask the consumers if they want to receive the purported trial membership, let alone any agreement to be enrolled in the membership. And, MWI does not ask the consumers for permission or consent to charge their credit and/or debit cards.

---

[6]     While there can be minor variations to the script – *e.g.*, the list of stores can change, the MWI program can change, the script may say "to thank you for your purchase," or as a "special thanks," and such – the substance of the telemarketing pitch is identical across all scripts.

29.     At most, the consumer is led to believe that a free trial membership will be mailed to the consumer to evaluate, and if the consumer likes the product he or she can call to purchase a membership. *No express consent to mail the membership is obtained from the consumer, let alone any agreement to be enrolled in the membership. Nor is any express consent requested to bill the consumers' credit or debit cards.* This is Defendants' "upsell" and Defendants' excuse for charging consumers for a membership program they neither wanted nor ordered.

30.     Notwithstanding the failure to obtain consent to enroll consumers in MWI's membership programs and charge their cards, the Telemarketing Entities transfer the class members' confidential credit and/or debit card information, which they obtained when the consumers called to purchase the unrelated bait products, to MWI. MWI then mails a membership kit and charges the consumers' credit and/or debit cards. Neither Defendants, nor the Telemarketing Entities, nor the Bait Product Suppliers seek or obtain the consumers' express consent to charge the MWI membership to the consumers' credit and/or debit card accounts.

31.     The fraud at issue is the assessment of an unsolicited and unlawful fee charged to consumers which the consumers did not seek out and did not want. The consumers are deceived by Defendants' purposely misleading script, then mailed a membership kit and enrolled and charged for a membership they did not want or order. Defendants' automatic self-renewing membership is an outright theft of money under the guise of a membership.

**The Mechanics of the Scheme**

32.     To generate calls, Defendants rely on the popularity of the non-MWI products offered by the bait entities.

33.     After a consumer has viewed an infomercial or read an advertisement for a bait product they want to purchase, the class members call a "1-800" telephone number to order the product. The purchasers of these products are given the option of purchasing by credit card or debit

- 13 -

card. To complete the purchase, the class members are required to provide their names, credit or debit card numbers and the expiration date to the Telemarketers who answer the calls and process the sales. Thus, at the end of the purchase transactions, the Telemarketing Entities possess all of the information necessary for MWI to assess the unsolicited membership fees against unsuspecting consumers.

34.     After the financial information for the sale of the advertised bait product is obtained by the Telemarketers, MWI has them read the "upsell" script. The message of the upsell script is that the consumer will be mailed a 30-day, risk-free trial membership. The class members are not asked whether they want to enroll, they are not billed or invoiced and they are not asked to give or to confirm their credit or debit card information to pay for the membership. Instead, Defendants wait approximately 30 days and then charge the class members' credit and/or debit cards using the information Defendants received from consumers when they purchased the product they actually wanted.

35.     The class members are never asked to provide their confidential credit or debit card information in connection with the unrelated MWI upsell. Class members are never asked to give permission to permit their confidential financial information to be transferred to defendant MWI. The class members are never even asked if they want to receive the purported membership materials – rather they are simply informed that for purchasing the advertised product risk-free they are being sent a 30-day trial membership. The purported membership kit which allows the consumer to access the so-called benefits of the program are mailed shortly after the call.

36.     Approximately one month after the call, defendant MWI uses the confidential financial information it received from the consumers' purchases of the unrelated product to charge the class members' credit and/or debit cards. On information and belief, some consumers are "enrolled" more than once. This situation would only arise if the consumer did not know they had

- 14 -

already been enrolled, or were going to be enrolled, in the purported membership as no one would twice pay $60-$150 to MWI to join the same membership. It, of course, makes no difference to MWI how many times a consumer is enrolled, as each "enrollment" is simply another $60-$150 a year for MWI, other than if a member is "enrolled" multiple times, they are more likely to notice the offending charge.

37.    The class members do not know they have been enrolled in MWI's membership programs and therefore never use any of the programs' so-called benefits (*see* ¶¶54-61 below). Defendants count on this deception and subsequent non-use of the benefits to hold the costs of the programs to a nominal amount thus making the annual fees pure profit for Defendants.

38.    Unless the class member notices the charge to their debit and/or credit card and call to complain, the class member will continue to be charged $60-$150 each and every year. As with the initial charges to the class members' credit and/or debit cards, no invoice or bill is ever sent to the class members to inform them that their credit and/or debit cards have been, or will be, charged by defendant MWI. What is even more insidious is that the purported "annual" membership is charged every 11 months and, similarly, no invoice or bill is ever sent to the class members for renewal charges.

39.    The fraud is perpetuated because the customers' prior expressed acceptance or consent to enroll in the membership is not obtained. Defendants do not clearly and unambiguously communicate the terms of the purported membership programs. The membership that is mailed is neither risk-free, nor a free 30-day trial as was represented by Defendants. Defendants charge the class members for a membership they did not order. The consumers charged for the membership who never use the so-called benefits are paying $60-$150 per year for nothing.

40.    Defendants know that consumers do not understand that they will be charged a membership fee unless they call to cancel. Defendants mail the membership kit fully understanding

- 15 -

that the consumers will not understand they are being charged for the materials. Further, Defendants have designed the generic membership materials so as to appear to be "junk mail" so the materials will be discarded and thus never read. Defendants purposely design their scripts to maximize consumer confusion and allow Defendants to "enroll" the maximum number of unsuspecting persons. Defendants then mail the membership kit to the deceived and/or confused consumers who Defendants "enroll" in the MWI memberships. Defendants are able to maximize their profits at the expense of the consumers deceived by Defendants' scheme.

41.     The *only* notice that a class member receives that he or she has been charged for a membership is his or her credit or debit card statement reflecting a charge – which may or may not identify MWI as the entity who levied the charge – which the class member may not notice depending on how closely the class member reads his or her credit and/or debit card statement. If the class member notices and challenges the charge, the charge may be reversed or a pro rata refund may be sent. In this way, Defendants conceal their deception from the other class members and from the public. Those class members who do not notice the charge are billed every 11 months until they notice that they have been charged and complain.

42.     These acts take place as a result of the concerted action, agreement and direction by Defendants.

**The Lack of Audiotaped Confirmations**

43.     Until required as part of the Nebraska Attorney General "Better Practices" requirements, Defendants failed to confirm consumers' acceptance of the upsell offer by MWI for many, if not most, of the "enrolled" consumers.

44.     Accordingly, no audiotaping of the upsells occurred for most of the class members deceived by Defendants.

**The Deceptive "Upsell" Script**

45.     Defendants worked together to produce a script to be read to each consumer.  MWI creates the deceptive scripts to be read when marketing the MWI programs and the Telemarketing Entities comment on and approve the deceptive scripts.

46.     Defendants purposely avoid clearly and unambiguously notifying consumers that their credit and/or debit cards will be charged between $60-$150 for the "membership" mailed to them.  No focus groups or other consumer research is undertaken by Defendants.  Even after Defendants received numerous consumer complaints, ranging from a lack of any recollection of ever even hearing of MWI or any of its purported memberships to accusations of fraud and theft, Defendants avoided ascertaining whether their scripts clearly and unambiguously (i) requested consent from the consumer to charge for the membership, (ii) notified the consumers of the terms of the purported membership or (iii) informed the consumers that their credit and/or debit cards would be charged.

47.     Defendants are well aware of the fact that consumers are deceived by their scripts as seven state attorneys general alleged that MWI was deceiving consumers.  MWI settled the matters with five of the attorneys general, and agreed to pay civil penalties in excess of $2 million to one of those attorneys general.  Defendants know that consumers are misled into believing that they are not making a purchase decision regarding the MWI memberships.  Defendants' script is intended to, and does, convey to consumers that the membership mailed to them is a free trial membership, which if they like the membership they can call to order.

48.     The scripts are written and designed to be read in a manner intended to confuse, mislead and deceive consumers.

49.     Defendants' conduct is deceptive, unlawful and fraudulent and it cannot be justified in any manner.  Indeed, seven different attorneys general have determined that the MWI scripts are

- 17 -

deceptive and do not clearly and unambiguously communicate to consumers that they will be charged for an annual self-renewing membership unless they affirmatively act to cancel the membership. Nor do the scripts inform the class members that they will be required to return the purported membership card should they desire to cancel.

**The Membership**

50.    After receiving the class members' confidential financial information by piggybacking onto the advertised product, defendant MWI mails out membership materials and customer service information to the persons enrolled. Then, MWI simply bills the consumers $60-$150 each year on the consumer's credit or debit card.

51.    Defendants have designed the generic purported membership materials so as to appear to be "junk mail" in the hopes that the materials will be discarded and thus never read. If the packet mailed by MWI for the risk-free trial membership is thrown out by the recipient, then the consumer will not have the number to access the so-called benefits. The kits are mailed out bulk rate indicating the lack of value of the material. The kits contain a cheap paper membership card typical of cards received in mail solicitations. This card is, however, the actual membership card for the enrolled member. By making the kit typical junk mail, Defendants further conceal the fact that the class members have been charged an annual, self-renewing membership fee.

52.    Other than the one line on their credit and/or debit card statements, the class members are not notified that they have been "enrolled" in an MWI membership program or that their credit and/or debit cards have been charged. Defendants do not send new "members" any invoice or record of the charge. Moreover, after the membership kits are mailed and consumers are charged and throughout the duration of the "membership," class members never hear from any of the Defendants about any membership benefits. After the initial mailing of the membership kit, consumers do not

receive any newsletters, coupons, surveys or any other notifications. The only thing they receive is a charge of $60-$150 on their credit and/or debit cards.

53.     The term "membership" used by Defendants is merely an excuse to take money from consumers who submit their credit and/or debit card information for their purchase of other products. Defendants take consumers' money by mailing them an unordered membership and then charging them for it.

**Lack of Usage of the Membership Benefits**

54.     The manner in which a consumer can access the purported membership is further evidence of Defendants' scheme to defraud. Other than the purported membership kit, Defendants do not send "members" anything. No newsletter or other correspondence is sent to the class members. No confirmation letters or satisfaction surveys are sent. The class members receive nothing after they are charged, or before the next time they are "renewed."

55.     For consumers to obtain the purported membership benefits, they must contact defendant MWI either by telephone or via the Internet, and obtain certificates through MWI. If the retail establishment works with MWI, then the consumer can order a certificate that can be used at that retail establishment. Unless the consumer knows to call MWI, they receive nothing.[7]

56.     In the *West* Action, MWI produced a database containing the transactions of 567,430 California consumers, many of whom are members of the class. Some of these consumers were enrolled under West's Joint Venture and Wholesale arrangements with MWI, which were settled in the *West* Action and for which no recovery is sought in this action. The database establishes that 552,605 (or 97.5%) of the consumers included in this database never used any membership benefits.

---

[7]     Some coupons of nominal value are included in some membership kits. However, Defendants pitch their reward program as the biggest member benefit and the reward program requires the "member" to contact MWI to use it.

The database establishes that out of 567,430 consumers included in the data, only one person purchased any of the following membership benefits:

| | |
|---|---|
| $25 Exxon Gas Card | $25 WalMart Gift Card |
| $25 Gas Card Choice A | $25 Babies R Us Gift Card |
| $25 Warner Bros. Certificate | $25 SunCoast Gift Card |
| $25 Hollywood Video Gift Cards | Hickory Farms Offer |
| Lady Footlocker Merchandise Certificate | Sharper Image Coupon |

57.     The database establishes that out of 567,430 consumers *only two people* bought one or more of the following:

| | |
|---|---|
| ARCO Gas Cards | $25 Structure Certificates |
| $10 Olive Garden Gift Cards | $25 Bloomingdales Certificates |
| Zales Certificates | |

58.     Out of 567,430 consumers *only three people* bought one or more:

| | |
|---|---|
| $10 Toys R Us Certificates | $25 Borders Gift Cards |
| $25 Barnes and Nobel Gift Certificates | |

59.     Out of the 567,430 consumers, four people bought one or more $25 Toys R Us Gift Cards or a $10 Applebees Certificates; five bought a GNC Coupon; eight bought a $10 Blockbuster Gift Card or a $25 Linens-N-Things Gift Card; ten bought a $25 Sam Goody Gift Card, a $25 K-Mart certificate or a $10 Red Lobster/Olive Garden Certificate; 11 bought a $10 Outback Steak House Certificate or a $25 Lowes Gift Card; 12 bought a $25 KB Toys Gift Card; 16 bought a Pier 1 Gift Card; 17 bought a $25 Footlocker Certificate; 26 bought a $25 Home Depot Gift Certificate; 28 bought a $25 Sears Certificate; 35 bought a Nordstrom Gift Certificate; 36 bought a $25 TJ MAXX Certificate; and just 152 people bought a $25 Target gift card.  Equally significant, the most purchased benefits were purchased by less than one percent of the 567,430 consumers – just 0.4% (2,250 people) received one or more $40 Hair Cut Rebates and just 0.7% (4,063 people) received 4/$5 Dining Rebates.

60.     As part of its investigation, the Iowa Attorney General sent questionnaires to 400 Iowa residents enrolled in MWI membership programs.  The Iowa Attorney General reported that,

most of the consumers who responded indicated that they had never used their membership and none of those responding said they were satisfied members.

61.     The lack of use of the membership benefits demonstrates that Defendants knew, or should have known that the people they charged $60-$150 were utterly unaware that they had been charged for and enrolled in the MWI memberships. Consumers were treating the membership kit as the law allows; they were ignoring it and assuming they had no obligation to the sender of the unordered merchandise. Defendants charged them and took their money in violation of law.

**Consumer Complaints**

62.     Immediately after the first customers were charged for an MWI membership, Defendants began receiving an enormous number of customer complaints. These complaints ranged from the consumers having no recollection of ever being told about an MWI program to irate consumers alleging theft and fraud by Defendants. A simple Internet search for "MemberWorks," pulls up thousands of consumer complaints, including at websites such as www.ripoffreport.com, www.consumeraffairs.com and www.uspeakout.com. Despite receiving such complaints and despite knowing of the existence of a number of Internet sites dedicated to complaining about MWI and its unlawful practices, Defendants took no steps to make sure that their marketing practices were not deceptive.

63.     In addition to complaints directly by consumers, MWI received numerous inquiries by the Better Business Bureau (the "BBB") regarding its practices as they related to customers. Defendant MWI received an unsatisfactory rating by the BBB due to a pattern of complaints concerning unauthorized charges to consumers' credit cards. The BBB's website reported on June 30, 2006 that it had processed a total of 2,277 complaints about MWI in the previous 36 months, including 765 in the previous year. The conduct giving rise to these complaints continues.

Almost one year later, on June 2, 2007, the BBB's website reported that it had processed a total of 2,180 complaints about MWI in the previous 36 months, including 667 in the previous year.

64.     Defendants received so many complaints from consumers that they scripted responses to "frequently asked questions" or "FAQs" for their customer service representatives. The following "frequently asked questions" were received by Defendants who prepared scripted responses to them:

(a)     "I received my credit card bill and saw this Essentials or Home & Garden Rewards program listed here for $84 – what is this";

(b)     "I don't remember hearing about Essentials or Home & Garden Rewards";

(c)     "I said 'no' to this program";

(d)     "I didn't authorize this program"; and

(e)     "Who authorized this billing/purchase?"

65.     The conduct of each of the Defendants contributed to the scheme designed to deceive and defraud class members, resulting in the unlawful assessment of an unsolicited annual recurring membership fee.

**Governmental Actions**

66.     Every governmental and judicial entity to review Defendants' telemarketing practices has concluded they are deceptive and misleading.

67.     Seven attorneys general (from Minnesota, New York, Nebraska, California, Florida, Ohio and Iowa) have separately concluded that the telemarketing scheme Defendants employed was deceptive. In the words of the Minnesota Attorney General:

> "They just say at the end of the script so we're going to send you the package in the mail ok and they never say Is it OK to charge your credit card? . . . [The Telemarketers] tell you that the deal is about you getting something for nothing . . . . You're going to get a free gift, you're going to get a risk-free membership and that's

- 22 -

not what the real deal is. The real deal is you're going to get charged unless you act to cancel that."[8]

68.     According to the New York Attorney General:

Consumers may be confused and mistakenly believe that (1) their credit card or bank card accounts will not be debited unless they directly provide their billing information to MW; (2) they do not have to take any affirmative action to avoid being charged a membership fee; (3) they do not have to take any affirmative action to avoid being charged a renewal fee upon expiration of the initial membership term; and (4) they are not making a purchasing decision at the time of the telemarketing call.

69.     The New York Attorney General also charged that:

Because the trial offer is termed "risk free," Consumers may be confused or fail to understand that they will be charged a membership fee unless they cancel their membership before the end of the trial offer. By reason of the foregoing, the Attorney General believes that MW has engaged in business conduct that has the tendency and capacity to be deceptive and misleading in violation of New York's consumer protection laws.

70.     As a result of the Minnesota and New York Attorneys General investigations, MWI was forced to stop reading its scripts to Minnesota and New York consumers until the scripts were revised to: (i) inform consumers that they would be billed after 30 days if they did not call to cancel; and (ii) ask the consumers' permission to charge their credit and/or debit cards. While in 2001 MWI ultimately revised the scripts in Minnesota and New York, it did not include similar disclosures on any of its scripts read in any other state.

71.     Following on the Minnesota and New York investigations the Nebraska Attorney General implemented an investigation into the deceptive telemarketing practices. As a result, MWI was required to modify its scripting nationwide to inform consumers that they would be billed after 30 days if they did not call to cancel; ask their permission to charge their credit and/or debit cards. The new scripting requirements were referred to as "Best Practices" requirements or "Best Practices"

_____

[8]     *Why Some U.S. Flag Buyers Are Seeing Red*, ABC News.com, Nov. 28, 2001.

scripting. Prior to the June 1, 2001 deadline for implementing the Best Practices scripting, MWI tested the disclosures on several "bait" products. The results were dramatic as affirmative responses to the telemarketing script dropped to nearly zero. In response to the test results, MWI secured an extension of the implementation date, and returned to using the old deceptive scripting to maximize their "sales."

72.     In 2001, MWI also entered a settlement with the California Attorney General relating to the sale of MWI memberships to consumers who called to purchase unrelated products from Sears. Under the settlement, MWI agreed to pay an unprecedented $2 million fine. MWI also agreed to use the Best Practices scripts in California, and to send renewal notices to California residents that they would be charged unless they called to cancel.

73.     On information and belief, in order to circumvent the scripting requirements required by the Nebraska, Minnesota, New York, Florida and California Attorneys General, MWI hatched a scheme to allow it to continue its deceptive telemarketing practices. Without discussing the matter with any of the attorneys general, MWI and certain of the Telemarketers took the position that the Best Practices requirements did not apply to enrollments originated by the Telemarketers. This meant that while Best Practices scripting would have to be used where MWI simply paid a fee to the Telemarketers to read the scripts and where consumers were enrolled under the joint venture arrangements with the Telemarketers, the old deceptive scripting would continue to be read by Telemarketers having wholesale arrangements with MWI. Certain of these Telemarketers would then turn around and "sell" the enrolled consumers back to MWI who would bill the credit and/or debit cards of consumers for the bogus memberships.

74.     On October 21, 2003, the Florida Attorney General filed a complaint concerning Defendants' deceptive telemarketing practices. Noting that MWI reported annual revenue of $400 million, the Florida Attorney General's Office indicated its investigation estimated that 50% of all

sales were reported as "unauthorized." In 2004, MWI also entered into a settlement agreement with the Florida Attorney General relating to the sale of its products in conjunction with unrelated infomercial products. MWI agreed to pay a $950,000 fine. The agreement also required MWI to clearly disclose all terms and conditions of its programs, and to obtain consumers' express consent to charge their credit cards for MWI programs.

75.     The Iowa Attorney General filed suit on May 11, 2006.

76.     As part of its investigation, the Iowa Attorney General sent questionnaires to 400 Iowa residents enrolled in MWI membership programs. Among the questionnaire respondents, 67% indicated that they did not know they were members and/or that they did not authorize MWI to charge them. The Iowa Attorney General reports that: "Most of the rest of the consumers who responded indicated that they had never used their membership, or thought that they had already cancelled. None of those responding said that they were satisfied members."

77.     In 2002, the Federal Trade Commission (the "FTC") published its Notice of Proposed Rulemaking (the "Notice") pertaining to telemarketing sales rules stating "in many preacquired account telemarketing solicitations, products and services (often buyers' clubs) are marketed through the use of free trial offers, which are presented to consumers as 'low involvement marketing decisions.'" *See* 67 Fed. Reg. 4492, 4501 (Jan. 30, 2002). The Notice went on to state, "[c]onsumers are asked merely to consent to the mailing of materials about the offer. Consumers frequently do not realize that the seller or telemarketer already has their billing information in hand and, instead, mistakenly believe they must take some action before they will be charged – *i.e.*, that they are under no obligation unless they take some additional affirmative step to consent to the purchase." *Id.*

78.     In 2003, the FTC enacted rules to combat "abusive telemarketing . . . practices" by telemarketers using a "free-to-pay conversion feature" when the telemarketers have "pre-acquired

- 25 -

account information." *See* 16 C.F.R. §310.4.  Significantly, in adopting these rules, the FTC

included defendants Memberworks Incorporated among a list of "bad actors" charged with engaging

in this type of abusive telemarketing practices. 68 Fed. Reg. 4580, 4621, n.472 (Jan. 29, 2003). The

rule sets forth three objective requirements which, at a minimum, must be satisfied to meet the

FTC's informed consent requirement.  MWI would have had to "obtain *from the customer*, at a

minimum, the last four (4) digits of the account number to be charged." 16 C.F.R.

§310.4(a)(6)(i)(A).  It would have had to "obtain *from the customer* his or her express agreement *to

be charged* for the goods or services *and to be charged using the account number* [identified by the

customer]." 16 C.F.R. §310.4(a)(6)(i)(B).  And MWI would have had to "make and maintain an

audio recording of the entire telemarketing transaction." 68 Fed. Reg. 4580, 4621 n.471 (Jan. 29,

2003).  In order to circumvent these requirements, MWI began charging $1 for the 30-day trial so

that at the end of 30 days, there would not be a "pay to pay" conversion.

79.    In connection with the rule-making proceedings, MWI submitted a purported

consumer survey on the understandability of the telemarketing scripts.  The FTC concluded that

MWI's survey was biased in its favor and that even in the face of this bias the study demonstrated

that "at least 46 percent of the respondents did not even 'mostly' understand the way in which they

would be billed after listening carefully to a sales offer involving preacquired account information

and a 'free-to-pay conversion' feature." 68 Fed. Reg. 4580, 4621 n.468 (Jan. 29, 2003).

80.    In the *Sanford* Federal Class Action, after weighing the evidence and expert

testimony submitted, the federal arbitrator concluded:

> When I look at the overall picture here from an objective reasonable person
> viewpoint I consider: the experience that MWI has had in thousands of these cases,
> the circumstances of this type of call (an unsolicited, unexpected offer read by MWI
> with high sounding words such as "RISK-FREE" membership – "YOU WON'T BE
> BILLED" – "So, look for this kit in the mail, OKAY?"), *I conclude that even if the
> script was read to [the consumer], [they were] misled, [they] didn't agree to this
> "deal," there was no meeting of the minds*, and MWI not only could suspect, but

- 26 -

knew that many of the callers did not understand that they were making a "deal" to purchase a membership and assuming a burden to act.

Arbitration Award at 6-7.

81.     In reaching this conclusion, the arbitrator stated: "I conclude that the script has fuzzy language, would have been read in less than 30 seconds (my estimate) as a fast sell over the phone for a product that had nothing to do with the purpose of [the consumer's] call. The script, if it was read to [the consumer], was *foisted upon [them] in a quick, slick and misleading sales pitch that few people would understand*." *Id.* at 7. Ultimately, he found: "*This script is a recipe for misunderstanding and confusion when heard by a consumer hearing it under the circumstances*." *Id.* at 8.

82.     In the *Ritt* action, the Ohio Court of Appeals found the upsell scripts were deceptive and misleading:

> The fact is, with or without authorization, consumers who stayed on the telephone line long enough to receive the entire scripted pitch would not have known the ramifications of what they were agreeing to once the upsell had been pitched to them and they said "yes" to receiving a membership kit.[9]

### TOLLING OF THE STATUTE OF LIMITATIONS

83.     The running of any applicable statutes of limitation has been tolled for several reasons.

### Tolling by Virtue of MWI's Fraudulent Concealment

84.     Through various techniques and devices of secrecy, deception and misrepresentation, Defendants affirmatively and intentionally concealed the existence of their unlawful and unfair telemarketing practices from Plaintiffs, class members and the public. The fraudulent concealment, deception and misrepresentation existed before Plaintiffs were enrolled and charged and continued

---

[9]     *Ritt v. Billy Blanks Enters.*, No. 80983, 2003 Ohio App. LEXIS 3297, at *7, *20-*21 (Ohio Ct. App. July 10, 2003).

throughout the class period. Defendants carried out their violations of law in secret and consistently deceived, misrepresented and concealed the truth regarding the unauthorized enrollment into the various membership programs and the unauthorized charging of Plaintiffs' and class members' credit and/or debit cards. Such acts included purposely designing their scripts to maximize consumers' confusion, thus allowing Defendants to enroll the maximum number of unsuspecting consumers.

85.    Defendants' scheme is based upon their knowledge that a large segment of the consumer population does not check their credit card statements and/or would miss the charge even if they did review their credit card statement.

86.    So as to assuage any suspicion that a consumer may have, Defendants emphasize that the trial membership they are sending is "FREE" and that the class members "WON'T BE BILLED."

87.    To conceal the fact of billing consumers' credit and/or debit cards, Defendants intentionally did not send Plaintiffs or class members any invoice or any other notification that they were going to charge their cards. Similarly, to conceal the true facts concerning the billing of the consumers' credit and/or debit cards, after they billed the consumers' credit and/or debit cards, Defendants did not send any invoice, or notification of the fact that they had in fact billed the class members' cards.

88.    Another method that Defendants used to conceal their wrongful practices from Plaintiffs and the class was to reverse the charges for any consumer that is able to track down the source of the illicit charge and calls to complain. After reading scripts in an attempt to keep the consumer enrolled, Defendants and/or their agents will reverse the charges for complaining consumers so that the complaints do not get escalated to the point that their practices become common knowledge and reach the ears of the consumers they illicitly enrolled in, and charged for,

- 28 -

the bogus programs.  Further evidence of this concealment is demonstrated by the existence of a

Frequently Asked Questions script providing their telephone operators and/or operators of their

agents, with scripted answers to consumer questions/statement such as "I did not authorize this

charge," "how did you get my credit card number" and "what is this program," among others.

89.     To further conceal their wrongful conduct from those consumers who do review their

credit card statements, Defendants intentionally charged $60-$150 – amounts that were unlikely to

rouse suspicion from the consumer and provoke any further inquiry.  Indeed, had Defendants billed

the consumers' credit and/or debit cards for several hundred dollars, consumers would be more

likely to notice the illicit charges and seek to have them reversed.  Similarly, the identification of the

charges was designed to conceal the illicit nature of the subject charges, as the charges were

identified by such words as "Essentials," "Value Max," "Travel" and "Home and Garden," among

others.  A consumer who reviewed his or her statement seeing a charge for $75 to "Essentials," for

example, would likely perceive such name to be a clothing store, curio store, drug store or other

retail establishment from which his or her spouse would have made a purchase, and thus not pursue

any further inquiry to determine if the charge was legitimate or fraudulent.

90.     Through such acts of fraudulent concealment, even assuming that a class member

noticed the charge on their credit or debit card statement, the existence of a charge for Essential,

Value Max, Travel, Home & Garden or others would not provide any indication to the class member

that their card was fraudulently charged.

91.     Defendants' scheme worked perfectly on Plaintiffs and the class members.

Succumbing to Defendants' practices of fraudulent concealment described above, Plaintiffs did not

notice the fraudulent charges when they were originally enrolled, and charged, by Defendants.

Accordingly, until recently Plaintiffs had absolutely no knowledge they had previously been billed

approximately $180.00 in membership fees.  In addition, while class members and consumers may

- 29 -

recall contacting Defendants regarding a renewal charge, on information and belief it was Defendants' policy, regarding renewal charges, not to inform consumers this was a "renewal" charge and that they had previously billed one or more times earlier.

92.     By virtue of their pervasive deception and misrepresentation and concealment of facts, Defendants successfully concealed from Plaintiffs and class members the truth about the memberships thereby tolling the running of any applicable statutes of limitation. Plaintiffs and class members were unaware of, and through the exercise of due diligence could not have discovered, the existence of such violations until after they had been charged for the membership.

93.     In the alternative, based on the facts alleged herein, Defendants are estopped from relying on any statutes of limitation because of their fraudulent concealment, deception and misrepresentation of facts regarding the enrollment into the membership programs and unauthorized charges. They were under a duty to disclose this information because it is non-public information over which Defendants had exclusive control, because Defendants knew this information was not available to Plaintiffs and class members and because this information was crucial to the consuming public in making purchasing decisions.

**Tolling by Reason of Prior Class Action Pending**

94.     This is a related case to the *Sanford* Federal Class Action. The *Sanford* Federal Class Action was filed on March 28, 2002. In addition to federal claims, the *Sanford* Federal Class Action originally included these state law claims. The state law claims were finally dismissed from the federal action on December 23, 2008. Under established case law, the filing of the *Sanford* Federal Class Action against MWI tolls all statutes of limitation until a final judgment of dismissal, which is no longer subject to additional appeals, has been entered.

95.     The court in the *Sanford* Federal Class Action issued an order on September 29, 2008, granting defendants' motion to dismiss the federal claims, and refusing to exercise supplemental

jurisdiction over plaintiff Patricia Sanford's and the class members' state law claims. Furthermore, relying on *Wright v. Schock*, 742 F.2d 541, 545 (9th Cir. 1984) (citing *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 352-53 (1983)), the federal court held the pendency of the federal action "tolled the statute of limitations for individual claims, mitigating prejudice to members of the putative class."

96.     On October 14, 2008, plaintiffs filed an *ex parte* application for reconsideration, asking the federal court for leave to amend the complaint, which application was granted on November 3, 2008, directing plaintiffs to file a motion for leave. On November 17, 2008, plaintiffs filed the motion for leave to amend. On December 16, 2008, defendants filed an *ex parte* motion to dismiss or, in the alternative, to strike, among other things, the state law claims from the proposed amended federal complaint, arguing that "the Court previously dismissed numerous state law claims without prejudice, and thus the state law claims can be pursued in the appropriate state court(s)." MemberWorks Inc.'s Memorandum of Points and Authorities in Support of *Ex Parte* Application for Dismissal or, in the Alternative, to Strike Claims and Additional Parties at 8. On December 23, 2008, the federal court struck the state law claims from the proposed amended complaint, holding: "Furthermore, dismissing the action would not preclude Plaintiffs from pursuing relief in other venues. The Court has not precluded the Plaintiffs from pursuing its state law claims in state court." Order Striking Counts I, IX, X, and XI from the Proposed TAC Attached to Plaintiffs' Motion for Leave to Amend at 4.

97.     As the above facts establish, Defendants have at all times known the core facts concerning the claims for which Plaintiffs and the class members seek to hold them accountable. Defendants have also known that at no time have Plaintiffs ever intended to drop the claims asserted against them. Accordingly, there is no prejudice to Defendants in permitting Plaintiffs and the class members to proceed with this action and prosecute their rights against Defendants.

## CLASS ACTION ALLEGATIONS

98.     Plaintiffs bring this class action pursuant to Superior Court Civil Rule 23, on behalf of themselves and all other persons similarly situated in the District of Columbia.  The class which Plaintiffs represent is composed of all persons in the District of Columbia who, after calling a telephone number to inquire about or purchase another product: (i) were sent a membership kit in the mail; and (ii) were charged for an annual MWI membership program (the "Class").  Excluded from the Class are all persons enrolled in an MWI program under the March 16, 1998 "Joint Marketing Agreement between West Telemarketing Corporation and MemberWorks Incorporated," and/or the January 1, 1999 "Agreement" between West Telemarketing Corporation and MemberWorks Incorporated, and/or the July 1, 1999 "Joint and Wholesale Marketing Agreement" between West Telemarketing Corporation, West Teleservices Corporation and MemberWorks Incorporated and/or the December 1, 2001 "Wholesale and Retail Marketing Agreement" between MemberWorks Incorporated and West Direct, Inc., and any amendments or addendums to these agreements.[10]  Not included within the Class are Defendants and their officers, directors, employees, agents and/or affiliates.

99.     The Class is composed of hundreds of thousands of persons geographically dispersed throughout the District of Columbia, the joinder of whom in one action is impracticable, and the disposition of their claims in a class action will provide substantial benefits to both the parties and the Court.

---

[10]     The information regarding these unnamed class members was obtained pursuant to a protective order and is required to be filed under seal.  If the Court desires, Plaintiffs will amend this complaint to add these additional unnamed class members.

100.    The Class is ascertainable and maintains a sufficient community of interest since the rights of each member of the Class were violated in a similar fashion based upon Defendants' use of a uniform script that was read to the class members.

101.    The victimized consumers can be identified in the databases maintained by MWI. More specifically, MWI maintains databases that contain the following information: (i) the name of each class member "enrolled" in an MWI program via an inbound call; (ii) the address of each such class member; (iii) the date each class member was enrolled; (iv) the date and amount each class member was charged; and (v) the date and amount each class member was refunded. Thus the class members can be located and notified with specificity of the pendency of this action using techniques and a form of notice customarily used in class action litigation.

102.    Plaintiffs' claims are typical of the members of the Class as a whole because of the similarity, uniformity and common purpose of the unlawful conduct of Defendants. Each class member was read the subject "upsell" script. Each class member was mailed a membership kit for an MWI membership program. Each class member has sustained damage as a result of Defendants' wrongful conduct in violation of state statutes, state common law, as well as general principles of equity and fair play.

103.    Plaintiffs will fairly and adequately protect the members of the Class as Plaintiffs have retained competent counsel who are experienced in federal and state class action claims such as those asserted in this case.

104.    A class action is superior to all other methods for the just, fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, the damages suffered by individual class members are not sufficient to justify the enormous cost associated with the prosecution of this type of litigation. The expense and burden posed by such individual litigation makes it impossible for the class members to individually redress the wrong

done to them, nor would such an individual case be adequate to ensure that such practices cease to harm others. Further, there will be no difficulty in the management of this action as a class action.

105.    Common questions of law and fact exist as to all members of the Class and these common issues predominate over any questions which go particularly to any individual member of the Class. Among such common questions of law and fact are the following:

(a)    did Defendants mail memberships to the class members without obtaining prior express consent or acceptance;

(b)    were the subject "upsell" scripts deceptive;

(c)    did Defendants clearly and unambiguously communicate that the class members would be charged unless they called Defendants to cancel the "risk-free" trial membership;

(d)    were the membership materials deceptive;

(e)    did Defendants act willfully or recklessly;

(f)    did Defendants' acts, as alleged herein, violate federal statutes, District of Columbia statutes and/or general principles of equity and fair play;

(g)    whether the Defendants engaged in a pattern and practice of deceiving and defrauding the Class and concealing their unlawful conduct;

(h)    whether the Defendants violated state consumer protection statutes;

(i)    what amount of damages the Class sustained as a result of Defendants' wrongful conduct, and the proper measure of such damages;

(j)    what restitution is due class members; and

(k)    whether Plaintiffs and members of the Class are entitled to an award of reasonable attorneys' fees, prejudgment interest, post-judgment interest, costs of suit and other appropriate relief under the circumstances of this case.

**FIRST CAUSE OF ACTION**
**For Violation of the District of Columbia Consumer Protection Procedures Act**
**(On Behalf of Plaintiffs and the Members of the Class)**

106. Plaintiffs hereby reallege and incorporate by reference the allegations contained in ¶¶1-105 above.

107. This claim arises under CPPA, D.C. Code §§28-3901-28-3911 *et seq.*

108. The CPPA is a broad act intended to protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive or unfair acts or practices in the course of any trade or commerce.

109. D.C. Code §28-3905(k)(1) states, "[a] person, whether acting for the interests of itself, its members, or the general public, may bring an action under this chapter in the Superior Court of the District of Columbia seeking relief from the use by any person of a trade practice in violation of a law of the District of Columbia."

110. The term "'trade practice' means any act which does or would create, alter, repair, furnish, make available, provide information about, or, directly or indirectly, solicit or offer for or effectuate, a sale, lease or transfer, of consumer goods or services." D.C. Code §28-3901(a)(6).

111. The term "'merchant' means a person . . . who . . . does or would sell, lease (to), or transfer, either directly or indirectly, consumer goods or services, or a person who . . . does or would supply the goods or services which are or would be the subject matter of a trade practice." D.C. Code §28-3901(a)(3).

112. A "'consumer' means a person who does or would purchase, lease (from), or receive consumer goods or services, including a co-obligor or surety, or a person who does or would provide the economic demand for a trade practice; as an adjective, 'consumer' describes anything, without exception, which is primarily for personal, household, or family use." D.C. Code §28-3901(a)(2).

113.   Plaintiffs and class members are "consumer[s]" and/or "persons" within the meaning of D.C. Code §§28-3901(a)(2) and 28-3905(k)(1).

114.   Defendants' conduct involves a consumer transaction for "personal, household, or family use." D.C. Code §28-3901(a)(2).

115.   CPPA recognizes explicitly that the "'goods and services'" involved in a consumer transaction may concern "any and all parts of the economic output of society, . . . includ[ing] consumer credit, franchises, business opportunities, real estate transactions, and consumer services of all types." D.C. Code §28-3901(a)(7).

116.   At all times relevant, Defendants engaged in deceptive acts, omissions, conduct or misrepresentations, as part of trade or commerce within the District of Columbia and/or had an impact within the District of Columbia within the meaning of CPPA, for that statute applies whether a merchant makes a sale to a consumer directly or indirectly.  MWI was a seller of the product to Plaintiffs and class members and Plaintiffs and class members suffered substantial loss because of one or more of Defendants' deceptive acts or omissions.

117.   The policies, acts and practices of Defendants as described above were intended to deceive, deceived and continue to deceive Plaintiffs, members of the Class, and the general public as described herein and have resulted (and will result) in annual fees being imposed on members of the Class and offend the District of Columbia's public policy.

118.   The acts, omissions, misrepresentations, policies, practices and non-disclosures as alleged herein were intended to, and did, result in the sale of the products at issue to Plaintiffs and the Class and violated and continued to violate CPPA, D.C. Code §§28-3901-28-3911 *et seq.*

119.   It shall be a violation of CPPA, whether or not any consumer is in fact misled, deceived or damaged thereby. Defendants, in connection with the advertising, tender and/or delivery of the products at issue, employed unconscionable tactics and inserted unconscionable provisions

- 36 -

into the sales of the products at issue herein by unilaterally attempting to impose an automatic, unauthorized fee for enrollment in a fictitious and/or useless and unwanted membership which is offensive to the District of Columbia's public policy and constitutes unfair and deceptive methods of competition in violation of one or more of the following:

   (a) in violation of D.C. Code §28-3904 of the CPPA, Defendants' acts and practices constitute the use of deceptive representations in connection with the products in question;

   (b) in violation of D.C. Code §28-3904(e) of the CPPA, Defendants have made false or misleading representations of material fact concerning the nature of the transaction or obligation incurred concerning the products at issue which have a tendency to mislead;

   (c) in violation of D.C. Code §28-3904(f) of the CPPA, Defendants have made false or misleading representations and failed to state material fact concerning the nature of the transaction or obligation incurred concerning the products at issue and such failure tends to mislead;

   (d) in violation of D.C. Code §28-3904(h) of the CPPA, Defendants' acts and practices constitute the advertisement or offer of goods or products without the intent to sell them as advertised or offered;

   (e) in violation of D.C. Code §28-3904(q) of the CPPA, Defendants fail to supply to a consumer a copy of a sales or service contract, lease, promissory note, trust agreement or other evidence of indebtedness which the consumer may execute; and

   (f) in violation of D.C. Code §28-3904(r) of the CPPA, Defendants inserted unconscionable provisions into the sales contracts at issue herein by unilaterally attempting to impose an automatic, unauthorized fee for enrollment in a fictitious membership. The following factors may be taken into consideration, as well as other factors in violation of D.C. Code §28-3904:

    (i) knowledge by the person at the time of the sale or lease of the inability of the consumer to receive substantial benefits from the property or services sold or leased; and

(ii)      that the person has knowingly taken advantage of the inability of the consumer reasonably to protect his or her interests by reasons of inability to understand the language of the agreement, or similar factors.

120.    Furthermore, the acts, omissions, misrepresentations, policies, practices and non-disclosures of Defendants as alleged herein were willful, intentional, malicious, immoral, unethical, unscrupulous or oppressive and constituted violations under CPPA, D.C. Code §§28-3901-28-3911 *et seq.* as:

(a)      Defendants have made false or misleading representations concerning the offering price of, or the person's cost for the products at issue;

(b)      Defendants have used Plaintiffs' and class members' credit and/or debit cards with the intent to injure and/or defraud Plaintiffs and class members by the unauthorized use of Plaintiffs' and class members' credit and/or debit cards in regards to the products at issue;

(c)      Defendants' unfair or deceptive acts or trade practices, of knowingly and willfully enrolling, charging and collecting an invalid and illegal membership fee from Plaintiffs and all putative class members, are immoral, unethical, oppressive, despicable, reprehensible, unscrupulous and have and continue to cause substantial financial injury;

(d)      Defendants' use of bait products to promote the sale of the products at issue through false and deceptive representations;

(e)      Defendants knowingly concealed, suppressed and omitted in their scripts, advertisements and membership kits, material facts about the deceptive products at issue with the intent that Plaintiffs and the Class would rely upon the concealments, suppressions or omissions; and

(f)      MWI profited at the expense of Plaintiffs and the Class by systematically enrolling them in a MWI program and charging their credit and/or debit cards without their authorization.

- 38 -

121.    By reason of the foregoing, Plaintiffs, members of the Class and the general public have been (and will continue to be) irreparably harmed.

122.    Defendants' conduct also violates CPPA in that Defendants either were or reasonably should have been aware that imposition of such representations and fees is unfair, unlawful and/or fraudulent under the circumstances.

123.    Injuries suffered by Plaintiffs and the Class were not outweighed by any countervailing benefits to Plaintiffs and class members.

124.    At all times material to this Complaint, Defendants were acting for financial gain within the meaning of CPPA.

125.    Through the unauthorized enrollment into the products at issue, Plaintiffs and the Class were subjected to unauthorized charges to their credit and/or debit cards thereby suffering "ascertainable and quantifiable losses" as a result of Defendants' unlawful, unfair and fraudulent business practices in violation of CPPA.

126.    As a direct and proximate result of Defendants' violations of CPPA, Plaintiffs and class members have suffered losses and are entitled to the statutory damages, punitive damages and injunctive relief provided in D.C. Code §28-3905.

127.    The conduct of Defendants, as set forth herein, was unlawful, unfair, immoral, unscrupulous, deceptive and/or fraudulent and constitutes unfair and deceptive acts in violation of CPPA, D.C. Code §28-3901 *et seq.*

128.    Plaintiffs reserve the right to allege other violations of law which constitute unlawful business acts or practices. Defendants continue to posses funds that belong to the class members, to this date.

## SECOND CAUSE OF ACTION
### For Conversion
### (On Behalf of Plaintiffs and the Members of the Class)

129.    Plaintiffs hereby reallege and incorporate by reference the allegations contained in ¶¶1-128 above.

130.    Defendants have converted to their own use, property belonging to Plaintiffs and members of the Class through unlawful acts and conduct.  The specific sum of money that was converted by Defendants should be readily identifiable from information and records in Defendants' possession or control.

131.    Defendants knowingly or intentionally charged and collected money for unordered merchandise from credit and/or debit card accounts of consumers, including Plaintiffs and members of the Class.  Defendants obtained money from consumers through fraud and/or deception. Defendants thus converted to their own use property, specifically monies, belonging to Plaintiffs and the Class.

132.    The specific sum of money of Plaintiffs and members of the Class that was converted by Defendants are readily identifiable from information and records in Defendants' possession or control.

133.    As a direct and proximate result of Defendants' unlawful acts and conduct, Plaintiffs and the Class were deprived of the use of their money that was unlawfully converted by Defendants, and are thereby entitled to restoration of their monies, interest on these monies from the date said monies were converted by Defendants to the date of judgment, compensatory damages (including overdraft fees paid by consumers due to Defendants' conversion of their money) and punitive damages.

### THIRD CAUSE OF ACTION
### For Unjust Enrichment
### (On Behalf of Plaintiffs and the Members of the Class)

134.    Plaintiffs hereby reallege and incorporate by reference the allegations contained in ¶¶1-133 above.

135.    Defendants have received, and continue to receive, a benefit at the expense of Plaintiffs and members of the Class.

136.    Defendants have fraudulently and/or deceptively charged and collected membership fees and/or renewals from consumers, including Plaintiffs and members of the Class, for unordered merchandise. Accordingly, Defendants have received benefits which they have unjustly retained at the expense of Plaintiffs and members of the Class.

137.    As a direct and proximate result of Defendants' unlawful acts and conduct, Plaintiffs and members of the Class were deprived of the use of their money that was unlawfully charged and collected by Defendants, and are therefore entitled to restoration of their monies.

### FOURTH CAUSE OF ACTION
### For Fraud and Deceit
### (On Behalf of Plaintiffs and the Members of the Class)

138.    Plaintiffs hereby reallege and incorporate by reference the allegations contained in ¶¶1-137 above.

139.    The acts, conduct and practices of Defendants, as alleged above, were fraudulent and deceptive. The use of deceptive scripts assuring consumers that they were being mailed a free 30-day trial membership is and was likely to mislead, and did in fact mislead, Plaintiffs and members of the Class.

140.    Plaintiffs and members of the Class ordered non-MWI products. Approximately one month later, class members were enrolled in an MWI membership program and were charged an approximate amount of between $60 and $150 to their credit or debit cards. Eleven months after the initial charge, Defendants charge the class members approximately the same amount (usually 15%-

25% more) without seeking any approval to do so.  These charges, if undetected, will keep occurring in subsequent years.

141.    Through the use of deceptive scripts that were read to the class members, Defendants concealed material facts from Plaintiffs and the Class.  Defendants tell and have told members of the Class that they are being mailed a risk-free 30-day trial membership.  No permission to use the consumers' credit and/or debit cards is sought or obtained.  The scripts deceive members of the Class.  After mailing the unsolicited membership kit to the class members, Defendants charge the members of the Class for an unsolicited and unwanted membership.

142.    Defendants falsely and fraudulently utilize deceptive scripts that conceal from the class members that they will be automatically charged unless the class members affirmatively call Defendants to cancel the membership.  Defendants' scripts contain misrepresentations and are intended to, and do, deceive the class members.

143.    Defendants intentionally designed the scripts and the purported membership material in order to mislead the class members into believing that they would receive a risk-free trial membership that they could try out, and if they liked the membership, the class members could contact Defendants to activate a full membership.  The true facts are just the opposite – Defendants charge the class members unless they call to cancel.

144.    Defendants have intentionally designed the generic membership materials so as to appear to be "junk mail" in the hopes that the materials will be discarded and thus never read.  If the packet mailed by MWI for the risk-free trial membership is thrown out by the recipient, then the consumer will not have the number to access the benefits.  The kits are mailed out bulk rate indicating the lack of value of the material.  In this way, Defendants further conceal the fact that the class members will be charged an annual, self-renewing membership fee.

145.    To further their scheme to conceal the true facts, Defendants never send any invoice or bill to Plaintiffs and the class members informing them that their credit and/or debit cards were going to be, or were in fact, charged.

146.    Defendants' renewal of the purported memberships is fraudulently concealed by Defendants in the same manner. No bill or invoice is sent to the class members informing them that they were going to be, or had in fact been, charged.

147.    Plaintiffs and members of the Class reasonably relied on Defendants and believed that they were making a one-time purchase of non-MWI products.

148.    Defendants' false and misleading statements and suppression of the material facts set forth above and throughout this Complaint defrauded Plaintiffs and the Class, and are in direct violation of federal and state statutes, as well as principles of common law, for which Plaintiffs and members of the Class are entitled to recover damages, including punitive damages.

### FIFTH CAUSE OF ACTION
### For Negligent Misrepresentation
### (On Behalf of Plaintiffs and the Members of the Class)

149.    Plaintiffs hereby reallege and incorporate by reference the allegations contained in ¶¶1-148 above.

150.    In making representations to Plaintiffs and members of the Class described herein, Defendants failed to fulfill their duty to disclose the material facts set forth above. Among the direct and proximate causes of said failures to disclose were the negligence and carelessness of Defendants.

151.    Defendants owed Plaintiffs and members of the Class the duty to act with reasonable care in retaining, training and supervising their agents and sales agents. Defendants also failed to take reasonable steps to ensure that their representatives conducted themselves in accordance with the law and to ensure that the representatives disclosed all material facts and did not misrepresent or omit such facts in conducting such sales.

152.    Defendants, as set forth herein, breached their duties to retain, train, supervise and discipline their sales force and to ensure full disclosure by them.

153.    Plaintiffs and the members of the Class were unaware of the falsity of Defendants' affirmative misrepresentations and their failure to disclose that Plaintiffs and members of the Class would be charged undisclosed and unauthorized fees for a fictitious membership on their credit card accounts.  Plaintiffs and the members of the Class, as a direct and proximate cause of Defendants' breaches of their various duties, reasonably relied upon such representations to their detriment.  By reason thereof, Plaintiffs and members of the Class have suffered damage, in an amount according to proof at time of trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs on behalf of themselves and the members of the Class, prays for judgment and relief against Defendants as follows:

A.    an order preliminarily and/or permanently enjoining Defendants from violating CPPA, D.C. Code §28-3901 *et seq.*, and pursuing the policies, acts and practices complained of herein;

B.    an order of this Court ordering Defendants to immediately cease all acts of unfair competition and enjoin Defendants from continuing to conduct business via the unlawful, unfair or fraudulent business acts or practices as particularized herein;

C.    Plaintiffs also requests an order requiring Defendants to identify all class members and pay restitution to Plaintiffs and all members of the Class so as to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, fraudulent or unfair business act or practice, in violation of applicable laws, statutes or regulations or constituting unfair competition or untrue or misleading advertising;

- 44 -

D.      Plaintiffs also requests an order of the Court requiring Defendants to disgorge to the District of Columbia all monies wrongfully collected that could not be returned to class members as alleged herein and all monies and profits derived by Defendants as a result of the wrongful, deceptive, unfair and/or unlawful acts, conduct and practices alleged above, and requiring disgorgement and/or imposing a trust upon Defendants' ill-gotten monies and freezing Defendants' assets;

E.      an order certifying that the action be maintained as a class action;

F.      an order requiring Defendants to effect and pay the costs of restoring the rights and benefits owing to Plaintiffs and other members of the Class under the agreements which are the subject of this action and a corrective advertising campaign;

G.      restitution as may be provided for by equity and/or by statute;

H.      actual and compensatory damages in an amount to be proven at trial, including any damages as may be provided for by statute;

I.      enter and award of damages to Plaintiffs and class members in an amount equal to treble damages or $1,500 per violation whichever is greater pursuant to D.C. Code §28-3905, plus punitive damages;

J.      reasonable attorneys' fees and costs of suit pursuant to D.C. Code §28-3905;

K.      pre-and post-judgment interest; and

L.      such other and further relief as this Court may deem necessary, proper and/or appropriate.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

DATED: February 23, 2009

THE LAW OFFICE OF ROGER M. ADELMAN
ROGER M. ADELMAN (DC BAR #56358)

ROGER M. ADELMAN

1100 Connecticut Ave., NW, Suite 730
Washington, D.C. 20036
Telephone: 202/822-0600
202/822-6722 (fax)
radelman@erols.com

JOHN E. DRURY LAW OFFICES
JOHN E. DRURY (DC BAR #924407)
1900 "L" Street, NW, Suite 303
Washington, D.C. 20036
Telephone: 202/463-6131
202/463-6695 (fax)

COUGHLIN STOIA GELLER
        RUDMAN & ROBBINS LLP
FRANK J. JANECEK, JR.
CHRISTOPHER COLLINS
CHRISTIE SURIEL
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

LANDSKRONER • GRIECO • MADDEN, LTD.
JACK LANDSKRONER
1360 West 9th Street, Suite 200
Cleveland, OH 44113
Telephone: 216/522-9000
216/522-9007 (fax)

LAW OFFICES OF ARTIE BARAN, APC
ARTIE BARAN
4545 Murphy Canyon Road, Suite 300
San Diego, CA 92123
Telephone: 858/560-5600
858/836-0318 (fax)

Attorneys for Plaintiffs

7

GORDON LAW OFFICES, CHTD.
PHILIP GORDON, ISB #1996
BRUCE S. BISTLINE, ISB #1988
623 West Hays Street
Boise, ID 83702-5512
Telephone: 208/345-7100
208/345-0050 (fax)

COUGHLIN STOIA GELLER RUDMAN
  & ROBBINS LLP
PATRICK J. COUGHLIN
FRANK J. JANECEK, JR.
CHRISTOPHER COLLINS
CHRISTIE SURIEL
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff

F I L E D
_____A.M._____P.M.

FEB 2 7 2009

CANYON COUNTY CLERK
K CANNON, DEPUTY

IN THE DISTRICT COURT OF THE THIRD JUDICIAL DISTRICT OF THE STATE OF
IDAHO, IN AND FOR THE COUNTY OF CANYON

| | |
|---|---|
| PATRICIA GUCKER, On Behalf of Herself and All Others Similarly Situated in the State of Idaho,<br><br>             Plaintiff,<br><br>   vs.<br><br>VERTRUE INCORPORATED, previously known as MEMBERWORKS, INCORPORATED, ADAPTIVE MARKETING LLC, and DOES 1 through 50,<br><br>             Defendants. | Case No. CV-09-2264-C<br><br>CLASS ACTION<br><br>COMPLAINT FOR: (1) VIOLATION OF THE IDAHO CONSUMER PROTECTION ACT; (2) CONVERSION; (3) UNJUST ENRICHMENT; (4) FRAUD AND DECEIT; AND (5) NEGLIGENT MISREPRESENTATION |

COMPLAINT



NOW COMES Patricia Gucker ("Plaintiff"), on behalf of herself and all others similarly situated in the State of Idaho, by and through counsel, and for her complaint states the following:

## SUMMARY OF COMPLAINT

1.    Defendants MemberWorks, Incorporated,[1] also known as MWI Essentials, MWI Leisure Advantage, MWI Home & Garden, MWI Connections, MWI Value Max and other MWI entities, which subsequently changed its name to Vertrue Inc. (collectively, "MWI"),[2] in conjunction with its co-conspirators, the telemarketing entities (collectively, the "Telemarketers" or "Telemarketing Entities")[3] and the bait product suppliers (the "Bait Product Suppliers") have been

---

[1]      MemberWorks, Incorporated, with Adaptive Marketing LLC and Doe defendants 1 through 50 are referred to herein as "Defendants."

[2]      As used in this Complaint, the term "Defendants" does not refer to West Corporation, and/or West Telemarketing Corporation and/or West Telemarketing, L.P., and their predecessors, successors, present and former owners, subsidiaries, affiliates, employees, officers, directors, agents, attorneys and assigns, including West Direct, Inc. and West TeleServices Corporation (collectively, "West"). Therefore, any reference to acts or omissions by "Defendants" does not include or refer to the West entities. Further, the claims for relief in this Complaint do not arise from  actions or omissions under the following agreements: the March 16, 1998 "Joint Marketing Agreement between West Telemarketing Corporation and MemberWorks Incorporated," and/or the January 1, 1999 "Agreement" between West Telemarketing Corporation and MemberWorks Incorporated, and/or the July 1, 1999 "Joint and Wholesale Marketing Agreement" between West Telemarketing Corporation, West Teleservices Corporation and MemberWorks Incorporated and/or the December 1, 2001 "Wholesale and Retail Marketing Agreement" between MemberWorks Incorporated and West Direct, Inc., and any amendments or addendums to these agreements. Thus, by way of example (but without limitation), any acts or omissions that include, relate to or were part of an upsell to a Tae-Bo product that occurred under or as part of one of the agreements listed in this footnote 2, are not included in the claims and allegations of this Complaint.

[3]      As used in this Complaint, the terms "Telemarketers" and "Telemarketing Entities" and the allegations of this Complaint referring to acts or omissions of "Telemarketing Entities" and "Telemarketers" do not include or refer to the actions or omissions of  West Corporation and/or West Telemarketing Corporation under the March 16, 1998 "Joint Marketing Agreement between West Telemarketing Corporation and MemberWorks Incorporated," and/or the January 1, 1999 "Agreement" between West Telemarketing Corporation and MemberWorks Incorporated, and/or the July 1, 1999 "Joint and Wholesale Marketing Agreement" between West Telemarketing Corporation, West Teleservices Corporation and MemberWorks Incorporated and/or the December 1, 2001 Wholesale and Retail Marketing Agreement between MemberWorks Incorporated and West Direct, Inc., and any amendments or addendums to these agreements.

COMPLAINT – 1

engaged in the practice of making unlawful charges to consumers' credit and/or debit cards through a scheme involving the mailing of an unordered membership program marketed through the use of a deceptive script. Defendants obtain the necessary information to mail their unwanted membership (and charge for it) through the use of a telemarketing scam. By this method, Defendants are able to accomplish the old and pernicious practice of mailing unsolicited merchandise and then tricking consumers into paying for it.

2.     MWI, in concert with the Telemarketers and the Bait Product Suppliers, through agreements with MWI, capture consumers' credit and/or debit card information when those consumers call to order products – products which are **not** marketed or produced by MWI. This is referred to as an "inbound" telemarketing call, as the consumer initiates the call. The consumer has initiated the call to inquire about or purchase a product usually advertised with a 1-800 number. The consumer **does not call** to order an MWI product. In fact, the consumer has most likely never heard of MWI and has no expectation of receiving an MWI membership program when the call is made by the consumer. Moreover, the consumer gives his/her credit or debit card information, which Defendants capture long before the consumer ever hears of any MWI product. This private financial information is then used by Defendants to charge the consumer for a membership the consumer never wanted or agreed to purchase.

3.     MWI has reached agreements with a number of Telemarketing Entities, whereby the consumer is subjected to a deceptive sales pitch to purchase an MWI membership program before the call made by the consumer to purchase an unrelated product is completed. This is referred to as an "unrelated upsell." MWI's products are not related to the product sought by the consumer and the consumer has no idea that an MWI product will be made a part of the call – or even what an MWI product is.

COMPLAINT – 2

4.      MWI prepares a script for the Telemarketers to use for the unrelated upsell. As more specifically alleged below, MWI pays the Telemarketers and the Bait Product Suppliers a fee for each consumer who they enroll in MWI's membership programs.   Some number of MWI membership programs are sold through a joint venture and wholesale arrangement between MWI and the Telemarketers, where MWI and the Telemarketers jointly pay a separate fee to the Bait Product Suppliers for each of their customers enrolled in an MWI program. The Telemarketers, who handle the inbound calls, approve the scripts, read the scripts to the consumers, capture the consumers' credit and/or debit card information and transmit that information to MWI to mail the "kits" and bill the consumers' cards.

5.      After the consumers have given the information necessary to purchase the product the consumers called to buy, a deceptive script is read to the consumers informing them that they will be sent *free* materials in the mail.   Consent to receive the materials in the mail is not requested. Consent to bill the credit and/or debit cards is not requested.   In actuality, Defendants enroll consumers in a membership and mail them a membership "kit." Consumers are deceived and do not know that they have been enrolled in a "membership" and will be charged $60-$170 annually unless they call MWI to inform them that they want to cancel the FREE 30-day trial membership. MWI mails a packet with a membership card to the consumers which allows the consumers to access the so-called benefits of an MWI membership. By enrolling consumers who called to order an unrelated product and mailing those consumers a membership kit without the prior express consent of the consumers, consumers are unwittingly charged by Defendants for a membership they neither requested nor intended to purchase.

6.      Consumers are never asked their permission for the Telemarketers to provide their credit and/or debit card information to MWI. MWI has the Telemarketing Entities transfer the class members' confidential credit and/or debit card information to MWI, who uses the information to

charge consumers membership fees and membership renewal fees which range from $60-$170 annually. Although MWI processes the charges, neither it nor the Telemarketing Entities send the consumers any bill or invoice notifying them that their credit and/or debit cards have been assessed such a charge.

7.     In order to conceal their scheme, MWI will reverse the charges for those consumers who notice that they have been assessed a charge on their credit and/or debit card statements who call to question the charge and get through Defendants' multifarious system of avoiding cancellations. However, as Defendants know, a significant percentage of the population does not closely review their credit and/or debit card statements, and will not notice the offending charge (as was the case with plaintiff Patricia Sanford ("Sanford") in the federal action, *Sanford, et al. v. MemberWorks, Inc., et al.*, No. 02-CV-0601 (S.D. Cal.) ("*Sanford* Federal Class Action")[4], who did not realize she had been assessed such a charge until the **second** time it appeared on her credit card statement). These individuals are charged between $60-$170, each year, until they notice the charge and complain. ***Defendants never send any bill or invoice to the class members notifying them that***

---

[4]     The *Sanford* Federal Class Action was filed in 2002, as a class action against West and MWI in the United States District Court for the Southern District of California. The claims against MWI were asserted on behalf of all consumers in the United States enrolled in an MWI membership in connection with their purchase of an unrelated bait product. The claims against West were asserted on behalf of all consumers in the United States enrolled in an MWI membership program who were customers of a joint venture between MWI and West or were wholesale customers of West. The district court dismissed the federal count against West and declined to exercise supplemental jurisdiction over the state law claims. Plaintiffs re-filed the state law claims against West (*Sanford v. West Corporation and West Telemarketing Corporation, et al.*, Case No. GIC 805541 (the "*West* Action")) and was ultimately assigned to the Honorable Ronald L. Styn. The *West* Action included the same or similar claims, based on the same factual allegations asserted in this action. The court in the *West* Action certified a class (February 16, 2007 Order Granting Plaintiffs' Motion for Class Certification), the case settled and Final Approval of the settlement was entered on December 24, 2008.

---

COMPLAINT – 4

*they have been, or will be, charged.* The named Plaintiff and the class members in this action were all victimized by Defendants by this same exact method.

8.      Defendants share in the revenues and profits generated from their deceptive scheme of mailing unordered merchandise and then charging consumers for it.

9.      Defendants' conduct violates the Idaho Consumer Protection Act (the "ICPA"), and also constitutes fraud, conversion, unjust enrichment and negligent misrepresentation.  Plaintiff therefore seeks on behalf of herself and all others similarly situated in Idaho compensatory damages, costs, attorneys' fees and injunctive relief against Defendants barring them continuing deceptive and false business and trade practices in connection with their advertising and enrollment in Defendants' membership programs.

## JURISDICTION AND VENUE

10.     This is an action for damages, injunctive relief and other statutory relief pursuant to the ICPA, Idaho Code §48-601 *et seq.*, and the common law to obtain injunctive relief to prevent the unlawful acts and practices alleged in this Complaint and other relief, including restitution, civil penalties, costs of investigation and attorneys' fees.

11.     This Court has jurisdiction over Defendants pursuant to Idaho Code §5-514 because each defendant is either a corporation or association organized under the laws of the State of Idaho, a foreign corporation or association authorized to do business in Idaho and registered with the Idaho Secretary of State, or does sufficient business, has sufficient minimum contacts with Idaho or otherwise intentionally avails itself of the Idaho market, through the manufacturing, production, promotion, sale, marketing and distribution of its products in Idaho, and committing a tortuous act within Idaho to render the exercise of jurisdiction by the Idaho courts permissible under traditional notions of fair play and substantial justice.

12.     Venue is proper in this Court since Plaintiff resides in Canyon County, as well as numerous class members reside in and throughout Idaho; a substantial portion of the practices complained of herein occurred in this County because Defendants have received substantial compensation as a result thereof in this County; and/or none of the Defendants are either an Idaho corporation or are qualified to do business in Idaho, thus pursuant of Idaho Code §5-504 this case "may be tried in any county which the plaintiff may designate in his complaint."

13.     Venue is also proper in this Court in that the state law claims alleged herein were severed from the *Sanford* Federal Class Action, and the federal court directed that the state law claims be filed in state court.

## PARTIES

14.     Plaintiff Patricia Gucker ("Gucker") has been, at all times relevant to the action, a resident of the city of Nampa, County of Canyon, State of Idaho.  Gucker purchased Tae-Bo fitness videotapes after viewing the television advertising campaign for the product.  In connection with this purchase, MWI charged Gucker unsolicited, unauthorized and unexpected charges for several of MWI's membership programs.  Gucker was never asked for consent to be charged for any of these MWI membership programs.  Moreover, Gucker never utilized or received any benefit from any of the MWI membership programs.  Gucker's credit card was assessed unsolicited and unexpected charges totaling approximately $680.00 for one or more MWI membership programs.

(a)     On or about February 14, 1999, at the end of the call to purchase the bait product, Tae-Bo fitness exercise videotapes, the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Gucker informing her she would be receiving a risk-free 30-day trial membership, emphasizing the thank you gift was FREE and that Gucker, "WON'T BE BILLED."  The language of the deceptive telemarketing pitch is quoted in full in ¶25 below.  The telemarketer thereafter transferred Gucker's confidential credit card information to MWI using the

COMPLAINT – 6

wires. Thereafter, on March 14, 1999, in connection with the Tae-Bo product, Gucker's credit card was assessed an unsolicited and unexpected $72.00 charge by Defendants for an Essential's membership.

        (b)    On January 14, 2000, MWI charged Gucker's credit card an unsolicited and unexpected renewal fee of $84.00 (charged as "MWI Essentials").

        (c)    On January 15, 2001, MWI charged Gucker's credit card an unsolicited and unexpected renewal fee of $99.95 (charged as "MWI Essentials").

        (d)    On January 14, 2002, MWI charged Gucker's credit card an unsolicited and unexpected renewal fee of $109.95 (charged as "MWI Essentials").

        (e)    On January 15, 2003, MWI charged Gucker's credit card an unsolicited and unexpected new membership fee of $149.95.

        (f)    On January 14, 2004, MWI charged Gucker's credit card an unsolicited and unexpected renewal fee of $169.95.

    15.    Until recently, Gucker was completely unaware of the renewal charges or that she had been enrolled in the MWI membership and/or that her credit card had been billed.

    16.    In addition, Plaintiff includes in her allegations the names, the dates of the fraudulent charges and the bogus membership enrollments of unnamed Idaho class members.[5] The names of the unnamed class members represent only a fraction of the unnamed class members included in the proposed class. The identity of the remainder of the unnamed class members are contained within MWI's electronic database(s), and will be revealed through discovery. Each of these unnamed class members, as well as each of the unnamed class members who have yet to be identified through

---

[5]    The information regarding these unnamed class members was obtained pursuant to a protective order and is required to be filed under seal. If the Court desires, Plaintiff will amend this Complaint to add these additional unnamed class members.

discovery, received the deceptive telemarketing pitch at the end of their calls, the language of which is quoted at ¶25 below.

17.     At this time, without the benefit of discovery from Defendants, Plaintiff is aware that the most recent telemarketing pitch was made on or about September 10, 2002, and that the most recent fraudulent charge occurred on October 15, 2002. Based upon a database MWI produced in the related California state court action, Plaintiff is aware that the most recent fraudulent charge to a West Subclass member[6] were levied on March 9, 2007 – the month that the database was produced. Accordingly, based upon this information Plaintiff believes that discovery will reveal a continuation of the pattern and practice of fraudulently charging the credit and/or debit cards of the class members in this action, through at least March 2007, through the present, and for the foreseeable future.

18.     Defendant Vertrue Incorporated, previously known as MWI, has been, at all times relevant to the action, a Delaware corporation whose primary place of business is 20 Glover Avenue, Norwalk, Connecticut 06850. Defendant MWI does business in Idaho, and throughout the nation, as MWI Essentials, MWI Leisure Advantage, MWI Home & Garden, MWI Connections, Health Trends, Travel Arrangements, Transmedia, Cardmember Protection Service, Countrywide Dental, 24 Protect, Smartsource, Value Max Shopping Service, Money Master Tai Value Max, Tai Vital Basics and various other names under which it markets and charges consumers, by and through nationwide telemarketing campaigns, as well as by and through the interstate instrumentality of mailings throughout Idaho and the nation. Defendant MWI entered into express and tacit agreements with the Telemarketers. Defendant MWI drafted the deceptive script used and sought comments from and

---

[6]     As noted above, the claims of the West Subclass members were severed from this action and subsequently settled with West and this action seeks no recovery for these dismissed West Subclass members.

approval by the Telemarketers. Defendant MWI operates and is involved in the unlawful scheme of charging the credit and/or debit card accounts of consumers for unordered merchandise.

19.     Defendant Adaptive Marketing LLC is a Delaware limited liability company with its principal place of business in Norwalk, Connecticut 06850 (collectively with Vertrue Incorporated). Adaptive Marketing LLC is a wholly-owned subsidiary and "operating company" of Vertrue Incorporated. Adaptive Marketing LLC shares personnel with Vertrue Incorporated and markets Vertrue Incorporated's membership programs. There exists, and at all relevant times, a unity of interest and ownership between MWI and Adaptive Marketing LLC, such that any individuality and separateness between each of them ceased and each is the alter ego of the other in that each entity is completely controlled, dominated, managed and operated without regard for corporate individuality.

20.     The true names and capacities of defendants sued herein as Does 1 through 50, inclusive, are presently unknown to Plaintiff, who therefore sues the Doe defendants by such fictitious names. Plaintiff will seek to amend this Complaint and include the Doe defendants' true names and capacities when they are ascertained. Each of the fictitiously named defendants are responsible in some manner for the conduct alleged herein and are therefore responsible for the damages suffered by Plaintiff and class members.

21.     In committing the wrongful acts alleged herein, Defendants have pursued a common course of conduct, acted in concert with, aided and abetted and conspired, in furtherance of their common plan, scheme or design to make unauthorized charges to customers' credit and/or debit cards for an unsolicited, unwanted and unordered membership and thereafter to conceal and cover up their wrongdoing – all for their own personal profit. Defendants actually knew, or should have known, of the fraudulent conduct being committed and actively participated in covering up its true nature. Thus, in addition to the wrongful conduct herein alleged as giving rise to primary liability, Defendants further aided and abetted and knowingly assisted each other in the breach of their

respective duties, contracts and obligations as herein alleged, and acted as the agent of each other in participating in this wrongdoing.

22.     At all times herein mentioned in the claims for relief alleged herein, each and every defendant was an agent and/or employee of each and every other defendant.  In doing the acts alleged in the claims for relief alleged herein, each and every defendant was acting within the course and scope of this agency or employment, and was acting with the consent, permission and authorization of each of the remaining Defendants.  All of the actions of each defendant as alleged in the claims for relief stated herein were ratified and approved by every other defendant or their officers or managing agents.

## DEFENDANTS' WRONGFUL CONDUCT

### The Upsell

23.     Defendants obtain the necessary information to bill consumers for MWI memberships by piggybacking onto popular consumer products.  MWI looks for products advertised heavily on television or in print which ask consumers to call a 1-800 number to order that product.  Some examples of the products which MWI uses to upsell its programs are: Nad's, Tae-Bo, vitamins, knives, Q-Ray bracelets, Edgemaster paint rollers, Simoniz car washer, flowers, dance videos, AB Slider, ultrasonic toothbrushes and OxiClean.

24.     The consumers see the advertising for the product (such as a Tae-Bo, Nad's, a Simoniz car washer or an OxiClean infomercial) and call the 1-800 number.  The consumer has not seen or heard anything about any MWI product and has no desire or intent to purchase an MWI product.  The consumer is most likely to wind up speaking with an employee of the Telemarketers. The consumers go through the process of ordering the product they wanted and the Telemarketing Entities who handle the incoming calls "capture" the consumers' credit and/or debit card information.  This portion of the call may take anywhere from 5-15 minutes or so.

COMPLAINT – 10

25.    Before the Telemarketers let the consumers off the line, MWI has the Telemarketing Entities read the following deceptive script to the consumers:

> Mr(s) _____, for purchasing **[NAME OF BAIT PRODUCT]** today, we're sending you a risk-FREE 30-day membership to **[MWI PROGRAM]**, a service designed to SAVE YOU 20% from leading stores such as **[STORES]**, PLUS additional savings on eyewear, beauty products, haircuts and more! After 30 days, the service is extended to a full year for just $6 a month, billed annually in advance to the credit card you're using today. If you want to cancel, just call the toll-free number that appears in your kit in the first 30 days and YOU WON'T BE BILLED. So look for that kit in the mail, OKAY?[7]

26.    The words in ALL CAPITAL LETTERS are the words the telemarketer emphasizes when reading the script. In other words, MWI emphasizes that the trial membership is "FREE," and that class members "WON'T BE BILLED." At the end of the call, MWI merely tells class members: "So look for that kit in the mail, OKAY?" MWI does not ask the consumers if they want to receive the purported trial membership, let alone any agreement to be enrolled in the membership. And, MWI does not ask consumers for permission or consent to charge their credit and/or debit cards.

27.    At most, the consumer is led to believe that a free trial membership will be mailed to the consumer to evaluate, and if the consumer likes the product he or she can call to purchase a membership. ***No express consent to mail the membership is obtained from the consumer, let alone any agreement to be enrolled in the membership. Nor is any express consent requested to bill the consumers' credit and/or debit cards.*** This is Defendants' "upsell" and Defendants' excuse for charging consumers for a membership program they neither wanted nor ordered.

28.    Notwithstanding the failure to obtain consent to enroll consumers in MWI's membership programs and charge their cards, the Telemarketing Entities transfer the class members'

---

[7]    While there can be minor variations to the script – *e.g.*, the list of stores can change, the MWI program can change, the script may say "to thank you for your purchase," or as a "special thanks," and such – the substance of the telemarketing pitch is identical across all scripts.

COMPLAINT – 11

confidential credit and/or debit card information, which they obtained when the consumers called to purchase the unrelated bait products, to MWI. MWI then mails a membership kit and charges the consumers' credit and/or debit cards. Neither Defendants, the Telemarketing Entities nor the Bait Product Suppliers seek or obtain the consumers' express consent to charge the MWI membership to the consumers' credit and/or debit card accounts.

29.     The fraud at issue is the assessment of an unsolicited and unlawful fee charged to consumers which the consumers did not seek out and did not want. The consumers are deceived by Defendants' purposely misleading script, then mailed a membership kit and enrolled and charged for a membership they did not want or order. Defendants' automatic self-renewing membership is an outright theft of money under the guise of a membership.

**The Mechanics of the Scheme**

30.     To generate calls, Defendants rely on the popularity of the non-MWI products offered by the bait entities.

31.     After a consumer has viewed an infomercial or read an advertisement for a bait product they want to purchase, the class members call a "1-800" telephone number to order the product. The purchasers of these products are given the option of purchasing by credit card or debit card. To complete the purchase, the class members are required to provide their names, credit or debit card numbers and the expiration date to the Telemarketers who answer the calls and process the sales. Thus, at the end of the purchase transactions, the Telemarketing Entities possess all of the information necessary for MWI to assess the unsolicited membership fees against unsuspecting consumers.

32.     After the financial information for the sale of the advertised bait product is obtained by the Telemarketers, MWI has them read the "upsell" script. The message of the upsell script is that the consumer will be mailed a 30-day, risk-free trial membership. The class members are not

COMPLAINT – 12

asked whether they want to enroll, they are not billed or invoiced and they are not asked to give or to confirm their credit or debit card information to pay for the membership. Instead, Defendants wait approximately 30 days and then charge the class members' credit and/or debit cards using the information Defendants received from consumers when they purchased the product they actually wanted.

33.     The class members are never asked to provide their confidential credit or debit card information in connection with the unrelated MWI upsell. Class members are never asked to give permission to permit their confidential financial information to be transferred to defendant MWI. The class members are never even asked if they want to receive the purported membership materials – rather they are simply informed that for purchasing the advertised product, risk-free they are being sent a 30-day trial membership. The purported membership kit which allows the consumer to access the so-called benefits of the program are mailed shortly after the call.

34.     Approximately one month after the call, defendant MWI uses the confidential financial information it received from the consumers' purchases of the unrelated product to charge the class members' credit and/or debit cards. On information and belief, some consumers are "enrolled" more than once. This situation would only arise if the consumer did not know they had already been enrolled, or were going to be enrolled, in the purported membership as no one would twice pay $60-$170 to MWI to join the same membership. It, of course, makes no difference to MWI how many times a consumer is enrolled, as each "enrollment" is simply another $60-$170 a year for MWI, other than if a member is "enrolled" multiple times, they are more likely to notice the offending charge.

35.     The class members do not know they have been enrolled in MWI's membership programs and therefore never use any of the programs' so-called benefits. *See* ¶¶52-59 below.

Defendants count on this deception and subsequent non-use of the benefits to hold the costs of the programs to a nominal amount thus making the annual fees pure profit for Defendants.

36.     Unless the class members notice the charges to their debit and/or credit card and call to complain, the class members will continue to be charged $60-$170 each and every year.  As with the initial charges to the class members' credit and/or debit cards, no invoice or bill is ever sent to the class members to inform them that their credit and/or debit cards have been, or will be, charged by defendant MWI.  What is even more insidious is that the purported "annual" membership is charged every 11 months and, similarly, no invoice or bill is ever sent to the class members for renewal charges.

37.     The fraud is perpetuated because the customers' prior expressed acceptance or consent to enroll in the membership is not obtained.  Defendants do not clearly and unambiguously communicate the terms of the purported membership programs.  The membership that is mailed is neither risk-free, nor a free 30-day trial as was represented by Defendants.  Defendants charge the class members for a membership they did not order.  The consumers charged for the membership who never use the so-called benefits are paying $60-$170 per year for nothing.

38.     Defendants know that consumers do not understand that they will be charged a membership fee unless they call to cancel.  Defendants mail the membership kit fully understanding that the consumers will not understand they are being charged for the materials.  Further, Defendants have designed the generic membership materials so as to appear to be "junk mail" so the materials will be discarded and thus never read.  Defendants purposely design their scripts to maximize consumer confusion and allow Defendants to "enroll" the maximum number of unsuspecting persons.  Defendants then mail the membership kit to the deceived and/or confused consumers who Defendants "enroll" in the MWI memberships.  Defendants are able to maximize their profits at the expense of the consumers deceived by Defendants' scheme.

COMPLAINT – 14

39.     The *only* notice that a class member receives that he or she has been charged for a membership is his or her credit or debit card statement reflecting a charge – which may or may not identify MWI as the entity who levied the charge – which the class member may not notice depending on how closely the class member reads his or her credit and/or debit card statement. If the class member notices and challenges the charge, the charge may be reversed or a pro rata refund may be sent. In this way, Defendants conceal their deception from the other class members and from the public. Those class members who do not notice the charge are billed every 11 months until they notice that they have been charged and complain.

40.     These acts take place as a result of the concerted action, agreement and direction by Defendants.

**The Lack of Audiotaped Confirmations**

41.     Until required as part of the Nebraska Attorney General "Better Practices" requirements, Defendants failed to confirm consumers' acceptance of the upsell offer by MWI for many, if not most, of the "enrolled" consumers.

42.     Accordingly, no audiotaping of the upsells occurred for most of the class members deceived by Defendants.

**The Deceptive "Upsell" Script**

43.     Defendants worked together to produce a script to be read to each consumer. MWI creates the deceptive scripts to be read when marketing the MWI programs and the Telemarketing Entities comment on and approve the deceptive scripts.

44.     Defendants purposely avoid clearly and unambiguously notifying consumers that their credit and/or debit cards will be charged between $60-$170 for the "membership" mailed to them. No focus groups or other consumer research is undertaken by Defendants. Even after Defendants received numerous consumer complaints, ranging from a lack of any recollection of ever

even hearing of MWI or any of its purported memberships to accusations of fraud and theft, Defendants avoided ascertaining whether their scripts clearly and unambiguously (i) requested consent from the consumer to charge for the membership, (ii) notified the consumers of the terms of the purported membership or (iii) informed the consumers that their credit and/or debit cards would be charged.

45.     Defendants are well aware of the fact that consumers are deceived by their scripts as seven state attorneys general alleged that MWI was deceiving consumers. MWI settled the matters with five of the attorneys general, and agreed to pay civil penalties in excess of $2 million to one of those attorneys general. Defendants know that consumers are misled into believing that they are not making a purchase decision regarding the MWI memberships. Defendants' script is intended to, and does, convey to consumers that the membership mailed to them is a free trial membership, which if they like the membership they can call to order.

46.     The scripts are written and designed to be read in a manner intended to confuse, mislead and deceive consumers.

47.     Defendants' conduct is deceptive, unlawful and fraudulent and it cannot be justified in any manner. Indeed, seven different attorneys general have determined that the MWI scripts are deceptive and do not clearly and unambiguously communicate to consumers that they will be charged for an annual self-renewing membership unless they affirmatively act to cancel the membership. Nor do the scripts inform the class members that they will be required to return the purported membership card should they desire to cancel.

**The Membership**

48.     After receiving the class members' confidential financial information by piggybacking onto the advertised product, defendant MWI mails out membership materials and

COMPLAINT – 16

customer service information to the persons enrolled.  Then, MWI simply bills the consumers $60-$170 each year on the consumer's credit or debit card.

49.     Defendants have designed the generic purported membership materials so as to appear to be "junk mail" in the hopes that the materials will be discarded and thus never read.  If the packet mailed by MWI for the risk-free trial membership is thrown out by the recipient, then the consumer will not have the number to access the so-called benefits.  The kits are mailed out bulk rate indicating the lack of value of the material.  The kits contain a cheap paper membership card typical of cards received in mail solicitations.  This card is, however, the actual membership card for the enrolled member.  By making the kit typical junk mail, Defendants further conceal the fact that the class members have been charged an annual, self-renewing membership fee.

50.     Other than the one line on their credit and/or debit card statements, the class members are not notified that they have been "enrolled" in an MWI membership program or that their credit and/or debit cards have been charged.  Defendants do not send new "members" any invoice or record of the charge.  Moreover, after the membership kits are mailed and consumers are charged, and throughout the duration of the "membership," class members never hear from any of the Defendants about any membership benefits.  After the initial mailing of the membership kit, consumers do not receive any newsletters, coupons, surveys or any other notifications.  The only thing they receive is a charge of $60-$170 on their credit and/or debit cards.

51.     The term "membership" used by Defendants is merely an excuse to take money from consumers who submit their credit and/or debit card information for their purchase of other products.  Defendants take consumers' money by mailing them an unordered membership and then charging them for it.

COMPLAINT – 17

**Lack of Usage of the Membership Benefits**

52.     The manner in which a consumer can access the purported membership is further evidence of Defendants' scheme to defraud. Other than the purported membership kit, Defendants do not send "members" anything. No newsletter or other correspondence is sent to the class members. No confirmation letters or satisfaction surveys are sent. The class members receive nothing after they are charged, or before the next time they are "renewed."

53.     For consumers to obtain the purported membership benefits, they must contact defendant MWI either by telephone or via the Internet, and obtain certificates through MWI. If the retail establishment works with MWI, then the consumer can order a certificate that can be used at that retail establishment. Unless the consumer knows to call MWI, they receive nothing.[8]

54.     In the *West* Action, MWI produced a database containing the transactions of 567,430 California consumers, many of whom are members of the class. Some of these consumers were enrolled under West's Joint Venture and Wholesale arrangements with MWI, which were settled in the *West* Action and for which no recovery is sought in this action. The database establishes that 552,605 (or 97.5%) of the consumers included in this database never used any membership benefits. The database establishes that out of 567,430 consumers included in the data, only one person purchased any of the following membership benefits:

| | |
|---|---|
| $25 Exxon Gas Card | $25 WalMart Gift Card |
| $25 Gas Card Choice A | $25 Babies R Us Gift Card |
| $25 Warner Bros. Certificate | $25 SunCoast Gift Card |
| $25 Hollywood Video Gift Cards | Hickory Farms Offer |
| Lady Footlocker Merchandise Certificate | Sharper Image Coupon |

---

[8]     Some coupons of nominal value are included in some membership kits. However, Defendants pitch their reward program as the biggest member benefit and the reward program requires the "member" to contact MWI to use it.

55.     The database establishes that out of 567,430 consumers *only two people* bought one or more of the following:

| | |
|---|---|
| ARCO Gas Cards | $25 Structure Certificates |
| $10 Olive Garden Gift Cards | $25 Bloomingdales Certificates |
| Zales Certificates | |

56.     The database establishes that out of 567,430 consumers *only three people* bought one or more:

| | |
|---|---|
| $10 Toys R Us Certificates | $25 Borders Gift Cards |
| $25 Barnes and Nobel Gift Certificates | |

57.     The database establishes that out of the 567,430 consumers, *four* people bought one or more $25 Toys R Us Gift Cards or a $10 Applebees Certificates; *five* bought a GNC Coupon; *eight* bought a $10 Blockbuster Gift Card or a $25 Linens-N-Things Gift Card; *ten* bought a $25 Sam Goody Gift Card, a $25 K-Mart certificate or a $10 Red Lobster/Olive Garden Certificate; *11* bought a $10 Outback Steak House Certificate or a $25 Lowes Gift Card; *12* bought a $25 KB Toys Gift Card; *16* bought a Pier 1 Gift Card; *17* bought a $25 Footlocker Certificate; *26* bought a $25 Home Depot Gift Certificate; *28* bought a $25 Sears Certificate; *35* bought a Nordstrom Gift Certificate; *36* bought a $25 TJ MAXX Certificate; and just *152* people bought a $25 Target gift card.  Equally significant, the most purchased benefits were purchased by less than one percent of the 567,430 consumers – just 0.4% (2,250 people) received one or more $40 Hair Cut Rebates and just 0.7% (4,063 people) received 4/$5 Dining Rebates.

58.     As part of its investigation, the Iowa Attorney General sent questionnaires to 400 Iowa residents enrolled in MWI membership programs.  The Iowa Attorney General reported that, most of the consumers who responded indicated that they had never used their membership and none of those responding said they were satisfied members.

59.     The lack of use of the membership benefits demonstrates that Defendants knew, or should have known that the people they charged $60-$170 were utterly unaware that they had been

charged for and enrolled in the MWI memberships.  Consumers were treating the membership kit as the law allows; they were ignoring it and assuming they had no obligation to the sender of the unordered merchandise.  Defendants charged them and took their money in violation of law.

**Consumer Complaints**

60.     Immediately after the first customers were charged for an MWI membership, Defendants began receiving an enormous number of customer complaints.  These complaints ranged from the consumers having no recollection of ever being told about an MWI program to irate consumers alleging theft and fraud by Defendants.  A simple Internet search for "MemberWorks," pulls up thousands of consumer complaints, including at websites such as www.ripoffreport.com, www.consumeraffairs.com and www.uspeakout.com.  Despite receiving such complaints and despite knowing of the existence of a number of Internet sites dedicated to complaining about MWI and its unlawful practices, Defendants took no steps to make sure that their marketing practices were not deceptive.

61.     In addition to complaints directly by consumers, MWI received numerous inquiries by the Better Business Bureau (the "BBB") regarding its practices as they related to customers.  Defendant MWI received an unsatisfactory rating by the BBB due to a pattern of complaints concerning unauthorized charges to consumers' credit cards.  The BBB's website reported on June 30, 2006 that it had processed a total of 2,277 complaints about MWI in the previous 36 months, including 765 in the previous year.  The conduct giving rise to these complaints continues.  Almost one year later, on June 2, 2007, the BBB's website reported that it had processed a total of 2,180 complaints about MWI in the previous 36 months, including 667 in the previous year.

62.     Defendants received so many complaints from consumers that they scripted responses to "frequently asked questions" or "FAQs" for their customer service representatives.  The following "frequently asked questions" were received by Defendants who prepared scripted responses to them:

COMPLAINT – 20

(a)     "I received my credit card bill and saw this Essentials or Home & Garden Rewards program listed here for $84 – what is this";

(b)     "I don't remember hearing about Essentials or Home & Garden Rewards";

(c)     "I said 'no' to this program";

(d)     "I didn't authorize this program"; and

(e)     "Who authorized this billing/purchase?"

63.     The conduct of each of the Defendants contributed to the scheme designed to deceive and defraud class members, resulting in the unlawful assessment of an unsolicited annual recurring membership fee.

**Governmental Actions**

64.     Every governmental and judicial entity to review Defendants' telemarketing practices has concluded they are deceptive and misleading.

65.     Seven attorneys general (from Minnesota, New York, Nebraska, California, Florida, Ohio and Iowa) have separately concluded that the telemarketing scheme Defendants employed was deceptive.  In the words of the Minnesota Attorney General:

> "They just say at the end of the script so we're going to send you the package in the mail ok and they never say Is it OK to charge your credit card? . . .  [The Telemarketers] tell you that the deal is about you getting something for nothing . . . . You're going to get a free gift, you're going to get a risk-free membership and that's not what the real deal is.  The real deal is you're going to get charged unless you act to cancel that."[9]

66.     According to the New York Attorney General:

> Consumers may be confused and mistakenly believe that (1) their credit card or bank card accounts will not be debited unless they directly provide their billing information to MW; (2) they do not have to take any affirmative action to avoid being charged a membership fee; (3) they do not have to take any affirmative action to avoid being charged a renewal fee upon expiration of the initial membership term;

---

[9]   *Why Some U.S. Flag Buyers Are Seeing Red*, ABC News.com, Nov. 28, 2001.

and (4) they are not making a purchasing decision at the time of the telemarketing call.

67.     The New York Attorney General also charged that:

Because the trial offer is termed "risk free," Consumers may be confused or fail to understand that they will be charged a membership fee unless they cancel their membership before the end of the trial offer.  By reason of the foregoing, the Attorney General believes that MW has engaged in business conduct that has the tendency and capacity to be deceptive and misleading in violation of New York's consumer protection laws.

68.     As a result of the Minnesota and New York Attorneys General investigations, MWI was forced to stop reading its scripts to Minnesota and New York consumers until the scripts were revised to: (i) inform consumers that they would be billed after 30 days if they did not call to cancel; and (ii) ask the consumers' permission to charge their credit and/or debit cards.  While in 2001 MWI ultimately revised the scripts in Minnesota and New York, it did not include similar disclosures on any of its scripts read in any other state.

69.     Following on the Minnesota and New York investigations the Nebraska Attorney General implemented an investigation into the deceptive telemarketing practices.  As a result, MWI was required to modify its scripting nationwide to inform consumers that they would be charged after 30 days if they did not call to cancel; and to ask their permission to charge their credit and/or debit cards.  The new scripting requirements were referred to as "Best Practices" requirements or "Best Practices" scripting.  Prior to the June 1, 2001 deadline for implementing the Best Practices scripting, MWI tested the disclosures on several "bait" products.  The results were dramatic as affirmative responses to the telemarketing script dropped to nearly zero.  In response to the test results, MWI secured an extension of the implementation date, and returned to using the old deceptive scripting to maximize their "sales."

70.     In 2001, MWI also entered a settlement with the California Attorney General relating to the sale of MWI memberships to consumers who called to purchase unrelated products from

Sears.  Under the settlement, MWI agreed to pay an unprecedented $2 million fine.  MWI also agreed to use the Best Practices scripts in California, and to send renewal notices to California residents that they would be charged unless they called to cancel.

71.     On information and belief, in order to circumvent the scripting requirements required by the Nebraska, Minnesota, New York, Florida and California Attorneys General, MWI hatched a scheme to allow it to continue its deceptive telemarketing practices.  Without discussing the matter with any of the Attorneys General, MWI and certain of the Telemarketers took the position that the Best Practices requirements did not apply to enrollments originated by the Telemarketers.  This meant that while Best Practices scripting would have to be used where MWI simply paid a fee to the Telemarketers to read the scripts and where consumers were enrolled under the joint venture arrangements with the Telemarketers, the old deceptive scripting would continue to be read by Telemarketers having wholesale arrangements with MWI.  Certain of these Telemarketers would then turn around and "sell" the enrolled consumers back to MWI who would bill the credit and/or debit cards of consumers for the bogus memberships.

72.     On October 21, 2003, the Florida Attorney General filed a complaint concerning Defendants' deceptive telemarketing practices. Noting that MWI reported annual revenue of $400 million, the Florida Attorney General's Office indicated its investigation estimated that 50% of all sales were reported as "unauthorized." In 2004, MWI also entered into a settlement agreement with the Florida Attorney General relating to the sale of its products in conjunction with unrelated infomercial products.  MWI agreed to pay a $950,000 fine.  The agreement also required MWI to clearly disclose all terms and conditions of its programs, and to obtain consumers' express consent to charge their credit cards for MWI programs.

73.     The Iowa Attorney General filed suit on May 11, 2006.

COMPLAINT – 23

74.     As part of its investigation, the Iowa Attorney General sent questionnaires to 400 Iowa residents enrolled in MWI membership programs. Among the questionnaire respondents, 67% indicated that they did not know they were members and/or that they did not authorize MWI to charge them. The Iowa Attorney General reports that: "Most of the rest of the consumers who responded indicated that they had never used their membership, or thought that they had already cancelled. None of those responding said that they were satisfied members."

75.     In 2002, the Federal Trade Commission (the "FTC") published its Notice of Proposed Rulemaking (the "Notice") pertaining to telemarketing sales rules stating "in many preacquired account telemarketing solicitations, products and services (often buyers' clubs) are marketed through the use of free trial offers, which are presented to consumers as 'low involvement marketing decisions.'" *See* 67 Fed. Reg. 4492, 4501 (Jan. 30, 2002). The Notice went on to state, "[c]onsumers are asked merely to consent to the mailing of materials about the offer. Consumers frequently do not realize that the seller or telemarketer already has their billing information in hand and, instead, mistakenly believe they must take some action before they will be charged – *i.e.*, that they are under no obligation unless they take some additional affirmative step to consent to the purchase." *Id.*

76.     In 2003, the FTC enacted rules to combat "abusive telemarketing . . . practices" by telemarketers using a "free-to-pay conversion feature" when the telemarketers have "pre-acquired account information." *See* 16 C.F.R. §310.4. Significantly, in adopting these rules, the FTC included defendants "Memberworks Incorporated" among a list of "bad actors" charged with engaging in this type of abusive telemarketing practices. 68 Fed. Reg. 4580, 4621 n.472 (Jan. 29, 2003). The rule sets forth three objective requirements which, at a minimum, must be satisfied to meet the FTC's informed consent requirement. MWI would have had to "obtain *from the customer*, at a minimum, the last four (4) digits of the account number to be charged." 16 C.F.R.

COMPLAINT – 24

§310.4(a)(6)(i)(A). It would have had to "obtain *from the customer* his or her express agreement *to be charged* for the goods or services *and to be charged using the account number* [identified by the customer]." 16 C.F.R. §310.4(a)(6)(i)(B). And MWI would have had to "make and maintain an audio recording of the entire telemarketing transaction." 68 Fed. Reg. 4580, 4621 n.471 (Jan. 29, 2003). In order to circumvent these requirements, MWI began charging $1 for the 30-day trial so that at the end of 30 days, there would not be a "pay to pay" conversion.

77.     In connection with the rule-making proceedings, MWI submitted a purported consumer survey on the understandability of the telemarketing scripts. The FTC concluded that MWI's survey was biased in its favor and that even in the face of this bias the study demonstrated that "at least 46 percent of the respondents did not even 'mostly' understand the way in which they would be billed after listening carefully to a sales offer involving preacquired account information and a 'free-to-pay conversion' feature." 68 Fed. Reg. 4580, 4621 n.468 (Jan. 29, 2003).

78.     In the *Sanford* Federal Class Action, after weighing the evidence and expert testimony submitted, the federal arbitrator concluded:

> When I look at the overall picture here from an objective reasonable person viewpoint I consider: the experience that MWI has had in thousands of these cases, the circumstances of this type of call (an unsolicited, unexpected offer read by MWI with high sounding words such as "RISK-FREE" membership – "YOU WON'T BE BILLED" – "So, look for this kit in the mail, OKAY?"), *I conclude that even if the script was read to [the consumer], [they were] misled, [they] didn't agree to this "deal," there was no meeting of the minds*, and MWI not only could suspect, but knew that many of the callers did not understand that they were making a "deal" to purchase a membership and assuming a burden to act.

Arbitration Award at 6-7.

79.     In reaching this conclusion, the arbitrator stated: "I conclude that the script has fuzzy language, would have been read in less than 30 seconds (my estimate) as a fast sell over the phone for a product that had nothing to do with the purpose of [the consumer's] call. The script, if it was read to [the consumer], was *foisted upon [them] in a quick, slick and misleading sales pitch that*

*few people would understand.*"  *Id.* at 7.   Ultimately, he found: "***This script is a recipe for***

***misunderstanding and confusion when heard by a consumer hearing it under the circumstances.***"

*Id.* at 8.

80.     In the *Ritt* action, the Ohio Court of Appeals found the upsell scripts were deceptive

and misleading:

> The fact is, with or without authorization, consumers who stayed on the telephone
> line long enough to receive the entire scripted pitch would not have known the
> ramifications of what they were agreeing to once the upsell had been pitched to them
> and they said "yes" to receiving a membership kit.[10]

## TOLLING OF THE STATUTE OF LIMITATIONS

81.     The running of any applicable statutes of limitation has been tolled for several

reasons.

**Tolling by Virtue of MWI's Fraudulent Concealment**

82.     Through various techniques and devices of secrecy, deception and misrepresentation,

Defendants affirmatively and intentionally concealed the existence of their unlawful and unfair

telemarketing practices from Plaintiff, class members and the public.   The fraudulent concealment,

deception and misrepresentation existed before Plaintiff was enrolled and charged and continued

throughout the class period.   Defendants carried out their violations of law in secret and consistently

deceived, misrepresented and concealed the truth regarding the unauthorized enrollment into the

various membership programs and the unauthorized charging of Plaintiff's and class members'

credit and/or debit cards.   Such acts included purposely designing their scripts to maximize

consumers' confusion, thus allowing Defendants to enroll the maximum number of unsuspecting

consumers.

---

[10]     *Ritt v. Billy Blanks Enters.*, No. 80983, 2003 Ohio App. LEXIS 3297, at *7, *20-*21 (Ohio
Ct. App. July 10, 2003).

COMPLAINT – 26

83.     Defendants' scheme is based upon their knowledge that a large segment of the consumer population does not check their credit card statements and/or would miss the charge even if they did review their credit card statement.

84.     So as to assuage any suspicion that a consumer may have, Defendants emphasize that the trial membership they are sending is "FREE" and that the class members "WON'T BE BILLED."

85.     To conceal the fact of billing consumers' credit and/or debit cards, Defendants intentionally did not send Plaintiff or class members any invoice or any other notification that they were going to charge their cards.  Similarly, to conceal the true facts concerning the billing of the consumers' credit and/or debit cards, after they billed the consumers' credit and/or debit cards, Defendants did not send any invoice, or notification of the fact that they had in fact billed the class members' cards.

86.     Another method that Defendants used to conceal their wrongful practices from Plaintiff and the class was to reverse the charges for any consumer that is able to track down the source of the illicit charge and calls to complain.  After reading scripts in an attempt to keep the consumer enrolled, Defendants and/or their agents will reverse the charges for complaining consumers so that the complaints do not get escalated to the point that their practices become common knowledge and reach the ears of the consumers they illicitly enrolled in, and charged for, the bogus programs.  Further evidence of this concealment is demonstrated by the existence of a Frequently Asked Questions script providing their telephone operators and/or operators of their agents, with scripted answers to consumer questions/statements such as "I did not authorize this charge," "how did you get my credit card number" and "what is this program," among others.

87.     To further conceal their wrongful conduct from those consumers who do review their credit card statements, Defendants intentionally charged $60-$170 – amounts that were unlikely to

rouse suspicion from the consumer and provoke any further inquiry. Indeed, had Defendants billed the consumers' credit and/or debit cards for several hundred dollars, consumers would be more likely to notice the illicit charges and seek to have them reversed. Similarly, the identification of the charges was designed to conceal the illicit nature of the subject charges, as the charges were identified by such words as "Essentials," "Value Max," "Travel" and "Home and Garden," among others. A consumer who reviewed his or her statement seeing a charge for $75 to "Essentials," for example, would likely perceive such name to be a clothing store, curio store, drug store or other retail establishment from which his or her spouse would have made a purchase, and thus not pursue any further inquiry to determine if the charge was legitimate or fraudulent.

88.     Through such acts of fraudulent concealment, even assuming that a class member noticed the charge on their credit or debit card statement, the existence of a charge for Essential, Value Max, Travel, Home & Garden or others would not provide any indication to the class member that their card was fraudulently charged.

89.     Defendants' scheme worked perfectly on Plaintiff and the class members. Succumbing to Defendants' practices of fraudulent concealment described above, Plaintiff did not notice the fraudulent charges when she was originally enrolled, and charged, by Defendants. Accordingly, until recently Plaintiff had absolutely no knowledge that she had previously been billed approximately $680.00 in membership and renewal fees. In addition, while class members and consumers may recall contacting Defendants regarding a renewal charge, on information and belief it was Defendants' policy, regarding renewal charges, not to inform consumers this was a "renewal" charge and that they had previously been billed one or more times earlier.

90.     By virtue of their pervasive deception and misrepresentation and concealment of facts, Defendants successfully concealed from Plaintiff and class members the truth about the memberships thereby tolling the running of any applicable statutes of limitation. Plaintiff and class

members were unaware of, and through the exercise of due diligence could not have discovered, the existence of such violations until after they had been charged for the membership.

91.     In the alternative, based on the facts alleged herein, Defendants are estopped from relying on any statutes of limitation because .of their fraudulent concealment, deception and misrepresentation of facts regarding the enrollment into the membership programs and unauthorized charges.  They were under a duty to disclose this information because it is non-public information over which Defendants had exclusive control, because Defendants knew this information was not available to Plaintiff and class members and because this information was crucial to the consuming public in making purchasing decisions.

**Tolling by Reason of Prior Class Action Pending**

92.     This is a related case to the *Sanford* Federal Class Action.  The *Sanford* Federal Class Action was filed on March 28, 2002.  In addition to federal claims, the *Sanford* Federal Class Action originally included state law claims.  The state law claims were finally dismissed from the federal action on December 23, 2008.  Under established case law, the filing of the *Sanford* Federal Class Action against MWI tolls all statutes of limitation until a final judgment of dismissal, which is no longer subject to additional appeals, has been entered.

93.     The court in the *Sanford* Federal Class Action issued an order on September 29, 2008, granting defendants' motion to dismiss the federal claims, and refusing to exercise supplemental jurisdiction over plaintiff Sanford's and the class members' state law claims.  Furthermore, relying on *Wright v. Schock*, 742 F.2d 541, 545 (9th Cir. 1984) (citing *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 352-53 (1983)), the federal court held the pendency of the federal action "tolled the statute of limitations for individual claims, mitigating prejudice to members of the putative class."

94.     On October 14, 2008, plaintiffs filed an *ex parte* application for reconsideration, asking the federal court for leave to amend the complaint, which application was granted on

COMPLAINT – 29

November 3, 2008, directing plaintiffs to file a motion for leave. On November 17, 2008, plaintiffs filed the motion for leave to amend. On December 16, 2008, defendants filed an *ex parte* motion to dismiss or, in the alternative, to strike, among other things, the state law claims from the proposed amended federal complaint, arguing that "the Court previously dismissed numerous state law claims without prejudice, and thus the state law claims can be pursued in the appropriate state court(s)." MemberWorks Inc.'s Memorandum of Points and Authorities in Support of *Ex Parte* Application for Dismissal or, in the Alternative, to Strike Claims and Additional Parties at 8. On December 23, 2008, the federal court struck the state law claims from the proposed amended complaint, holding: "Furthermore, dismissing the action would not preclude Plaintiffs from pursuing relief in other venues. The Court has not precluded the Plaintiffs from pursuing its state law claims in state court." Order Striking Counts I, IX, X, and XI from the Proposed TAC Attached to Plaintiffs' Motion for Leave to Amend at 4.

95.     As the above facts establish, Defendants have at all times known the core facts concerning the claims for which Plaintiffs and the class members seek to hold them accountable. Defendants have also known that at no time have Plaintiffs ever intended to drop the claims asserted against them. Accordingly, there is no prejudice to Defendants in permitting Plaintiff and the class members to proceed with this action and prosecute their rights against Defendants.

## CLASS ACTION ALLEGATIONS

96.     Plaintiff brings this class action pursuant to Rules 23(a) and (b)(1), (2) and (3) of the Idaho Rules of Civil Procedure, on behalf of herself and all other persons similarly situated in the State of Idaho. The class which Plaintiff represents is composed of all persons in Idaho who, after calling a telephone number to inquire about or purchase another product: (i) were sent a membership kit in the mail; and (ii) were charged for an annual MWI membership program (the "Class"). Excluded from the Class are all persons enrolled in an MWI program under the March 16, 1998

COMPLAINT – 30

"Joint Marketing Agreement between West Telemarketing Corporation and MemberWorks Incorporated," and/or the January 1, 1999 "Agreement" between West Telemarketing Corporation and MemberWorks Incorporated, and/or the July 1, 1999 "Joint and Wholesale Marketing Agreement" between West Telemarketing Corporation, West Teleservices Corporation and MemberWorks Incorporated and/or the December 1, 2001 "Wholesale and Retail Marketing Agreement" between MemberWorks Incorporated and West Direct, Inc., and any amendments or addendums to these agreements.[11] Not included within the Class are Defendants and their officers, directors, employees, agents and/or affiliates.

97.    The Class is composed of thousands of persons geographically dispersed throughout the state, the joinder of whom in one action is impracticable, and the disposition of their claims in a class action will provide substantial benefits to both the parties and the Court.

98.    The Class is ascertainable and maintains a sufficient community of interest since the rights of each member of the Class were violated in a similar fashion based upon Defendants' use of a uniform script that was read to the class members.

99.    The victimized consumers can be identified in the databases maintained by MWI. More specifically, MWI maintains databases that contain the following information: (i) the name of each class member "enrolled" in an MWI program via an inbound call; (ii) the address of each such class member; (iii) the date each class member was enrolled; (iv) the date and amount each class member was charged; and (v) the date and amount each class member was refunded. Thus the class

[11]    The identities of the consumers encompassed by this exclusion are identified on Exhibit A to the Declaration of Markham Sherwood Re Mailing of Notice and Claim Form, Report on Opt-Outs and Objections Received, filed in the *West* Action in support of plaintiffs' final approval of settlement.

COMPLAINT – 31

members can be located and notified with specificity of the pendency of this action using techniques and a form of notice customarily used in class action litigation.

100.    Plaintiff's claims are typical of the members of the Class as a whole because of the similarity, uniformity and common purpose of the unlawful conduct of Defendants.  Each class member was read the subject "upsell" script.  Each class member was mailed a membership kit for an MWI membership program.  Each class member has sustained damage as a result of Defendants' wrongful conduct in violation of state statutes, state common law, as well as general principles of equity and fair play.

101.    Plaintiff will fairly and adequately protect the members of the Class as Plaintiff has retained competent counsel who are experienced in federal and state class action claims such as those asserted in this case.

102.    A class action is superior to all other methods for the just, fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, the damages suffered by individual class members are not sufficient to justify the enormous cost associated with the prosecution of this type of litigation.  The expense and burden posed by such individual litigation makes it impossible for the class members to individually redress the wrong done to them, nor would such an individual case be adequate to ensure that such practices cease to harm others.  Further, there will be no difficulty in the management of this action as a class action.

103.    Common questions of law and fact exist as to all members of the Class and these common issues predominate over any questions which go particularly to any individual member of the Class.  Among such common questions of law and fact are the following:

        (a)    did Defendants mail memberships to the class members without obtaining prior express consent or acceptance;

        (b)    were the subject "upsell" scripts deceptive;

(c)      did Defendants clearly and unambiguously communicate that the class members would be charged unless they called Defendants to cancel the "risk-free" trial membership;

(d)      were the membership materials deceptive;

(e)      did Defendants act willfully or recklessly;

(f)      did Defendants' acts, as alleged herein, violate federal statutes, Idaho statutes and/or general principles of equity and fair play;

(g)      whether Defendants engaged in a pattern and practice of deceiving and defrauding the Class and concealing their unlawful conduct;

(h)      whether Defendants violated the ICPA;

(i)      what amount of damages the Class sustained as a result of Defendants' wrongful conduct, and the proper measure of such damages;

(j)      what restitution is due class members; and

(k)      whether Plaintiff and members of the Class are entitled to an award of reasonable attorneys' fees, pre-judgment interest, post-judgment interest, costs of suit and other appropriate relief under the circumstances of this case.

**FIRST CAUSE OF ACTION: Violation of Idaho Consumer Protection Procedures Act**

104.    Plaintiff hereby realleges and incorporates by reference the allegations contained in ¶¶1-103 above.

105.    This claim arises under the ICPA, Idaho Code §48-601 *et seq.*

106.    The ICPA is a broad act, remedial in nature, and it is intended to protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, and unfair or deceptive acts or practices in the conduct of any trade or commerce. It is especially intended to protect against any "unconscionable method, act or practice in the conduct of

any trade or commerce, . . . [whether they] occur[] before, during or after the conduct of the trade or commerce." Idaho Code §48-603C(1).

107.    Idaho Code §48-608(1) provides a private cause of action to "[a]ny person who purchases or leases goods or services and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by [Idaho Code Title 48, Chapter 6]."

108.    The terms "trade" and "commerce" mean the "advertising, offering for sale, selling, leasing, renting, collecting debts arising out of the sale or lease of goods or services or distributing goods or services, either to or from locations within the state of Idaho, or directly or indirectly affecting the people of this state." Idaho Code §48-602(2).

109.    "'Person' means natural persons, corporations both foreign and domestic, trusts, partnerships both limited and general, incorporated or unincorporated associations, companies, trusts, business entities, and any other legal entity, or any other group associated in fact although not a legal entity or any agent, assignee, heir, employee, representative or servant thereof." Idaho Code §48-602(1).

110.    Plaintiff and class members are "persons" within the meaning of Idaho Code §48-602(1).

111.    The ICPA recognizes explicitly that the "goods" involved in a consumer transaction may concern "any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, including certificates or coupons exchangeable for such goods." Idaho Code §48-602(6).

112.    At all times relevant, Defendants engaged in deceptive acts, omissions, conduct or misrepresentations, as part of trade or commerce within Idaho and/or had an impact within Idaho within the meaning of ICPA, for that statute applies whether a merchant makes a sale to a consumer

directly or indirectly. MWI was a seller of product to Plaintiff and class members and Plaintiff and class members suffered substantial loss because of one or more of Defendants' deceptive acts or omissions.

113. The policies, acts and practices of Defendants as described above were intended to deceive, deceived and continue to deceive Plaintiff, members of the Class and the general public as described herein and have resulted (and will result) in annual fees being imposed on members of the Class and offend Idaho's public policy.

114. The acts, omissions, misrepresentations, policies, practices and non-disclosures as alleged herein were intended to, and did, result in the sale of the products at issue to Plaintiff and the Class and violated and continue to violate the ICPA, Idaho Code §48-601 *et seq.*

115. It shall be a violation of the ICPA, whether or not any consumer is in fact misled, deceived or damaged thereby. Defendants, in connection with the advertising, tender and/or delivery of the products at issue, employed unconscionable tactics and inserted unconscionable provisions into the sales of the products at issue herein by unilaterally attempting to impose an automatic, unauthorized fee for enrollment in a fictitious and/or useless and unwanted membership which is offensive to Idaho's public policy and constitutes unfair and deceptive methods of competition in violation of one or more of the following:

(a) in violation of Idaho Code §48-601 of the ICPA, Defendants' acts and practices constitute the use of deceptive representations in connection with the products in question;

(b) in violation of Idaho Code §48-603 of the ICPA, Defendants have made false or misleading representations of material fact concerning the nature of the transaction or obligation incurred concerning the products at issue causing the likelihood of confusion or of misunderstanding as which have a tendency to mislead;

COMPLAINT – 35

(c)    in violation of Idaho Code §48-603 of the ICPA, Defendants have made false or misleading representations and failed to state material fact concerning the nature of the transaction or obligation incurred concerning the products at issue and such failure tends to mislead;

(d)    in violation of Idaho Code §48-603(9) of the ICPA, Defendants' acts and practices constitute the advertisement or offer of goods or products without the intent to sell them as advertised or offered; and

(e)    in violation of Idaho Code §48-603C of the ICPA, Defendants inserted unconscionable provisions into the sales contracts at issue herein by unilaterally attempting to impose an automatic, unauthorized fee for enrollment in a fictitious membership.  The following factors, as well as others, may be taken into consideration in determining whether Defendants' methods, acts and practices are unconscionable within the meaning of Idaho Code §48-603C:

(i)    knowledge by the person at the time of the sale or lease of the inability of the consumer to receive substantial benefits from the property or services sold or leased; and

(ii)    that the person has knowingly taken advantage of the inability of the consumer reasonably to protect his interests by reasons of inability to understand the language of the agreement, or similar factors.

116.    Furthermore, the acts, omissions, misrepresentations, policies, practices and non-disclosures of Defendants as alleged herein were willful, intentional, malicious, immoral, unethical, unscrupulous or oppressive and constituted violations under the ICPA, Idaho Code §48-601 *et seq.* as:

(a)    Defendants have made false or misleading representations concerning the offering price of, or the person's cost for the products at issue;

(b)     Defendants have used Plaintiff's and class members' credit and/or debit cards with the intent to injure and/or defraud Plaintiff and class members by the unauthorized use of Plaintiff's and class members' credit and/or debit cards in regards to the products at issue;

(c)     Defendants' unfair or deceptive acts or trade practices, of knowingly and willfully enrolling, charging and collecting an invalid and illegal membership fee from Plaintiff and all putative class members, are immoral, unethical, oppressive, despicable, reprehensible, unscrupulous and have and continue to cause substantial financial injury;

(d)     Defendants' use of bait products to promote the sale of the products at issue through false and deceptive representations;

(e)     Defendants knowingly concealed, suppressed and omitted in their scripts, advertisements and membership kits, material facts about the deceptive products at issue with the intent that Plaintiff and the Class would rely upon the concealments, suppressions or omissions; and

(f)     MWI profited at the expense of Plaintiff and the Class by systematically enrolling them in a MWI program and charging their credit and/or debit cards without their authorization.

117.    By reason of the foregoing, Plaintiff, members of the Class and the general public have been (and will continue to be) irreparably harmed.

118.    Defendants' conduct also violates the ICPA in that Defendants either were or reasonably should have been aware that imposition of such representations and fees is unfair, unlawful and/or fraudulent under the circumstances.

119.    Injuries suffered by Plaintiff and the Class were not outweighed by any countervailing benefits to Plaintiff and class members.

120.    At all times material to this Complaint, Defendants were acting for financial gain within the meaning of the ICPA.

121.     Through the unauthorized enrollment into the products at issue, Plaintiff and the Class were subjected to unauthorized charges to their credit and/or debit cards thereby suffering "ascertainable and quantifiable losses" as a result of Defendants' unlawful, unfair and fraudulent business practices in violation of the ICPA.

122.     As a direct and proximate result of Defendants' violations of the ICPA, Plaintiff and class members have suffered losses and are entitled to the statutory damages and injunctive relief provided in Idaho Code §48-608.

123.     The conduct of Defendants, as set forth herein, was unlawful, unfair, immoral, unscrupulous, deceptive and/or fraudulent and constitutes unfair and deceptive acts in violation of the ICPA, Idaho Code §48-601 *et seq.*

124.     Plaintiff reserves the right to allege other violations of law which constitute unlawful business acts or practices.  Defendants continue to possess funds that belong to the class members, to this date.

## SECOND CAUSE OF ACTION: Conversion

125.     Plaintiff hereby realleges and incorporates by reference the allegations contained in ¶¶1-124 above.

126.     Defendants have converted to their own use, property belonging to Plaintiff and members of the Class through unlawful acts and conduct.  The specific sum of money that was converted by Defendants should be readily identifiable from information and records in Defendants' possession or control.

127.     Defendants knowingly or intentionally charged and collected money for unordered merchandise from credit and/or debit card accounts of consumers, including Plaintiff and members of the Class.  Defendants obtained money from consumers through fraud and/or deception.

Defendants thus converted to their own use property, specifically monies, belonging to Plaintiff and the Class.

128.    The specific sum of money of Plaintiff and members of the Class that was converted by Defendants is readily identifiable from information and records in Defendants' possession or control.

129.    As a direct and proximate result of Defendants' unlawful acts and conduct, Plaintiff and the Class were deprived of the use of their money that was unlawfully converted by Defendants, and are thereby entitled to restoration of their monies, interest on these monies from the date said monies were converted by Defendants to the date of judgment and compensatory damages (including overdraft fees paid by consumers due to Defendants' conversion of their money.

### THIRD CAUSE OF ACTION: Unjust Enrichment

130.    Plaintiff hereby realleges and incorporates by reference the allegations contained in ¶¶1-129 above.

131.    Defendants have received, and continue to receive, a benefit at the expense of Plaintiff and members of the Class.

132.    Defendants have fraudulently and/or deceptively charged and collected membership fees and/or renewals from consumers, including Plaintiff and members of the Class, for unordered merchandise. Accordingly, Defendants have received benefits which they have unjustly retained at the expense of Plaintiff and members of the Class.

133.    As a direct and proximate result of Defendants' unlawful acts and conduct, Plaintiff and members of the Class were deprived of the use of their money that was unlawfully charged and collected by Defendants, and are therefore entitled to restoration of their monies.

## FOURTH CAUSE OF ACTION: Fraud and Deceit

134.    Plaintiff hereby realleges and incorporates by reference the allegations contained in ¶¶1-133 above.

135.    The acts, conduct and practices of Defendants, as alleged above, were fraudulent and deceptive.  The use of deceptive scripts assuring consumers that they were being mailed a free 30-day trial membership is and was likely to mislead, and did in fact mislead, Plaintiff and members of the Class.

136.    Plaintiff and members of the Class ordered non-MWI products.  Approximately one month later, class members were enrolled in an MWI membership program and were charged an approximate amount of between $60 and $170 to their credit or debit cards.  Eleven months after the initial charge, Defendants charge the class members approximately the same amount (usually 15%-25% more) without seeking any approval to do so.  These charges, if undetected, will keep occurring in subsequent years.

137.    Through the use of deceptive scripts that were read to the class members, Defendants concealed material facts from Plaintiff and the Class.  Defendants tell and have told members of the Class that they are being mailed a risk-free 30-day trial membership.  No permission to use the consumers' credit and/or debit cards is sought or obtained.  The scripts deceive members of the Class.  After mailing the unsolicited membership kit to the class members, Defendants charge the members of the Class for an unsolicited and unwanted membership.

138.    Defendants falsely and fraudulently utilize deceptive scripts that conceal from the class members that they will be automatically charged unless the class members affirmatively call Defendants to cancel the membership.  Defendants' scripts contain misrepresentations and are intended to, and do, deceive the class members.

139.    Defendants intentionally designed the scripts and the purported membership material in order to mislead the class members into believing that they would receive a risk-free trial membership that they could try out, and if they liked the membership, the class members could contact Defendants to activate a full membership. The true facts are just the opposite – Defendants charge the class members unless they call to cancel.

140.    Defendants have intentionally designed the generic membership materials so as to appear to be "junk mail" in the hopes that the materials will be discarded and thus never read. If the packet mailed by MWI for the risk-free trial membership is thrown out by the recipient, then the consumer will not have the number to access the benefits. The kits are mailed out bulk rate indicating the lack of value of the material. In this way, Defendants further conceal the fact that the class members will be charged an annual, self-renewing membership fee.

141.    To further their scheme to conceal the true facts, Defendants never send any invoice or bill to Plaintiff and the class members informing them that their credit and/or debit cards were going to be, or were in fact, charged.

142.    Defendants' renewal of the purported memberships is fraudulently concealed by Defendants in the same manner. No bill or invoice is sent to the class members informing them that they were going to be, or had in fact been, charged.

143.    Plaintiff and members of the Class reasonably relied on Defendants and believed that they were making a one-time purchase of non-MWI products.

144.    Defendants' false and misleading statements and suppression of the material facts set forth above and throughout this Complaint defrauded Plaintiff and the Class, and are in direct violation of federal and state statutes, as well as principles of common law, for which Plaintiff and members of the Class are entitled to recover damages.

## FIFTH CAUSE OF ACTION: Negligent Misrepresentation

145.    Plaintiff hereby realleges and incorporates by reference the allegations contained in ¶¶1-144 above.

146.    In making representations to Plaintiff and members of the Class described herein, Defendants failed to fulfill their duty to disclose the material facts set forth above.  Among the direct and proximate causes of said failures to disclose were the negligence and carelessness of Defendants.

147.    Defendants owed Plaintiff and members of the Class the duty to act with reasonable care in retaining, training and supervising their agents and sales agents.  Defendants also failed to take reasonable steps to ensure that their representatives conducted themselves in accordance with the law and to ensure that the representatives disclosed all material facts and did not misrepresent or omit such facts in conducting such sales.

148.    Defendants, as set forth herein, breached their duties to retain, train, supervise and discipline their sales force and to ensure full disclosure by them.

149.    Plaintiff and the members of the Class were unaware of the falsity of Defendants' affirmative misrepresentations and their failure to disclose that Plaintiff and members of the Class would be charged undisclosed and unauthorized fees for a fictitious membership on their debit and/or credit card accounts.  Plaintiff and the members of the Class, as a direct and proximate cause of Defendants' breaches of their various duties, reasonably relied upon such representations to their detriment.  Such reliance was foreseeable and intended by Defendants.  By reason thereof, Plaintiff and members of the Class have suffered damage, in an amount according to proof at time of trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff on behalf of herself and the members of the Class, prays for judgment and relief against Defendants as follows:

A.     An order preliminarily and/or permanently enjoining Defendants from violating ICPA, Idaho Code §48-601 *et seq.*, and pursuing the policies, acts and practices complained of herein;

B.     An order of this Court ordering Defendants to immediately cease all acts of unfair competition and enjoin Defendants from continuing to conduct business via the unlawful, unfair or fraudulent business acts or practices as particularized herein;

C.     Plaintiff also requests an order requiring Defendants to identify all class members and pay restitution to Plaintiff and all members of the Class so as to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, fraudulent or unfair business act or practice, in violation of applicable laws, statutes or regulations or constituting unfair competition or untrue or misleading advertising;

D.     Plaintiff also requests an order of the Court requiring Defendants to disgorge to Idaho all monies wrongfully collected that could not be returned to class members as alleged herein and all monies and profits derived by Defendants as a result of the wrongful, deceptive, unfair and/or unlawful acts, conduct and practices alleged above, and requiring disgorgement and/or imposing a trust upon Defendants' ill-gotten monies and freezing Defendants' assets;

E.     An order certifying that the action be maintained as a class action;

F.     An order requiring Defendants to effect and pay the costs of restoring the rights and benefits owing to Plaintiff and other members of the Class under the agreements which are the subject of this action and a corrective advertising campaign;

G.     Restitution as may be provided for by equity and/or by statute;

H.     Actual and compensatory damages in an amount to be proven at trial, including any damages as may be provided for by statute;

I.     Reasonable attorneys' fees and costs;

J.     Pre-and post-judgment interest; and

K.     Such other and further relief as this Court may deem necessary, proper and/or appropriate.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: February 26, 2009

<div style="margin-left:40%">

GORDON LAW OFFICES, CHTD.
PHILIP GORDON, ISB #1996
BRUCE S. BISTLINE, ISB #1988

PHILIP GORDON

623 West Hays Street
Boise, ID 83702-5512
Telephone:  208/345-7100
208/345-0050 (fax)

COUGHLIN STOIA GELLER RUDMAN
& ROBBINS LLP
PATRICK J. COUGHLIN
FRANK J. JANECEK, JR.
CHRISTOPHER COLLINS
CHRISTIE SURIEL
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff

</div>

C:\DOCUME~1\DeeM\LOCALS~1\Temp\13\MetaSave\CPT 00057736 ID_Gucker.doc

COMPLAINT – 44

8

1    BONNETT, FAIRBOURN,
      FRIEDMAN & BALINT, P.C.
2    Andrew S. Friedman (AZ 005425)
      Francis J. Balint, Jr. (AZ 007669)
3    Suite 1000
      2901 N. Central Avenue
4    Phoenix AZ 85012
      602/274-1100
5    602/274-1199 (fax)

6    COUGHLIN STOIA GELLER
      RUDMAN & ROBBINS LLP
7    Frank J. Janecek, Jr. (*pro hac* pending)
      655 West Broadway, Suite 1900
8    San Diego, CA  92101
      Telephone:  619/231-1058
9    619/231-7423 (fax)

10    [Additional Counsel on Signature Page]

11    Attorneys for Plaintiffs

12

     IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
13
     IN AND FOR THE COUNTY OF PIMA
14

15    MICHAEL LIMON, DEBBY LIMON, and )   Case No. **C20091533**
      ELIZABETH LOEPER, On Behalf of      )
16    Themselves and All Others Similarly    )   CLASS ACTION
      Situated in the State of Arizona,       )
17                             )   COMPLAINT FOR: (1) VIOLATION
                 Plaintiffs,    )   OF THE ARIZONA CONSUMER
18                             )   FRAUD ACT; (2) CONVERSION; (3)
        vs.                      )   UNJUST ENRICHMENT; (4) FRAUD
19                             )   AND DECEIT; AND (5) NEGLIGENT
      VERTRUE INCORPORATED, previously )   MISREPRESENTATION
20    known as MEMBERWORKS,         )
      INCORPORATED, ADAPTIVE       )   DEMAND FOR TRIAL BY JURY
21    MARKETING LLC, and DOES 1 through )
      50,                                  )
22                             )
                Defendants.    )
23                             )

24

25

26

27

28

COPY

MAR - 3 2009

PATRICIA A. NOLAND
CLERK, SUPERIOR COURT

JAVIER CHON-LOPEZ

1    Plaintiffs Michael and Debby Limon and Elizabeth Loeper, on behalf of themselves and

2  all others similarly situated in the State of Arizona (collectively "Plaintiffs"), by and through

3  counsel, and for their complaint state the following:

### SUMMARY OF COMPLAINT

5    1.    Defendants MemberWorks, Inc.,[1] also known as MWI Essentials, MWI Leisure

6  Advantage, MWI Home & Garden, MWI Connections, MWI ValueMax and other MWI

7  entities, which subsequently changed its name to Vertrue Incorporated (collectively, "MWI"),[2]

8  in conjunction with and its co-conspirators, the telemarketing entities (collectively, the

9  "Telemarketers" or "Telemarketing Entities")[3] and the bait product suppliers ("Bait Product

10  Suppliers") have been engaged in the practice of making unlawful charges to consumers' credit

[1]    MemberWorks, Inc., Vertrue, Inc. and Adaptive Marketing LLC are referred to herein as "Defendants."

[2]    As used in this Complaint, the term "Defendants" does not refer to West Corporation, and/or West Telemarketing Corporation, and/or West Telemarketing, L.P. and their predecessors, successors, present and former owners, subsidiaries, affiliates, employees, officers, directors, agents, attorneys and assigns, including West Direct, Inc. and West TeleServices Corporation (collectively, "West"). Therefore, any reference to acts or omissions by "Defendants" does not include or refer to the West entities. Further, the claims for relief in this Complaint do not arise from actions or omissions under the following agreements: the March 16, 1998 "Joint Marketing Agreement between West Telemarketing Corporation and MemberWorks Incorporated," and/or the January 1, 1999 "Agreement" between West Telemarketing Corporation and MemberWorks Incorporated, and/or the July 1, 1999 "Joint and Wholesale Marketing Agreement" between West Telemarketing Corporation, West Teleservices Corporation and MemberWorks Incorporated and/or the December 1, 2001 "Wholesale and Retail Marketing Agreement" between MemberWorks Incorporated and West Direct, Inc., and any amendments or addendums to these agreements. Thus, by way of example (but without limitation), any acts or omissions that include, relate to or were part of an upsell to a Tae-Bo product that occurred under or as part of one of the agreements listed in this footnote 1, are not included in the claims and allegations of this Complaint.

[3]    As used in this Complaint, the terms "Telemarketers" and "Telemarketing Entities" and the allegations of this Complaint referring to acts or omissions of "Telemarketing Entities" and "Telemarketers" do not include or refer to the actions or omissions of West Corporation and/or West Telemarketing Corporation under the March 16, 1998 "Joint Marketing Agreement between West Telemarketing Corporation and MemberWorks Incorporated," and/or the January 1, 1999 "Agreement" between West Telemarketing Corporation and MemberWorks Incorporated, and/or the July 1, 1999 "Joint and Wholesale Marketing Agreement" between West Telemarketing Corporation, West Teleservices Corporation and MemberWorks Incorporated and/or the December 1, 2001 Wholesale and Retail Marketing Agreement between MemberWorks Incorporated and West Direct, Inc., and any amendments or addendums to these agreements.

1

1    and/or debit cards through a scheme involving the mailing of an unordered membership

2    program marketed through the use of a deceptive script. Defendants obtain the necessary

3    information to mail their unwanted membership (and charge for it) through the use of a

4    telemarketing scam. By this method, Defendants are able to accomplish the old and pernicious

5    practice of mailing unsolicited merchandise and then tricking consumers into paying for it.

6        2.      MWI, in concert with the Telemarketers and the Bait Product Suppliers, through

7    agreements with MWI, capture consumers' credit and/or debit card information when those

8    consumers call to order products – products which are *not* marketed or produced by MWI. This

9    is referred to as an "inbound" telemarketing call, as the consumer initiates the call. The

10    consumer has initiated the call to inquire about or purchase a product usually advertised with a

11    1-800 number. The consumer *does not call* to order an MWI product. In fact, the consumer

12    has most likely never heard of MWI and has no expectation of receiving an MWI membership

13    program when the call is made by the consumer. Moreover, the consumer gives his/her credit

14    card or debit card information, which Defendants capture long before the consumer ever hears

15    of any MWI product. This private financial information is then used by Defendants to charge

16    the consumer for a membership the consumer never wanted or agreed to purchase.

17        3.      MWI has reached agreements with a number of Telemarketing Entities, whereby

18    the consumer is subjected to a deceptive sales pitch to purchase an MWI membership program

19    before the call made by the consumer to purchase an unrelated product is completed. This is

20    referred to as an "unrelated upsell." MWI's products are not related to the product sought by

21    the consumer and the consumer has no idea that an MWI product will be made a part of the call

22    – or even what an MWI product is.

23        4.      MWI prepares a script for the Telemarketers to use for the unrelated upsell. As

24    more specifically alleged below, MWI pays the Telemarketers and the Bait Product Suppliers a

25    fee for each consumer who they enroll in MWI's membership programs. Some number of

26    MWI membership programs are sold through a joint venture and wholesale arrangement

27    between MWI and the Telemarketers, where MWI and the Telemarketers jointly pay a separate

28    fee to the Bait Product Suppliers for each of their customers enrolled in an MWI program. The

1  Telemarketers, who handle the inbound calls, approve the scripts, read the scripts to the
2  consumers, capture the consumers' credit and/or debit card information and transmit that
3  information to MWI to mail the "kits" and bill the consumers' cards.

4        5.       After the consumers have given the information necessary to purchase the product
5  the consumers called to buy, a deceptive script is read to the consumers informing them that
6  they will be sent *free* materials in the mail.  Consent to receive the materials in the mail is not
7  requested.  Consent to bill the credit and debit cards are not requested.  In actuality, Defendants
8  enroll consumers in a membership and mail them a membership "kit." Consumers are deceived
9  and do not know that they have been enrolled in a "membership" and will be charged $60-$170
10 annually unless they call MWI to inform them that they want to cancel the FREE 30-day trial
11 membership.  MWI mails a packet with a membership card to the consumers which allow the
12 consumers to access the so-called benefits of an MWI membership.  By enrolling consumers
13 who called to order an unrelated product and mailing those consumers a membership kit
14 without the prior express consent of the consumers, consumers are unwittingly charged by
15 Defendants for a membership they neither requested nor intended to purchase.

16       6.       Consumers are never asked their permission for the Telemarketers to provide their
17 credit and/or debit card information to MWI.  MWI has the Telemarketing Entities transfer the
18 class members' confidential credit and/or debit card information to MWI, who uses the
19 information to charge consumers membership fees and membership renewal fees which range
20 from $60-$170 annually.   Although MWI processes the charges, neither it nor the
21 Telemarketing Entities send the consumers any bill or invoice notifying them that their credit
22 and/or debit cards have been assessed such a charge.

23       7.       In order to conceal their scheme, MWI will reverse the charges for those
24 consumers who notice that they have been assessed a charge on their credit and/or debit card
25 statements who call to question the charge and get through Defendants' multifarious system of
26 avoiding cancellations.   However, as Defendants know, a significant percentage of the
27 population does not closely review their credit and/or debit card statements, and will not notice
28 the offending charge (as was the case with Plaintiffs Patricia Sanford in the federal action

3

1  *Sanford, et al. v. MemberWorks, Inc., et al.*, No. 02-CV-0601 (S.D. Cal.) ("*Sanford* Federal

2  Class Action")[4], who did not realize she had been assessed such a charge until the *second* time

3  it appeared on her credit card statement).  These individuals are charged between $60-$170,

4  each year, until they notice the charge and complain.  ***Defendants never send any bill or***

5  ***invoice to the class members notifying them that they have been, or will be, charged.***  The

6  named Plaintiffs and the class members in this action were all victimized by Defendants by this

7  same exact method.

8      8.    Defendants share in the revenues and profits generated from their deceptive

9  scheme of mailing unordered merchandise and then charging consumers for it.

10                              **JURISDICTION AND VENUE**

11      9.    This action is brought pursuant to the Arizona consumer protection statute and the

12  common law, to obtain compensatory damages, punitive damages and such other and further

13  relief as is appropriate under Arizona law. This Court has subject matter jurisdiction under

14

15  A.R.S. § 12-123.

16      10.    This Court has jurisdiction over each Defendants named below because each

17  Defendants is either a corporation or association organized under the laws of the State of

18  Arizona, a foreign corporation or association authorized to do business in Arizona and

19

20

21     [4]   The *Sanford* Federal Class Action was filed in 2002, as a class action against West and
MWI in the United States District Court for the Southern District of California.  The claims

22  against MWI were asserted on behalf of all consumers in the United States enrolled in an MWI
membership in connection with their purchase of an unrelated bait product.  The claims against

23  West were asserted on behalf of all consumers in the United States enrolled in an MWI
membership program who were customers of a joint venture between MWI and West or were

24  wholesale customers of West.  The district court dismissed the federal count against West and
declined to exercise supplemental jurisdiction over the state law claims.  Plaintiffs re-filed the

25  state law claims against West (*Patricia Sanford v West Corporation and West Telemarketing
Corporation, et al.*, Case No. GIC 805541 (the "*West* Action")) and was ultimately assigned to

26  the Honorable Ronald L. Styn.  The *West* Action included the same or similar claims, based on
the same factual allegations asserted in this action.  The *West* Court certified a class (February

27  16, 2007 Order Granting Plaintiffs' Motion for Class Certification), the case settled and Final
Approval of the settlement was entered on December 24, 2008.

28

registered with the Arizona Secretary of State, or does sufficient business, has sufficient minimum contacts with Arizona or otherwise intentionally avails itself of the Arizona market, through the manufacturing, production, promotion, sale, marketing and distribution of its products in Arizona, to render the exercise of jurisdiction by the Arizona courts permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this Court under A.R.S. § 12-401 because Plaintiff Elizabeth Loeper, as well as numerous Class members reside in Pima County and throughout Arizona, and Defendants either maintain offices in this County, a substantial portion of the practices complained of herein occurred in this County (since the products here at issue were mailed to this County) or because Defendants have received substantial compensation as a result thereof in this County.

12.     Venue is also proper in this Court in that the state law claims alleged herein were severed from the *Sanford* Federal Class Action, and the federal court directed that the state law claims be filed in state court.

## PARTIES

13.     Plaintiffs Michael and Debby Limon ("the Limons") have been, at all times relevant to the action, residents of the City of Casa Grande, County of Pinal and State of Arizona. The Limons purchased Tae Bo fitness videotapes after viewing the television advertising campaign for the product. In connection with this purchase, MWI charged the Limons unsolicited, unauthorized and unexpected charges for several of MWI's membership programs. The Limons were never asked for consent to be charged for any of these MWI membership programs. Moreover, the Limons never utilized or received any benefit from any of the MWI membership programs. The Limons' credit card was assessed unsolicited and unexpected charges totaling approximately $680.00 for one or more MWI membership programs.

(a)     On or about February 17, 1999, at the end of the call to purchase the bait product Tae Bo fitness exercise videotapes, the telemarketer who answered the call read MWI's

deceptive telemarketing pitch to the Limons, informing them they were receiving a risk-free 30-day trial membership in Essentials, emphasizing the thank you gift was FREE and that the Limons "WON'T BE BILLED." The language of the deceptive telemarketing pitch is quoted in full in ¶ 26 below. The telemarketer thereafter transferred the Limon' 'confidential credit card information to MWI using the wires. Thereafter, on March 17, 1999, in connection with the Tae Bo product, the Limons' credit card was assessed an unsolicited and unexpected $72.00 charge by Defendants for an Essentials membership.

        (b)     On January 17, 2000, MWI charged the Limons' credit card an unsolicited and unexpected renewal fee of $84.00 (charged as "MWI Essentials").

        (c)     On January 15, 2001, MWI charged the Limons' credit card an unsolicited and unexpected renewal fee of $99.95 (charged as "MWI Essentials").

        (d)     On January 15, 2002, MWI charged the Limons' credit card an unsolicited and unexpected renewal fee of $109.95 (charged as "MWI Essentials").

        (e)     On January 15, 2003, MWI enrolled the Limons in a second membership and charged the Limons' credit card an unsolicited and unexpected fee of $149.95.

        (f)     On January 14, 2004, MWI charged the Limons' credit card an unsolicited and unexpected renewal fee of $169.95.

    14.    After inquiring about the January 2004 charge, and without even realizing that this was the sixth charge, the Limons were informed by MWI that the charge was for some membership associated with Tae-Bo.

    15.    Until late 2008, the Limon's were completely unaware of the renewal charges or that they had been enrolled in the any MWI membership and/or that their credit card had been billed.

    16.    Plaintiff Elizabeth Loeper ("Loeper") has been, at all times relevant to the action, a resident of the City of Tucson, County of Pima and State of Arizona. Loeper purchased Tae Bo fitness videotapes after viewing the television advertising campaign for the product. In connection with this purchase, MWI charged Loeper unsolicited, unauthorized and unexpected charges for a MWI membership program. Loeper was never asked for her consent to be

charged for the MWI membership program.  Moreover, Loeper never utilized or received any benefit from any of the MWI membership programs.  Loeper's credit card was assessed unsolicited and unexpected charges for one or more MWI membership programs.

(a)     On or about March 5, 2000, at the end of the call to purchase the bait product Tae Bo fitness exercise videotapes, the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Loeper informing her she was receiving a risk-free 30-day trial membership in Travel, emphasizing the thank you gift was FREE and that Plaintiffs Loeper, "WON'T BE BILLED."  The language of the deceptive telemarketing pitch is quoted in full in ¶ 26 below.   The telemarketer thereafter transferred Loeper's confidential credit card information to MWI using the wires.  Thereafter, on April 5, 2000, in connection with the Tae Bo product, Loeper's credit card was assessed an unsolicited and unexpected $84.00 charge by Defendants for a Travel membership.

(b)     On February 7, 2001, MWI charged Loeper's credit card an unsolicited and unexpected renewal fee of $99.95 (charged as "Travel").

(c)     On March 29, 2001, Loeper's credit card was refunded $99.95 for MWI's inability to authorize the charge.

17.    Until late 2008, Loeper was completely unaware of the renewal charge or that she had been enrolled in the any MWI membership and/or that her credit card had been billed.

18.    In addition, Plaintiffs include in their allegations the names, the dates of the fraudulent charges and the bogus membership enrollments of unnamed Arizona class members.[5] The names of the unnamed class members represent only a fraction of the unnamed class members included in the proposed class.  The identity of the remainder of the unnamed class members are contained within MWI's electronic database(s), and will be revealed through discovery.  Each of these unnamed class members, as well as each of the unnamed class

_____

[5]  The information regarding these unnamed class members was obtained pursuant to a protective order and is required to be filed under seal.  If the Court desires, Plaintiffs will amend this complaint to add these additional unnamed class members.

1    members who have yet to be identified through discovery, received the deceptive telemarketing

2    pitch at the end of their calls, the language of which is quoted at ¶ 26 below.

3         19.    Defendants Vertrue Incorporated, previously known and collectively identified

4    herein as MWI, has been at all times relevant to the action a Delaware corporation whose

5    primary place of business is 20 Glover Avenue, Norwalk, Connecticut. MWI does business in

6    Arizona, and throughout the nation, as MWI Essentials, MWI Leisure Advantage, MWI Home

7    & Garden, MWI Connections, Health Trends, Travel Arrangements, Transmedia, Cardmember

8    Protection Service, Countrywide Dental, 24 Protect, Smartsource, Value Max Shopping

9    Service, Money Master Tai Value Max, Tai Vital Basics and various other names under which

10    it markets and charges consumers, by and through nationwide telemarketing campaigns, as well

11    as by and through the interstate instrumentality of mailings throughout Arizona and the nation.

12    MWI entered into express and tacit agreements with the Telemarketers. MWI drafted the

13    deceptive script used and sought comments from and approval by the Telemarketers. MWI

14    operates and is involved in the unlawful scheme of charging the credit card and/or debit card

15    accounts of consumers for unordered merchandise.

16         20.    Defendants Adaptive Marketing LLC is a Delaware limited liability company

17    with its principal place of business in Norwalk, Connecticut along with Vertrue Incorporated.

18    Adaptive Marketing LLC is a wholly-owned subsidiary and "operating company" of Vertrue

19    Incorporated. Adaptive Marketing LLC shares personnel with Vertrue Incorporated and

20    markets Vertrue Incorporated's membership programs. There exists, and at all relevant times

21    existed, a unity of interest and ownership between MWI and Adaptive Marketing LLC, such

22    that any individuality and separateness between each of them ceased and each is the alter ego of

23    the other in that each entity is completely controlled, dominated, managed and operated without

24    regard for corporate individuality.

25         21.    The true names and capacities of Defendants sued herein as Does 1 through 50,

26    inclusive, are presently unknown to Plaintiffs, who therefore sues the Defendants by such

27    fictitious names. Plaintiffs will seek to amend this Complaint and include the Doe Defendants'

28    true names and capacities when they are ascertained. Each of the fictitiously named Defendants

1   are responsible in some manner for the conduct alleged herein and are therefore responsible for

2   the damages suffered by Plaintiffs and class members.

3       22.   In committing the wrongful acts alleged herein, Defendants have pursued a

4   common course of conduct, acted in concert with, aided and abetted and conspired, in

5   furtherance of their common plan, scheme or design to make unauthorized charges to

6   customers' credit cards and/or debit cards for an unsolicited, unwanted and unordered

7   membership and thereafter to conceal and cover up their wrongdoing – all for their own

8   personal profit. Defendants actually knew, or should have known, of the fraudulent conduct

9   being committed and actively participated in covering up its true nature. Thus, in addition to

10  the wrongful conduct herein alleged as giving rise to primary liability, Defendants further aided

11  and abetted and knowingly assisted each other in the breach of their respective duties, contracts

12  and obligations as herein alleged, and acted as the agent of each other in participating in this

13  wrongdoing.

14      23.   At all times herein mentioned in the claims for relief alleged herein, each and

15  every Defendant was an agent and/or employee of each and every other Defendant. In doing

16  the acts alleged in the claims for relief alleged herein, each and every Defendant was acting

17  within the course and scope of this agency or employment, and was acting with the consent,

18  permission and authorization of each of the remaining Defendants. All of the actions of each

19  Defendant as alleged in the claims for relief stated herein were ratified and approved by every

20  other Defendants or their officers or managing agents.

21                  **DEFENDANTS' WRONGFUL CONDUCT**

22  **The Upsell**

23      24.   Defendants obtain the necessary information to bill consumers for MWI

24  memberships by piggybacking onto popular consumer products. MWI looks for products

25  advertised heavily on television or in print which ask consumers to call a 1-800 number to order

26  that product. Some examples of the products which MWI uses to upsell its programs are:

27  Nad's, Tae Bo, vitamins, knives, Q-Ray bracelets, Edgemaster paint roller, Simoniz car washer,

28  flowers, dance videos, AB Slider, ultrasonic toothbrushes and OxiClean.

9

25.     The consumers see the advertising for the product (such as Tae Bo, Nad's, a Simoniz car washer or an OxiClean infomercial) and call the 1-800 number. The consumer has not seen or heard anything about any MWI product and has no desire or intent to purchase an MWI product. The consumer is most likely to wind up speaking with an employee of the Telemarketers. The consumer goes through the process of ordering the product the consumer wanted and the Telemarketing Entities who handle the incoming calls "capture" the consumer's credit or debit card information. This portion of the call may take anywhere from 5-15 minutes or so.

26.     Before the telemarketer lets the consumer off the line, MWI has the telemarketing entity read the following deceptive script to the consumer:

> Mr(s) _____, for purchasing [NAME OF BAIT PRODUCT] today, we're sending you a risk-FREE 30-day membership to [MWI PROGRAM], a service designed to SAVE YOU 20% from leading stores such as [STORES], PLUS additional savings on eyewear, beauty products, haircuts and more! After 30 days, the service is extended to a full year for just $6 a month, billed annually in advance to the credit card you're using today. If you want to cancel, just call the toll-free number that appears in your kit in the first 30 days and YOU WON'T BE BILLED. So look for that kit in the mail, OKAY?[6]

27.     The words in ALL CAPITAL LETTERS are the words the telemarketer emphasizes when reading the script. In other words, MWI emphasizes that the trial membership is "FREE," and that class members "WON'T BE BILLED." At the end of the call, MWI merely tells class members: "So look for that kit in the mail, OKAY?" MWI does not ask the consumers if they want to receive the purported trial membership, let alone any agreement to be enrolled in the membership. And, MWI does not ask the consumer for permission or consent to charge their credit cards and debit cards.

28.     At most, the consumer is led to believe that a free trial membership will be mailed to the consumer to evaluate, and if the consumer likes the product he or she can call to purchase

---

[6]  While there can be minor variations to the script – *e.g.* the list of stores can change, the MWI program can change, the script may say "to thank you for your purchase," or as a "special thanks," and such – the substance of the telemarketing pitch is identical across all scripts.

1  a membership. *No express consent to mail the membership is obtained from the consumer,*
2  *let alone any agreement to be enrolled in the membership. Nor is any express consent*
3  *requested to bill the consumers' credit or debit cards.* This is Defendants' "upsell" and
4  Defendants' excuse for charging consumers for a membership program they neither wanted nor
5  ordered.

6      29.    Notwithstanding the failure to obtain consent to enroll consumers in MWI's
7  membership programs and charge their cards, the Telemarketing Entities transfer the class
8  members' confidential credit and/or debit card information, which they obtained when the
9  consumers called to purchase the unrelated bait products, to MWI. MWI then mails a
10  membership kit and charges the consumers' credit and/or debit cards. Neither Defendants, nor
11  the Telemarketing Entities, nor the Bait Product Suppliers seek or obtain the consumers'
12  express consent to charge the MWI membership to the consumers' credit and/or debit card
13  accounts.

14      30.    The fraud at issue is the assessment of an unsolicited and unlawful fee charged to
15  consumers which the consumers did not seek out and did not want. The consumers are
16  deceived by Defendants' purposely misleading script, then mailed a membership kit and
17  enrolled and charged for a membership they did not want or order. Defendants' automatic self-
18  renewing membership is an outright theft of money under the guise of a membership.

19  **The Mechanics of the Scheme**

20      31.    To generate calls, Defendants rely on the popularity of the non-MWI products
21  offered by the bait entities.

22      32.    After a consumer has viewed an infomercial or read an advertisement for a bait
23  product they want to purchase, the class members call a "1-800" telephone number to order the
24  product. The purchasers of these products are given the option of purchasing by credit card or
25  debit card. To complete the purchase, the class members are required to provide their names,
26  credit card or debit card numbers and the expiration date to the Telemarketers who answer the
27  calls and process the sales. Thus, at the end of the purchase transactions, the Telemarketing
28

1  Entities possess all of the information necessary for MWI to assess the unsolicited membership
2  fees against unsuspecting consumers.

3      33.    After the financial information for the sale of the advertised bait product is
4  obtained by the Telemarketers, MWI has them read the "upsell" script. The message of the
5  upsell script is that the consumer will be mailed a 30-day, risk-free trial membership. The class
6  members are not asked whether they want to enroll, they are not billed or invoiced and they are
7  not asked to give or to confirm their credit or debit card information to pay for the membership.
8  Instead, Defendants wait approximately 30 days and then charge the class members' credit
9  and/or debit cards using the information Defendants received from consumers when they
10  purchased the product they actually wanted.

11      34.    The class members are never asked to provide their confidential credit or debit
12  card information in connection with the unrelated MWI upsell. Class members are never asked
13  to give permission to permit their confidential financial information to be transferred to
14  Defendants MWI. The class members are never even asked if they want to receive the
15  purported membership materials – rather they are simply informed that for purchasing the
16  advertised product, risk-free they are being sent a 30-day trial membership. The purported
17  membership kit which allows the consumer to access the so-called benefits of the program are
18  mailed shortly after the call.

19      35.    Approximately one month after the call, Defendants MWI uses the confidential
20  financial information it received from the consumers' purchases of the unrelated product to
21  charge the class members' credit and/or debit cards. On information and belief, some
22  consumers are "enrolled" more than once. This situation would only arise if the consumer did
23  not know they had already been enrolled, or were going to be enrolled, in the purported
24  membership as no one would twice pay $60-$170 to MWI to join the same membership. It, of
25  course, makes no difference to MWI how many times a consumer is enrolled, as each
26  "enrollment" is simply another $60-$170 a year for MWI, other than if a member is "enrolled"
27  multiple times, they are more likely to notice the offending charge.

28

36.     The class members do not know they have been enrolled in MWI's membership programs and therefore never use any of the programs' so-called benefits. Defendants count on this deception and subsequent non-use of the benefits to hold the costs of the programs to a nominal amount thus making the annual fees pure profit for Defendants.

37.     Unless the class member notices the charge to their debit and/or credit card and calls to complain, the class member will continue to be charged $60-$170 each and every year. As with the initial charges to the class members' credit and/or debit cards, no invoice or bill is ever sent to the class members to inform them that their credit and/or debit cards have been, or will be, charged by Defendants MWI. What is even more insidious is that the purported "annual" membership is charged every 11 months and, similarly, no invoice or bill is ever sent to the class members for renewal charges.

38.     The fraud is perpetuated because the customers' prior expressed acceptance or consent to enroll in the membership is not obtained. Defendants do not clearly and unambiguously communicate the terms of the purported membership programs. The membership that is mailed is neither risk-free, nor a free 30-day trial as was represented by Defendants. Defendants charge the class members for a membership they did not order. The consumers charged for the membership who never use the so-called benefits are paying $60-$170 per year for nothing.

39.     Defendants know that consumers do not understand that they will be charged a membership fee unless they call to cancel. Defendants mail the membership kit fully understanding that the consumer will not understand they are being charged for the materials. Further, Defendants have designed the generic membership materials so as to appear to be "junk mail" so the materials will be discarded and thus never read. Defendants purposely design their scripts to maximize consumer confusion and allow Defendants to "enroll" the maximum number of unsuspecting persons. Defendants then mail the membership kit to the deceived and/or confused consumers who Defendants "enroll" in the MWI memberships. Defendants are able to maximize their profits at the expense of the consumers deceived by Defendants' scheme.

13

40.     The *only* notice that a class member receives that he or she has been charged for a membership is his or her credit or debit card statement reflecting a charge – which may or may not identify MWI as the entity who levied the charge – which the class member may not notice depending on how closely the class member reads his or her credit and/or debit card statement. If the class member notices and challenges the charge, the charge may be reversed or a pro rata refund may be sent.   In this way, Defendants conceal their deception from the other class members and from the public.   Those class members who do not notice the charge are billed every 11 months until they notice that they have been charged and complain.

41.     These acts take place as a result of the concerted action, agreement and direction by Defendants.

**The Lack of Audiotaped Confirmations**

42.     Until required as part of the Nebraska Attorney General "Better Practices" requirements, Defendants failed to confirm consumers' acceptance of the upsell offer by MWI for many, if not most, of the "enrolled" consumers.

43.     Accordingly, *no* audiotaping of the upsells occurred for most of the class members deceived by Defendants.

**The Deceptive "Upsell" Script**

44.     Defendants worked together to produce a script to be read to each consumer. MWI creates the deceptive scripts to be read when marketing the MWI programs and the Telemarketing Entities comment on and approve the deceptive scripts.

45.     Defendants purposely avoid clearly and unambiguously notifying consumers that their credit and/or debit cards will be charged between $60-$170 for the "membership" mailed to them.   No focus groups or other consumer research is undertaken by Defendants.   Even after Defendants received numerous consumer complaints, ranging from a lack of any recollection of ever even hearing of MWI or any of its purported memberships to accusations of fraud and theft, Defendants avoided ascertaining whether their scripts clearly and unambiguously (1) requested consent from the consumer to charge for the membership, (2) notified the consumers

1   of the terms of the purported membership or (3) informed the consumers that their credit and/or

2   debit cards would be charged.

3       46.    Defendants are well aware of the fact that consumers are deceived by their scripts

4   as seven state attorneys general alleged that MWI was deceiving consumers. MWI settled the

5   matters with five of the attorneys general, and agreed to pay civil penalties in excess of $2

6   million to one of those attorneys general. Defendants know that consumers are misled into

7   believing that they are not making a purchase decision regarding the MWI memberships.

8   Defendants' script is intended to, and does, convey to consumers that the membership mailed to

9   them is a free trial membership, which if they like the membership they can call to order.

10      47.    The scripts are written and designed to be read in a manner intended to confuse,

11  mislead and deceive consumers.

12      48.    Defendants' conduct is deceptive, unlawful and fraudulent and it cannot be

13  justified in any manner. Indeed, seven different attorneys general have determined that the

14  MWI scripts are deceptive and do not clearly and unambiguously communicate to consumers

15  that they will be charged for an annual self-renewing membership unless they affirmatively act

16  to cancel the membership. Nor do the scripts inform the class members that they will be

17  required to return the purported membership card should they desire to cancel.

18  **The Membership**

19      49.    After receiving the class members' confidential financial information by

20  piggybacking onto the advertised product, MWI mails out membership materials and customer

21  service information to the persons enrolled. Then, MWI simply bills the consumers $60-$170

22  each year on the consumer's credit or debit card.

23      50.    Defendants have designed the generic purported membership materials so as to

24  appear to be "junk mail" in the hopes that the materials will be discarded and thus never read.

25  If the packet mailed by MWI for the risk-free trial membership is thrown out by the recipient,

26  then the consumer will not have the number to access the so-called benefits. The kits are

27  mailed out bulk rate indicating the lack of value of the material. The kits contain a cheap paper

28  membership card typical of cards received in mail solicitations. This card is, however, the

actual membership card for the enrolled member.  By making the kit typical junk mail, Defendants further conceal the fact that the class members have been charged an annual, self-renewing membership fee.

51.     Other than the one line on their credit and/or debit card statements, the class members are not notified that they have been "enrolled" in an MWI membership program or that their credit and/or debit cards have been charged. Defendants do not send new "members" any invoice or record of the charge.  Moreover, after the membership kits are mailed and consumers are charged and throughout the duration of the "membership," class members never hear from any of the Defendants about any membership benefits. After the initial mailing of the membership kit, consumers do not receive any newsletters, coupons, surveys or any other notifications.  The only thing they receive is a charge of $60-$170 on their credit and/or debit cards.

52.     The term "membership" used by Defendants is merely an excuse to take money from consumers who submit their credit and/or debit card information for their purchase of other products. Defendants take consumers' money by mailing them an unordered membership and then charging them for it.

**Lack of Usage of the Membership Benefits**

53.     The manner in which a consumer can access the purported membership is further evidence of Defendants' scheme to defraud.  Other than the purported membership kit, Defendants do not send "members" anything. No newsletter or other correspondence is sent to the class members. No confirmation letters or satisfaction surveys are sent. The class members receive nothing after they are charged, or before the next time they are "renewed."

54.     For consumers to obtain the purported membership benefits, they must contact MWI either by telephone or via the Internet, and obtain certificates through MWI. If the retail

1  establishment works with MWI, then the consumer can order a certificate that can be used at

2  that retail establishment.  Unless the consumer knows to call MWI, they receive nothing.[7]

3      55.    In the *West* Action, MWI produced a database containing the transactions of

4  567,430 California consumers.  Some of these consumers were enrolled under West's Joint

5  Venture and Wholesale arrangements with MWI, which were settled in the *West* Action and for

6  which no recovery is sought in this action.  The database establishes that 552,605 (or 97.5%) of

7  the consumers included in this database never used any membership benefits.  The database

8  establishes that out of 567,430 consumers included in the data, only one person purchased any

9  of the following membership benefits:

10        $25 Exxon Gas Card          $25 WalMart Gift Card

11        $25 Gas Card Choice A        $25 Babies R Us Gift Card
      $25 Warner Bros. Certificate     $25 SunCoast Gift Card

12        $25 Hollywood Video Gift Cards   Hickory Farms Offer

13        Lady Footlocker Merchandise     Sharper Image Coupon
      Certificate

14

15      56.    The database establishes that out of 567,430 consumers *only two people* bought

16  one or more of the following:

17        ARCO Gas Cards           $25 Structure Certificates
      $10 Olive Garden Gift Cards    $25 Bloomingdales Certificates

18        Zales Certificates

19

20      57.    Out of 567,430 consumers *only three people* bought one or more:

21        $10 Toys R Us Certificates     $25 Borders Gift Cards
      $25 Barnes and Nobel Gift

22        Certificates

23      58.    Out of the 567,430 consumers, four people bought one or more $25 Toys R Us

24  Gift Cards or a $10 Applebees Certificates; five bought a GNC Coupon; eight bought a $10

25

26  [7] Some coupons of nominal value are included in some membership kits.  However,

27  Defendants pitch their reward program as the biggest member benefit and the reward program
requires the "member" to contact MWI to use it.

28

1   Blockbuster Gift Card or a $25 Linens-N-Things Gift Card; ten bought a $25 Sam Goody Gift

2   Card, a $25 K-Mart certificate or a $10 Red Lobster/Olive Garden Certificate; 11 bought a $10

3   Outback Steak House Certificate or a $25 Lowes Gift Card; 12 bought a $25 KB Toys Gift

4   Card; 16 bought a Pier 1 Gift Card; 17 bought a $25 Footlocker Certificate; 26 bought a $25

5   Home Depot Gift Certificate; 28 bought a $25 Sears Certificate; 35 bought a Nordstrom Gift

6   Certificate; 36 bought a $25 TJ MAXX Certificate; and just 152 people bought a $25 Target gift

7   card. Equally significant, the most purchased benefits were purchased by less than one percent

8   of the 567,430 consumers -- just 0.4% (2,250 people) received one or more $40 Hair Cut

9   Rebates and just 0.7% (4,063 people) received 4/$5 Dining Rebates.

10          59.     As part of its investigation, the Iowa Attorney General sent questionnaires to 400

11  Iowa residents enrolled in MWI membership programs.  The Iowa Attorney General reported

12  that, most of the consumers who responded indicated that they had never used their membership

13  and none of those responding said they were satisfied members.

14          60.     The lack of use of the membership benefits demonstrates that Defendants knew,

15  or should have known that the people they charged $60-$170 were utterly unaware that they

16  had been charged for and enrolled in the MWI memberships.  Consumers were treating the

17  membership kit as the law allows; they were ignoring it and assuming they had no obligation to

18  the sender of the unordered merchandise.  Defendants charged them and took their money in

19  violation of law.

20  **Consumer Complaints**

21          61.     Immediately after the first customers were charged for an MWI membership,

22  Defendants began receiving an enormous number of customer complaints.  These complaints

23  ranged from the consumers having no recollection of ever being told about an MWI program to

24  irate consumers alleging theft and fraud by Defendants.  A simple Internet search for

25  "MemberWorks," pulls up thousands of consumer complaints, including at websites such as

26  www.ripoffreport.com, www.consumeraffairs.com and www.uspeakout.com. Despite receiving

27  such complaints and despite knowing of the existence of a number of Internet sites dedicated to

28

1    complaining about MWI and its unlawful practices, Defendants took no steps to make sure that

2    their marketing practices were not deceptive.

3        62.    In addition to complaints directly by consumers, MWI received numerous

4    inquiries by the Better Business Bureau regarding their practices as they related to customers.

5    MWI received an unsatisfactory rating by the Better Business Bureau due to a pattern of

6    complaints concerning unauthorized charges to consumers' credit cards. The Better Business

7    Bureau's website reported on June 30, 2006 that it had processed a total of 2,277 complaints

8    about MWI in the previous 36 months, including 765 in the previous year. The conduct giving

9    rise to these complaints continues. Almost one year later, on June 2, 2007, the Better Business

10    Bureau's website reported that it had processed a total of 2,180 complaints about MWI in the

11    previous 36 months, including 667 in the previous year.

12        63.    Defendants received so many complaints from consumers that they scripted

13    responses to "frequently asked questions" or "FAQ's" for their customer service

14    representatives. The following "frequently asked questions" were received by Defendants who

15    prepared scripted responses to them:

16        (a)    "I received my credit card bill and saw this Essentials or Home & Garden

17    Rewards program listed here for $84 – what is this;"

18        (b)    "I don't remember hearing about Essentials or Home & Garden Rewards;"

19        (c)    "I said 'no' to this program;"

20        (d)    "I didn't authorize this program;" and

21        (e)    "Who authorized this billing/purchase?"

22        64.    The conduct of each of the Defendants contributed to the scheme designed to

23    deceive and defraud class members, resulting in the unlawful assessment of an unsolicited

24    annual recurring membership fee.

25    **Governmental Actions**

26        65.    Every governmental and judicial entity to review Defendants' telemarketing

27    practices has concluded they are deceptive and misleading.

28

66.     Seven attorneys general (from Minnesota, New York, Nebraska, California, Florida, Ohio and Iowa) have separately concluded that the telemarketing scheme Defendants employed was deceptive.  In the words of the Minnesota Attorney General:

> They just say at the end of the script so we're going to send you the package in the mail ok and they never say Is it OK to charge your credit card? . . . [The Telemarketers] tell you that the deal is about you getting something for nothing . . . .  You're going to get a free gift, you're going to get a risk-free membership and that's not what the real deal is.  The real deal is you're going to get charged unless you act to cancel that.[8]

67.     According to the New York Attorney General:

> Consumers may be confused and mistakenly believe that (1) their credit card or bank card accounts will not be debited unless they directly provide their billing information to MW; (2) they do not have to take any affirmative action to avoid being charged a membership fee; (3) they do not have to take any affirmative action to avoid being charged a renewal fee upon expiration of the initial membership term; and (4) they are not making a purchasing decision at the time of the telemarketing call.

68.     The New York Attorney General also charged that:

> Because the trial offer is termed "risk free," Consumers may be confused or fail to understand that they will be charged a membership fee unless they cancel their membership before the end of the trial offer.  By reason of the foregoing, the Attorney General believes that MW has engaged in business conduct that has the tendency and capacity to be deceptive and misleading in violation of New York's consumer protection laws.

69.     As a result of the Minnesota and New York Attorneys General investigations, MWI was forced to stop reading its scripts to Minnesota and New York consumers until the scripts were revised to: (1) inform consumers that they would be billed after 30 days if they did not call to cancel; and (2) ask the consumers' permission to charge their credit and/or debit cards.  While in 2001 MWI ultimately revised the scripts in Minnesota and New York, it did not include similar disclosures on any of its scripts read in any other state.

---

[8] *Why Some U.S. Flag Buyers Are Seeing Red*, ABC News.com, Nov. 28, 2001.

70.     Following on the Minnesota and New York investigations the Nebraska Attorney General implemented an investigation into the deceptive telemarketing practices. As a result, MWI was required to modify its scripting nationwide to inform consumers that they would be billed after 30 days if they did not call to cancel; ask their permission to charge their credit and/or debit cards. The new scripting requirements were referred to as "Best Practices" requirements or "Best Practices" scripting. Prior to the June 1, 2001 deadline for implementing the Best Practices scripting, MWI tested the disclosures on several "bait" products. The results were dramatic as affirmative responses to the telemarketing script dropped to nearly zero. In response to the test results, MWI secured an extension of the implementation date, and returned to using the old deceptive scripting to maximize their "sales."

71.     In 2001, MWI also entered a settlement with the California Attorney General relating to the sale of MWI memberships to consumers who called to purchase unrelated products from Sears. Under the settlement, MWI agreed to pay an unprecedented $2 million fine. MWI also agreed to use the Best Practices scripts in California, and to send renewal notices to California residents that they would be charged unless they called to cancel.

72.     On information and belief, in order to circumvent the scripting requirements required by the Nebraska, Minnesota, New York, Florida and California Attorneys General, MWI hatched a scheme to allow it to continue its deceptive telemarketing practices. Without discussing the matter with any of the Attorneys General, MWI and certain of the Telemarketers took the position that the Best Practices requirements did not apply to enrollments originated by the Telemarketers. This meant that while Best Practices scripting would have to be used where MWI simply paid a fee to the Telemarketers to read the scripts and where consumers were enrolled under the joint venture arrangements with the Telemarketers, the old deceptive scripting would continue to be read by Telemarketers having wholesale arrangements with MWI. Certain of these Telemarketers would then turn around and "sell" the enrolled consumers back to MWI who would bill the credit and/or debit cards of consumers for the bogus memberships.

73.     On October 21, 2003, the Florida Attorney General filed a complaint concerning Defendants' deceptive telemarketing practices. Noting that MWI reported annual revenue of $400 million, the Florida Attorney General's Office indicated its investigation estimated that 50 percent of all sales were reported as "unauthorized."  In 2004, MWI also entered into a settlement agreement with the Florida Attorney General relating to the sale of its products in conjunction with unrelated infomercial products.  MWI agreed to pay a $950,000 fine.  The agreement also required MWI to clearly disclose all terms and conditions of its programs, and to obtain consumers' express consent to charge their credit cards for MWI programs.

74.     The Iowa Attorney General filed suit on May 11, 2006.

75.     As part of its investigation, the Iowa Attorney General sent questionnaires to 400 Iowa residents enrolled in MWI membership programs. Among the questionnaire respondents, 67% indicated that they did not know they were members and/or that they did not authorize MWI to charge them.  The Iowa Attorney General reports that: "Most of the rest of the consumers who responded indicated that they had never used their membership, or thought that they had already cancelled.  None of those responding said that they were satisfied members."

76.     In 2002, the FTC published its Notice of Proposed Rulemaking pertaining to telemarketing sales rules stating "in many pre-acquired account telemarketing solicitations, products and services (often buyers' clubs) are marketed through the use of free trial offers, which are presented to consumers as low involvement marketing decisions." *See* 16 C.F.R. §310.4 Notice of Proposed Rulemaking, ("Notice") p. 27.  The Notice went on to state, "Consumers are asked merely to consent to the mailing of materials about the offer. Consumers frequently do not realize that the seller or telemarketer already has their billing information in hand and, instead, believe they must take some action before they will be charged – *i.e.*, that they are under no obligation unless they take some additional affirmative step to consent to the purchase." *Id.*

77.     In 2003, the Federal Trade Commission ("FTC") enacted rules to combat "abusive telemarketing . . . practices" by telemarketers using a "free-to-pay conversion feature" when the telemarketers have "pre-acquired account information." *See* 16 C.F.R. §310.4.

22

1  Significantly, in adopting these Rules, the FTC included Memberworks Incorporated among a
2  list of "bad actors" charged with engaging in this type of abusive telemarketing practices. 68
3  Fed. Reg. 4580, 4621, n.472 (Jan. 29, 2003). The rule sets forth three objective requirements
4  which, at a minimum, must be satisfied to meet the FTC's informed consent requirement. MWI
5  would have had to "obtain *from the customer*, at a minimum, the last four (4) digits of the
6  account number to be charged." 16 C.F.R. §310.4(a)(6)(i)(A). It would have had to "obtain
7  *from the customer* his or her express agreement *to be charged* for the goods or services *and to
8  be charged using the account number* [identified by the customer]." 16 C.F.R.
9  §310.4(a)(6)(i)(B). And MWI would have had to "make and maintain an audio recording of the
10  entire telemarketing transaction." 68 Fed. Reg. 4580, 4621 n.471 (Jan. 29, 2003). In order to
11  circumvent these requirements, MWI began charging $1 for the 30-day trial so that at the end of
12  30 days, there would not be a "pay to pay" conversion.

13      78.    In connection with the rule-making proceedings, MWI submitted a purported
14  consumer survey on the understandability of the telemarketing scripts. The FTC concluded that
15  MWI's survey was biased in its favor and that even in the face of this bias the study
16  demonstrated that "at least 46 percent of the respondents did not even 'mostly' understand the
17  way in which they would be billed after listening carefully to a sales offer involving pre-
18  acquired account information and a "free-to-pay conversion" feature." Final Amended Rules,
19  68 Fed. Reg. 4580, 4621 n.468 (Jan. 29, 2003).

20      79.    In the *Sanford Federal Class Action*, after weighing the evidence and expert
21  testimony submitted, the federal arbitrator concluded:

22          When I look at the overall picture here from an objective reasonable
            person viewpoint I consider: the experience that MWI has had in thousands of
23          these cases, the circumstances of this type of call (an unsolicited, unexpected
            offer read by MWI with high sounding words such as "RISK-FREE" membership
24          – "YOU WON'T BE BILLED" – "So, look for this kit in the mail, OKAY?"), *I
25          conclude that even if the script was read to [the consumer], [they were] misled,
            [they] didn't agree to this "deal," there was no meeting of the minds,* and MWI
26          not only could suspect, but knew that many of the callers did not understand that
27          they were making a "deal" to purchase a membership and assuming a burden to
            act.
28

23

1   Arbitration Award at 6-7.

2      80.   In reaching this conclusion, the arbitrator stated: "I conclude that the script has

3   fuzzy language, would have been read in less than 30 seconds (my estimate) as a fast sell over

4   the phone for a product that had nothing to do with the purpose of [the consumer's] call. The

5   script, if it was read to [the consumer], was *foisted upon [them] in a quick, slick and*

6   *misleading sales pitch that few people would understand.*" *Id.* at 7. Ultimately, he found:

7   "*This script is a recipe for misunderstanding and confusion when heard by a consumer*

8   *hearing it under the circumstances.*" *Id.* at 8.

9      81.   In the *Ritt Class Action*, the Ohio Court of Appeals found the upsell scripts were

10   deceptive and misleading:

11           The fact is, with or without authorization, consumers who stayed on the
            telephone line long enough to receive the entire scripted pitch would not have

12           known the ramifications of what they were agreeing to once the upsell had been

13           pitched to them and they said "yes" to receiving a membership kit.[9]

14                     **TOLLING OF THE STATUTE OF LIMITATIONS**

15      82.   The running of any applicable statutes of limitation has been tolled for several

16   reasons.

17   **Tolling by Virtue of MWI's Fraudulent Concealment**

18      83.   Through various techniques and devices of secrecy, deception and

19   misrepresentation, Defendants affirmatively and intentionally concealed the existence of their

20   unlawful and unfair telemarketing practices from Plaintiffs, class members and the public. The

21   fraudulent concealment, deception and misrepresentation existed before Plaintiffs was enrolled

22   and charged and continued throughout the class period. Defendants carried out their violations

23   of law in secret and consistently deceived, misrepresented and concealed the truth regarding the

24   unauthorized enrollment into the various membership programs and the unauthorized charging

25   of Plaintiffs' and class members' credit and/or debit cards.  Such acts included purposely

26

27   [9]  *Ritt v. Billy Blanks Enters.*, No. 80983, 2003 Ohio App. LEXIS 3297, at *7, *20-*21
28   (Ohio Ct. App. July 10, 2003).

1    designing their scripts to maximize consumers' confusion, thus allowing Defendants to enroll

2    the maximum number of unsuspecting consumers.

3        84.    Defendants' scheme is based upon their knowledge that a large segment of the

4    consumer population does not check their credit card statements and/or would miss the charge

5    even if they did review their credit card statement.

6        85.    So as to assuage any suspicion that a consumer may have, Defendants emphasize

7    that the trial membership they are sending is "FREE" and that the class members "WON'T BE

8    BILLED."

9        86.    To conceal the fact of billing consumers' credit and/or debit cards, Defendants

10   intentionally did not send Plaintiffs or class members any invoice or any other notification that

11   they were going to charge their cards.  Similarly, to conceal the true facts concerning the billing

12   of the consumers' credit and/or debit cards, after they billed the consumers' credit and/or debit

13   cards, Defendants did not send any invoice, or notification of the fact that they had in fact billed

14   the class members' cards.

15       87.    Another method that Defendants used to conceal their wrongful practices from

16   Plaintiffs and the class was to reverse the charges for any consumer that is able to track down

17   the source of the illicit charge and calls to complain.  After reading scripts in an attempt to keep

18   the consumer enrolled, Defendants and/or their agents will reverse the charges for complaining

19   consumers so that the complaints do not get escalated to the point that their practices become

20   common knowledge and reach the ears of the consumers they illicitly enrolled in, and charged

21   for, the bogus programs.  Further evidence of this concealment is demonstrated by the existence

22   of a Frequently Asked Questions script providing their telephone operators and/or operators of

23   their agents, with scripted answers to consumer questions/statement such as "I did not authorize

24   this charge," "how did you get my credit card number" and "what is this program," among

25   others.

26       88.    To further conceal their wrongful conduct from those consumers who do review

27   their credit card statements, Defendants intentionally charged between $60 and $170 – amounts

28   that were unlikely to rouse suspicion from the consumer and provoke any further inquiry.

1   Indeed, had Defendants billed the consumers' credit and/or debit cards for several hundred
2   dollars, consumers would be more likely to notice the illicit charges and seek to have them
3   reversed. Similarly, the identification of the charges was designed to conceal the illicit nature
4   of the subject charges, as the charges were identified by such words as "Essentials," "Value
5   Max," "Travel," and "Home and Garden," among others. A consumer who reviewed his or her
6   statement seeing a charge for $75 to "Essentials," for example would likely perceive such name
7   to be a clothing store, curio store, drug store or other retail establishment from which his or her
8   spouse would have made a purchase, and thus not pursue any further inquiry to determine if the
9   charge was legitimate or fraudulent.

10       89.    Through such acts of fraudulent concealment, even assuming that a class member
11   noticed the charge on their credit or debit card statement, the existence of a charge for Essential,
12   Value-Max, Travel, Home & Garden or others would not provide any indication to the class
13   member that their card was fraudulently charged.

14       90.    Defendants' scheme worked perfectly on Plaintiffs and the class members.
15   Succumbing to Defendants' practices of fraudulent concealment described above, Plaintiffs did
16   not notice the fraudulent charges when they were originally enrolled, and charged, by
17   Defendants. Accordingly, until late 2008 the Limons had absolutely no knowledge they had
18   previously been billed approximately $685.00 in membership fees. While the Limons recall
19   contacting Defendants regarding the a renewal charge, on information and belief it was
20   Defendants' policy, regarding renewal charges, not to inform consumers this was a "renewal"
21   charge and that they had previously billed one or more times earlier.

22       91.    Similarly, it was not until late 2008 that Loeper learned of the wrongful charges to
23   her credit card account.

24       92.    By virtue of their pervasive deception and misrepresentation and concealment of
25   facts, Defendants successfully concealed from Plaintiffs and class members the truth about the
26   memberships thereby tolling the running of any applicable statutes of limitation. Plaintiffs and
27   class members were unaware of, and through the exercise of due diligence could not have

28

1  discovered, the existence of such violations until after they had been charged for the

2  membership.

3      93.    In the alternative, based on the facts alleged herein, Defendants are estopped from

4  relying on any statutes of limitation because of their fraudulent concealment, deception and

5  misrepresentation of facts regarding the enrollment into the membership programs and

6  unauthorized charges. They were under a duty to disclose this information because it is non-

7  public information over which Defendants had exclusive control, because Defendants knew this

8  information was not available to Plaintiffs and class members and because this information was

9  crucial to the consuming public in making purchasing decisions.

10 **Tolling by Reason of Prior Class Action Pending**

11     94.    This is a related case to the *Sanford* Federal Class Action. The *Sanford* Federal

12 Class Action was filed on March 28, 2002. In addition to federal claims, the *Sanford* Federal

13 Class Action originally included these state law claims. The state law claims were finally

14 dismissed from the federal action on December 23, 2008. Under established case law, the filing

15 of the *Sanford* Federal Class Action against MWI tolls all statutes of limitation until a final

16 judgment of dismissal, which is no longer subject to additional appeals, has been entered.

17     95.    The court in the *Sanford* Federal Class Action issued an order on September 29,

18 2008, granting Defendants' motion to dismiss the federal claims, and refusing to exercise

19 supplemental jurisdiction over Plaintiffs Patricia Sanford's and the class members' state law

20 claims. Furthermore, relying on *Wright v. Schock*, 742 F.2d 541, 545 (9th Cir. 1984) (citing

21 *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 352-53 (1983)), the federal court held

22 the pendency of the federal action "tolled the statute of limitations for individual claims,

23 mitigating prejudice to members of the putative class."

24     96.    On October 14, 2008, Plaintiffs filed an *ex parte* application for reconsideration,

25 asking the federal court for leave to amend the complaint, which application was granted on

26 November 3, 2008, directing Plaintiffs to file a motion for leave. On November 17, 2008,

27 Plaintiffs filed the motion for leave to amend. On December 16, 2008, Defendants filed an *ex*

28 *parte* motion to dismiss or, in the alternative, to strike, among other things, the state law claims

1 from the proposed amended federal complaint, arguing that "the Court previously dismissed

2 numerous state law claims without prejudice, and thus the state law claims can be pursued in

3 the appropriate state court(s)." MemberWorks Inc.'s Memorandum of Points and Authorities in

4 Support of *Ex Parte* Application for Dismissal or, in the Alternative, to Strike Claims and

5 Additional Parties at 8. On December 23, 2008, the federal court struck the state law claims

6 from the proposed amended complaint, holding: "Furthermore, dismissing the action would not

7 preclude Plaintiffs from pursuing relief in other venues. The Court has not precluded the

8 Plaintiffs from pursuing its state law claims in state court." Order Striking Counts I, IX, X, and

9 XI from the Proposed TAC Attached to Plaintiffs' Motion for Leave to Amend at 4.

10    97.    As the above facts establish, Defendants have at all times known the core facts

11 concerning the claims for which Plaintiffs and the class members seek to hold them

12 accountable. Defendants have also known that at no time has Plaintiffs ever intended to drop

13 the claims asserted against them. Accordingly, there is no prejudice to Defendants in permitting

14 Plaintiffs and the class members to proceed with this action and prosecute their rights against

15 Defendants.

16                          **CLASS ACTION ALLEGATIONS**

17    98.    Plaintiffs bring this class action pursuant to Rule 23(a), *Arizona Rules of Civil*

18 *Procedure*, on behalf of themselves and all other persons similarly situated Arizona residents.

19 The class which Plaintiffs represents is composed of all persons in the State of Arizona who,

20 after calling a telephone number to inquire about or purchase another product: (1) were sent a

21 membership kit in the mail; and (2) charged for an annual MWI membership program (the

22 "Class"). Excluded from the Class are all persons enrolled in an MWI program under the

23 March 16, 1998 "Joint Marketing Agreement between West Telemarketing Corporation and

24 MemberWorks Incorporated," and/or the January 1, 1999 "Agreement" between West

25 Telemarketing Corporation and MemberWorks Incorporated, and/or the July 1, 1999 "Joint and

26 Wholesale Marketing Agreement" between West Telemarketing Corporation, West

27 Teleservices Corporation and MemberWorks Incorporated and/or the December 1, 2001

28 "Wholesale and Retail Marketing Agreement" between MemberWorks Incorporated and West

1  Direct, Inc., and any amendments or addendums to these agreements.[10] Not included within the

2  Class are Defendants and their officers, directors, employees, agents and/or affiliates.

3        99.    The Class is composed of thousands of persons geographically dispersed

4  throughout the state, the joinder of whom in one action is impracticable, and the disposition of

5  their claims in a class action will provide substantial benefits to both the parties and the Court.

6        100.    The Class is ascertainable and maintains a sufficient community of interest since

7  the rights of each member of the Class were violated in a similar fashion based upon

8  Defendants' use of a uniform script that was read to the class members.

9        101.    The victimized consumers can be identified in the databases maintained by MWI.

10 More specifically, MWI maintains databases that contain the following information: (1) the

11 name of each class member "enrolled" in an MWI program via an inbound call; (2) the address

12 of each such class member; (3) the dates each class member was enrolled; (4) the date and

13 amount each class member was charged; and (5) the date and amount each class member was

14 refunded. Thus the class members can be located and notified with specificity of the pendency

15 of this action using techniques and a form of notice customarily used in class action litigation.

16       102.    Plaintiffs' claims are typical of the members of the Class as a whole because of

17 the similarity, uniformity and common purpose of the unlawful conduct of Defendants. Each

18 class member was read the subject "upsell" script. Each class member was mailed a

19 membership kit for an MWI membership program. Each class member has sustained damage

20 as a result of Defendants' wrongful conduct in violation of state statutes, state common law, as

21 well as general principles of equity and fair play.

22       103.    Plaintiffs will fairly and adequately protect the members of the Class as Plaintiffs

23 has retained competent counsel who are experienced in federal and state class action claims

24 such as those asserted in this case.

25

---

26 [10]   The identities of the consumers encompassed by this exclusion are identified on Exhibit A to
the Declaration of Markham Sherwood Re Mailing of Notice and Claim Form, Report on Opt-
27 Outs and Objections Received, filed in the *West* Action in support of Plaintiffs' final approval
of settlement.

28

1    104.   A class action is superior to all other methods for the just, fair and efficient

2  adjudication of this controversy since joinder of all members is impracticable. Furthermore, the

3  damages suffered by individual class members are not sufficient to justify the enormous cost

4  associated with the prosecution of this type of litigation.   The expense and burden posed by

5  such individual litigation make it impossible for the class members to individually redress the

6  wrong done to them, nor would such an individual case be adequate to ensure that such

7  practices cease to harm others.   Further, there will be no difficulty in the management of this

8  action as a class action.

9    105.   Common questions of law and fact exist as to all members of the Class and these

10  common issues predominate over any questions which go particularly to any individual member

11  of the Class.   Among such common questions of law and fact are the following:

12        (a)    whether the Defendants mailed memberships to the class members without

13  obtaining prior express consent or acceptance;

14        (b)    whether the "upsell" scripts used by Defendants were deceptive;

15        (c)    whether Defendants failed to clearly and unambiguously communicate that

16  the class members would be charged unless they called Defendants to cancel the "risk-free" trial

17  membership;

18        (d)    whether the membership materials used by Defendants were deceptive;

19        (e)    whether the Defendants violated the Arizona consumer protection statute;

20        (f)    whether Defendants violated Arizona common law;

21        (g)    whether Defendants acted in conscious disregard for the interests of the

22  Arizona consumers, warranting the imposition of punitive damages;

23        (h)    whether the Defendants engaged in a pattern and practice of deceiving and

24  defrauding the Class and concealing their unlawful conduct;

25        (i)    what amount of damages Plaintiffs have sustained as a result of

26  Defendants' wrongful conduct, and the proper measure of such damages;

27        (j)    whether restitution is due to Plaintiffs; and

28

1    (k)    whether Plaintiffs are entitled to an award of reasonable attorneys' fees,

2  prejudgment interest, post-judgment interest, costs of suit, and other appropriate relief under the

3  circumstances of this case.

4    ### FIRST CAUSE OF ACTION

5    **(For Violation of Arizona Consumer Fraud Act A.R.S. §§44-1521**

6    **and 44-1522 *et seq* on Behalf of Plaintiffs and the Members of the Class)**

7    106.    Plaintiffs hereby reallege and incorporate by reference the allegations contained in

8  ¶¶ 1-105 above.

9    107.    This claim arises under the Arizona Consumer Fraud Act (the "Act") A.R.S.

10  §§44-1521 and 44-1522, *et seq.*

11    108.    The Act is a broad act intended to prohibit and protect Arizona consumers against

12  unfair, deceptive or fraudulent business practices, unfair competition and false advertising

13  practices in merchant-consumer transactions.

14    109.    A.R.S. § 44-1522(C) of the Act further provides that it be construed consistent

15  with the Federal Trade Commission Act, 15 U.S.C.A. §§ 44, 52 and 55(a)(1)(false advertising

16  provisions).

17    110.    The Act provides an injured consumer with an implied private right of action to

18  bring an action to recover actual damages against the violator of the Act.

19    111.    At all times relevant, Defendants engaged in deceptive acts, omissions, conduct or

20  misrepresentations; as part of trade or commerce within the State of Arizona and/or had an

21  impact within the State of Arizona as defined in the Act.  MWI was a seller of product to

22  Plaintiffs and the other members of the Class, who suffered substantial loss because of one or

23  more of the Defendants' deceptive acts or omissions.

24    112.    The acts, omissions, misrepresentations, policies, practices and non-disclosures of

25  Defendants as alleged herein were intentional, malicious, immoral, unethical, unscrupulous, or

26  oppressive and constituted violations of the Act.

27    113.    The policies, acts and practices of Defendants as described above were intended

28  to deceive, deceived and continue to deceive Plaintiffs and the Class.

114.   The acts, omissions, misrepresentations, policies, practices and non-disclosures as alleged herein were intended to, and did, result in the sale of the products at issue to Plaintiffs and the Class and violated and continued to violate the Act.

115.   Defendants, in connection with the advertising, tender and/or delivery of the products at issue, employed unconscionable tactics and inserted unconscionable provisions into the sales of the products at issue herein by unilaterally attempting to impose an automatic, unauthorized fee for enrollment in a fictitious and/or useless and unwanted membership which is offensive to the Act and to Arizona's public policy codified in the Act.

116.   Defendants advertised the products at issue with the intent not to sell them as advertised or represented.

117.   Defendants have made false or misleading representations concerning the nature of the transaction or obligation incurred concerning the products at issue.

118.   Defendants have made false or misleading representations concerning the offering price of, or the person's cost for the products at issue.

119.   Defendants have used the credit and/or debit cards of Plaintiffs and the other members of the Class with the intent to injure and/or defraud them by the unauthorized use of their credit and/or debit cards in regards to the products at issue.

120.   Defendants' unfair or deceptive acts or trade practices, of knowingly and willfully enrolling, charging and collecting an invalid and illegal membership fee from Plaintiffs and the Class are immoral, unethical, oppressive, despicable, reprehensible, unscrupulous, and have and continue to cause substantial financial injury.

121.   MWI profited at the expense of Plaintiffs and the Class by systematically enrolling them in a MWI program and charging their credit/debit cards without their authorization.

122.   Defendants' use of bait products to promote the sale of the products at issue through false and deceptive representations as alleged herein constitutes unfair and deceptive acts within the meaning of the Act.

123.   Injuries suffered by Plaintiffs and the Class were not outweighed by any countervailing benefits to Plaintiffs.

124.   At all times material to this complaint, Defendants were acting for financial gain within the meaning of the Act.

125.   Defendants knowingly concealed, suppressed and omitted in their scripts, advertisements and membership kits, material facts about the deceptive products at issue with intent that consumers such as Plaintiffs and the Class would rely upon the concealments, suppressions or omissions, in violation of the Act.

126.   Pursuant to the Act, Plaintiffs and the Class are entitled to compensatory damages, punitive damages, and such other relief as the Court deems just.

## SECOND CAUSE OF ACTION

### (For Conversion on Behalf of Plaintiffs and the Class)

127.   Plaintiffs hereby reallege and incorporates herein by reference ¶¶ 1-126 above.

128.   Defendants have converted to their own use, property belonging to Plaintiffs and the Class through unlawful acts and conduct. The specific sum of money that was converted by Defendants should be readily identifiable from information and records in Defendants' possession or control.

129.   Defendants knowingly or intentionally charged and collected money for unordered merchandise from credit and/or debit card accounts of consumers, including Plaintiffs and other Class members. Defendants obtained money from consumers through fraud and/or deception. Defendants thus converted to their own use property, specifically monies, belonging to Plaintiffs and the Class.

130.   The specific sum of money of Plaintiffs and members of the Class that was converted by Defendants are readily identifiable from information and records in Defendants' possession or control.

131.   As a direct and proximate result of Defendants' unlawful acts and conduct, Plaintiffs and the Class were deprived of the use of their money that was unlawfully converted by Defendants, and are thereby entitled to restoration of their monies, interest on these monies

33

1  from the date said monies were converted by Defendants to the date of judgment, compensatory

2  damages (including overdraft fees paid by consumers due to Defendants' conversion of their

3  money) and punitive damages.

### THIRD CAUSE OF ACTION

#### (For Unjust Enrichment on Behalf of Plaintiffs and the Class)

132.   Plaintiffs hereby reallege and incorporates herein by reference ¶¶ 1-131 above.

133.   Defendants have received, and continue to receive, a benefit at the expense of Plaintiffs and members of the Class.

134.   Defendants have fraudulently and/or deceptively charged and collected membership fees and/or renewals from consumers, including Plaintiffs and members of the Class, for unordered merchandise. Accordingly, Defendants have received benefits which they have unjustly retained at the expense of Plaintiffs and members of the Class.

135.   As a direct and proximate result of Defendants' unlawful acts and conduct, Plaintiffs and members of the Class were deprived of the use of their money that was unlawfully charged and collected by Defendants, and are therefore entitled to restoration of their monies.

### FOURTH CAUSE OF ACTION

#### (For Fraud and Deceit on Behalf of Plaintiffs and the Class)

136.   Plaintiffs hereby reallege and incorporates herein by reference ¶¶ 1-135 above.

137.   The acts, conduct and practices of Defendants, as alleged above, were fraudulent and deceptive. The use of deceptive scripts assuring consumers that they were being mailed a free 30-day trial membership is and was likely to mislead, and did in fact mislead, Plaintiffs and members of the Class.

138.   Plaintiffs and members of the Class ordered non-MWI products. Approximately one month later, class members were enrolled in an MWI membership program and were charged an approximate amount of between $60 and $170 to their credit or debit cards. Eleven months after the initial charge, Defendants charge the class members approximately the same

1   amount (usually *15%-25% more*) *without seeking any approval to do so. These charges, if*
2   undetected, will keep occurring in subsequent years.

3      139.   Through the use of deceptive scripts that were read to the class members,
4   Defendants concealed material facts from Plaintiffs and the Class. Defendants tell and have
5   told members of the Class that they are being mailed a risk-free 30-day trial membership. No
6   permission to use the consumers' credit and/or debit cards is sought or obtained. The scripts
7   deceive members of the Class. After mailing the unsolicited membership kit to the class
8   members, Defendants charge the members of the Class for an unsolicited and unwanted
9   membership.

10      140.   Defendants falsely and fraudulently utilize deceptive scripts that conceal from the
11   class members that they will be automatically charged unless the class members affirmatively
12   call Defendants to cancel the membership. Defendants' scripts contain misrepresentations and
13   are intended to, and do, deceive the Class members.

14      141.   Defendants intentionally designed the scripts and the purported membership
15   material in order to mislead the Class members into believing that they would receive a risk-
16   free trial membership that they could try out, and if they liked the membership, the Class
17   members could contact Defendants to activate a full membership. The true facts are just the
18   opposite – Defendants charge the Class members unless they call to cancel.

19      142.   Defendants have intentionally designed the generic membership materials so as to
20   appear to be "junk mail" in the hopes that the materials will be discarded and thus never read.
21   If the packet mailed by MWI for the risk-free trial membership is thrown out by the recipient,
22   then the consumer will not have the number to access the benefits. The kits are mailed out bulk
23   rate indicating the lack of value of the material. In this way, Defendants further conceal the fact
24   that the class members will be charged an annual, self-renewing membership fee.

25      143.   To further their scheme to conceal the true facts, Defendants never send any
26   invoice or bill to Plaintiffs and the Class informing them that their credit and/or debit cards
27   were going to be, or were in fact, charged.

28

144.    Defendants' renewal of the purported memberships is fraudulently concealed by Defendants in the same manner. No bill or invoice is sent to the class members informing them that they were going to be, or had in fact been, charged.

145.    Plaintiffs and members of the Class reasonably relied on Defendants and believed that they were making a one-time purchase of non-MWI products.

146.    Defendants' false and misleading statements and suppression of the material facts set forth above and throughout this Complaint defrauded Plaintiffs and the Class, and are in direct violation of federal and state statutes, as well as principles of common law, for which Plaintiffs and members of the Class are entitled to recover damages, including punitive damages.

## FIFTH CAUSE OF ACTION

### (For Negligent Misrepresentation on Behalf of Plaintiffs and the Class)

147.    Plaintiffs hereby reallege and incorporates herein by reference ¶¶ 1-146 above.

148.    In making representations to Plaintiffs and members of the Class described herein, Defendants failed to fulfill their duty to disclose the material facts set forth above. Among the direct and proximate causes of said failures to disclose were the negligence and carelessness of Defendants.

149.    Defendants owed Plaintiffs and members of the Class the duty to act with reasonable care in retaining, training and supervising their agents and sales agents. Defendants also failed to take reasonable steps to ensure that their representatives conducted themselves in accordance with the law and to ensure that the representatives disclosed all material facts and did not misrepresent or omit such facts in conducting such sales.

150.    Defendants, as set forth herein, breached their duties to retain, train, supervise and discipline their sales force and to ensure full disclosure by them.

151.    Plaintiffs and the members of the Class were unaware of the falsity of Defendants' affirmative misrepresentations and their failure to disclose that Plaintiffs and members of the Class would be charged undisclosed and unauthorized fees for a fictitious

1   membership on their credit card accounts.  Plaintiffs and the members of the Class, as a direct

2   and proximate cause of Defendants' breaches of their various duties, reasonably relied upon

3   such representations to their detriment.  By reason thereof, Plaintiffs and members of the Class

4   have suffered damage, in an amount according to proof at time of trial.

5   <div align="center">**PRAYER FOR RELIEF**</div>

6       WHEREFORE, Plaintiffs on behalf of themselves and the members of the Class, prays

7   for judgment and relief against Defendants awarding:

8           (i)     an order certifying that the action be maintained as a class action;

9           (ii)    compensatory damages in an amount to be proven at trial, including any

10   damages as may be provided for by statute;

11           (iii)   exemplary and punitive damages;

12           (iv)   restitution as may be provided for by equity and/or by statute;

13           (v)    reasonable attorneys' fees and costs of suit;

14           (vi)   pre-and post-judgment interest; and

15           (vii)  such other and further relief as this Court may deem necessary, proper

16   and/or appropriate.

17   <div align="center">**JURY DEMAND**</div>

18       Plaintiffs demand a trial by jury.

19

20   DATED:  March 3, 2009

21                          BONNETT, FAIRBOURN, FRIEDMAN &

22                          BALINT, P.C.

23

24                          Andrew S. Friedman

25                          Francis J. Balint, Jr.
                            2901 N. Central Avenue
                            Suite 1000

26                          Phoenix, AZ 85018
                            602/274-1100

27

28

<div align="center">37</div>

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
FRANK J. JANECEK, JR.
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

LANDSKRONER • GRIECO • MADDEN, LTD.
JACK LANDSKRONER
1360 West 9th Street, Suite 200
Cleveland, OH 44113
Telephone: 216/522-9000
216/522-9007 (fax)

LAW OFFICES OF ARTIE BARAN, APC
ARTIE BARAN
4545 Murphy Canyon Road, Suite 300
San Diego, CA 92123
Telephone: 858/560-5600
858/836-0318 (fax)

Attorneys for Plaintiffs

9

IN THE CIRCUIT COURT OF THE 15TH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA
CIVIL ACTION

ARLINE ROSENZWEIG, FREDERICK )
FRENCH, and TARI FAULK, On Behalf of )
Themselves and All Others Similarly Situated )
in the State of Florida, )
                              )
                  Plaintiffs, )
                              )
    vs. )
                              )
MEMBERWORKS, INCORPORATED, now )
known as VERTRUE INCORPORATED, )
ADAPTIVE MARKETING LLC, and DOES 1 )
through 50, )
                              )
                  Defendants. )
                              )
_____ )

Case No. 2009 CA 009706 XXXXMB

CLASS ACTION

COMPLAINT FOR: (1) VIOLATION OF
THE FLORIDA DECEPTIVE AND UNFAIR
TRADE PRACTICES ACT; (2)
MISLEADING ADVERTISING; (3)
CONVERSION; (4) UNJUST
ENRICHMENT; (5) FRAUD AND DECEIT;
(6) NEGLIGENT MISREPRESENTATION;
(7) MONEY HAD AND RECEIVED; AND
(8) INJUNCTIVE RELIEF

DEMAND FOR TRIAL BY JURY

AH

COPY
RECEIVED FOR FILING
MAR 19 2009
SHARON R. BOCK
CLERK & COMPTROLLER
CIRCUIT CIVIL DIVISION

NOW COMES Arline Rosenzweig ("Rosenzweig"), Frederick French ("French") and Tari Faulk ("Faulk"), on behalf of themselves and all others similarly situated in the State of Florida (collectively, "Plaintiffs"), by and through counsel, and for their complaint state the following:

## SUMMARY OF COMPLAINT

1.      Defendant MemberWorks, Incorporated,[1] also known as MWI Essentials, MWI Leisure Advantage, MWI Home & Garden, MWI Connections, MWI Value Max and other MWI entities, which subsequently changed its name to Vertrue Incorporated (collectively, "MWI"),[2] in conjunction with its co-conspirators, the telemarketing entities (collectively, the "Telemarketers" or "Telemarketing Entities")[3] and the bait product suppliers (the "Bait Product Suppliers") have been

---

[1]      MemberWorks, Incorporated, with Adaptive Marketing LLC and Doe defendants 1 through 50 are referred to herein as "Defendants."

[2]      As used in this Complaint, the term "Defendants" does not refer to West Corporation, and/or West Telemarketing Corporation and/or West Telemarketing, L.P., and their predecessors, successors, present and former owners, subsidiaries, affiliates, employees, officers, directors, agents, attorneys and assigns, including West Direct, Inc. and West TeleServices Corporation (collectively, "West"). Therefore, any reference to acts or omissions by "Defendants" does not include or refer to the West entities. Further, the claims for relief in this Complaint do not arise from actions or omissions under the following agreements: the March 16, 1998 "Joint Marketing Agreement between West Telemarketing Corporation and MemberWorks Incorporated," and/or the January 1, 1999 "Agreement" between West Telemarketing Corporation and MemberWorks Incorporated, and/or the July 1, 1999 "Joint and Wholesale Marketing Agreement" between West Telemarketing Corporation, West Teleservices Corporation and MemberWorks Incorporated and/or the December 1, 2001 "Wholesale and Retail Marketing Agreement" between MemberWorks Incorporated and West Direct, Inc., and any amendments or addendums to these agreements. Thus, by way of example (but without limitation), any acts or omissions that include, relate to or were part of an upsell to a Tae-Bo product that occurred under or as part of one of the agreements listed in this footnote 2, are not included in the claims and allegations of this Complaint.

[3]      As used in this Complaint, the terms "Telemarketers" and "Telemarketing Entities" and the allegations of this Complaint referring to acts or omissions of the "Telemarketing Entities" and "Telemarketers" do not include or refer to the actions or omissions of West Corporation and/or West Telemarketing Corporation under the March 16, 1998 "Joint Marketing Agreement between West Telemarketing Corporation and MemberWorks Incorporated," and/or the January 1, 1999 "Agreement" between West Telemarketing Corporation and MemberWorks Incorporated, and/or the July 1, 1999 "Joint and Wholesale Marketing Agreement" between West Telemarketing

engaged in the practice of making unlawful charges to consumers' credit and/or debit cards through a scheme involving the mailing of an unordered membership program marketed through the use of a deceptive script.  Defendants obtain the necessary information to mail their unwanted membership (and charge for it) through the use of a telemarketing scam.  By this method, Defendants are able to accomplish the old and pernicious practice of mailing unsolicited merchandise and then tricking consumers into paying for it.

2.     MWI, in concert with the Telemarketers and the Bait Product Suppliers, through agreements with MWI, capture consumers' credit and/or debit card information when those consumers call to order products -- products which are *not* marketed or produced by MWI. This is referred to as an "inbound" telemarketing call, as the consumer initiates the call. The consumer has initiated the call to inquire about or purchase a product usually advertised with a 1-800 number. The consumer *does not call* to order an MWI product.  In fact, the consumer has most likely never heard of MWI and has no expectation of receiving an MWI membership program when the call is made by the consumer.  Moreover, the consumer gives his/her credit and/or debit card information, which Defendants capture long before the consumer ever hears of any MWI product. This private financial information is then used by Defendants to charge the consumer for a membership the consumer never wanted or agreed to purchase.

3.     MWI has reached agreements with a number of Telemarketing Entities, whereby the consumer is subjected to a deceptive sales pitch to purchase an MWI membership program before the call made by the consumer to purchase an unrelated product is completed.  This is referred to as an "unrelated upsell." MWI's products are not related to the product sought by the consumer and

Corporation, West Teleservices Corporation and MemberWorks Incorporated and/or the December 1, 2001 Wholesale and Retail Marketing Agreement between MemberWorks Incorporated and West Direct, Inc., and any amendments or addendums to these agreements.

the consumer has no idea that an MWI product will be made a part of the call – or even what an MWI product is.

4.     MWI prepares a script for the Telemarketers to use for the unrelated upsell. As more specifically alleged below, MWI pays the Telemarketers and the Bait Product Suppliers a fee for each consumer who they enroll in MWI's membership programs. Some number of MWI membership programs are sold through a joint venture and wholesale arrangement between MWI and the Telemarketers, where MWI and the Telemarketers jointly pay a separate fee to the Bait Product Suppliers for each of their customers enrolled in an MWI program. The Telemarketers, who handle the inbound calls, approve the scripts, read the scripts to the consumers, capture the consumers' credit and/or debit card information and transmit that information to MWI to mail the "kits" and bill the consumers' cards.

5.     After the consumers have given the information necessary to purchase the product the consumers called to buy, a deceptive script is read to the consumers informing them that they will be sent *free* materials in the mail. Consent to receive the materials in the mail is not requested. Consent to bill the credit and debit cards is not requested. In actuality, Defendants enroll consumers in a membership and mail them a membership "kit." Consumers are deceived and do not know that they have been enrolled in a "membership" and will be charged $60-$170 annually unless they call MWI to inform them that they want to cancel the FREE 30-day trial membership. MWI mails a packet with a membership card to the consumers which allows the consumers to access the so-called benefits of an MWI membership. By enrolling consumers who called to order an unrelated product and mailing those consumers a membership kit without the prior express consent of the consumers, consumers are unwittingly charged by Defendants for a membership they neither requested nor intended to purchase.

6.     Consumers are never asked their permission for the Telemarketers to provide their credit and/or debit card information to MWI. MWI has the Telemarketing Entities transfer the class members' confidential credit and/or debit card information to MWI, who uses the information to charge consumers membership fees and membership renewal fees which range from $60-$170 annually. Although MWI processes the charges, neither it nor the Telemarketing Entities send the consumers any bill or invoice notifying them that their credit and/or debit cards have been assessed such a charge.

7.     In order to conceal its scheme, MWI will reverse the charges for those consumers who notice that they have been assessed a charge on their credit and/or debit card statements who call to question the charge and get through Defendants' multifarious system of avoiding cancellations. However, as Defendants know, a significant percentage of the population does not closely review their credit and/or debit card statements, and will not notice the offending charge (as was the case with plaintiff Patricia Sanford ("Sanford") in the federal action, *Sanford, et al. v. MemberWorks, Inc., et al.*, No. 02-CV-0601 (S.D. Cal.) ("*Sanford* Federal Class Action")[4], who did not realize she had been assessed such a charge until the *second* time it appeared on her credit card

---

[4]     The *Sanford* Federal Class Action was filed in 2002, as a class action against West and MWI in the United States District Court for the Southern District of California. The claims against MWI were asserted on behalf of all consumers in the United States enrolled in an MWI membership in connection with their purchase of an unrelated bait product. The claims against West were asserted on behalf of all consumers in the United States enrolled in an MWI membership program who were customers of a joint venture between MWI and West or were wholesale customers of West. The district court dismissed the federal count against West and declined to exercise supplemental jurisdiction over the state law claims. Plaintiffs re-filed the state law claims against West (*Sanford v. West Corporation and West Telemarketing Corporation, et al.*, Case No. GIC 805541 (the "*West* Action")) and was ultimately assigned to the Honorable Ronald L. Styn. The *West* Action included the same or similar claims, based on the same factual allegations asserted in this action. The court in the *West* Action certified a class (February 16, 2007 Order Granting Plaintiffs' Motion for Class Certification), the case settled and Final Approval of the settlement was entered on December 24, 2008.

statement). These individuals are charged between $60-$170, each year, until they notice the charge and complain. ***Defendants never send any bill or invoice to the class members notifying them that they have been, or will be, charged.*** The named Plaintiffs and class members in this action were all victimized by Defendants by this same exact method.

8.    Defendants share in the revenues and profits generated from their deceptive scheme of mailing unordered merchandise and then charging consumers for it.

## JURISDICTION AND VENUE

9.    This is an action for damages, injunctive relief and other statutory relief pursuant to the Florida Deceptive and Unfair Trade Practices Act (the "Act"), Fla. Stat. §§501, 817.06 and 817.41, and the common law to obtain injunctive relief to prevent the unlawful acts and practices alleged in this Complaint and other relief, including restitution, civil penalties, costs of investigation and attorneys' fees.

10.    This Court has jurisdiction over Defendants pursuant to Fla. Stat. §48.193(a)-(b) because each defendant is either a corporation or association organized under the laws of the State of Florida, a foreign corporation or association authorized to do business in Florida and registered with the Florida Secretary of State, or does sufficient business, has sufficient minimum contacts with Florida or otherwise intentionally avails itself of the Florida market, through the manufacturing, production, promotion, sale, marketing and distribution of its products in Florida, and committing a tortuous act within the State of Florida to render the exercise of jurisdiction by the Florida courts permissible under traditional notions of fair play and substantial justice.

11.    Venue is proper in this Court since plaintiff Rosenzweig, as well as numerous class members reside in Palm Beach County and throughout Florida and Defendants either maintain offices in this County, a substantial portion of the practices complained of herein occurred in this

- 5 -

County or because Defendants have received substantial compensation as a result thereof in this County.

12.     Venue is also proper in this Court in that the state law claims alleged herein were severed from the *Sanford* Federal Class Action, and the federal court directed that the state law claims be filed in state court.

## PARTIES

13.     Plaintiff Arline Rosenzweig has been, at all times relevant to the action, a resident of Boynton Beach, Palm Beach County, Florida. Rosenzweig purchased Tae-Bo fitness videotapes after viewing the television advertising campaign for the product. In connection with this purchase, MWI charged Rosenzweig unsolicited, unauthorized and unexpected charges for several of MWI's membership programs. Rosenzweig was never asked for consent to be charged for any of these MWI membership programs. Moreover, Rosenzweig never utilized or received any benefit from any of the MWI membership programs. Rosenzweig's credit card was assessed unsolicited and unexpected charges totaling approximately $600.00 for one or more of the MWI membership programs.

(a)     On or about February 6, 2000, at the end of the call to purchase the bait product, Tae-Bo fitness exercise videotapes, the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Rosenzweig informing her she would be receiving a risk-free 30-day trial membership, emphasizing the thank you gift was FREE and that Rosenzweig, "WON'T BE BILLED." The language of the deceptive telemarketing pitch is quoted in full in ¶29 below. The telemarketer thereafter transferred Rosenzweig's confidential credit card information to MWI using the wires. Thereafter, on March 6, 2000, in connection with the Tae-Bo product, Rosenzweig's credit card was assessed an unsolicited and unexpected $84.00 charge by Defendants for an Essentials membership.

(b)     On January 5, 2001, MWI charged Rosenzweig's credit card an unsolicited and unexpected renewal fee of $99.95 (charged as "MWI Essentials").

(c)     On January 7, 2002, MWI charged Rosenzweig's credit card an unsolicited and unexpected renewal fee of $109.95 (charged as "MWI Essentials").

(d)     On January 15, 2003, MWI enrolled Rosenzweig in a second membership, believed to be "MWI Essentials" and charged Rosenzweig's credit card an unsolicited and unexpected fee of $149.95.

(e)     On January 14, 2004, MWI charged Rosenzweig's credit card an unsolicited and unexpected renewal fee of $165.95 (believed to be charged as "MWI Essentials").

14.     Until recently, Rosenzweig was completely unaware of these charges or that she had been enrolled in any MWI membership and/or that her credit card had been billed.

15.     Plaintiff Frederick French has been, at all times relevant to the action, a resident of Cape Coral, Florida.  French purchased Tae-Bo fitness videotapes after viewing the television advertising campaign for the product.  In connection with this purchase, MWI charged French unsolicited, unauthorized and unexpected charges for several of MWI's membership programs. French was never asked for consent to be charged for any of these MWI membership programs. Moreover, French never utilized or received any benefit from any of the MWI membership programs.  French's credit card was assessed unsolicited and unexpected charges totaling approximately $560.00 for one or more of the MWI membership programs.

(a)     On or about January 2, 2000, at the end of the call to purchase the bait product, Tae-Bo fitness exercise videotapes, the telemarketer who answered the call read MWI's deceptive telemarketing pitch to French informing him he would be receiving a risk-free 30-day trial membership, emphasizing the thank you gift was FREE and that French, "WON'T BE BILLED." The language of the deceptive telemarketing pitch is quoted in full in ¶29 below.  The telemarketer

thereafter transferred French's confidential credit card information to MWI using the wires. Thereafter, on February 2, 2000, in connection with the Tae-Bo product, French's credit card was assessed an unsolicited and unexpected $84.00 charge by Defendants for a Home & Garden membership.

(b)     On December 5, 2000, MWI charged French's credit card an unsolicited and unexpected renewal fee of $99.95 (charged as "MWI Home & Garden").

(c)     On December 3, 2001, MWI charged French's credit card an unsolicited and unexpected renewal fee of $109.95 (charged as "MWI Home & Garden").

(d)     On December 3, 2002, MWI charged French's credit card an unsolicited and unexpected renewal fee of $119.95 (charged as "MWI Home & Garden").

(e)     On December 3, 2003, MWI enrolled French in a second membership, believed to be "MWI Home & Garden" and charged French's credit card an unsolicited and unexpected fee of $149.95.

16.     Until recently, French was completely unaware of these charges or that he had been enrolled in any MWI membership and/or that his credit card had been billed.

17.     Plaintiff Tari Faulk has been, at all times relevant to the action, a resident of Clermont, Florida.  Faulk purchased Tae-Bo fitness videotapes after viewing the television advertising campaign for the product.  In connection with this purchase, MWI charged Faulk unsolicited, unauthorized and unexpected charges for a MWI membership program.  Faulk was never asked for her consent to be charged for the MWI membership program.  Moreover, Faulk never utilized or received any benefit from any of the MWI membership programs.  Faulk's credit card was assessed unsolicited and unexpected charges for one or more of the MWI membership programs.

(a)     On or about February 13, 1999, at the end of the call to purchase the bait product, Tae-Bo fitness exercise videotapes, the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Faulk informing her she was receiving a risk-free 30-day trial membership in Travel, emphasizing the thank you gift was FREE and that Faulk, "WON'T BE BILLED." The language of the deceptive telemarketing pitch is quoted in full in ¶29 below. The telemarketer thereafter transferred Faulk's confidential credit card information to MWI using the wires. Thereafter, on March 13, 1999, in connection with the Tae-Bo product, Faulk's credit card was assessed an unsolicited and unexpected $72.00 charge by Defendants for an Essential's membership.

(b)     On January 14, 2000, MWI charged Faulk's credit card an unsolicited and unexpected renewal fee of $84.00 (charged as "MWI Essentials").

(c)     On January 15, 2001, MWI charged Faulk's credit card an unsolicited and unexpected renewal fee of $99.95 (charged as "MWI Essentials").

(d)     On January 14, 2002, MWI charged Faulk's credit card an unsolicited and unexpected renewal fee of $109.95 (charged as "MWI Essentials").

(e)     On January 15, 2003, MWI enrolled Faulk in a second membership, believed to be "MWI Essentials" and charged Faulk's credit card an unsolicited and unexpected fee of $149.95.

18.     After inquiring about the January 2003 charge, and without even realizing that this was the fifth charge, Faulk was informed by MWI that the charge was for some membership associated with Tae-Bo.

19.     Until recently, Faulk was completely unaware of the renewal charge or that she had been enrolled in the any MWI membership and/or that her credit card had been billed.

20.    In addition, Plaintiffs include in their allegations the names, the dates of the fraudulent charges and the bogus membership enrollments of unnamed Florida class members.[5] The names of the unnamed class members represent only a fraction of the unnamed class members included in the proposed class. The identity of the remainder of the unnamed class members are contained within MWI's electronic database(s), and will be revealed through discovery. Each of these unnamed class members, as well as each of the unnamed class members who have yet to be identified through discovery, received the deceptive telemarketing pitch at the end of their calls, the language of which is quoted at ¶29 below.

21.    At this time, without the benefit of discovery from Defendants, Plaintiffs are aware that the most recent telemarketing pitch was made on or about September 10, 2002, and that the most recent fraudulent charge occurred on October 15, 2002. Based upon a database MWI produced in the related California state court action, Plaintiffs are aware that the most recent fraudulent charge to a West subclass member[6] was levied on March 9, 2007 – the month that the database was produced. Accordingly, based upon this information Plaintiffs believe that discovery will reveal a continuation of the pattern and practice of fraudulently charging the credit and/or debit cards of the class members in this action, through at least March 2007, through the present and for the foreseeable future.

22.    Defendant MWI, now known as Vertrue Incorporated, has been, at all times relevant to the action, a Delaware corporation whose primary place of business is 20 Glover Avenue,

---

[5]    The information regarding these unnamed class members was obtained pursuant to a protective order and is required to be filed under seal. If the Court desires, Plaintiffs will amend this Complaint to add these additional unnamed class members.

[6]    As noted above, the claims of the West Subclass Members were severed from this action and subsequently settled with West and this action seeks no recovery for these dismissed West Subclass Members.

Norwalk, Connecticut. Defendant MWI does business in Florida, and throughout the nation, as MWI Essentials, MWI Leisure Advantage, MWI Home & Garden, MWI Connections, Health Trends, Travel Arrangements, Transmedia, Cardmember Protection Service, Countrywide Dental, 24 Protect, Smartsource, Value Max Shopping Service, Money Master Tai Value Max, Tai Vital Basics and various other names under which it markets and charges consumers, by and through nationwide telemarketing campaigns, as well as by and through the interstate instrumentality of mailings throughout Florida and the nation. Defendant MWI entered into express and tacit agreements with the Telemarketers. Defendant MWI drafted the deceptive script used and sought comments from and approval by the Telemarketers. Defendant MWI operates and is involved in the unlawful scheme of charging the credit and/or debit card accounts of consumers for unordered merchandise.

23.     Defendant Adaptive Marketing LLC is a Delaware limited liability company with its principal place of business in Norwalk, Connecticut (collectively with Vertrue Incorporated). Adaptive Marketing LLC is a wholly-owned subsidiary and "operating company" of Vertrue Incorporated. Adaptive Marketing LLC shares personnel with Vertrue Incorporated and markets Vertrue Incorporated's membership programs. There exists, and at all relevant times, a unity of interest and ownership between MWI and Adaptive Marketing LLC, such that any individuality and separateness between each of them ceased and each is the alter ego of the other in that each entity is completely controlled, dominated, managed and operated without regard for corporate individuality.

24.     The true names and capacities of defendants sued herein as Does 1 through 50, inclusive, are presently unknown to Plaintiffs, who therefore sue the Doe defendants by such fictitious names. Plaintiffs will seek to amend this Complaint and include the Doe defendants' true names and capacities when they are ascertained. Each of the fictitiously named defendants are

- 11 -

responsible in some manner for the conduct alleged herein and are therefore responsible for the damages suffered by Plaintiffs and class members.

25.    In committing the wrongful acts alleged herein, Defendants have pursued a common course of conduct, acted in concert with, aided and abetted and conspired, in furtherance of their common plan, scheme or design to make unauthorized charges to customers' credit and/or debit cards for an unsolicited, unwanted and unordered membership and thereafter to conceal and cover up their wrongdoing – all for their own personal profit. Defendants actually knew, or should have known, of the fraudulent conduct being committed and actively participated in covering up its true nature. Thus, in addition to the wrongful conduct herein alleged as giving rise to primary liability, Defendants further aided and abetted and knowingly assisted each other in the breach of their respective duties, contracts and obligations as herein alleged, and acted as the agent of each other in participating in this wrongdoing.

26.    At all times herein mentioned in the claims for relief alleged herein, each and every defendant was an agent and/or employee of each and every other defendant. In doing the acts alleged in the claims for relief alleged herein, each and every defendant was acting within the course and scope of this agency or employment, and was acting with the consent, permission and authorization of each of the remaining Defendants. All of the actions of each defendant as alleged in the claims for relief stated herein were ratified and approved by every other defendant or their officers or managing agents.

## DEFENDANTS' WRONGFUL CONDUCT

**The Upsell**

27.    Defendants obtain the necessary information to bill consumers for MWI memberships by piggybacking onto popular consumer products. MWI looks for products advertised heavily on television or in print which ask consumers to call a 1-800 number to order that product. Some

- 12 -

examples of the products which MWI uses to upsell its programs are: Nad's, Tae-Bo, vitamins, knives, Q-Ray bracelets, Edgemaster paint rollers, Simoniz car washer, flowers, dance videos, AB Slider, ultrasonic toothbrushes and OxiClean.

28.     The consumers see the advertising for the product (such as a Tae-Bo, a Nad's, a Simoniz car washer or an OxiClean infomercial) and call the 1-800 number. The consumer has not seen or heard anything about any MWI product and has no desire or intent to purchase an MWI product. The consumer is most likely to wind up speaking with an employee of the Telemarketers. The consumers go through the process of ordering the product they wanted and the Telemarketing Entities who handle the incoming calls "capture" the consumers' credit and/or debit card information. This portion of the call may take anywhere from 5-15 minutes or so.

29.     Before the Telemarketers let the consumers off the line, MWI has the Telemarketing Entities read the following deceptive script to the consumers:

> Mr(s) _____, for purchasing **[NAME OF BAIT PRODUCT]** today, we're sending you a risk-FREE 30-day membership to **[MWI PROGRAM]**, a service designed to SAVE YOU 20% from leading stores such as **[STORES]**, PLUS additional savings on eyewear, beauty products, haircuts and more! After 30 days, the service is extended to a full year for just $6 a month, billed annually in advance to the credit card you're using today. If you want to cancel, just call the toll-free number that appears in your kit in the first 30 days and YOU WON'T BE BILLED. So look for that kit in the mail, OKAY?[7]

30.     The words in ALL CAPITAL LETTERS are the words the telemarketer emphasizes when reading the script. In other words, MWI emphasizes that the trial membership is "FREE," and that class members "WON'T BE BILLED." At the end of the call, MWI merely tells class members: "So look for that kit in the mail, OKAY?" MWI does not ask the consumers if they want

---

[7]     While there can be minor variations to the script – *e.g.*, the list of stores can change, the MWI program can change, the script may say "to thank you for your purchase," or as a "special thanks," and such – the substance of the telemarketing pitch is identical across all scripts.

to receive the purported trial membership, let alone any agreement to be enrolled in the membership. And, MWI does not ask the consumers for permission or consent to charge their credit and/or debit cards.

31.    At most, the consumer is led to believe that a free trial membership will be mailed to the consumer to evaluate, and if the consumer likes the product he or she can call to purchase a membership. *No express consent to mail the membership is obtained from the consumer, let alone any agreement to be enrolled in the membership. Nor is any express consent requested to bill the consumers' credit and/or debit cards.* This is Defendants' "upsell" and Defendants' excuse for charging consumers for a membership program they neither wanted nor ordered.

32.    Notwithstanding the failure to obtain consent to enroll consumers in MWI's membership programs and charge their cards, the Telemarketing Entities transfer the class members' confidential credit and/or debit card information, which they obtained when the consumers called to purchase the unrelated bait products, to MWI. MWI then mails a membership kit and charges the consumers' credit and/or debit cards. Neither Defendants, the Telemarketing Entities nor the Bait Product Suppliers seek or obtain the consumers' express consent to charge the MWI membership to the consumers' credit and/or debit card accounts.

33.    The fraud at issue is the assessment of an unsolicited and unlawful fee charged to consumers which the consumers did not seek out and did not want. The consumers are deceived by Defendants' purposely misleading script, then mailed a membership kit and enrolled and charged for a membership they did not want or order. Defendants' automatic self-renewing membership is an outright theft of money under the guise of a membership.

**The Mechanics of the Scheme**

34.    To generate calls, Defendants rely on the popularity of the non-MWI products offered by the bait entities.

35.    After a consumer has viewed an infomercial or read an advertisement for a bait product they want to purchase, the class members call a "1-800" telephone number to order the product. The purchasers of these products are given the option of purchasing by credit card or debit card. To complete the purchase, the class members are required to provide their names, credit and/or debit card numbers and the expiration date to the Telemarketers who answer the calls and process the sales. Thus, at the end of the purchase transactions, the Telemarketing Entities possess all of the information necessary for MWI to assess the unsolicited membership fees against unsuspecting consumers.

36.    After the financial information for the sale of the advertised bait product is obtained by the Telemarketers, MWI has them read the "upsell" script. The message of the upsell script is that the consumer will be mailed a 30-day, risk-free trial membership. The class members are not asked whether they want to enroll, they are not billed or invoiced and they are not asked to give or to confirm their credit or debit card information to pay for the membership. Instead, Defendants wait approximately 30 days and then charge the class members' credit and/or debit cards using the information Defendants received from consumers when they purchased the product they actually wanted.

37.    The class members are never asked to provide their confidential credit or debit card information in connection with the unrelated MWI upsell. Class members are never asked to give permission to permit their confidential financial information to be transferred to defendant MWI. The class members are never even asked if they want to receive the purported membership materials -- rather they are simply informed that for purchasing the advertised product, risk-free they are being sent a 30-day trial membership. The purported membership kit which allows the consumer to access the so-called benefits of the program are mailed shortly after the call.

- 15 -

38.   Approximately one month after the call, defendant MWI uses the confidential financial information it received from the consumers' purchases of the unrelated product to charge the class members' credit and/or debit cards.  On information and belief, some consumers are "enrolled" more than once.  This situation would only arise if the consumer did not know they had already been enrolled, or were going to be enrolled, in the purported membership as no one would twice pay $60-$170 to MWI to join the same membership.  It, of course, makes no difference to MWI how many times a consumer is enrolled, as each "enrollment" is simply another $60-$170 a year for MWI, other than if a member is "enrolled" multiple times, they are more likely to notice the offending charge.

39.   The class members do not know they have been enrolled in MWI's membership programs and therefore never use any of the programs' so-called benefits.  *See* ¶¶56-63 below. Defendants count on this deception and subsequent non-use of the benefits to hold the costs of the programs to a nominal amount thus making the annual fees pure profit for Defendants.

40.   Unless the class members notice the charge to their debit and/or credit card and call to complain, the class members will continue to be charged $60-$170 each and every year.  As with the initial charges to the class members' credit and/or debit cards, no invoice or bill is ever sent to the class members to inform them that their credit and/or debit cards have been, or will be, charged by defendant MWI.  What is even more insidious is that the purported "annual" membership is charged every 11 months and, similarly, no invoice or bill is ever sent to the class members for renewal charges.

41.   The fraud is perpetuated because the customers' prior expressed acceptance or consent to enroll in the membership is not obtained.  Defendants do not clearly and unambiguously communicate the terms of the purported membership programs.  The membership that is mailed is neither risk-free, nor a free 30-day trial as was represented by Defendants.  Defendants charge the

- 16 -

class members for a membership they did not order. The consumers charged for the membership who never use the so-called benefits are paying $60-$170 per year for nothing.

42.     Defendants know that consumers do not understand that they will be charged a membership fee unless they call to cancel. Defendants mail the membership kit fully understanding that the consumers will not understand they are being charged for the materials. Further, Defendants have designed the generic membership materials so as to appear to be "junk mail" so the materials will be discarded and thus never read. Defendants purposely design their scripts to maximize consumer confusion and allow Defendants to "enroll" the maximum number of unsuspecting persons. Defendants then mail the membership kit to the deceived and/or confused consumers who Defendants "enroll" in the MWI memberships. Defendants are able to maximize their profits at the expense of the consumers deceived by Defendants' scheme.

43.     The *only* notice that a class member receives that he or she has been charged for a membership is his or her credit or debit card statement reflecting a charge – which may or may not identify MWI as the entity who levied the charge – which the class member may not notice depending on how closely the class member reads his or her credit and/or debit card statement. If the class member notices and challenges the charge, the charge may be reversed or a pro rata refund may be sent. In this way, Defendants conceal their deception from the other class members and from the public. Those class members who do not notice the charge are billed every 11 months until they notice that they have been charged and complain.

44.     These acts take place as a result of the concerted action, agreement and direction by Defendants.

**The Lack of Audiotaped Confirmations**

45.    Until required as part of the Nebraska Attorney General "Better Practices" requirements, Defendants failed to confirm consumers' acceptance of the upsell offer by MWI for many, if not most, of the "enrolled" consumers.

46.    Accordingly, no audiotaping of the upsells occurred for most of the class members deceived by Defendants.

**The Deceptive "Upsell" Script**

47.    Defendants worked together to produce a script to be read to each consumer. MWI creates the deceptive scripts to be read when marketing the MWI programs and the Telemarketing Entities comment on and approve the deceptive scripts.

48.    Defendants purposely avoid clearly and unambiguously notifying consumers that their credit and/or debit cards will be charged between $60-$170 for the "membership" mailed to them. No focus groups or other consumer research is undertaken by Defendants. Even after Defendants received numerous consumer complaints, ranging from a lack of any recollection of ever even hearing of MWI or any of its purported memberships to accusations of fraud and theft, Defendants avoided ascertaining whether their scripts clearly and unambiguously (i) requested consent from the consumer to charge for the membership, (ii) notified the consumers of the terms of the purported membership or (iii) informed the consumers that their credit and/or debit cards would be charged.

49.    Defendants are well aware of the fact that consumers are deceived by their scripts as seven state attorneys general alleged that MWI was deceiving consumers. MWI settled the matters with five of the attorneys general, and agreed to pay civil penalties in excess of $2 million to one of those attorneys general. Defendants know that consumers are misled into believing that they are not making a purchase decision regarding the MWI memberships. Defendants' script is intended

- 18 -

to, and does, convey to consumers that the membership mailed to them is a free trial membership, which if they like the membership they can call to order.

50.     The scripts are written and designed to be read in a manner intended to confuse, mislead and deceive consumers.

51.     Defendants' conduct is deceptive, unlawful and fraudulent and it cannot be justified in any manner.  Indeed, seven different attorneys general have determined that the MWI scripts are deceptive and do not clearly and unambiguously communicate to consumers that they will be charged for an annual self-renewing membership unless they affirmatively act to cancel the membership.  Nor do the scripts inform the class members that they will be required to return the purported membership card should they desire to cancel.

**The Membership**

52.     After receiving the class members' confidential financial information by piggybacking onto the advertised product, defendant MWI mails out membership materials and customer service information to the persons enrolled.  Then, MWI simply bills the consumers $60-$170 each year on the consumer's credit or debit card.

53.     Defendants have designed the generic purported membership materials so as to appear to be "junk mail" in the hopes that the materials will be discarded and thus never read.  If the packet mailed by MWI for the risk-free trial membership is thrown out by the recipient, then the consumer will not have the number to access the so-called benefits.  The kits are mailed out bulk rate indicating the lack of value of the material.  The kits contain a cheap paper membership card typical of cards received in mail solicitations.  This card is, however, the actual membership card for the enrolled member.  By making the kit typical junk mail, Defendants further conceal the fact that the class members have been charged an annual, self-renewing membership fee.

- 19 -

54.     Other than the one line on their credit and/or debit card statements, the class members are not notified that they have been "enrolled" in an MWI membership program or that their credit and/or debit cards have been charged.  Defendants do not send new "members" any invoice or record of the charge.  Moreover, after the membership kits are mailed and consumers are charged, and throughout the duration of the "membership," class members never hear from any of the Defendants about any membership benefits.  After the initial mailing of the membership kit, consumers do not receive any newsletters, coupons, surveys or any other notifications.  The only thing they receive is a charge of $60-$170 on their credit and/or debit cards.

55.     The term "membership" used by Defendants is merely an excuse to take money from consumers who submit their credit and/or debit card information for their purchase of other products.  Defendants take consumers' money by mailing them an unordered membership and then charging them for it.

## Lack of Usage of the Membership Benefits

56.     The manner in which a consumer can access the purported membership is further evidence of Defendants' scheme to defraud.  Other than the purported membership kit, Defendants do not send "members" anything.  No newsletter or other correspondence is sent to the class members.  No confirmation letters or satisfaction surveys are sent.  The class members receive nothing after they are charged, or before the next time they are "renewed."

57.     For consumers to obtain the purported membership benefits, they must contact defendant MWI either by telephone or via the Internet, and obtain certificates through MWI.  If the

retail establishment works with MWI, then the consumer can order a certificate that can be used at that retail establishment. Unless the consumer knows to call MWI, they receive nothing.[8]

58.    In the *West* Action, MWI produced a database containing the transactions of 567,430 California consumers, many of whom are members of the class. Some of these consumers were enrolled under West's Joint Venture and Wholesale arrangements with MWI, which were settled in the *West* Action and for which no recovery is sought in this action. The database establishes that 552,605 (or 97.5%) of the consumers included in this database never used any membership benefits. The database establishes that out of 567,430 consumers included in the data, *only one person* purchased any of the following membership benefits:

| | |
|---|---|
| $25 Exxon Gas Card | $25 WalMart Gift Card |
| $25 Gas Card Choice A | $25 Babies R Us Gift Card |
| $25 Warner Bros. Certificate | $25 SunCoast Gift Card |
| $25 Hollywood Video Gift Cards | Hickory Farms Offer |
| Lady Footlocker Merchandise Certificate | Sharper Image Coupon |

59.    The database establishes that out of 567,430 consumers *only two people* bought one or more of the following:

| | |
|---|---|
| ARCO Gas Cards | $25 Structure Certificates |
| $10 Olive Garden Gift Cards | $25 Bloomingdales Certificates |
| Zales Certificates | |

60.    The database establishes that out of 567,430 consumers *only three people* bought one or more:

| | |
|---|---|
| $10 Toys R Us Certificates | $25 Borders Gift Cards |
| $25 Barnes and Nobel Gift Certificates | |

---

[8]    Some coupons of nominal value are included in some membership kits. However, Defendants pitch their reward program as the biggest member benefit and the reward program requires the "member" to contact MWI to use it.

61.   The database establishes that out of the 567,430 consumers, *four* people bought one or more $25 Toys R Us Gift Cards or a $10 Applebees Certificates; *five* bought a GNC Coupon; *eight* bought a $10 Blockbuster Gift Card or a $25 Linens-N-Things Gift Card; *ten* bought a $25 Sam Goody Gift Card, a $25 K-Mart certificate or a $10 Red Lobster/Olive Garden Certificate; *11* bought a $10 Outback Steak House Certificate or a $25 Lowes Gift Card; *12* bought a $25 KB Toys Gift Card; *16* bought a Pier 1 Gift Card; *17* bought a $25 Footlocker Certificate; *26* bought a $25 Home Depot Gift Certificate; *28* bought a $25 Sears Certificate; *35* bought a Nordstrom Gift Certificate; *36* bought a $25 TJ MAXX Certificate; and just *152* people bought a $25 Target gift card. Equally significant, the most purchased benefits were purchased by less than one percent of the 567,430 consumers – just 0.4% (2,250 people) received one or more $40 Hair Cut Rebates and just 0.7% (4,063 people) received 4/$5 Dining Rebates.

62.   As part of its investigation, the Iowa Attorney General sent questionnaires to 400 Iowa residents enrolled in MWI membership programs. The Iowa Attorney General reported that, most of the consumers who responded indicated that they had never used their membership and none of those responding said they were satisfied members.

63.   The lack of use of the membership benefits demonstrates that Defendants knew, or should have known that the people they charged $60-$170 were utterly unaware that they had been charged for and enrolled in the MWI memberships. Consumers were treating the membership kit as the law allows; they were ignoring it and assuming they had no obligation to the sender of the unordered merchandise. Defendants charged them and took their money in violation of law.

**Consumer Complaints**

64.   Immediately after the first customers were charged for an MWI membership, Defendants began receiving an enormous number of customer complaints. These complaints ranged from the consumers having no recollection of ever being told about an MWI program to

irate consumers alleging theft and fraud by Defendants.   A simple Internet search for "MemberWorks," pulls up thousands of consumer complaints, including at websites such as www.ripoffreport.com, www.consumeraffairs.com and www.uspeakout.com. Despite receiving such complaints and despite knowing of the existence of a number of Internet sites dedicated to complaining about MWI and its unlawful practices, Defendants took no steps to make sure that their marketing practices were not deceptive.

65.    In addition to complaints directly by consumers, MWI received numerous inquiries by the Better Business Bureau (the "BBB") regarding its practices as they related to customers. Defendant MWI received an unsatisfactory rating by the BBB due to a pattern of complaints concerning unauthorized charges to consumers' credit cards. The BBB's website reported on June 30, 2006 that it had processed a total of 2,277 complaints about MWI in the previous 36 months, including 765 in the previous year. The conduct giving rise to these complaints continues. Almost one year later, on June 2, 2007, the BBB's website reported that it had processed a total of 2,180 complaints about MWI in the previous 36 months, including 667 in the previous year.

66.    Defendants received so many complaints from consumers that they scripted responses to "frequently asked questions" or "FAQs" for their customer service representatives.   The following "frequently asked questions" were received by Defendants who prepared scripted responses to them:

(a)    "I received my credit card bill and saw this Essentials or Home & Garden Rewards program listed here for $84 – what is this";

(b)    "I don't remember hearing about Essentials or Home & Garden Rewards";

(c)    "I said 'no' to this program";

(d)    "I didn't authorize this program"; and

(e)    "Who authorized this billing/purchase?"

- 23 -

67.     The conduct of each of the Defendants contributed to the scheme designed to deceive and defraud class members, resulting in the unlawful assessment of an unsolicited annual recurring membership fee.

**Governmental Actions**

68.     Every governmental and judicial entity to review Defendants' telemarketing practices has concluded they are deceptive and misleading.

69.     Seven attorneys general (from Minnesota, New York, Nebraska, California, Florida, Ohio and Iowa) have separately concluded that the telemarketing scheme Defendants employed was deceptive. In the words of the Minnesota Attorney General:

> "They just say at the end of the script so we're going to send you the package in the mail ok and they never say Is it OK to charge your credit card? . . . [The Telemarketers] tell you that the deal is about you getting something for nothing . . . . You're going to get a free gift, you're going to get a risk-free membership and that's not what the real deal is. The real deal is you're going to get charged unless you act to cancel that."[9]

70.     According to the New York Attorney General:

> Consumers may be confused and mistakenly believe that (1) their credit card or bank card accounts will not be debited unless they directly provide their billing information to MW; (2) they do not have to take any affirmative action to avoid being charged a membership fee; (3) they do not have to take any affirmative action to avoid being charged a renewal fee upon expiration of the initial membership term; and (4) they are not making a purchasing decision at the time of the telemarketing call.

71.     The New York Attorney General also charged that:

> Because the trial offer is termed "risk free," Consumers may be confused or fail to understand that they will be charged a membership fee unless they cancel their membership before the end of the trial offer. By reason of the foregoing, the Attorney General believes that MW has engaged in business conduct that has the tendency and capacity to be deceptive and misleading in violation of New York's consumer protection laws.

---

[9]     Why Some U.S. Flag Buyers Are Seeing Red, ABC News.com, Nov. 28, 2001.

- 24 -

72.     As a result of the Minnesota and New York Attorneys General investigations, MWI was forced to stop reading its scripts to Minnesota and New York consumers until the scripts were revised to: (i) inform consumers that they would be billed after 30 days if they did not call to cancel; and (ii) ask the consumers' permission to charge their credit and/or debit cards.  While in 2001 MWI ultimately revised the scripts in Minnesota and New York, it did not include similar disclosures on any of its scripts read in any other state.

73.     Following on the Minnesota and New York investigations the Nebraska Attorney General implemented an investigation into the deceptive telemarketing practices.  As a result, MWI was required to modify its scripting nationwide to inform consumers that they would be billed after 30 days if they did not call to cancel; ask their permission to charge their credit and/or debit cards. The new scripting requirements were referred to as "Best Practices" requirements or "Best Practices" scripting.  Prior to the June 1, 2001 deadline for implementing the Best Practices scripting, MWI tested the disclosures on several "bait" products.  The results were dramatic as affirmative responses to the telemarketing script dropped to nearly zero.  In response to the test results, MWI secured an extension of the implementation date, and returned to using the old deceptive scripting to maximize their "sales."

74.     In 2001, MWI also entered a settlement with the California Attorney General relating to the sale of MWI memberships to consumers who called to purchase unrelated products from Sears.  Under the settlement, MWI agreed to pay an unprecedented $2 million fine.  MWI also agreed to use the Best Practices scripts in California, and to send renewal notices to California residents that they would be charged unless they called to cancel.

75.     On information and belief, in order to circumvent the scripting requirements required by the Nebraska, Minnesota, New York, Florida and California Attorneys General, MWI hatched a scheme to allow it to continue its deceptive telemarketing practices. Without discussing the matter

- 25 -

with any of the Attorneys General, MWI and certain of the Telemarketers took the position that the Best Practices requirements did not apply to enrollments originated by the Telemarketers. This meant that while Best Practices scripting would have to be used where MWI simply paid a fee to the Telemarketers to read the scripts and where consumers were enrolled under the joint venture arrangements with the Telemarketers, the old deceptive scripting would continue to be read by Telemarketers having wholesale arrangements with MWI. Certain of these Telemarketers would then turn around and "sell" the enrolled consumers back to MWI who would bill the credit and/or debit cards of consumers for the bogus memberships.

76.     On October 21, 2003, the Florida Attorney General filed a complaint concerning Defendants' deceptive telemarketing practices. Noting that MWI reported annual revenue of $400 million, the Florida Attorney General's Office indicated its investigation estimated that 50% of all sales were reported as "unauthorized." In 2004, MWI also entered into a settlement agreement with the Florida Attorney General relating to the sale of its products in conjunction with unrelated infomercial products. MWI agreed to pay a $950,000 fine. The agreement also required MWI to clearly disclose all terms and conditions of its programs, and to obtain consumers' express consent to charge their credit cards for MWI programs.

77.     The Iowa Attorney General filed suit on May 11, 2006.

78.     As part of its investigation, the Iowa Attorney General sent questionnaires to 400 Iowa residents enrolled in MWI membership programs. Among the questionnaire respondents, 67% indicated that they did not know they were members and/or that they did not authorize MWI to charge them. The Iowa Attorney General reports that: "Most of the rest of the consumers who responded indicated that they had never used their membership, or thought that they had already cancelled. None of those responding said that they were satisfied members."

- 26 -

79.    In 2002, the Federal Trade Commission (the "FTC") published its Notice of Proposed Rulemaking (the "Notice") pertaining to telemarketing sales rules stating "in many preacquired account telemarketing solicitations, products and services (often buyers' clubs) are marketed through the use of free trial offers, which are presented to consumers as 'low involvement marketing decisions.'" *See* 67 Fed. Reg. 4492, 4501 (Jan. 30, 2002). The Notice went on to state, "[c]onsumers are asked merely to consent to the mailing of materials about the offer. Consumers frequently do not realize that the seller or telemarketer already has their billing information in hand and, instead, mistakenly believe they must take some action before they will be charged – *i.e.*, that they are under no obligation unless they take some additional affirmative step to consent to the purchase." *Id.*

80.    In 2003, the FTC enacted rules to combat "abusive telemarketing . . . practices" by telemarketers using a "free-to-pay conversion feature" when the telemarketers have "pre-acquired account information." *See* 16 C.F.R. §310.4. Significantly, in adopting these rules, the FTC included defendants "Memberworks Incorporated" among a list of "bad actors" charged with engaging in this type of abusive telemarketing practices. 68 Fed. Reg. 4580, 4621 n.472 (Jan. 29, 2003). The rule sets forth three objective requirements which, at a minimum, must be satisfied to meet the FTC's informed consent requirement. MWI would have had to "obtain *from the customer*, at a minimum, the last four (4) digits of the account number to be charged." 16 C.F.R. §310.4(a)(6)(i)(A). It would have had to "obtain *from the customer* his or her express agreement *to be charged* for the goods or services *and to be charged using the account number* [identified by the customer]." 16 C.F.R. §310.4(a)(6)(i)(B). And MWI would have had to "make and maintain an audio recording of the entire telemarketing transaction." 68 Fed. Reg. 4580, 4621 n.471 (Jan. 29, 2003). In order to circumvent these requirements, MWI began charging $1 for the 30-day trial so that at the end of 30 days, there would not be a "pay to pay" conversion.

- 27 -

81.    In connection with the rule-making proceedings, MWI submitted a purported consumer survey on the understandability of the telemarketing scripts. The FTC concluded that MWI's survey was biased in its favor and that even in the face of this bias the study demonstrated that "at least 46 percent of the respondents did not even 'mostly' understand the way in which they would be billed after listening carefully to a sales offer involving preacquired account information and a 'free-to-pay conversion' feature." 68 Fed. Reg. 4580, 4621 n.468 (Jan. 29, 2003).

82.    In the *Sanford* Federal Class Action, after weighing the evidence and expert testimony submitted, the federal arbitrator concluded:

> When I look at the overall picture here from an objective reasonable person viewpoint I consider: the experience that MWI has had in thousands of these cases, the circumstances of this type of call (an unsolicited, unexpected offer read by MWI with high sounding words such as "RISK-FREE" membership – "YOU WON'T BE BILLED" – "So, look for this kit in the mail, OKAY?"), *I conclude that even if the script was read to [the consumer], [they were] misled, [they] didn't agree to this "deal," there was no meeting of the minds,* and MWI not only could suspect, but knew that many of the callers did not understand that they were making a "deal" to purchase a membership and assuming a burden to act.

Arbitration Award at 6-7.

83.    In reaching this conclusion, the arbitrator stated: "I conclude that the script has fuzzy language, would have been read in less than 30 seconds (my estimate) as a fast sell over the phone for a product that had nothing to do with the purpose of [the consumer's] call. The script, if it was read to [the consumer], was *foisted upon [them] in a quick, slick and misleading sales pitch that few people would understand.*" *Id.* at 7. Ultimately, he found: "*This script is a recipe for misunderstanding and confusion when heard by a consumer hearing it under the circumstances.*" *Id.* at 8.

84.    In the *Ritt* action, the Ohio Court of Appeals found the upsell scripts were deceptive and misleading:

> The fact is, with or without authorization, consumers who stayed on the telephone line long enough to receive the entire scripted pitch would not have known the

- 28 -

ramifications of what they were agreeing to once the upsell had been pitched to them and they said "yes" to receiving a membership kit.[10]

## TOLLING OF THE STATUTE OF LIMITATIONS

85.     The running of any applicable statutes of limitation has been tolled for several reasons.

### Tolling by Virtue of MWI's Fraudulent Concealment

86.     Through various techniques and devices of secrecy, deception and misrepresentation, Defendants affirmatively and intentionally concealed the existence of their unlawful and unfair telemarketing practices from Plaintiffs, class members and the public. The fraudulent concealment, deception and misrepresentation existed before Plaintiffs were enrolled and charged and continued throughout the class period. Defendants carried out their violations of law in secret and consistently deceived, misrepresented and concealed the truth regarding the unauthorized enrollment into the various membership programs and the unauthorized charging of Plaintiffs' and class members' credit and/or debit cards. Such acts included purposely designing their scripts to maximize consumers' confusion, thus allowing Defendants to enroll the maximum number of unsuspecting consumers.

87.     Defendants' scheme is based upon their knowledge that a large segment of the consumer population does not check their credit card statements and/or would miss the charge even if they did review their credit card statement.

88.     So as to assuage any suspicion that a consumer may have, Defendants emphasize that the trial membership they are sending is "FREE" and that the class members "WON'T BE BILLED."

---

[10]     *Ritt v. Billy Blanks Enters.*, No. 80983, 2003 Ohio App. LEXIS 3297, at *7, *20-*21 (Ohio Ct. App. July 10, 2003).

89.   To conceal the fact of billing consumers' credit and/or debit cards, Defendants intentionally did not send Plaintiffs or class members any invoice or any other notification that they were going to charge their cards.  Similarly, to conceal the true facts concerning the billing of the consumers' credit and/or debit cards, after they billed the consumers' credit and/or debit cards, Defendants did not send any invoice, or notification of the fact that they had in fact billed the class members' cards.

90.   .Another method that Defendants used to conceal their wrongful practices from Plaintiffs and the class was to reverse the charges for any consumer that is able to track down the source of the illicit charge and calls to complain.  After reading scripts in an attempt to keep the consumer enrolled, Defendants and/or their agents will reverse the charges for complaining consumers so that the complaints do not get escalated to the point that their practices become common knowledge and reach the ears of the consumers they illicitly enrolled in, and charged for, the bogus programs.  Further evidence of this concealment is demonstrated by the existence of a Frequently Asked Questions script providing their telephone operators and/or operators of their agents, with scripted answers to consumer questions/statements such as "I did not authorize this charge," "how did you get my credit card number" and "what is this program," among others.

91.   To further conceal their wrongful conduct from those consumers who do review their credit card statements, Defendants intentionally charged $60-$170 – amounts that were unlikely to rouse suspicion from the consumer and provoke any further inquiry.  Indeed, had Defendants billed the consumers' credit and/or debit cards for several hundred dollars, consumers would be more likely to notice the illicit charges and seek to have them reversed.  Similarly, the identification of the charges was designed to conceal the illicit nature of the subject charges, as the charges were identified by such words as "Essentials," "Value Max," "Travel" and "Home and Garden," among others.  A consumer who reviewed his or her statement seeing a charge for $75 to "Essentials," for

- 30 -

example, would likely perceive such name to be a clothing store, curio store, drug store or other retail establishment from which his or her spouse would have made a purchase, and thus not pursue any further inquiry to determine if the charge was legitimate or fraudulent.

92.    Through such acts of fraudulent concealment, even assuming that a class member noticed the charge on their credit or debit card statement, the existence of a charge for Essential, Value Max, Travel, Home & Garden or others would not provide any indication to the class member that their card was fraudulently charged.

93.    Defendants' scheme worked perfectly on Plaintiffs and the class members. Succumbing to Defendants' practices of fraudulent concealment described above, Plaintiffs did not notice the fraudulent charges when they were originally enrolled, and charged, by Defendants. Accordingly, until recently plaintiffs Rosenzweig and French had absolutely no knowledge they had previously been billed approximately $560.00 in membership fees. In addition, while Faulk recalled contacting Defendants regarding the renewal charge, on information and belief it was Defendants' policy, regarding renewal charges, not to inform consumers this was a "renewal" charge and that they had previously billed one or more times earlier and until recently, Faulk had no knowledge she had previously been billed approximately $500.00 in membership fees.

94.    By virtue of their pervasive deception and misrepresentation and concealment of facts, Defendants successfully concealed from Plaintiffs and class members the truth about the memberships thereby tolling the running of any applicable statutes of limitation. Plaintiffs and class members were unaware of, and through the exercise of due diligence could not have discovered, the existence of such violations until after they had been charged for the membership.

95.    In the alternative, based on the facts alleged herein, Defendants are estopped from relying on any statutes of limitation because of their fraudulent concealment, deception and misrepresentation of facts regarding the enrollment into the membership programs and

unauthorized charges. They were under a duty to disclose this information because it is non-public information over which Defendants had exclusive control, because Defendants knew this information was not available to Plaintiffs and class members and because this information was crucial to the consuming public in making purchasing decisions.

**Tolling by Reason of Prior Class Action Pending**

96.     This is a related case to the *Sanford* Federal Class Action. The *Sanford* Federal Class Action was filed on March 28, 2002.  In addition to federal claims, the *Sanford* Federal Class Action originally included state law claims.  The state law claims were finally dismissed from the federal action on December 23, 2008.  Under established case law, the filing of the *Sanford* Federal Class Action against MWI tolls all statutes of limitation until a final judgment of dismissal, which is no longer subject to additional appeals, has been entered.

97.     The court in the *Sanford* Federal Class Action issued an order on September 29, 2008, granting defendants' motion to dismiss the federal claims, and refusing to exercise supplemental jurisdiction over plaintiff Sanford's and the class members' state law claims.  Furthermore, relying on *Wright v. Schock*, 742 F.2d 541, 545 (9th Cir. 1984) (citing *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 352-53 (1983)), the federal court held the pendency of the federal action "tolled the statute of limitations for individual claims, mitigating prejudice to members of the putative class."

98.     On October 14, 2008, plaintiffs filed an *ex parte* application for reconsideration, asking the federal court for leave to amend the complaint, which application was granted on November 3, 2008, directing plaintiffs to file a motion for leave.  On November 17, 2008, plaintiffs filed the motion for leave to amend.  On December 16, 2008, defendants filed an *ex parte* motion to dismiss or, in the alternative, to strike, among other things, the state law claims from the proposed amended federal complaint, arguing that "the Court previously dismissed numerous state law claims without prejudice, and thus the state law claims can be pursued in the appropriate state

- 32 -

court(s)." MemberWorks Inc.'s Memorandum of Points and Authorities in Support of *Ex Parte* Application for Dismissal or, in the Alternative, to Strike Claims and Additional Parties at 8. On December 23, 2008, the federal court struck the state law claims from the proposed amended complaint, holding: "Furthermore, dismissing the action would not preclude Plaintiffs from pursuing relief in other venues. The Court has not precluded the Plaintiffs from pursuing its state law claims in state court."  Order Striking Counts I, IX, X, and XI from the Proposed TAC Attached to Plaintiffs' Motion for Leave to Amend at 4.

99.    As the above facts establish, Defendants have at all times known the core facts concerning the claims for which Plaintiffs and the class members seek to hold them accountable. Defendants have also known that at no time have Plaintiffs ever intended to drop the claims asserted against them. Accordingly, there is no prejudice to Defendants in permitting Plaintiffs and the class members to proceed with this action and prosecute their rights against Defendants.

## CLASS ACTION ALLEGATIONS

100.   Plaintiffs bring this class action pursuant to Rule 1.220 of the Florida Rules of Civil Procedure on behalf of themselves and all other persons similarly situated.  The class which Plaintiffs represent is composed of all persons in the State of Florida who, after calling a telephone number to inquire about or purchase another product: (i) were sent a membership kit in the mail; and (ii) were charged for an annual MWI membership program (the "Class"). Excluded from the Class are all persons enrolled in an MWI program under the March 16, 1998 "Joint Marketing Agreement between West Telemarketing Corporation and MemberWorks Incorporated," and/or the January 1, 1999 "Agreement" between West Telemarketing Corporation and MemberWorks Incorporated, and/or the July 1, 1999 "Joint and Wholesale Marketing Agreement" between West Telemarketing Corporation, West Teleservices Corporation and MemberWorks Incorporated and/or the December 1, 2001 "Wholesale and Retail Marketing Agreement" between MemberWorks

Incorporated and West Direct, Inc., and any amendments or addendums to these agreements.[11] Not included within the Class are Defendants and their officers, directors, employees, agents and/or affiliates.

101.   The Class is composed of hundreds of thousands of persons geographically dispersed throughout the state, the joinder of whom in one action is impracticable, and the disposition of their claims in a class action will provide substantial benefits to both the parties and the Court.

102.   The Class is ascertainable and maintains a sufficient community of interest since the rights of each member of the Class were violated in a similar fashion based upon Defendants' use of a uniform script that was read to the class members.

103.   The victimized consumers can be identified in the databases maintained by MWI. More specifically, MWI maintains databases that contain the following information: (i) the name of each class member "enrolled" in an MWI program via an inbound call; (ii) the address of each such class member; (iii) the date each class member was enrolled; (iv) the date and amount each class member was charged; and (v) the date and amount each class member was refunded.  Thus the class members can be located and notified with specificity of the pendency of this action using techniques and a form of notice customarily used in class action litigation.

104.   Plaintiffs' claims are typical of the members of the Class as a whole because of the similarity, uniformity and common purpose of the unlawful conduct of Defendants.  Each class member was read the subject "upsell" script. Each class member was mailed a membership kit for an MWI membership program.  Each class member has sustained damage as a result of

---

[11]     The identities of the consumers encompassed by this exclusion are identified on Exhibit A to the Declaration of Markham Sherwood Re Mailing of Notice and Claim Form, Report on Opt-Outs and Objections Received, filed in the *West* Action in support of plaintiffs' final approval of settlement.

- 34 -

Defendants' wrongful conduct in violation of state statutes, state common law, as well as general principles of equity and fair play.

105.   Plaintiffs will fairly and adequately protect the members of the Class as Plaintiffs have retained competent counsel who are experienced in federal and state class action claims such as those asserted in this case.

106.   A class action is superior to all other methods for the just, fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, the damages suffered by individual class members are not sufficient to justify the enormous cost associated with the prosecution of this type of litigation. The expense and burden posed by such individual litigation makes it impossible for the class members to individually redress the wrong done to them, nor would such an individual case be adequate to ensure that such practices cease to harm others. Further, there will be no difficulty in the management of this action as a class action.

107.   Common questions of law and fact exist as to all members of the Class and these common issues predominate over any questions which go particularly to any individual member of the Class. Among such common questions of law and fact are the following:

(a)   did Defendants mail memberships to the class members without obtaining prior express consent or acceptance;

(b)   were the subject "upsell" scripts deceptive;

(c)   did Defendants clearly and unambiguously communicate that the class members would be charged unless they called Defendants to cancel the "risk-free" trial membership;

(d)   were the membership materials deceptive;

(e)   did Defendants act willfully or recklessly;

(f)   did Defendants' acts, as alleged herein, violate federal statutes, Florida statutes and/or general principles of equity and fair play;

(g)     whether Defendants engaged in a pattern and practice of deceiving and defrauding the Class and concealing their unlawful conduct;

(h)     whether Defendants violated state consumer protection statutes;

(i)     what amount of damages the Class sustained as a result of Defendants' wrongful conduct, and the proper measure of such damages;

(j)     what restitution is due class members; and

(k)     whether Plaintiffs and members of the Class are entitled to an award of reasonable attorneys' fees, prejudgment interest, post-judgment interest, costs of suit and other appropriate relief under the circumstances of this case.

### FIRST CAUSE OF ACTION
### For Violation of the Florida Deceptive and Unfair Trade Practices Act
### (On Behalf of Plaintiffs and the Members of the Class)

108.   Plaintiffs hereby reallege and incorporate by reference the allegations contained in ¶¶1-107 above.

109.   This claim arises under the Act, Fla. Stat. §501.201 *et seq.*

110.   The Act is a broad act intended to protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive or unfair acts or practices in the course of any trade or commerce. Fla. Stat. §501.202(2).

111.   The Florida legislature expressly stated its intent to give "great weight" to the Federal Trade Commission Act ("FTCA") and rulings interpreting it. Fla. Stat. §501.203(3).

112.   Failure to disclose material information may cause deception within the meaning of the FTCA. *See* 15 U.S.C. §55(a)(1); FTC Policy Statement on Deception at 2 (Oct. 14, 1983). Such deception has occurred here as Defendants have failed to disclose important material information concerning the enrollment and billing of their membership programs.

113.  Plaintiffs and class members are "consumer[s]" and/or "interested part[ies] or persons" within the meaning of Fla. Stat. §501.203(6)-(7).

114.  Fla. Stat. §501.204(1) provides that "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

115.  At all times relevant, Defendants engaged in deceptive acts, omissions, conduct or misrepresentations, provided goods and/or services and thereby was engaged in trade or commerce within the State of Florida and/or had an impact within the State of Florida within the meaning of Fla. Stat. §501.203(8). MWI was a seller of product to Plaintiffs and class members and Plaintiffs and class members suffered substantial loss because of one or more of the Defendants' deceptive acts or omissions.

116.  The acts, omissions, misrepresentations, policies, practices and non-disclosures of Defendants as alleged herein were willful, intentional, malicious, immoral, unethical, unscrupulous or oppressive and constituted violations under the Act. *See* Fla. Stat. §§501.203(3) and 501.2075 *et seq.*

117.  The policies, acts and practices of Defendants as described above were intended to deceive, deceived and continue to deceive Plaintiffs, members of the Class and the general public as described herein and have resulted (and will result) in annual fees being imposed on members of the Class and offend Florida's public policy.

118.  The acts, omissions, misrepresentations, policies, practices and non-disclosures as alleged herein were intended to, and did, result in the sale of the products at issue to Plaintiffs and the Class and violated and continued to violate Fla. Stat. §501.201 *et seq.*

119.  Defendants, in connection with the advertising, tender and/or delivery of the products at issue, employed unconscionable tactics and inserted unconscionable provisions into the sales of

- 37 -

the products at issue herein by unilaterally attempting to impose an automatic, unauthorized fee for enrollment in a fictitious and/or useless and unwanted membership which is offensive to Florida's public policy and constitute unfair and deceptive methods of competition in violation of one or more of the following:

      (a)     the standards of fairness and deception set forth and interpreted by the FTC or by federal and state courts, as set forth in Fla. Stat. §§501.203(3)(b) and 501.204(1);

      (b)     Defendants advertised the products at issue with the intent not to sell them as advertised or represented;

      (c)     Defendants have made false or misleading representations concerning the nature of the transaction or obligation incurred concerning the products at issue;

      (d)     Defendants have made false or misleading representations concerning the offering price of, or the person's cost for the products at issue;

      (e)     Defendants have used Plaintiffs' and class members' credit and/or debit cards with the intent to injure and/or defraud Plaintiffs and class members by the unauthorized use of Plaintiffs' and class members' credit and/or debit cards in regards to the products at issue;

      (f)     Defendants' unfair or deceptive acts or trade practices, of knowingly and willfully enrolling, charging and collecting an invalid and illegal membership fee from Plaintiffs and all putative class members, are immoral, unethical, oppressive, despicable, reprehensible, unscrupulous and have and continue to cause substantial financial injury;

      (g)     Defendants' use of bait products to promote the sale of the products at issue through false and deceptive representations;

      (h)     Defendants knowingly concealed, suppressed and omitted in their scripts, advertisements and membership kits, material facts about the deceptive products at issue with intent that Plaintiffs and the Class would rely upon the concealments, suppressions or omissions; and

- 38 -

(i)    MWI profited at the expense of Plaintiffs and the Class by systematically enrolling them in a MWI program and charging their credit and/or debit cards without their authorization.

120.    By reason of the foregoing, Plaintiffs, members of the Class and the general public have been (and will continue to be) irreparably harmed.

121.    Defendants' conduct also violates the Act in that Defendants either were or reasonably should have been aware that imposition of such representations and fees is unfair, unlawful and/or fraudulent under the circumstances.

122.    Injuries suffered by Plaintiffs and the Class were not outweighed by any countervailing benefits to Plaintiffs and class members.

123.    At all times material to this Complaint, Defendants were acting for financial gain within the meaning of the Act.

124.    Through the unauthorized enrollment into the products at issue, Plaintiffs and the Class were subjected to unauthorized charges to their credit and/or debit cards thereby suffering "ascertainable and quantifiable losses" as a result of Defendants' unlawful, unfair and fraudulent business practices in violation of Fla. Stat. §501.204(1).

125.    The conduct of Defendants, as set forth herein, was unlawful, unfair, immoral, unscrupulous, deceptive and/or fraudulent and constitutes unfair and deceptive acts violation of Fla. Stat. §501.204(1).

126.    Plaintiffs have retained the services of the undersigned attorneys who are entitled to a reasonable fee upon prevailing pursuant to Fla. Stat. §501.2105.

127.    Plaintiffs seek to obtain a pecuniary benefit for the Class in the form of all actual and consequential damages recoverable from Defendants. Plaintiffs also seek to obtain a non-pecuniary benefit for the Class in the form of injunctive relief against Defendants. Plaintiffs' counsel are

entitled to recover their reasonable attorneys' fees and expenses as a result of the conference of a pecuniary and non-pecuniary benefit on behalf of the Class, and will seek an award of such fees at the appropriate time.

128.   Plaintiffs reserve the right to allege other violations of law which constitute unlawful business acts or practices.  Defendants continue to possess funds that belong to class members, to this date.

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for relief and judgment against Defendants as follows:

A.      For an order certifying the Class under the appropriate provisions of Rule 1.220 and appointing Plaintiffs and their legal counsel to represent the Class;

B.      Awarding actual damages as provided by Fla. Stat. §501.211(2);

C.      Awarding injunctive relief as provided by Fla. Stat. §501.211(1);

D.      For pre- and post-judgment interest to the Class, as allowed by law;

E.      For an order of this Court ordering Defendants to immediately cease all acts of unfair competition and enjoin Defendants from continuing to conduct business via the unlawful, unfair or fraudulent business acts or practices as particularized herein;

F.      Plaintiffs also requests an order requiring Defendants to identify all class members and pay restitution to Plaintiffs and all members of the Class so as to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, fraudulent or unfair business act or practice, in violation of applicable laws, statutes or regulations or constituting unfair competition or untrue or misleading advertising;

G.      Plaintiffs also requests an order of the Court requiring Defendants to disgorge to the State of Florida all monies wrongfully collected that could not be returned to class members as alleged herein and all monies and profits derived by Defendants as a result of the wrongful,

deceptive, unfair and/or unlawful acts, conduct and practices alleged above, and requiring disgorgement and/or imposing a trust upon Defendants' ill-gotten monies and freezing Defendants' assets;

      H.     An order requiring Defendants to effect and pay the costs of restoring the rights and benefits owing to Plaintiffs and other members of the Class under the agreements which are the subject of this action and a corrective advertising campaign;

      I.     For reasonable attorneys' fees and costs to counsel for the Class pursuant to Fla. Stat. §501.2105, and if and when pecuniary benefits are obtained on behalf of the Class; and

      J.     Granting such other and further relief as is just and proper.

<div align="center">

**SECOND CAUSE OF ACTION**
**For Misleading Advertising Pursuant to Chapter 817, Florida Statutes**
**(On Behalf of Plaintiffs and the Members of the Class)**

</div>

     129.   Plaintiffs hereby reallege and incorporate by reference the allegations contained in ¶¶1-107 above.

     130.   This claim arises under Fla. Stat. §817 *et seq.*

     131.   Defendants have in the course of marketing and upselling its membership programs violated Fla. Stat. §§817.06 and 817.41.

     132.   Fla. Stat. §817.06(1) states:

> No person, persons, association, copartnership, or institution shall, with intent to offer or sell or in [any way] dispose of merchandise . . . service or anything offered by such person, persons, association, copartnership, corporation, or institution directly or indirectly, to the public, for sale or distribution or issuance, or with intent to increase the consumption or use thereof, or with intent to induce the public in any manner to enter into any obligation relating thereto, or to acquire title thereto, or any interest therein, or ownership thereof, knowingly or intentionally make, publish, disseminate, circulate or place before the public, or cause, directly or indirectly, to be made, published, disseminated or circulated or placed before the public in this state in a . . . publication . . . or in any other way, an advertisement of any sort regarding such . . . merchandise, . . . service or anything so offered to the public, which advertisement contains any assertion, representation or statement which is untrue, deceptive, or misleading.

<div align="center">- 41 -</div>

133.  Fla. Stat. §817.40(5) describes misleading advertising as:

[A]ny statements made, or disseminated, in oral, written, or printed form or otherwise, to or before the public, or any portion thereof, which are known, or through the exercise of reasonable care or investigation could or might have been ascertained, to be untrue or misleading, and which are or were so made or disseminated with the intent or purpose, either directly or indirectly, of selling or disposing of real or personal property, services of any nature whatever, professional or otherwise, or to induce the public to enter into any obligation relating to such property or services.

134.  Fla. Stat. §817.41(1) provides:

It shall be unlawful for any person to make or disseminate or cause to be made or disseminated before the general public of the state, or any portion thereof, any misleading advertisement.  Such making or dissemination of misleading advertising shall constitute and is hereby declared to be fraudulent and unlawful, designed and intended for obtaining money or property under false pretenses.

135.  Defendants have made or disseminated, or caused to be made or disseminated, to the Plaintiffs, class members and the general public, false or misleading representations concerning the nature of the transaction or obligation incurred concerning the products at issue as defined in Fla. Stat. §817.40(5) in violation of Fla. Stat. §§817.41(1) and 817.06.

136.  Defendants have advertised through false and misleading statements informing class members that they will be sent *free* materials in the mail and "WON'T BE BILLED."  Class members are deceived and do not know that they have been enrolled in a "membership" and will be charged $60-$170 annually unless they call MWI to inform them that they want to cancel the FREE 30-day trial membership. The words in ALL CAPITAL LETTERS are the words the telemarketer emphasizes when reading the script.  MWI emphasizes that the trial membership is "FREE," and that class members "WON'T BE BILLED."  At the end of the call, MWI merely tells class members: "So look for that kit in the mail, OKAY?"  At most, the class members are led to believe that a free trial membership will be mailed to the consumer to evaluate, and if the consumer likes the product he or she can call to purchase a membership. The membership that is mailed is neither risk-free, nor a free 30-day trial as was represented by Defendants.

137.   Through the use of deceptive scripts that were read to the class members, Defendants concealed material facts from Plaintiffs and the Class. Defendants tell and have told members of the Class that they are being mailed a risk-free 30-day trial membership. No permission to use the consumers' credit and/or debit cards is sought or obtained. The scripts deceive members of the Class. After mailing the unsolicited membership kit to the class members, Defendants charge the members of the Class for an unsolicited and unwanted membership.

138.   Defendants falsely and fraudulently utilize deceptive scripts that conceal from the class members that they will be automatically charged unless the class members affirmatively call Defendants to cancel the membership. Defendants' scripts contain misrepresentations and are intended to, and do, deceive the class members.

139.   Defendants intentionally designed the scripts and the purported membership material in order to mislead the class members into believing that they would receive a risk-free trial membership that they could try out, and if they liked the membership, the class members could contact Defendants to activate a full membership. The true facts are just the opposite – Defendants charge the class members unless they call to cancel.

140.   Defendants have intentionally designed the generic membership materials so as to appear to be "junk mail" in the hopes that the materials will be discarded and thus never read. If the packet mailed by MWI for the risk-free trial membership is thrown out by the recipient, then the consumer will not have the number to access the benefits. The kits are mailed out bulk rate indicating the lack of value of the material. In this way, Defendants further conceal the fact that the class members will be charged an annual, self-renewing membership fee.

141.   To further their scheme to conceal the true facts, Defendants never send any invoice or bill to Plaintiffs and the class members informing them that their credit and/or debit cards were going to be, or were in fact, charged.

- 43 -

142.   Defendants' renewal of the purported memberships is fraudulently concealed by Defendants in the same manner.  No bill or invoice is sent to the class members informing them that they were going to be, or had in fact been, charged.

143.   Plaintiffs and members of the Class reasonably relied on Defendants and believed that they were making a one-time purchase of non-MWI products.

144.   Defendants have made false or misleading representations concerning the offering price of, or the person's cost for the products at issue.

145.   Defendants' false and misleading statements and suppression of the material facts set forth above and throughout this Complaint defrauded Plaintiffs and the Class, and are in direct violation of federal statutes and Fla. Stat. §§817.41(1) and 817.06, as well as principles of common law, for which Plaintiffs and members of the Class are entitled to recover damages.

146.   Fla. Stat. §501.203(3)(c) states that a violation of the Act may be based on violation of any law which proscribes a deceptive act or practice.  By violating Fla. Stat. §§817.41(1) and 817.06, Defendants have engaged in deceptive and unfair trade practices in violation of Fla. Stat. §501.204.

147.   Defendants knew or should have known that the methods, acts or practices alleged herein were deceptive and unfair.

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for relief and judgment against Defendants as follows:

A.      For an order certifying the Class under the appropriate provisions of Rule 1.220 and appointing Plaintiffs and their legal counsel to represent the Class;

B.      Awarding actual damages as provided by Fla. Stat. §817.41(6);

C.      Awarding injunctive relief as provided by Fla. Stat. § 501.211(1);

D.      For pre- and post-judgment interest to the Class, as allowed by law;

- 44 -

E.      For an order of this Court ordering Defendants to immediately cease all acts of unfair competition and enjoin Defendants from continuing to conduct business via the unlawful, unfair or fraudulent business acts or practices as particularized herein;

F.      Plaintiffs also request an order requiring Defendants to identify all class members and pay restitution to Plaintiffs and all members of the Class so as to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, fraudulent or unfair business act or practice, in violation of applicable laws, statutes or regulations or constituting unfair competition or untrue or misleading advertising;

G.      Plaintiffs also request an order of the Court requiring Defendants to disgorge to the State of Florida all monies wrongfully collected that could not be returned to class members as alleged herein and all monies and profits derived by Defendants as a result of the wrongful, deceptive, unfair and/or unlawful acts, conduct and practices alleged above, and requiring disgorgement and/or imposing a trust upon Defendants' ill-gotten monies and freezing Defendants' assets;

H.      For an order requiring Defendants to effect and pay the costs of restoring the rights and benefits owing to Plaintiffs and other members of the Class under the agreements which are the subject of this action and a corrective advertising campaign;

I.      For reasonable attorneys' fees and costs to counsel for the Class pursuant to Fla. Stat. §817.41(6), and if and when pecuniary benefits are obtained on behalf of the Class; and

J.      Granting such other and further relief as is just and proper.

## THIRD CAUSE OF ACTION
### For Conversion
### (On Behalf of Plaintiffs and the Members of the Class)

148.  Plaintiffs hereby reallege and incorporate by reference the allegations contained in ¶¶1-107 above.

149.   Defendants have converted to their own use, property belonging to Plaintiffs and members of the Class through unlawful acts and conduct. The specific sum of money that was converted by Defendants should be readily identifiable from information and records in Defendants' possession or control.

150.   Defendants knowingly or intentionally charged and collected money for unordered merchandise from credit and/or debit card accounts of consumers, including Plaintiffs and members of the Class. Defendants obtained money from consumers through fraud and/or deception. Defendants thus converted to their own use property, specifically monies, belonging to Plaintiffs and the Class.

151.   The specific sum of money of Plaintiffs and members of the Class that was converted by Defendants are readily identifiable from information and records in Defendants' possession or control.

152.   As a direct and proximate result of Defendants' unlawful acts and conduct, Plaintiffs and the Class were deprived of the use of their money that was unlawfully converted by Defendants, and are thereby entitled to restoration of their monies, interest on these monies from the date said monies were converted by Defendants to the date of judgment and compensatory damages (including overdraft fees paid by consumers due to Defendants' conversion of their money).

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for relief and judgment against Defendants as follows:

A.     For an order certifying the Class under the appropriate provisions of Rule 1.220 and appointing Plaintiffs and their legal counsel to represent the Class;

B.     Awarding reimbursement, restitution and disgorgement from Defendants of the benefits conferred by Plaintiffs and the Class;

C.    For pre- and post-judgment interest to the Class, as allowed by law;

D.    An order of this Court ordering Defendants to immediately cease all acts of unfair competition and enjoin Defendants from continuing to conduct business via the unlawful, unfair or fraudulent business acts or practices as particularized herein;

E.    Plaintiffs also requests an order requiring Defendants to identify all class members and pay restitution to Plaintiffs and all members of the Class so as to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, fraudulent or unfair business act or practice, in violation of applicable laws, statutes or regulations or constituting unfair competition or untrue or misleading advertising;

F.    Plaintiffs also requests an order of the Court requiring Defendants to disgorge to the State of Florida all monies wrongfully collected that could not be returned to class members as alleged herein and all monies and profits derived by Defendants as a result of the wrongful, deceptive, unfair and/or unlawful acts, conduct and practices alleged above, and requiring disgorgement and/or imposing a trust upon Defendants' ill-gotten monies and freezing Defendants' assets;

G.    An order requiring Defendants to effect and pay the costs of restoring the rights and benefits owing to Plaintiffs and other members of the Class under the agreements which are the subject of this action and a corrective advertising campaign;

H.    For reasonable attorneys' fees and costs to counsel for the Class pursuant to Fla. Stat. §501.2105, and if and when pecuniary benefits are obtained on behalf of the Class; and

I.    Granting such other and further relief as is just and proper.

## FOURTH CAUSE OF ACTION
### For Unjust Enrichment
### (On Behalf of Plaintiffs and the Members of the Class)

153.  Plaintiffs hereby reallege and incorporate herein by reference the allegations contained in ¶¶1-107 above.

154.  Defendants have received, and continue to receive, a benefit at the expense of Plaintiffs and members of the Class.

155.  Defendants have fraudulently and/or deceptively charged and collected membership fees and/or renewals from consumers, including Plaintiffs and members of the Class, for unordered merchandise.  Accordingly, Defendants have received benefits which they have unjustly retained at the expense of Plaintiffs and members of the Class.

156.  As a direct and proximate result of Defendants' unlawful acts and conduct, Plaintiffs and members of the Class were deprived of the use of their money that was unlawfully charged and collected by Defendants, and are therefore entitled to restoration of their monies.

157.  Because Defendants' retention of the non-gratuitous benefits conferred by Plaintiffs and the class members is unjust and inequitable, Defendants must pay restitution in the manner established by the Court, in addition to any other equitable remedy the Court may choose to impose.

158.  Accordingly, Plaintiffs and members of the Class seek full restitution of Defendants' enrichment, benefits and ill-gotten gains acquired as a result of the unlawful and/or wrongful conduct alleged herein.

159.  Plaintiffs and the Class have no adequate remedy at law.

160.  Plaintiffs seek to obtain a pecuniary benefit for the Class in the form of all reimbursement, restitution and disgorgement from Defendants.  Plaintiffs' counsel are entitled to recover their reasonable attorneys' fees and expenses as a result of the conference of a pecuniary

- 48 -

benefit on behalf of the Class, and will seek an award of such fees and expenses at the appropriate time.

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for relief and judgment against Defendants as follows:

A.      For an order certifying the Class under the appropriate provisions of Rule 1.220 and appointing Plaintiffs and their legal counsel to represent the Class;

B.      Awarding reimbursement, restitution and disgorgement from Defendants of the benefits conferred by Plaintiffs and the Class;

C.      For pre- and post-judgment interest to the Class, as allowed by law;

D.      An order of this Court ordering Defendants to immediately cease all acts of unfair competition and enjoin Defendants from continuing to conduct business via the unlawful, unfair or fraudulent business acts or practices as particularized herein;

E.      Plaintiffs also requests an order requiring Defendants to identify all class members and pay restitution to Plaintiffs and all members of the Class so as to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, fraudulent or unfair business act or practice, in violation of applicable laws, statutes or regulations or constituting unfair competition or untrue or misleading advertising;

F.      Plaintiffs also requests an order of the Court requiring Defendants to disgorge to the State of Florida all monies wrongfully collected that could not be returned to class members as alleged herein and all monies and profits derived by Defendants as a result of the wrongful, deceptive, unfair and/or unlawful acts, conduct and practices alleged above, and requiring disgorgement and/or imposing a trust upon Defendants' ill-gotten monies and freezing Defendants' assets;

- 49 -

G.      An order requiring Defendants to effect and pay the costs of restoring the rights and benefits owing to Plaintiffs and other members of the Class under the agreements which are the subject of this action and a corrective advertising campaign;

H.      For reasonable attorneys' fees and costs to counsel for the Class pursuant to Fla. Stat. §501.2105, and if and when pecuniary benefits are obtained on behalf of the Class; and

I.      Granting such other and further relief as is just and proper.

### FIFTH CAUSE OF ACTION
### For Fraud and Deceit
### (On Behalf of Plaintiffs and the Members of the Class)

161.    Plaintiffs hereby reallege and incorporate by reference the allegations contained in ¶¶1-107 above.

162.    The acts, conduct and practices of Defendants, as alleged above, were fraudulent and deceptive. The use of deceptive scripts assuring consumers that they were being mailed a free 30-day trial membership is and was likely to mislead, and did in fact mislead, Plaintiffs and members of the Class.

163.    Plaintiffs and members of the Class ordered non-MWI products. Approximately one month later, class members were enrolled in an MWI membership program and were charged an approximate amount of between $60 and $170 to their credit or debit cards. Eleven months after the initial charge, Defendants charge the class members approximately the same amount (usually 15%-25% more) without seeking any approval to do so. These charges, if undetected, will keep occurring in subsequent years.

164.    Through the use of deceptive scripts that were read to the class members, Defendants concealed material facts from Plaintiffs and the Class. Defendants tell and have told members of the Class that they are being mailed a risk-free 30-day trial membership. No permission to use the consumers' credit and/or debit cards is sought or obtained. The scripts deceive members of the

- 50 -

Class. After mailing the unsolicited membership kit to the class members, Defendants charge the members of the Class for an unsolicited and unwanted membership.

165.   Defendants falsely and fraudulently utilize deceptive scripts that conceal from the class members that they will be automatically charged unless the class members affirmatively call Defendants to cancel the membership. Defendants' scripts contain misrepresentations and are intended to, and do, deceive the class members.

166.   Defendants intentionally designed the scripts and the purported membership material in order to mislead the class members into believing that they would receive a risk-free trial membership that they could try out, and if they liked the membership, the class members could contact Defendants to activate a full membership. The true facts are just the opposite – Defendants charge the class members unless they call to cancel.

167.   Defendants have intentionally designed the generic membership materials so as to appear to be "junk mail" in the hopes that the materials will be discarded and thus never read. If the packet mailed by MWI for the risk-free trial membership is thrown out by the recipient, then the consumer will not have the number to access the benefits. The kits are mailed out bulk rate indicating the lack of value of the material. In this way, Defendants further conceal the fact that the class members will be charged an annual, self-renewing membership fee.

168.   To further their scheme to conceal the true facts, Defendants never send any invoice or bill to Plaintiffs and the class members informing them that their credit and/or debit cards were going to be, or were in fact, charged.

169.   Defendants' renewal of the purported memberships is fraudulently concealed by Defendants in the same manner. No bill or invoice is sent to the class members informing them that they were going to be, or had in fact been, charged.

- 51 -

170.   Plaintiffs and members of the Class reasonably relied on Defendants and believed that they were making a one-time purchase of non-MWI products.

171.   Defendants' false and misleading statements and suppression of the material facts set forth above and throughout this Complaint defrauded Plaintiffs and the Class, and are in direct violation of federal and state statutes, as well as principles of common law, for which Plaintiffs and members of the Class are entitled to recover damages.

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for relief and judgment against Defendants as follows:

A.      For an order certifying the Class under the appropriate provisions of Rule 1.220 and appointing Plaintiffs and their legal counsel to represent the Class;

B.      Awarding reimbursement, restitution and disgorgement from Defendants of the benefits conferred by Plaintiffs and the Class;

C.      For pre- and post-judgment interest to the Class, as allowed by law;

D.      For an order of this Court ordering Defendants to immediately cease all acts of unfair competition and enjoin Defendants from continuing to conduct business via the unlawful, unfair or fraudulent business acts or practices as particularized herein;

E.      Plaintiffs also request an order requiring Defendants to identify all class members and pay restitution to Plaintiffs and all members of the Class so as to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, fraudulent or unfair business act or practice, in violation of applicable laws, statutes or regulations or constituting unfair competition or untrue or misleading advertising;

F.      Plaintiffs also request an order of the Court requiring Defendants to disgorge to the State of Florida all monies wrongfully collected that could not be returned to class members as alleged herein and all monies and profits derived by Defendants as a result of the wrongful,

- 52 -

deceptive, unfair and/or unlawful acts, conduct and practices alleged above, and requiring disgorgement and/or imposing a trust upon Defendants' ill-gotten monies and freezing Defendants' assets;

G.      For an order requiring Defendants to effect and pay the costs of restoring the rights and benefits owing to Plaintiffs and other members of the Class under the agreements which are the subject of this action and a corrective advertising campaign;

H.      For reasonable attorneys' fees and costs to counsel for the Class pursuant to Fla. Stat. §501.2105, and if and when pecuniary benefits are obtained on behalf of the Class; and

I.       Granting such other and further relief as is just and proper.

### SIXTH CAUSE OF ACTION
### For Negligent Misrepresentation
### (On Behalf of Plaintiffs and the Members of the Class)

172.   Plaintiffs hereby reallege and incorporate by reference the allegations contained in ¶¶1-107 above.

173.   In making representations to Plaintiffs and members of the Class described herein, Defendants failed to fulfill their duty to disclose the material facts set forth above.  Among the direct and proximate causes of said failures to disclose were the negligence and carelessness of Defendants.

174.   Defendants owed Plaintiffs and members of the Class the duty to act with reasonable care in retaining, training and supervising their agents and sales agents.  Defendants also failed to take reasonable steps to ensure that their representatives conducted themselves in accordance with the law and to ensure that the representatives disclosed all material facts and did not misrepresent or omit such facts in conducting such sales.

175.   Defendants, as set forth herein, breached their duties to retain, train, supervise and discipline their sales force and to ensure full disclosure by them.

176.   Plaintiffs and the members of the Class were unaware of the falsity of Defendants' affirmative misrepresentations and their failure to disclose that Plaintiffs and members of the Class would be charged undisclosed and unauthorized fees for a fictitious membership on their credit card accounts.  Plaintiffs and the members of the Class, as a direct and proximate cause of Defendants' breaches of their various duties, reasonably relied upon such representations to their detriment.  By reason thereof, Plaintiffs and members of the Class have suffered damage, in an amount according to proof at time of trial.

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for relief and judgment against Defendants as follows:

A.     For an order certifying the Class under the appropriate provisions of Rule 1.220 and appointing Plaintiffs and their legal counsel to represent the Class;

B.     Awarding reimbursement, restitution and disgorgement from Defendants of the benefits conferred by Plaintiffs and the Class;

C.     For pre- and post-judgment interest to the Class, as allowed by law;

D.     For an order of this Court ordering Defendants to immediately cease all acts of unfair competition and enjoin Defendants from continuing to conduct business via the unlawful, unfair or fraudulent business acts or practices as particularized herein;

E.     Plaintiffs also request an order requiring Defendants to identify all class members and pay restitution to Plaintiffs and all members of the Class so as to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, fraudulent or unfair business act or practice, in violation of applicable laws, statutes or regulations or constituting unfair competition or untrue or misleading advertising;

F.     Plaintiffs also request an order of the Court requiring Defendants to disgorge to the State of Florida all monies wrongfully collected that could not be returned to class members as

- 54 -

alleged herein and all monies and profits derived by Defendants as a result of the wrongful, deceptive, unfair and/or unlawful acts, conduct and practices alleged above, and requiring disgorgement and/or imposing a trust upon Defendants' ill-gotten monies and freezing Defendants' assets;

G.      For an order requiring Defendants to effect and pay the costs of restoring the rights and benefits owing to Plaintiffs and other members of the Class under the agreements which are the subject of this action and a corrective advertising campaign;

H.      For reasonable attorneys' fees and costs to counsel for the Class pursuant to Fla. Stat. §501.2105, and if and when pecuniary benefits are obtained on behalf of the Class; and

I.      Granting such other and further relief as is just and proper.

### SEVENTH CAUSE OF ACTION
#### Money Had & Received
#### (On Behalf of Plaintiff and the Members of the Class)

177.    Plaintiffs hereby reallege and incorporate by reference the allegations contained in ¶¶1-107 above.

178.    As a result of Defendants' conduct as alleged herein, Defendants improperly received monies from Plaintiffs and the Class they were not legally entitled to receive.

179.    Plaintiffs and class members have a claim for improperly paid fees for the products at issue.

180.    Equity and good conscience require that Defendants ought to pay over such additional monies, described above to Plaintiffs and the Class.

181.    As a direct and proximate result of Defendants' unfair, unlawful, deceptive and fraudulent business practices, Plaintiffs and class members have suffered injury and are entitled to reimbursement, restitution and disgorgement in the amount necessary to restore them to the

position they would have been in if Defendants had not improperly enrolled, billed, collected and retained the aforementioned unauthorized membership fees.

182.   Plaintiffs' counsel are entitled to recover their reasonable attorneys' fees and expenses as a result of the conferment of a pecuniary benefit on behalf of the Class, and will seek an award of such fees and expenses at the appropriate time.

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for relief and judgment against Defendants as follows:

A.   For an order certifying the Class under the appropriate provisions of Rule 1.220 and appointing Plaintiffs and their legal counsel to represent the Class;

B.   Awarding reimbursement, restitution and disgorgement from Defendants of the benefits conferred by Plaintiffs and the Class;

C.   For pre- and post-judgment interest to the Class, as allowed by law;

D.   For an order of this Court ordering Defendants to immediately cease all acts of unfair competition and enjoin Defendants from continuing to conduct business via the unlawful, unfair or fraudulent business acts or practices as particularized herein;

E.   Plaintiffs also request an order requiring Defendants to identify all class members and pay restitution to Plaintiffs and all members of the Class so as to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, fraudulent or unfair business act or practice, in violation of applicable laws, statutes or regulations or constituting unfair competition or untrue or misleading advertising;

F.   Plaintiffs also requests an order of the Court requiring Defendants to disgorge to the State of Florida all monies wrongfully collected that could not be returned to class members as alleged herein and all monies and profits derived by Defendants as a result of the wrongful, deceptive, unfair and/or unlawful acts, conduct and practices alleged above, and requiring

disgorgement and/or imposing a trust upon Defendants' ill-gotten monies and freezing Defendants' assets;

G.     For an order requiring Defendants to effect and pay the costs of restoring the rights and benefits owing to Plaintiffs and other members of the Class under the agreements which are the subject of this action and a corrective advertising campaign;

H.     For reasonable attorneys' fees and costs to counsel for the Class pursuant to Fla. Stat. §501.2105, and if and when pecuniary benefits are obtained on behalf of the Class; and

I.     Granting such other and further relief as is just and proper.

### EIGHTH CAUSE OF ACTION
### Injunctive Relief
### (On Behalf of Plaintiffs and the Members of the Class)

183.     Plaintiffs hereby reallege and incorporate by reference the allegations contained in ¶¶1-107 above.

184.     Plaintiffs have no adequate remedy at law for future unlawful conduct by Defendants in connection with their selling and advertisement of the products at issue to consumers.

185.     The continuing nature of Defendants acts would necessitate a separate action by Plaintiffs and each class member for damages for each act and would subject Plaintiffs, each class member, Defendants and this Court to the expense, annoyance and inconvenience of a multiplicity of suits.

186.     As a direct and proximate result of Defendants' unlawful acts and conduct, Plaintiffs and the Class have been and continue to be deprived of their money which has caused and continues to cause irreparable injury to Plaintiffs and the Class.

187.     Plaintiffs and the Class have a substantial likelihood of success on the merits of their claims (*i.e.*, Counts I through VII, *infra*), since Defendants' liability is clear and self-evident.

- 57 -

188.    An injunction prohibiting Defendants from continuing to engage in practices that are likely to cause injury and violate the Florida consumers protection statutes will serve the public interest since it will prevent Defendants from causing further damage to Plaintiffs and the Class.

189.    Plaintiffs and the Class are entitled to an injunction prohibiting Defendants from continuing to engage in practices alleged herein.

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for relief and judgment against Defendants as follows:

A.      For an order certifying the Class under the appropriate provisions of Rule 1.220 and appointing Plaintiffs and their legal counsel to represent the Class;

B.      For the named Plaintiffs and the Class, injunctive relief against Defendants as this Court deems necessary and proper including entering an injunction against Defendants which requires Defendants to cease all acts of unfair competition and enjoin Defendants from continuing to conduct business via the unlawful, unfair or fraudulent business acts or practices as particularized herein;

C.      For an order preliminarily and/or permanently enjoining Defendants from violating Fla. Stat. Chapter 501, Part II, and pursuing the policies, acts and practices complained of herein;

D.      For an order preliminarily and/or permanently enjoining Defendants from violating Fla. Stat. §§817.41(1) and 817.06, and pursuing the policies, acts and practices complained of herein;

E.      For reasonable attorneys' fees and costs to counsel for the Class if and when non-pecuniary benefits are obtained on behalf of the Class pursuant to Fla. Stat. §501.2105;

F.      For an order requiring Defendants to effect and pay the costs of restoring the rights and benefits owing to Plaintiffs and other members of the Class under the agreements which are the subject of this action and a corrective advertising campaign; and

- 58 -

G.      Granting such other and further relief in equity as is just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

DATED: March ___, 2009                    COUGHLIN STOIA GELLER RUDMAN
                                           & ROBBINS LLP
                                          DAVID J. GEORGE
                                          Florida Bar No. 0898570
                                          STUART A. DAVIDSON
                                          Florida Bar No. 0084824
                                          MARY B. CLARK
                                          Florida Bar No. 30178

                                          _Mary B. Clark_
                                          _____
                                                  MARY B. CLARK

                                          120 East Palmetto Park Road, Suite 500
                                          Boca Raton, FL 33432
                                          Telephone: 561/750-3000
                                          561/750-3364 (fax)

                                          COUGHLIN STOIA GELLER RUDMAN
                                           & ROBBINS LLP
                                          FRANK J. JANECEK, JR.
                                          CHRISTOPHER COLLINS
                                          CHRISTIE SURIEL
                                          655 West Broadway, Suite 1900
                                          San Diego, CA 92101
                                          Telephone: 619/231-1058
                                          619/231-7423 (fax)

                                          LANDSKRONER • GRIECO • MADDEN, LTD.
                                          JACK LANDSKRONER
                                          1360 West 9th Street, Suite 200
                                          Cleveland, OH 44113
                                          Telephone: 216/522-9000
                                          216/522-9007 (fax)

10



**COUGHLIN STOIA GELLER RUDMAN & ROBBINS** LLP

SAN DIEGO · SAN FRANCISCO
NEW YORK · BOCA RATON
WASHINGTON, DC · HOUSTON
LOS ANGELES · PHILADELPHIA

Chris Collins
ChrisC@csgrr.com

February 23, 2009

<u>VIA CERTIFIED MAIL/</u>
<u>RETURN RECEIPT REQUESTED MAIL</u>

VERTRUE INCORPORATED
c/o Gary Johnson, President/CEO/Director
20 Glover Avenue
Norwalk, CT 06850

ADAPTIVE MARKETING LLC
c/o Gary Johnson, CEO  and
    Jay Sung, President
20 Glover Avenue
Norwalk, CT 06850

Re:   *Ackermann, et al. v. Vertrue Inc., et al.*

Dear Gentlemen:

We represent James Ackermann and Lori Half and all other consumers similarly situated in an action against Vertrue Inc. (formerly MemberWorks Incorporated), also formerly known as MWI Essentials, MWI Leisure Advantage, MWI Home & Garden, MWI Connections, MWI ValueMax and other MWI entities, which subsequently changed its name to Vertrue Inc. and Adaptive Marketing LLC (collectively "MWI" or "defendants"), arising out of misrepresentations directed at consumers regarding claims, either express or implied, that certain MWI memberships are "risk free," that consumers "won't be billed," that consumers will "save hundreds of dollars" and that it is an "annual membership," when in actuality the customer is billed every 11 months.  Despite these representations, individuals were enrolled in MWI membership programs, and their credit and/or debit cards were assessed[1].  These representations are false and misleading and constitute unfair methods of competition and unlawful, unfair and fraudulent acts or practices, undertaken by defendants with the intent to result in increased sales of MWI memberships.  These representations do not assist consumers; they simply mislead them.  This practice constitutes a violation of among other statutes and the common law, the Georgia Fair Business Practices Act, O.C.G.A. §§10-1-390, *et. seq.* ("FBPA"), *intra qua*, the following subdivisions:

---

[1]      This letter and action are similar to the notice and demand letter provided to these same defendants in the California action, *Callahan v. Vertrue, Inc. et al*, and complaints filed in Connecticut, Ohio and Virginia of which defendants are aware.

655 West Broadway, Suite 1900 · San Diego, California 92101-8498 · 619.231.1058 · Fax 619.231.7423 · www.csgrr.com



COUGHLIN
STOIA
GELLER
RUDMAN
& ROBBINS LLP

VERTRUE INCORPORATED
ADAPTIVE MARKETING LLC
February 23, 2009
Page 2

(a)     The standards of fairness and deception set forth and interpreted by the FTC or by federal and state courts, as set forth in O.C.G.A. §10-1-391(b);

(b)     Defendants' uniform misrepresentations and effective nondisclosures of material facts detailed above also constitute deceptive or misleading practices in violation of, *inter alia*, the FBPA prohibiting unfair, deceptive, and misleading practices, by violating at least §§10-1-372(a)(9) and 10-1-393(b)(9) thereof because, *inter alia*, the defendants' acts and practices constitute advertising goods or services with the intent not to sell them as advertised; and

(c)     Defendants' uniform misrepresentations and effective nondisclosures of material facts detailed above also constitute deceptive or misleading practices in violation of, *inter alia*, the FBPA prohibiting unfair, deceptive, and misleading practices, by violating at least §§10-1-372(a)(5) and 10-1-372(a)(12) thereof because, *inter alia*, the defendants' acts and practices constitute misrepresentations that the services in question have characteristics, benefits, or uses which they do not have or because the defendants' conduct created a likelihood of confusion or of misunderstanding.

Pursuant to the FBPA, while a complaint is sufficient notice of the claims asserted herein, we hereby demand on behalf of our clients and all others similarly situated in the State of Georgia that defendants immediately correct and rectify this violation of FBPA, O.C.G.A. §§10-1-390, *et. seq.*, by ceasing from refusing to market the MWI memberships in that way. In addition, MWI should offer to refund all funds taken from these individuals, plus reimbursement for interest, costs and fees.

Plaintiffs will seek to include claims for actual and punitive damages (as may be appropriate) if a full and adequate response to this letter is not received. These damage claims would also include claims under already asserted theories of conversion, unjust enrichment, fraud and deceit and negligent misrepresentation, as well as the claims under the FBPA. Thus, to avoid further litigation, it is in the interests of all parties concerned that MWI address this problem immediately.

MWI must undertake ***all*** of the following actions to satisfy Plaintiffs' demand:

1.     Identify or make a reasonable attempt to identify those individuals enrolled in MWI memberships who reside in Georgia;

2.     Notify all such individuals so identified that upon their request, MWI will offer a full refund, plus interest, costs and fees;

3.     Undertake (or promise to undertake within a reasonable time if it cannot be done immediately) the actions described above for all affected individuals; and



**COUGHLIN
STOIA
GELLER
RUDMAN
& ROBBINS** LLP

VERTRUE INCORPORATED
ADAPTIVE MARKETING LLC
February 23, 2009
Page 3

    4.     Cease from expressly or impliedly representing to consumers that these purported memberships are "risk free," that consumers "won't be billed," that consumers will "save hundreds of dollars" and that it is an "annual membership."

    We await your response.

             Very truly yours,

             CHRIS COLLINS

CC:dee

cc:    Ryan Walsh
       Robert Herrington (via U.S. Mail)

S:\CasesSD\Memberworks\09 GA STATE_Ackermann\Corres\MWI Demand LTR_CC.doc